Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Charles H. Linehan (SBN 307439)
  *clinehan@glancylaw.com*
Pavithra Rajesh (SBN 323055)
  *prajesh@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIYYAZ PIRANI, as TRUSTEE OF IMPERIUM IRREVOCABLE TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>NETFLIX, INC., REED HASTINGS, TED SARANDOS, and SPENCER NEUMANN,<br><br>                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Fiyyaz Pirani, as Trustee of Imperium Irrevocable Trust, ("Plaintiff") individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Netflix, Inc. ("Netflix" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Netflix; and (c) review of other publicly available information concerning Netflix.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Netflix common stock or call options, or sold put options, between October 19, 2021 and April 19, 2022, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Netflix primarily operates an entertainment platform that offers TV series, documentaries, feature films, and mobile games across a variety of genres and languages. It also offers a DVD-by-mail service in the U.S.

3.      On January 20, 2022, after the market closed, Netflix reported that it "slightly over-forecasted paid net adds in Q4," adding 8.3 million subscribers compared to the 8.5 million forecast. The Company also stated that, despite "healthy" retention and engagement, it only expected to add 2.5 million net subscribers during first quarter 2022, below the 4.0 million net adds in the prior year period.

4.      On this news, the Company's stock price fell $110.75, or 21.7%, to close at $397.50 per share on January 21, 2022, on unusually heavy trading volume.

5.      On April 19, 2022, after the market closed, Netflix reported that it lost 200,000 subscribers during the first quarter of 2022, compared to prior guidance expecting the Company to add 2.5 million net subscribers. The Company cited the slowing revenue growth to four factors,

including account sharing with an estimated 100 million additional households and competition with other streaming services.

6.      On this news, the Company's share price fell $122.42, or over 35%, to close at $226.19 per share on April 20, 2022, on unusually heavy trading volume.

7.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Netflix was exhibiting slower acquisition growth due to, among other things, account sharing by customers and increased competition from other streaming services; (2) that the Company was experiencing difficulties retaining customers; (3) that, as a result of the foregoing, the Company was losing subscribers on a net basis; (4) that, as a result, the Company's financial results were being adversely affected; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in

substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13. Plaintiff Fiyyaz Pirani, as Trustee of Imperium Irrevocable Trust, as set forth in the accompanying certification, incorporated by reference herein, purchased Netflix securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant Netflix is incorporated under the laws of Delaware with its principal executive offices located in Los Gatos, California. Netflix's common stock trades on the NASDAQ exchange under the symbol "NFLX."

15. Defendant Reed Hastings ("Hastings") was the Co-Chief Executive Officer ("Co-CEO"), President, and a director of the Company at all relevant times.

16. Defendant Ted Sarandos ("Sarandos") was the Co-CEO, Chief Content Creator, and a director of the Company at all relevant times.

17. Defendant Spencer Neumann ("Neumann") was the Company's Chief Financial Officer ("CFO") at all relevant times.

18. Defendants Hastings, Sarandos, and Neumann (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that

the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Netflix primarily operates an entertainment platform that offers TV series, documentaries, feature films, and mobile games across a variety of genres and languages. It also offers a DVD-by-mail service in the U.S.

### Materially False and Misleading
### Statements Issued During the Class Period

20.     The Class Period begins on October 19, 2021.[1] On that day, Netflix announced its third quarter 2021 financial results in a letter to shareholders that stated, in relevant part:

> After a lighter-than-normal content slate in Q1 and Q2 due to COVID-related production delays in 2020*, we are seeing the positive effects of a stronger slate in the second half of the year.* In Q3, we grew revenue 16% year over year to $7.5 billion, while operating income rose 33% vs. the prior year quarter to $1.8 billion. *We added 4.4m paid net adds (vs. 2.2m in Q3'20) to end the quarter with 214m paid memberships.* We're very excited to finish the year with what we expect to be our strongest Q4 content offering yet, which shows up as bigger content expense and lower operating margins sequentially.
>
> *          *          *
>
> *We under-forecasted paid net adds for the quarter (4.4m actual vs. our 3.5m projection), while ending paid memberships of 214m was within 0.4% of our forecast.* For the second consecutive quarter, the APAC region was our largest contributor to membership growth with 2.2m paid net adds (half of total paid net adds) as we are continuing to improve our service in this region. In EMEA, paid net adds of 1.8m improved sequentially vs. the 188k in Q2 as several titles had a particularly strong impact. The UCAN and LATAM regions grew paid memberships more slowly. These regions have higher penetration of broadband homes although we believe we still have ample runway for growth as we continue to improve our service.
>
> As a reminder, the quarterly guidance we provide is our actual internal forecast at the time we report and we strive for accuracy. *For Q4'21, we forecast paid net adds of 8.5m, consistent with Q4'20 paid net additions.* For the full year 2021, we forecast an operating margin of 20% or slightly better. This means that Q4'21 operating margin will be approximately 6.5% compared with 14% in Q4'20. The year over year decline in operating margin is due mostly to our backloaded big content release

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

schedule in this Q4, which will result in a roughly 19% year over year increase in content amortization for Q4'21 (compared with ~8% growth year to date).

21.     The same day, Netflix filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2021, affirming the previously reported financial results. It was signed by Defendants Hastings and Neumann.

22.     Also on October 19, 2021, Netflix held a conference call to discuss the financial results with analysts and investors. During the call, Defendant Neumann stated that "throughout the quarter, the business remained healthy as it had been throughout the year with churn at low levels, down prior to the comparable periods both in 2020 and two years ago pre-COVID in 2019." He also stated that management "expect[ed] to continue in terms of that healthy retention and then this kind of acceleration as we get past those initial market reopenings with COVID [and] past the COVID pull forwarding into the strength of our slate . . . ."

23.     The above statements identified in ¶¶ 20-22 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Netflix was exhibiting slower acquisition growth due to, among other things, account sharing by customers and increased competition from other streaming services; (2) that the Company was experiencing difficulties retaining customers; (3) that, as a result of the foregoing, the Company was losing subscribers on a net basis; (4) that, as a result, the Company's financial results were being adversely affected; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

24.     On January 20, 2022, after the market closed, Netflix revealed that it "slightly over-forecasted paid net adds in Q4." In a letter to shareholders, Netflix announced its fourth quarter 2021 financial results and stated, in relevant part:

> Full year revenue of $30 billion grew 19% year over year while operating income of $6.2 billion rose 35% year over year. We finished Q4 with 222m paid memberships (with 8.3m paid net adds in Q4). Even in a world of uncertainty and increasing competition, we're optimistic about our long-term growth prospects as streaming supplants linear entertainment around the world.

*       *       *

*We slightly over-forecasted paid net adds in Q4 (8.3m actual compared to the 8.5m paid net adds in both the year ago quarter and our beginning of quarter projection).* For the full year 2021, paid net adds totaled 18m vs 37m in 2020. Our service continues to grow globally, with more than 90% of our paid net adds in 2021 coming from outside the UCAN region.

Nonetheless, our UCAN region added 1.2m paid memberships in Q4'21 (vs. 0.9m last year), marking our strongest quarter of member growth in this region since the early days of COVID-19 in 2020. In APAC, we increased paid memberships by 2.6m (vs. 2.0m in the year ago quarter) with strong growth in both Japan and India. EMEA was our largest contributor to paid net adds in Q4 (3.5m vs. 4.5m in the prior year period) and the region delivered record quarterly revenue, exceeding $2.5 billion for the first time. LATAM paid net adds totaled 1.0m vs. 1.2m last year.

*       *       *

*For Q1'22, we forecast paid net adds of 2.5m vs. 4.0m in the year ago quarter. Our guidance reflects a more back-end weighted content slate in Q1'22* (for example, *Bridgerton* S2 and our new original film *The Adam Project* will both be launching in March). *In addition, while retention and engagement remain healthy, acquisition growth has not yet re-accelerated to pre-Covid levels. We think this may be due to several factors including the ongoing Covid overhang and macro-economic hardship in several parts of the world like LATAM.*

*       *       *

Consumers have always had many choices when it comes to their entertainment time - competition that has only intensified over the last 24 months as entertainment companies all around the world develop their own streaming offering. *While this added competition may be affecting our marginal growth some, we continue to grow in every country and region in which these new streaming alternatives have launched.* This reinforces our view that the greatest opportunity in entertainment is the transition from linear to streaming and that with under 10% of total TV screen time in the US, our biggest market, Netflix has tremendous room for growth if we can continue to improve our service.

25.     The same day, Netflix held a conference call to discuss the financial results with analysts and investors. During the call, Defendant Neumann stated that "overall, the business was healthy. Retention was strong. Churn was down." He continued that "acquisition was growing, just not growing quite as fast as we were perhaps hoping or forecasting," which was "probably a bit of just overall COVID overhang that's still happening . . . [and] some macroeconomic strain in some parts of the world . . . ."

26.     On this news, the Company's stock price fell $110.75, or 21.7%, to close at $397.50 per share on January 21, 2022, on unusually heavy trading volume.

27.     On January 27, 2022, Netflix filed its annual report on Form 10-K with the SEC for the period ended December 31, 2021 (the "2021 10-K"), affirming the previously reported financial

results. It was signed by the Individual Defendants. Regarding risks affecting the business, the Company stated, in relevant part:

> ***If our efforts to attract and retain members are not successful, our business will be adversely affected.***
>
> We have experienced significant membership growth over the past several years. Our penetration and growth rates vary between the jurisdictions where we provide our service. In countries where we have been operating for many years or where we are highly penetrated, our membership growth is slower than in newer or less penetrated countries. ***Our ability to continue to attract and retain members will depend in part on our ability to consistently provide our members in countries around the globe with compelling content choices, effectively drive conversation around our content and service, as well as provide a quality experience for choosing and enjoying TV series, documentaries, feature films and mobile games. Furthermore, the relative service levels, content offerings, pricing and related features of competitors to our service may adversely impact our ability to attract and retain memberships. Competitors include other entertainment video providers, such as MVPDs, and streaming entertainment providers (including those that provide pirated content), video gaming providers, as well as user-generated content, and more broadly other sources of entertainment that our members could choose in their moments of free time.***
>
> If consumers do not perceive our service offering to be of value, including if we introduce new or adjust existing features, adjust pricing or service offerings, or change the mix of content in a manner that is not favorably received by them, we may not be able to attract and retain members. We have recently expanded our entertainment video offering to include games. If our efforts to develop and offer games are not valued by our current and future members, our ability to attract and retain members may be negatively impacted. We may, from time to time, adjust our membership pricing, our membership plans, or our pricing model itself, which may not be well-received by consumers, and which may result in existing members canceling our service or fewer new members joining our service. In addition, many of our members rejoin our service or originate from word-of-mouth advertising from existing members. If our efforts to satisfy our existing members are not successful, we may not be able to attract members, and as a result, our ability to maintain and/or grow our business will be adversely affected. Members cancel our service for many reasons, including a perception that they do not use the service sufficiently, the need to cut household expenses, availability of content is unsatisfactory, competitive services provide a better value or experience and customer service issues are not satisfactorily resolved. Membership growth is also impacted by seasonality, with the fourth quarter historically representing our greatest growth, as well as the timing of our content release schedules. We must continually add new memberships both to replace canceled memberships and to grow our business beyond our current membership base. ***While we currently permit multiple users within the same household to share a single account for non-commercial purposes, if multi-household usage is abused or if our efforts to restrict multi-household usage are ineffective, our ability to add new members may be hindered and our results of operations may be adversely impacted.*** If we do not grow as expected, given, in particular, that our content costs are largely fixed in nature and contracted over several years, we may not be able to adjust our expenditures or increase our (per membership) revenues commensurate with the lowered growth rate such that our margins, liquidity and results of operation may be adversely impacted. If we are unable to successfully compete with current and new competitors in providing

compelling content, retaining our existing memberships and attracting new memberships, our business will be adversely affected.

(First emphasis in original.)

28.    The above statements identified in ¶¶ 24-25, 27 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose to investors: (1) that Netflix was exhibiting slower acquisition growth due to, among other things, account sharing by customers and increased competition from other streaming services; (2) that the Company was experiencing difficulties retaining customers; (3) that, as a result of the foregoing, the Company was losing subscribers on a net basis; (4) that, as a result, the Company's financial results were being adversely affected; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

29.    On April 19, 2022, after the market closed, Netflix reported that it lost 200,000 subscribers during the first quarter of 2022, compared to prior guidance expecting the Company to add 2.5 million net subscribers. In a letter to shareholders, Netflix reported its first quarter 2022 financial results, including:

> ***Paid net additions were -0.2m compared against our guidance forecast of 2.5m and 4.0m in the same quarter a year ago.*** The suspension of our service in Russia and winding-down of all Russian paid memberships resulted in a -0.7m impact on paid net adds; excluding this impact, paid net additions totaled +0.5m. The main challenge for membership growth is continued soft acquisition across all regions. ***Retention was also slightly lower relative to our guidance forecast***, although it remains at a very healthy level (we believe among the best in the industry). Recent price changes are largely tracking in-line with our expectations and remain significantly revenue positive.
>
> In EMEA (-0.3M paid net adds, or +0.4m excluding the Russia impact), we saw a slowdown in our business in Central and Eastern Europe in March, coinciding with Russia's invasion of Ukraine. Paid net additions in LATAM totaled -0.4M; similar to recent quarters, we believe a combination of forces including macroeconomic weakness and our price changes (F/X neutral ARM grew 20% year over year) were a drag on our membership growth. UCAN paid net adds of -0.6M was largely the result of our price change which is tracking in-line with our expectations and is significantly revenue positive. We're making good progress in APAC where we are seeing nice growth in a variety of markets including Japan, India, Philippines, Thailand and Taiwan.

As a reminder, the quarterly guidance we provide is our actual internal forecast at the time we report. **_For Q2'22, we forecast paid net additions of -2.0m vs. +1.5m in the year ago quarter. Our forecast assumes our current trends persist (such as slow acquisition and the near term impact of price changes) plus typical seasonality (Q2 paid net adds are usually less than Q1 paid net adds)._** We project revenue to grow approximately 10% year over year in Q2, assuming roughly a mid-to-high single digit year over year increase in ARM on a F/X neutral basis. We still target a 19%-20% operating margin for the full year 2022, assuming no material swings in F/X rates from when we set this goal in January of 2022.

30.     The letter to shareholders stated that Netflix is "not growing revenue as fast as we'd like." It further stated: "COVID clouded the picture by significantly increasing our growth in 2020, leading us to believe that most of our slowing growth in 2021 was due to the COVID pull forward." However, Netflix cited the slowing revenue growth to four factors, including account sharing with an estimated 100 million additional households and competition with other streaming services. Specifically, the letter stated, in relevant part:

First, it's increasingly clear that the pace of growth into our underlying addressable market (broadband homes) is partly dependent on factors we don't directly control, like the uptake of connected TVs (since the majority of our viewing is on TVs), the adoption of on-demand entertainment, and data costs. We believe these factors will keep improving over time, so that all broadband households will be potential Netflix customers.

Second, in addition to our 222m paying households, _**we estimate that Netflix is being shared with over 100m additional households, including over 30m in the UCAN region.**_ Account sharing as a percentage of our paying membership hasn't changed much over the years, but, coupled with the first factor, means it's harder to grow membership in many markets - an issue that was obscured by our COVID growth.

Third, competition for viewing with linear TV as well as YouTube, Amazon, and Hulu has been robust for the last 15 years. _**However, over the last three years, as traditional entertainment companies realized streaming is the future, many new streaming services have also launched.**_ While our US television viewing share, for example, has been steady to up according to Nielsen, we want to grow that share faster. Higher view share is an indicator of higher satisfaction, which supports higher retention and revenue.

Fourth, macro factors, including sluggish economic growth, increasing inflation, geopolitical events such as Russia's invasion of Ukraine, and some continued disruption from COVID are likely having an impact as well.

31.     On this news, the Company's share price fell $122.42, or over 35%, to close at $226.19 per share on April 20, 2022, on unusually heavy trading volume.

**CLASS ACTION ALLEGATIONS**

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Netflix common stock or call options, or sold put options, between October 19, 2021 and April 19, 2022, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Netflix's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Netflix shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Netflix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Netflix; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

38.     The market for Netflix's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Netflix's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Netflix's securities relying upon the integrity of the market price of the Company's securities and market information relating to Netflix, and have been damaged thereby.

39.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Netflix's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Netflix's business, operations, and prospects as alleged herein.

40.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Netflix's financial well-being and prospects.  These material misstatements and/or

omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

41.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

42.     During the Class Period, Plaintiff and the Class purchased Netflix's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

43.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Netflix, their control over, and/or receipt and/or modification of Netflix's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Netflix, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

44.     The market for Netflix's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Netflix's securities traded at artificially inflated prices during the Class Period.   On November 17, 2021, the Company's share price closed at a Class Period high of $691.69 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Netflix's securities and market information relating to Netflix, and have been damaged thereby.

45.     During the Class Period, the artificial inflation of Netflix's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Netflix's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Netflix and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

46.     At all relevant times, the market for Netflix's securities was an efficient market for the following reasons, among others:

(a)     Netflix shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Netflix filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Netflix regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Netflix was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

47.     As a result of the foregoing, the market for Netflix's securities promptly digested current information regarding Netflix from all publicly available sources and reflected such information in Netflix's share price. Under these circumstances, all purchasers of Netflix's securities during the Class Period suffered similar injury through their purchase of Netflix's securities at artificially inflated prices and a presumption of reliance applies.

48.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

49.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Netflix who knew that the statement was false when made.

## **FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

50.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

51.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Netflix's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

52.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Netflix's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

53.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Netflix's financial well-being and prospects, as specified herein.

54.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Netflix's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Netflix and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

55.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

56.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Netflix's financial well-being and prospects from the investing public and

supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

57.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Netflix's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Netflix's securities during the Class Period at artificially high prices and were damaged thereby.

58.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Netflix was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Netflix securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

59.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

61.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.     Individual Defendants acted as controlling persons of Netflix within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64.     As set forth above, Netflix and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

1     (a)    Determining that this action is a proper class action under Rule 23 of the Federal

2 Rules of Civil Procedure;

3     (b)    Awarding compensatory damages in favor of Plaintiff and the other Class members

4 against all defendants, jointly and severally, for all damages sustained as a result of Defendants'

5 wrongdoing, in an amount to be proven at trial, including interest thereon;

6     (c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

7 action, including counsel fees and expert fees; and

8     (d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  May 3, 2022

**GLANCY PRONGAY & MURRAY LLP**

By:   */s/ Robert V. Prongay*

Robert V. Prongay
Charles Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff*

## SWORN CERTIFICATION OF PLAINTIFF

## NETFLIX, INC. SECURITIES LITIGATION

I, Fiyyaz Pirani, as Trustee of the Imperium Irrevocable Trust (the "Trust") certify that:

1.  I have reviewed the Complaint, adopt its allegations, and authorize the filing of a Lead Plaintiff motion on my behalf.

2.  I am duly authorized to institute legal action on the Trust's behalf against Netflix, Inc. and other defendants.

3.  I did not purchase the Netflix, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

4.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

5.  My transactions in Netflix, Inc. securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

6.  I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

    *Pirani v. Slack Techs., Inc., et al., Case No. 3:19-cv-05857 (N.D. Cal.)*

    *In re 2U, Inc. Securities Class Action, Case No. 8:19-cv-03455 (D. Md.)*

7.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

4/28/2022                                          *Fiyyaz Pirani*
_____                    _____
Date                                                          Fiyyaz Pirani

**Imperium Irrevocable Trust's Transactions in Netflix, Inc. (NFLX) Common Stock**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 1/21/2022 | Bought | 700 | $396.9486 |
| 1/21/2022 | Bought | 2,300 | $396.5574 |
| 1/21/2022 | Bought | 3,000 | $396.7072 |
| 1/21/2022 | Bought | 6,000 | $396.1207 |
| 1/21/2022 | Bought | 10,000 | $396.7942 |
| 1/21/2022 | Bought | 10,000 | $397.9882 |
| 1/21/2022 | Bought | 12,000 | $397.9324 |
| 1/21/2022 | Bought | 10,000 | $396.7263 |
| 1/21/2022 | Bought | 10,000 | $397.1284 |
| 1/21/2022 | Bought | 10,000 | $396.9912 |
| 1/21/2022 | Bought | 2,800 | $500.0000 |
| 1/26/2022 | Bought | 8,100 | $520.0000 |
| 1/28/2022 | Bought | 200 | $520.0000 |
| 2/3/2022 | Sold | -5,016 | $413.7232 |
| 2/3/2022 | Sold | -3,865 | $413.3725 |
| 2/3/2022 | Sold | -2,413 | $413.2317 |
| 2/3/2022 | Sold | -581 | $413.1000 |
| 2/3/2022 | Sold | -338 | $413.0679 |
| 2/3/2022 | Sold | -736 | $413.0015 |
| 2/3/2022 | Sold | -451 | $412.9599 |
| 2/3/2022 | Sold | -174 | $412.8000 |
| 2/3/2022 | Sold | -4,897 | $412.6514 |
| 2/3/2022 | Sold | -1,163 | $412.5058 |
| 2/3/2022 | Sold | -2,962 | $412.4000 |
| 2/3/2022 | Sold | -4,516 | $412.3267 |
| 2/3/2022 | Sold | -1,162 | $412.2884 |
| 2/3/2022 | Sold | -7 | $412.0000 |
| 2/3/2022 | Sold | -671 | $411.7770 |
| 2/3/2022 | Sold | -2,171 | $411.5150 |
| 2/3/2022 | Sold | -15,291 | $411.4432 |
| 2/3/2022 | Sold | -2,970 | $411.0058 |
| 2/3/2022 | Sold | -24,616 | $410.1109 |
| 2/3/2022 | Bought | 2,500 | $520.0000 |
| 2/4/2022 | Bought | 19,200 | $520.0000 |
| 3/9/2022 | Bought | 7,500 | $500.0000 |
| 3/14/2022 | Bought | 2,100 | $500.0000 |
| 3/18/2022 | Bought | 40,400 | $500.0000 |

**Imperium Irrevocable Trust's Transactions in Netflix, Inc. Options**

| Date | Transaction Type | Contract Type | Exp / Strike | Quantity | Price |
|---|---|---|---|---|---|
| 11/29/2021 | Bought to Close | Put | 21JAN22 / 500.0 P | 93 | $1.7000 |
| 11/29/2021 | Bought to Close | Put | 21JAN22 / 500.0 P | 25 | $1.7100 |
| 11/29/2021 | Bought to Close | Put | 21JAN22 / 500.0 P | 97 | $1.7200 |
| 11/29/2021 | Bought to Close | Put | 21JAN22 / 500.0 P | 107 | $1.7500 |
| 1/6/2022 | Sold to Open | Put | 04FEB22 / 520.0 P | -38 | $14.5000 |
| 1/6/2022 | Sold to Open | Put | 04FEB22 / 520.0 P | -48 | $14.2000 |
| 1/6/2022 | Sold to Open | Put | 04FEB22 / 520.0 P | -214 | $14.1086 |
| 1/6/2022 | Sold to Open | Put | 20JAN23 / 500.0 P | -150 | $53.2000 |
| 1/6/2022 | Sold to Open | Put | 20JAN23 / 500.0 P | -2 | $53.0000 |
| 1/6/2022 | Sold to Open | Put | 20JAN23 / 500.0 P | -10 | $52.7000 |
| 1/6/2022 | Sold to Open | Put | 20JAN23 / 500.0 P | -51 | $52.5002 |
| 1/6/2022 | Sold to Open | Put | 20JAN23 / 500.0 P | -1 | $52.3000 |
| 1/6/2022 | Sold to Open | Put | 20JAN23 / 500.0 P | -54 | $52.0000 |
| 1/6/2022 | Sold to Open | Put | 20JAN23 / 500.0 P | -332 | $51.0151 |
| 1/20/2022 | Sold to Open | Put | 18MAR22 / 500.0 P | -284 | $21.7000 |
| 1/20/2022 | Sold to Open | Put | 18MAR22 / 500.0 P | -107 | $21.6000 |
| 1/20/2022 | Sold to Open | Put | 18MAR22 / 500.0 P | -109 | $21.5038 |
| 1/27/2022 | Sold to Open | Call | 18FEB22 / 405.0 C | -849 | $10.0000 |
| 2/3/2022 | Bought to Close | Call | 18FEB22 / 405.0 C | 235 | $20.9000 |
| 2/3/2022 | Bought to Close | Call | 18FEB22 / 405.0 C | 4 | $21.1000 |
| 2/3/2022 | Bought to Close | Call | 18FEB22 / 405.0 C | 167 | $21.2000 |
| 2/3/2022 | Bought to Close | Call | 18FEB22 / 405.0 C | 50 | $21.8000 |
| 2/3/2022 | Bought to Close | Call | 18FEB22 / 405.0 C | 284 | $21.9887 |
| 2/7/2022 | Bought to Close | Call | 18FEB22 / 405.0 C | 109 | $9.9500 |