1  KEITH E. EGGLETON, State Bar No. 159842
   Email:  keggleton@wsgr.com
2  DIANE M. WALTERS, State Bar No. 148136
   Email:  dwalters@wsgr.com
3  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
4  650 Page Mill Road
   Palo Alto, CA 94304-1050
5  Telephone:  (650) 493-9300
   Facsimile:  (650) 493-6811
6
   FRED A. ROWLEY, JR., State Bar No. 192298
7  Email:  fred.rowley@wsgr.com
   WILSON SONSINI GOODRICH & ROSATI
8  Professional Corporation
   633 West Fifth Street, Suite 1550
9  Los Angeles, CA 90071-2027
   Telephone:  (323) 210-2900
10 Facsimile:  (866) 974-7329

11 *Attorneys for Defendants*
   Netflix, Inc., Reed Hastings,
12 Ted Sarandos, Spencer Neumann,
   and Gregory Peters

13

14                **UNITED STATES DISTRICT COURT**

15            **NORTHERN DISTRICT OF CALIFORNIA**

16

17 *In re Netflix, Inc. Securities Litigation*      )   Master File No.:  4:22-cv-02672-JST
                                                    )
18                                                  )   CLASS ACTION
                                                    )   ̲̲̲̲̲̲̲̲̲̲̲̲
19                                                  )   **DEFENDANTS' NOTICE OF**
                                                    )   **MOTION AND MOTION TO**
20                                                  )   **DISMISS AMENDED CLASS**
                                                    )   **ACTION COMPLAINT**
21                                                  )
                                                    )   Date:        June 22, 2023
22                                                  )   Time:        2:00 p.m.
                                                    )   Courtroom:   6
23                                                  )   Before:      Hon. Jon S. Tigar
                                                    )
24 ̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲)

25

26

27

28

1

# TABLE OF CONTENTS

2

**Page**

3  NOTICE OF MOTION AND MOTION ........................................................................ 1

4  STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3)) ......................... 1

5  MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

6  INTRODUCTION ........................................................................................................ 1

7  BACKGROUND ......................................................................................................... 3

8  THIS COURT SHOULD GRANT DEFENDANTS' MOTION TO DISMISS ............................ 6

9  I.        APPLICABLE LEGAL STANDARDS ............................................................... 6

10  II.      PLAINTIFF FAILS TO PLEAD FALSITY ......................................................... 6

11           A.    The Alleged Omissions Do Not Render the Statements False or Misleading ......... 7

12                 1.    Most of the Challenged Statements Do Not Address Account
                         Sharing ........................................................................................... 8

13
                 2.    Plaintiff Fails to Plead the Falsity of the Account Sharing
14                      Statements ...................................................................................... 9

15           B.    The Forward-Looking Statements Are Protected under the Safe Harbor ........... 12

16                 1.    Many of the Alleged Misstatements are Forward-Looking
                         Statements ..................................................................................... 12

17
                 2.    The Forward-Looking Statements Are Non-Actionable Because
18                      They Were Accompanied by Cautionary Language .................................. 13

19                 3.    Plaintiff Also Fails to Plead Actual Knowledge of Falsity ...................... 14

20           C.    Many of the Challenged Statements Are Non-Actionable Puffery ..................... 14

21           D.    Many of the Challenged Statements Are Non-Actionable Opinion
                   Statements ..................................................................................................... 16
22
23           E.    Plaintiff Fails to Plead the Falsity of the Market Penetration Statements ........... 18

             F.    Plaintiff Fails to Plead the Falsity of the "Metrics" Statements ...................... 18
24
25  III.    PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ............... 19

             A.    Plaintiff Fails to Plead Any Direct Evidence of Scienter ............................... 20
26
                 1.    The FE Allegations Fail to Support a Strong Inference of Scienter ........... 20
27
                 2.    The Pre-Class Period Statements Do Not Establish Scienter ................... 22
28
                 3.    The End of Class Period Statements Are Not "Admissions" of Fraud ..... 23

4.    The Changes to the Form 10-K Risk Disclosure Do Not Show Scienter ....................................................................... 23

B.    The Allegations Fail Both Individually and Holistically ...................................... 24

IV.    THE SECTION 20(a) CLAIM ALSO FAILS ................................................................. 25

CONCLUSION ............................................................................................................................. 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021).................................................................................... 2, 10, 11

5

*Bao v. SolarCity Corp.*,
6    No. 14-cv-01435-BLF, 2016 WL 4192177 (N.D. Cal. Aug. 9, 2016),
   *aff'd sub nom. Webb v. SolarCity Corp.*,
7    884 F.3d 844 (9th Cir. 2018)........................................................................................ 22

8  *Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ...................................................................................................... 8

9

*Berlinger v. Bienaimé*,
10   No. 21-cv-08254-MMC, 2023 WL 322899 (N.D. Cal. Jan. 19, 2023) ............................ 7

11 *Bodri v. GoPro, Inc.*,
   252 F. Supp. 3d 912 (N.D. Cal. 2017) .................................................................... 14, 25

12
*Brody v. Transitional Hosps. Corp.*,
13   280 F.3d 997 (9th Cir. 2002).......................................................................................... 8

14 *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017)........................................................................................ 16

15
*Elec. Workers Pension Fund, Local 103, I.B.E.W. v. HP Inc.*,
16   No. 20-cv-01260-SI, 2021 WL 4199273 (N.D. Cal. Sept. 15, 2021) ............................ 21

17 *In re Fastly, Inc. Sec. Litig.*,
   No. 20-cv-06024-PJH, 2021 WL 5494249 (N.D. Cal. Nov. 23, 2021)........................... 19

18
*In re Intrexon Corp. Sec. Litig.*,
19   No. 16-cv-02398-RS, 2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ............................... 19

20 *Lipton v. PathoGenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002)...................................................................................... 22

21
*Lopes v. Fitbit, Inc.*,
22   No. 18-cv-06665-JST, 2020 WL 1465932 (N.D. Cal. Mar. 23, 2020),
   *aff'd*, 848 F. App'x 278 (9th Cir. 2021) ................................................................... 15, 23

23
*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
24   39 F.4th 1092 (9th Cir. 2022)................................................................................. 15, 16

25 *In re Marriott Int'l, Inc.*,
   31 F.4th 898 (4th Cir. 2022)........................................................................................ 10

26
*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
27 540 F.3d 1049 (9th Cir. 2008)............................................................................. 6, 7, 20

28

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022)............................................................................................. 7

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020)................................................................................... 20, 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ................................................................................................... 17

*Pittleman v. Impac Mortg. Holdings, Inc.*,
    No. SACV 07-0970 AG (MLGx), 2009 WL 648983 (C.D. Cal. Mar. 9, 2009),
    *aff'd sub nom. Sharenow v. Impac Mortg. Holdings, Inc.*,
    385 F. App'x 714 (9th Cir. 2010)................................................................................. 20

*In re Pivotal Sec. Litig.*,
    No. 3:19-cv-03589-CRB, 2020 WL 4193384 (N.D. Cal. July 21, 2020) ............. 13, 22, 24

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)..........................................................................*passim*

*Prodanova v. H.C. Wainwright & Co.*,
    993 F.3d 1097 (9th Cir. 2021)................................................................................. 24, 25

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)....................................................................................... 23

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ....................................................................... 8

*In re Splunk, Inc. Sec. Litig.*,
    592 F. Supp. 3d 919 (N.D. Cal. 2022) ....................................................................... 25

*In re SunPower Corp. Sec. Litig.*,
    No. 16-cv-04710-RS, 2018 WL 1863055 (N.D. Cal. Apr. 18, 2018) ............................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................................... 19, 24

*In re Tibco Software, Inc. Sec. Litig.*,
    No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006)................................ 25

*In re Twitter, Inc. Sec. Litig.*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020),
    *aff'd sub nom. Weston Family P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022)......................................................................................... 8

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ......................................................................... 8

*Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*,
    321 F. Supp. 3d 1133 (C.D. Cal. 2018),
    *aff'd sub nom. Castro v. Mattel, Inc.*,
    794 F. App'x 669 (9th Cir. 2020)................................................................................. 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ................................................................................ 12, 13

*Wozniak v. Align Tech., Inc.*,
    No. C-09-3671 MMC, 2011 WL 2269418 (N.D. Cal. June 8, 2011) .............................. 21

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)................................................................................. 21, 24

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(B) ............................................................................................ 6

15 U.S.C. § 78u-4(b)(2)(A) ............................................................................................ 6

15 U.S.C. § 78u-5(c)(1) ............................................................................................... 12

15 U.S.C. § 78u-5(c)(1)(A)(i) ...................................................................................... 14

**RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 1

Fed. R. Civ. P. 8 .......................................................................................................... 1

Fed. R. Civ. P. 9(b) ...................................................................................................... 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on June 22, 2023 at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Jon S. Tigar of the U.S. District Court for the Northern District of California, Courtroom 6, 1301 Clay Street, Oakland, CA, 94612, defendants Netflix, Inc. ("Netflix" or the "Company"), and Reed Hastings, Ted Sarandos, Spencer Neumann, and Gregory Peters ("Individual Defendant(s)," together with Netflix, "Defendant(s)") will and hereby do move for an order dismissing the Amended Class Action Complaint ("Complaint" or "¶_").

Defendants seek dismissal pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal Rules of Civil Procedure 12(b)(6), 8, and 9(b).  Defendants' motion is based upon this Notice of Motion, the Memorandum of Points and Authorities, the request for judicial notice, the Declaration of Diane M. Walters and exhibits thereto ("Ex. _"), the pleadings and records in this action, oral argument, and any other matters properly before this Court.

**STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))**

1.  Should the Section 10(b)/Rule 10b-5 claims be dismissed for failure to allege falsity?

2.  Should the Section 10(b)/Rule 10b-5 claims be dismissed for failure to allege a strong inference of scienter as to any Defendant?

3.  Should the Section 20(a) claim be dismissed?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Netflix faced many challenges during the global COVID-19 pandemic, including (like most businesses) predicting how the pandemic would impact its business.  Early in the pandemic, Netflix experienced a sharp increase in membership growth as a result of home confinement.  At the same time, the pandemic resulted in unprecedented disruption and delays in new content, following an almost global shutdown of television and film production beginning in March 2020.  Throughout this period, Netflix repeatedly cautioned investors that the full extent of the pandemic's impact on its business was subject to numerous evolving factors and uncertainties that were difficult to predict.

As the pandemic extended into 2021, Netflix explained that the increase in paid memberships in 2020 had pulled forward growth from 2021, and the pandemic was adding "unusual

choppiness" to Netflix's growth.  Despite these challenges, Netflix continued to grow.  Global membership increased from 204 million in 2020 to 222 million in 2021, and revenue increased from $25 billion in 2020 to $30 billion in 2021.

Netflix announced results for the first quarter of 2022 on April 19, 2022.  Although its quarterly revenue of $7.9 billion was up 10% over the first quarter of 2021, Netflix cautioned in its letter to shareholders that revenue growth had "slowed considerably."  The Company explained that the pandemic had clouded the picture by significantly increasing growth in 2020.  Netflix reported that four interrelated factors were impacting growth: addressable market, account sharing, the launch of new streaming service competitors, and macro factors such as slow economic growth, geopolitical events, and ongoing COVID-19 disruption.

Shortly after the April announcement, Plaintiff filed this action, claiming that Netflix and its executives had defrauded investors.  Plaintiff challenges statements regarding, among other topics, growth and the impact of COVID-19, and alleges that all of these statements were misleading because of alleged omissions regarding account sharing.

Most of the challenged statements are not actionable because they are general expressions of corporate optimism, forward-looking statements, and/or statements of opinion.  Even apart from that fundamental defect, however, Plaintiff has failed to plead a material omission of fact.  Only three of the challenged statements even mention account sharing.  Two of those statements identified account sharing as an ongoing risk that the company was managing by making "efforts to restrict multi-household usage."  The third statement similarly noted Netflix's "flexible approach" to balancing multi-household "accessibility" and controlling accounts across customers "in different positions" with "different needs."  Plaintiff attempts to spin the risk disclosures and related earnings call statements back on Netflix, as being *themselves* misleading.  But far from "speak[ing] entirely of as-yet-unrealized risks and contingencies," *In re Alphabet, Inc. Securities Litigation*, 1 F.4th 687, 703 (9th Cir. 2021) (citation omitted), Netflix acknowledged account sharing as an *actual* and ongoing business risk.  At most, the information disclosed at the end of the class period in April 2022 indicated that the recognized need to balance account sharing and restriction had become, along with other factors, more challenging.

The Complaint also lacks the specificity necessary to plead a strong inference of scienter. Plaintiff fails to plead particularized facts showing that Netflix and its executives issued any false and misleading statements, much less that they did so with the intent to deceive, manipulate, or defraud. Indeed, the Complaint is devoid of any facts regarding the Individual Defendants' (Messrs. Hastings, Sarandos, Peters and Neumann) mental states at the time any statement was made or even any allegations as to why they purportedly would have engaged in securities fraud.

## BACKGROUND

Netflix is one of the world's leading entertainment services, offering TV series, films, and mobile games to more than 220 million members in over 190 countries. ¶¶2, 77. In 2020, Netflix experienced significant viewing and membership growth as a result of the pandemic. ¶69. From the outset of the pandemic, however, Netflix cautioned that the increases were a temporary effect, and that it expected membership growth to decelerate when home confinement ended. Ex. 1 at 1.

**Fourth Quarter 2020**: Netflix announced its financial results for the fourth quarter ("4Q") of 2020 and fiscal year ("FY") 2020 on January 19, 2021 – the start of the Class Period. ¶131; Ex. 2; Ex. 3. For FY2020, Netflix reported that it had surpassed 200 million paid members, added a record 37 million paid memberships, and achieved $25 billion in annual revenue (over a 24% increase year-over-year ("YOY")). Ex. 2 at 1. Netflix's Letter to Shareholders stated that it was "becoming an increasingly global service with 83% of [its] paid net adds in 2020 coming from outside the UCAN [United States and Canada] region." *Id.* at 2. Despite those record results, Netflix was cautious with its forward-looking guidance, telling investors to expect only 6 million new members in the March 2021 quarter, down from 15.8 million the prior, COVID lockdown year. ¶75.

Netflix filed its FY2020 SEC Form 10-K (¶135) on January 28, 2021, in which it cautioned:

- The full extent to which the pandemic and the various responses to it impacts our business . . . will depend on numerous evolving factors that we may not be able to accurately predict . . . .

  The . . . pandemic also led to an increase in our net paid membership additions relative to our quarterly forecast and historic trends in the first half of 2020, and slower net paid membership additions in the second half of 2020 relative to historic trends. These results . . . may not be indicative of results for future periods. . . .

- [I]f multi-household usage is abused or if our efforts to restrict multi-household usage are ineffective, our ability to add new members may be hindered and our results of

operations may be adversely impacted. . . .

- The market . . . is intensely competitive and subject to rapid change. . . .

Ex. 4 at 4-5.

**First Quarter 2021**: Netflix announced its 1Q2021 results on April 20, 2021, including $7.163 billion in revenue, up 24% YOY. Ex. 5 at 1; Ex. 6. Netflix reported that it "finished Q1 '21 with 208m paid memberships, up 14% year over year, but below [its] guidance forecast of 210m paid memberships" and reported quarterly paid net adds of 4 million, below the 6 million guidance. ¶137. As Netflix explained in its April 20, 2021 Letter to Shareholders: "[w]e believe paid membership growth slowed due to the big Covid-19 pull forward in 2020 and a lighter content slate in the first half of this year, due to Covid-19 production delays;" "[t]he extraordinary events of Covid-19 led to unprecedented membership growth in 2020, as it pulled forward growth from 2021, and delayed production across every region;" and Netflix "ended 2020 with a bigger membership and revenue base than [it] would otherwise would have had." Ex. 5 at 2.

**Second Quarter 2021**: Netflix announced its 2Q2021 results on July 20, 2021, including $7.3 billion in revenue, up 19% YOY. Ex. 8 at 1; Ex. 9. Netflix reported that it "finished the quarter with over 209m paid memberships," but cautioned that "COVID has created some lumpiness in our membership growth (higher growth in 2020, slower growth this year), which is working its way through." Ex. 8 at 1. Netflix added 3.5 million memberships, with the Asia-Pacific ("APAC") region "represent[ing] about two-thirds" of global paid net adds in the quarter. *Id.* at 2.

**Third Quarter 2021**: Netflix announced its 3Q2021 results on October 19, 2021, including $7.5 billion in revenue, up 16% YOY. Ex. 11 at 1; Ex. 12. Netflix reported quarterly net adds of 4.4 million and ended the quarter with 214 million paid memberships. ¶156. Netflix's October 19, 2021 Letter to Shareholders stated that the APAC region was the "largest contributor to membership growth with 2.2m paid net adds," and the Europe, Middle East, and Africa ("EMEA") region "improved sequentially" with paid net adds of 1.8 million. Ex. 11 at 2. Netflix explained that the UCAN and Latin America ("LATAM") regions "grew paid memberships more slowly," noting that "[t]hese regions have higher penetration of broadband homes," but Netflix "believe[d]" it still "had ample runway for growth as [it] continue[d] to improve [its] service." *Id.*

**Fourth Quarter 2021**: Netflix announced its 4Q2021 and FY2021 financial results, including FY2021 revenue of $30 billion (a 19% YOY increase), on January 20, 2022. Ex. 13 at 1; Ex. 14. Netflix reported that it "finished Q4 with 222m paid memberships (with 8.3m paid net adds in Q4)." ¶162. Netflix reported in its Letter to Shareholders that Netflix's "service continues to grow globally, with more than 90% of [its] paid net adds in 2021 coming from outside the UCAN region." *Id.* Netflix stated that the "UCAN region added 1.2m paid memberships in Q4'21 (vs. 0.9 last year), marking our strongest quarter of member growth in this region since the early days of COVID-19 in 2020." Ex. 13 at 2. APAC membership increased by 2.6 million, and the EMEA region "delivered record quarterly revenue, exceeding $2.5 billion for the first time." *Id.* For 1Q2022, Netflix "forecast paid net adds of 2.5m vs. 4.0m in the year ago quarter," stating that its "guidance reflect[ed] a more back-end weighted content slate" and "acquisition growth has not yet re-accelerated to pre-Covid levels." *Id.* at 3.

Netflix filed its FY2021 SEC Form 10-K on January 27, 2022, in which it cautioned:

- We have experienced significant membership growth over the past several years. Our penetration and growth rates vary between the jurisdictions where we provide our service. In countries where we have been operating for many years or where we are highly penetrated, our membership growth is slower. . . .

- [I]f multi-household usage is abused or if our efforts to restrict multi-household usage are ineffective, our ability to add new members may be hindered . . . .

- The market for entertainment video is intensely competitive . . . . If we are unable to successfully or profitably compete . . . our business will be adversely affected, and we may not be able to increase or maintain market share, revenues or profitability.

- The . . . pandemic and the various responses to it has disrupted our business . . . .

Ex. 15 at 4-5.

**First Quarter 2022**: Netflix announced its 1Q2022 results, which included $7.868 billion in revenue, up 10% YOY, on April 19, 2022. Ex. 16 at 1; Ex. 17. Netflix reported that "[p]aid net additions were -0.2m compared against [its] guidance forecast of 2.5m and 4.0m in the same quarter a year ago." ¶115. Suspension of service in Russia following Russia's invasion of Ukraine "resulted in a -0.7m impact on paid net adds; excluding this impact, paid net additions totaled +0.5m." *Id.* Netflix stated in its April 19, 2022 Letter to Shareholders that its "relatively high household penetration – when including the large number of households sharing accounts –

combined with competition, is creating revenue growth headwinds." *Id.*  The letter noted that the pandemic had "clouded the picture" and led Netflix to believe that slowing growth in 2021 was due to the COVID pull forward, but it now believed there were four "inter-related factors at work": the addressable market, account sharing, competition, and macro factors, including economic factors, geopolitical events, and continued COVID disruption.  ¶117.

Two weeks later, on May 3, 2022, Plaintiff filed the initial complaint in this action, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5.  ECF No. 1. Lead plaintiff filed the amended complaint on December 12, 2022.

### THIS COURT SHOULD GRANT DEFENDANTS' MOTION TO DISMISS

## I.      APPLICABLE LEGAL STANDARDS

To state a claim under Section 10(b)/Rule 10b-5, a plaintiff must plead, among other things: (1) a material misrepresentation or omission; and (2) scienter.[1]  *See Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057 (9th Cir. 2014).  Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA.  *Id.*  "Due in large part to the enactment of the [PSLRA], plaintiffs in private securities fraud class actions face formidable pleading requirements to properly state a claim and avoid dismissal[.]"  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008).

The PSLRA requires that a complaint: (i) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed" (15 U.S.C. § 78u-4(b)(1)(B)); and (ii) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" as to "each act or omission" (*id*. § 78u-4(b)(2)(A)).

## II.     PLAINTIFF FAILS TO PLEAD FALSITY

To satisfy the PSLRA's "exacting requirements for pleading 'falsity,'" Plaintiff must plead specific, contemporaneous facts indicating why each statement was false when made.  *Metzler*, 540

---

[1] Because Plaintiff's failure to plead falsity or scienter provides independent grounds for dismissal, Defendants do not address the other elements of a Section 10(b) claim in this motion.

F.3d at 1070. "By requiring specificity," the PSLRA "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022) (citation omitted).

It is unclear exactly which or how many statements Plaintiff is challenging because of the use of block quotes and "scattered" bold and italics in the Complaint. *Berlinger v. Bienaimé*, No. 21-cv-08254-MMC, 2023 WL 322899, at *3 (N.D. Cal. Jan. 19, 2023) (complaint subject to dismissal where it "include[d] no explanation as to the significance of the italics and boldface, which are scattered among numerous and relatively lengthy blocks of quoted text"). Plaintiff appears to challenge at least 50 statements, including those made in quarterly shareholder letters, earnings calls, and SEC filings, but fails to plead facts showing the "deceitful" or fraudulent nature of any of those statements. The challenged statements are also not actionable because they are generalized expressions of corporate optimism, forward-looking statements protected by the PSLRA Safe Harbor, and/or non-actionable opinion statements.

### A.     The Alleged Omissions Do Not Render the Statements False or Misleading

Plaintiff alleges that virtually all of the challenged statements were false and misleading due to omissions regarding account sharing. ¶¶137-173. Plaintiff repeatedly acknowledges, however, that investors, analysts, and the media were well aware of account sharing long before the start of the Class Period. Plaintiff alleges, for example, that, at a January 6, 2016 analyst conference, a former Netflix executive was quoted as stating:

> [I]n terms of password protection, we haven't been as focused on it as you guys have. That isn't to say that we don't look at it and have a point of view. It is just we don't feel like it is a material inhibitor to our growth. That might not be true forever. . . .

¶55; *see also, e.g.*, ¶¶50-52, 56-64. Plaintiff also acknowledges that news outlets, including The Washington Post (¶84), and "numerous analysts" (¶85) reported early in the Class Period that Netflix "appeared to be testing methods to limit account sharing" (¶84).

Because he cannot deny that the market was aware of account sharing, Plaintiff instead claims that Netflix failed to disclose specific details about it. Among other information, Plaintiff faults Defendants for not disclosing the approximate number of households using Netflix through

account sharing and the impact of account sharing on membership growth.  Plaintiff's omissions theory fails on multiple, independent grounds.

### 1.    Most of the Challenged Statements Do Not Address Account Sharing

"Silence, absent a duty to disclose, is not misleading[.]"  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).  Rather, Rule 10b-5 "prohibits '*only* misleading and untrue statements, not statements that are incomplete.'"  *Intuitive Surgical*, 759 F.3d at 1061 (citation omitted).  Thus, an omission becomes actionable only if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

With only three exceptions (¶¶135, 144, 170), none of the challenged statements discusses account sharing.  Instead, the majority of the challenged statements relate to growth, the impact of the pandemic, and other topics.  *See, e.g.*, ¶131 (UCAN penetration; growth); ¶133 (pandemic; guidance; growth); ¶137 (pandemic; expectations for the first half of 2021).[2]  Plaintiff fails to explain how the alleged account sharing omissions connect to the substance of these statements and thus fails to provide the requisite link between the alleged omissions and the statements "so as to make the lack of additional disclosure misleading."  *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 885 (N.D. Cal. 2020), *aff'd sub nom. Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022); *see, e.g.*, *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 807 (N.D. Cal. 2019) ("Many of the alleged misstatements . . . do not relate to the business practices at issue . . . and thus, the reasons Plaintiffs offer as to why many of the statements are false or misleading bear no connection to the substance of the statements.").  Plaintiff has therefore not met his burden to plead facts inconsistent with the public statements.  *Cf. Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1135-43 (N.D. Cal. 2017) (statements regarding growth, improved engagement, and "aggressive

---

[2] ¶139 (pandemic; engagement; viewing; churn; growth); ¶141 (pandemic; metrics; growth); ¶146 (pandemic); ¶148 (pandemic; viewing; engagement; acquisition); ¶150 (pandemic; acquisition); ¶152 (pandemic; growth); ¶154 (pandemic); ¶156 (growth); ¶158 (market penetration; growth); ¶160 (health of the business; churn; viewing); ¶162 (growth; 2Q2021 forecast; pandemic; macroeconomic factors); ¶164 (1Q2022 guidance; pandemic; competition; execution); ¶166 (pandemic; business fundamentals); ¶168 (LATAM market maturation and penetration; growth) ¶172 (UCAN market penetration; growth).

1    MAU [engagement metric] projections" were rendered misleading by omissions regarding Twitter's

2    primary internal metric (DAU), which was not disclosed and allegedly showed adverse engagement

3    trends).

4         Plaintiff also fails to explain how Defendants' statements were incomplete or misleading, as

5    nothing about these statements "would give a reasonable investor the impression that" the state of

6    Netflix's business "was different than it was in reality." *Intuitive Surgical*, 759 F.3d at 1061 (finding

7    that alleged omissions regarding "market saturation" and other negative trends did not render

8    optimistic growth statements misleading).  Plaintiff cannot dispute that Netflix experienced growth

9    during the Class Period.  Netflix increased its total paid memberships from just over 204 million in

10   FY2020 (Ex. 2 at 2) to more than 222 million at the end of the Class Period (¶116).  Netflix

11   repeatedly stated that it was becoming an increasingly global company with most new memberships

12   coming from outside UCAN in 2020 and 2021 (*supra* at 3, 5), which was borne out in its results:

13   EMEA memberships increased from 67 million to 74 million, APAC memberships increased from

14   26 million to 34 million, and LATAM memberships increased from 38 million to just under 40

15   million.  Even in UCAN, memberships increased by more than 600,000.  Ex. 2 at 7; Ex. 16 at 6.

16   Netflix's revenue also increased from $25 billion in FY2020 to $30 billion in FY2021.  Ex. 2 at 10;

17   Ex. 13 at 11.

18              **2.    Plaintiff Fails to Plead the Falsity of the Account Sharing Statements**

19        Of the three challenged statements that mention account sharing, two of the statements are

20   risk disclosures in Netflix's FY2020 and FY2021 Forms 10-K (¶¶135, 170), and the third is a

21   statement by Netflix COO Greg Peters in the April 2021 earnings call (¶144).  Plaintiff fails to plead

22   facts showing that these statements were false or misleading.

23        ***The FY2020 and FY2021 Forms 10-K***.  Netflix's risk disclosures about account sharing

24   contradict, rather than support, Plaintiff's claims.  Netflix cautioned in its FY 2021 Form 10-K that

25   "if multi-household usage is abused or if our efforts to restrict multi-household usage are ineffective,

26   our ability to add new members may be hindered . . . ."  ¶135; *see also* ¶170.  Netflix thus disclosed

27   at the outset of the Class Period that account sharing posed a risk to its ability to add new members,

28   undermining Plaintiff's core claim that Defendants hid account sharing risks.

While Plaintiff claims the risk factor itself was misleading because it "presented" the risks as "hypotheticals," and "multi-household usage was already being abused and Netflix's efforts to restrict it were ineffective," ¶136(d), this theory fails for two reasons.

*First*, the disclosures made clear that account sharing was happening, that Netflix was working to restrict it, and that account sharing might hurt results.  Netflix's disclosures were thus fundamentally different from "[r]isk disclosures that 'speak[] *entirely of as-yet-unrealized risks and contingencies.*'" *Alphabet*, 1 F.4th at 703 (emphasis added) (citation omitted).  Purely hypothetical risk disclosures may be misleading if they "do not 'alert[] the reader that some of these risks may already have come to fruition,'" when they in fact have.  *Id.*  But the challenged disclosures here recognized that account sharing was a current risk factor for Netflix—not a risk that might obtain at an uncertain time on the horizon—which the company was seeking to address through "efforts to restrict multi-household usage."  ¶135.  The point is underscored by Mr. Peters's statements (discussed more fully below) responding to a question about "tightening the screws" on account sharing by referencing Netflix's "flexible approach" to its plans.  ¶144.  Far from a "hypothetical" risk, account sharing was a challenge well known to the market and investors, and Netflix was already seeking to calibrate its response and password security efforts to facilitate growth.

*Second*, Plaintiff pleads no facts showing that Netflix's account sharing risk factor was misleading.  The gravamen of Plaintiff's claim is that Netflix knew the information it disclosed in its April 2022 shareholder letter—that an estimated 100 million account sharing households was making "it harder to grow membership in many markets"—when it set out this risk factor in its FY2020 and FY2021 Forms 10-K.  ¶117; *see* ¶¶136(a)-(c), 173(a)-(c).  In contrast to *Alphabet*, in which statements were deemed misleading because the plaintiff pled a concrete event that made clear "the risk had already come to fruition," 1 F.4th at 703, Plaintiff fails to plead how the disclosures in April 2022 render Netflix's earlier risk factor disclosures false.  *See, e.g.*, *In re Marriott Int'l, Inc.*, 31 F.4th 898, 904 (4th Cir. 2022) (distinguishing *Alphabet* and finding that alleged omissions regarding past data breaches did not render general cybersecurity risk disclosures misleading where the disclosure "'also acknowledged that the company had already experienced the sort of challenges' being discussed") (quoting *Alphabet*, 1 F.4th at 703-04).  In *Alphabet*, for

example, the plaintiff alleged that at the time Alphabet was disclosing the potential risk of a data breach, a software bug had *already* left private data belonging to hundreds of thousands of users *exposed for three years*. 1 F.4th at 693. Plaintiff has pled no such event here, and the information he has pled is consistent with the non-hypothetical risk disclosure that Netflix made. At most, the April 2022 disclosures reflected Netflix's determination that the already-recognized and disclosed account sharing challenge for Netflix's business had gotten more challenging. That sort of risk recalibration cannot be compared with the leap from *hypothetical* to *actual* that grounds *Alphabet*'s holding, particularly given the other complex factors at play, including the pandemic. While Plaintiff insists that account sharing had already "severely hindered" Netflix's "ability [to] acquire new paying members" in 2020 and 2021 (¶¶136(a)-(c), 171(a)-(c)), as the Forms 10-K reflect, global memberships *increased* from 167 million in FY2019 to 204 million in FY2020 and *increased* again from 204 million in FY2020 to 222 million in FY2021.

**April 20, 2021 Earnings Call**. During the April 20, 2021 1Q2021 earnings call, an analyst posed questions about tests Netflix had recently conducted about account sharing (*supra* at 7), asking Mr. Peters to "talk about the size of the opportunity here, and why now is kind of the right time to start tightening the screws on that?" ¶144. Mr. Peters noted that members have "different needs" across the countries that Netflix serves, and Netflix was "seeking that sort of flexible approach to make sure that we are providing the plans with the right features and the right price points to meet those broad set of needs," while also "making sure that the people who are using a Netflix account, who are accessing it are the ones that are authorized to do so." *Id.* Netflix uses testing, Mr. Peters explained, "to inform and guide" this balancing and Netflix's process of "continually try[ing] and mak[ing] that [service] better and better." *Id.*

Plaintiff alleges that Mr. Peters's statement was misleading because he failed to disclose that the testing purportedly was being done "specifically in response to market saturation caused by account sharing, as admitted in the April 19, 2022 [disclosures]." ¶145(e). The information that Plaintiff insists was omitted does not, however, render Mr. Peters's statement about Netflix's "flexible approach" to balancing account sharing and security false. Mr. Peters explained that Netflix continuously examined that balance between "accessibility" and controlling "authorized"

users across "members [who] are in different positions" with a "broad set of needs." ¶144. There is nothing inconsistent with Mr. Peters's April 2021 statements and the disclosures in April 2022 that account sharing, together with market addressability, "means it's harder to grow membership in many markets" (¶117)—instead, the statements work together to show the need for Netflix to continue to employ its "flexible" approach to address different challenges around the globe. Plaintiff's speculation aside, nothing in the disclosures at the end of the Class Period suggest that market saturation was the sole reason for past testing. *See, e.g.*, *Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1148 (C.D. Cal. 2018) ("Plaintiff has not alleged sufficient facts to support an inference that their allegations are more than 'speculation made in hindsight.'") (citation omitted), *aff'd sub nom. Castro v. Mattel, Inc.*, 794 F. App'x 669 (9th Cir. 2020).

### B.    The Forward-Looking Statements Are Protected under the Safe Harbor

The PSLRA Safe Harbor is "designed to protect companies and their officials" where, as here, they "merely fall short of their 'optimistic projections.'" *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189 (9th Cir. 2021) (citation omitted). Congress thus immunized forward-looking statements that are accompanied by meaningful, cautionary language or made without actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1). Of the more than fifty statements in the Complaint, at least seventeen are forward looking and subject to the Safe Harbor.

### 1.    Many of the Alleged Misstatements are Forward-Looking Statements

A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *Intuitive Surgical*, 759 F.3d at 1058 (citation omitted). Mixed statements that include both forward-looking and non-forward-looking elements are entitled to protection if such statements, when "examined as a whole," "related to future expectations and performance." *Id.* at 1059

Of the more than fifty statements challenged in the Complaint, at least seventeen are about future growth, projections, and prospects. *See, e.g.*, ¶133 ("[T]he long-term growth trajectory is at least as strong as ever."); ¶137 ("We continue to anticipate a strong second half . . . ."); ¶141 ("[F]eeling good about the long-term trends."); ¶142 ("So there's just this big long runway of

growth . . . ."); ¶162 ("[W]e're optimistic about our long-term growth prospects . . . ."); ¶162 ("For

Q1'22, we forecast paid net adds of 2.5m vs. 4.0m in the year ago quarter.").[3]  Such statements are

forward-looking.[4]  *See Intuitive Surgical*, 759 F.3d at 1058 ("[G]rowth and revenue projections . . .

are forward-looking on their face."); *In re Pivotal Sec. Litig.*, No. 3:19-cv-03589-CRB, 2020 WL

4193384, at *15 (N.D. Cal. July 21, 2020) (statements that "[w]e think we'll see our marketplace

expand" and "[w]e expect to see continued growth" were forward-looking).

Indeed, many of the alleged misstatements were made in the context of discussing Netflix's

guidance for each upcoming fiscal quarter.  *E.g.*, ¶133 (Netflix CFO Spence Neumann's response

to an analyst asking "So if you could just help us walk through the thought behind the

guidance . . . ."); *see also, e.g.*, ¶¶141, 150, 164.  Other statements also were made in response to

questions about future business.  *E.g.*, ¶158 ("ANALYST: . . . [H]ow is that making you think about

the longer-term prospects [in Latin America]?").  Statements about future performance and the

underlying assumptions are forward-looking.  *See Wochos*, 985 F.3d at 1192 ("any announced

'objective' for 'future operations' *necessarily* reflects an implicit assertion that the goal is achievable

based on current circumstances").

### 2. The Forward-Looking Statements Are Non-Actionable Because They Were Accompanied by Cautionary Language

Forward-looking statements accompanied by cautionary language identifying "important

factors that could cause actual results to differ materially from those in the forward-looking

---

[3] *See also* ¶131 ("we think we've got a lot of headroom in all these markets"); ¶133 ("very strong underlying growth metrics, and that's what you're seeing in the Q1 guide"); ¶133 ("there's probably still a little bit of that pull-forward dynamic in the early parts of 2021"); ¶141 ("there's this clear catalyst to a reacceleration of growth"); ¶150 (statements discussing 3Q2021 guidance); ¶152 ("we remain on that growth trajectory . . . [w]e'd expect to end the year on a much more normalized growth trajectory"); ¶156 ("These [UCAN and LATAM] regions have higher penetration of broadband homes although we believe we still have ample runway for growth as we continue to improve our service."); ¶158 ("we would expect . . . a lot of runway for growth"); ¶164 (summarizing factors and assumptions in 1Q2022 guidance); ¶168 ("And so I think there's a long runway of growth there.").

[4] *See* Ex. 2 at 9 ("This shareholder letter contains certain forward-looking statements . . . , including statements regarding . . . global streaming paid members, paid net additions, and membership growth . . . ."); Ex. 3 at 4 ("As a reminder, we'll be making forward-looking statements . . . ."); Ex. 5 at 9; Ex. 6 at 4; Ex. 8 at 10; Ex. 9 at 4; Ex. 11 at 10; Ex. 12 at 4; Ex. 13 at 10; Ex. 14 at 4; Ex. 15 at 1.

statement[s]" are protected under the Safe Harbor.  15 U.S.C. § 78u-5(c)(1)(A)(i).  Each forward-looking statement here was accompanied by meaningful, cautionary language identifying specific risks relating to the forward-looking statements.  Each quarterly shareholder letter – the subject matter of the quarterly earnings calls – included a section identifying forward-looking statements and the risks associated with those statements, and further incorporated the risk disclosures in Netflix's SEC filings.  For example, the January 19, 2021 Letter to Shareholders specifically identified, among other statements, statements regarding "global streaming paid members, paid net additions and membership growth" and statements regarding revenue growth and other metrics as forward-looking, and identified numerous risks that "could cause actual results and events to differ," including the "ability to compete effectively" and to "attract new members."  Ex. 2 at 9; *see also* Ex. 5 at 9 (similar); Ex. 8 at 10 (similar); Ex. 11 at 10 (similar); Ex. 13 at 10 (similar); Ex. 3 at 4 ("[W]e'll be making forward-looking statements, and actual results may vary."); Ex. 6 at 4 (same); Ex. 9 at 4 (same); Ex. 12 at 4 (same); Ex. 14 at 4 (same).  The quarterly shareholder letters also incorporated the risk factors in Netflix's SEC Form 10-K filings, including, among others, risks associated with the pandemic, competition, and multi-household usage.  *Supra* at 3-4 (quoting risk factors) & 5 (same); Ex. 4 at 4-5; *see also id.* at 6-15; Ex. 15 at 4-5; *see also id.* at 6-16.

Similar disclosures have been held sufficient to invoke Safe Harbor protection.  *See Intuitive Surgical*, 759 F.3d at 1059.  Because the forward-looking statements were accompanied by meaningful, cautionary language, they are protected under the Safe Harbor.

### 3.      Plaintiff Also Fails to Plead Actual Knowledge of Falsity

The forward-looking statements are also separately protected under the Safe Harbor's third prong because Plaintiff fails to plead actual knowledge of falsity.  *See infra* Section III.

### C.      Many of the Challenged Statements Are Non-Actionable Puffery

"In the Ninth Circuit, 'vague, generalized assertions of corporate optimism or statements of "mere puffing" are not actionable material misrepresentations under federal securities laws' because no reasonable investor would rely on such statements."  *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017) (citations omitted).  Indeed, the Ninth Circuit repeatedly has held that statements expressing generalized corporate optimism "fit beneath the umbrella" of inactionable

"puffery." *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098-99 (9th Cir. 2022); *Intuitive Surgical*, 759 F.3d at 1060 (statements regarding growth "represent the 'feel good' speak that characterizes 'non-actionable puffing'") (citation omitted).

At least twenty of the challenged statements are nothing more than optimistic statements regarding growth and the health of the business and are thus not actionable. *E.g.*, ¶131 ("we're still growing"); ¶131 ("we've got a lot of headroom in all these markets"); ¶133 ("So the long-term growth trajectory is at least as strong as ever. There's just more short-term noise and uncertainty right now but still very strong underlying growth metrics."); ¶139 ("But the key is the business remains healthy."); ¶139 ("the business is still growing"); ¶141 ("the core underlying metrics are very healthy and there's this clear catalyst to a reacceleration of growth . . . [s]o feeling good about the long-term trends"); ¶142 ("there's just this big long runway of growth if we . . . keep getting better").[5]

Numerous courts have found similar statements to be non-actionable puffery. *Supra* at 14; *see Macomb*, 39 F.4th at 1098-99 (statements regarding "great" and "tremendous" growth in China were non-actionable puffery because "[s]uch characterizations are not 'objectively verifiable,'" despite allegations that growth in China had "slowed materially" when the statements were made); *Lopes v. Fitbit, Inc.*, No. 18-cv-06665-JST, 2020 WL 1465932, at *6 (N.D. Cal. Mar. 23, 2020) (statements about "market prospects" were puffery), *aff'd*, 848 F. App'x 278 (9th Cir. 2021).

In addition, Plaintiff fails to plead contemporaneous facts demonstrating the falsity of any of these expressions of corporate optimism. As described above (*supra* at 3-6), the Complaint lacks particularized facts showing that membership and revenue were not growing during the Class Period, and in the absence of such facts, Plaintiff's claim that the statements expressing optimism

---

[5] *See also* ¶144 ("continuously" trying to improve); ¶150 ("the underlying business metrics are really healthy"); ¶152 ("we remain on that growth trajectory"); ¶156 ("we believe we still have ample runway for growth as we continue to improve"); ¶158 ("we would expect growth to be just a little bit harder to work for, but still a lot of runway for growth in both of those regions"); ¶160 ("business remained healthy"); ¶162 ("[o]ur service continues to grow globally"); ¶162 ("we're optimistic about our long-term growth prospects"); ¶164 ("our execution is steady and getting better"); ¶166 ("all the fundamentals of the business are pretty solid"); ¶168 ("business is still growing there"); ¶168 ("I think there's a long runway of growth there"); ¶172 ("we're not done growing in the U.S.").

constituted false statements of fact necessarily fails. *See Macomb*, 39 F.4th at 1099 ("Significantly, at the time Align's executives made the six challenged statements, the company's sales were *still growing* in China, albeit at a diminished rate, so these feel-good descriptions from Align's executives did not 'affirmatively create[] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'") (alterations in original) (citations omitted).

### D.    Many of the Challenged Statements Are Non-Actionable Opinion Statements

At least twenty of the challenged statements are statements of opinion, which are not actionable unless the plaintiff pleads facts showing that (i) the defendants did not genuinely believe the statements, and the statements were objectively untrue, (ii) the expressed opinions contained embedded statements of untrue facts, or (iii) material omitted facts were known to the defendants that go to the basis for their opinions and rendered the statements misleading to a reasonable person when read in context. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616-17 (9th Cir. 2017). Plaintiff fails to plead any such facts.

Since the onset of the COVID-19 global pandemic, Netflix, like most companies, has attempted to predict the myriad ways in which the pandemic would impact its business and has repeatedly warned of pandemic-related challenges. *See, e.g.*, ¶137 ("We believe paid membership growth slowed due to the big Covid-19 pull forward in 2020 and a lighter content slate in the first half of this year, due to Covid-19 production delays."); ¶139 (COVID "at a minimum, creates just some short-term kind of choppiness in some of the business trends that we see in our business"); ¶146 ("We believe the decrease in paid net membership additions can primarily be attributed to the COVID-19 pandemic . . . .").[6] Plaintiff alleges that the opinion statements about the effects of the

---

[6] ¶133 (statements regarding COVID "pull-forward"); ¶137 ("these dynamics are also contributing to a lighter content slate in the first half of 2021, and hence we believe slower membership growth"); ¶137 ("In Q1, paid net additions of 4m were below our 6m guidance . . . primarily due to acquisition . . . ."); ¶139 ("in terms of Q1 performance, it really boils down to COVID"); ¶141 ("still working through that pull forward"); ¶148 ("there's still a bit of choppiness to our growth"); ¶148 ("But we still feel a little bit of that drag in terms of our acquisition growth as we're kind of working through what we hope is – we can't be sure but what we hope is the tail end of this COVID choppiness where we see on the acquisition side as markets reopen, it does slow things down a little bit."); ¶150 ("But on the margin, acquisition is impacted."); ¶150 ("when things tightened up a little bit, say, in Brazil or India, we did see some increase in acquisition"); ¶150 ("as markets reopened . . . that did have a bit of a headwind on acquisition"); ¶152 (response to analyst's question regarding ability "to get back to pre-COVID levels of net adds"); ¶154 ("We believe the
(continued...)

global pandemic on Netflix's business were false and misleading because they purportedly "failed to disclose the material role that account sharing played in causing the slowdown in membership growth," and that the "principal reason for the slowdown in . . . membership growth was the degree of market saturation due to account sharing." ¶138.[7]

As an initial matter, none of the challenged COVID-19 statements discuss account sharing, and so the failure to include facts about account sharing in those statements does not render them false. *See supra* at 7-9. The statements regarding COVID-19 are also non-actionable opinion statements, presented as what Defendants believe or hope. *E.g.*, ¶¶137, 148, 162; *supra* at 16 n.6. The Supreme Court has held that reasonable investors "recognize[] the import of words like 'I think' or 'I believe,' and grasp[] that they convey some lack of certainty as to the statement's content." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). Proving a misleading opinion statement is "no small task," *id.* at 194, and investors are not "allow[ed]" to "second-guess inherently subjective and uncertain assessments," *id.* at 186. Plaintiff alleges no facts showing that Defendants' statements about the effects and impact of the global pandemic were not genuinely believed, were objectively untrue, contained untrue embedded facts or omitted facts that rendered the statements misleading when read in context.

The challenged statements responding to a question regarding competition and saturation also are non-actionable opinion statements. In response to an analyst asking if the 1Q2022 guidance reflected anything "structural" with respect to competition or saturation, Mr. Neumann opined that there was no "structural change in the business that we see." ¶164. Mr. Neumann went on to note that acquisition was "a bit slower than pre-COVID levels" and that it was "tough to say" why it had not recovered to pre-COVID levels. As the expressed uncertainty reflects, his response consisted

---

decrease in paid net membership additions can primarily be attributed to the COVID-19 pandemic . . . ."); ¶162 ("[A]cquisition growth has not yet re-accelerated to pre-Covid levels. We think this may be due to several factors including the ongoing Covid overhang . . . ."); ¶164 ("It's tough to say exactly why our acquisition hasn't kind of recovered to pre-COVID levels. It's probably a bit of just overall COVID overhang that's still happening after 2 years of a global pandemic that we're still unfortunately not fully out of . . . . COVID has introduced so much noise."); ¶166 ("Not only are we in a pandemic. We've kind of come in of and out of COVID at different levels in 2021 . . . . So it's created a lot of bumpiness . . . which makes it a little tougher to predict . . . .").

[7] *See also* ¶¶134, 140, 143, 147, 149, 151, 152, 155, 163, 167.

1   of non-actionable opinion statements.  *Supra* at 16-17.  Similarly, the response that "it doesn't feel

2   like any qualitative change there" is a non-actionable opinion statement.  ¶164.

3       Moreover, even if these statements were not deemed to be opinion statements, Plaintiff fails

4   to plead contemporaneous facts showing that any statement was misleading when made.

5       **E.    Plaintiff Fails to Plead the Falsity of the Market Penetration Statements**

6       Plaintiff alleges that two statements regarding a "roughly 60%" market penetration in UCAN

7   (¶¶131, 172) were misleading because when Mr. Neumann made these statements, he failed to

8   disclose that, if account sharing households also were included, the degree of market penetration in

9   UCAN allegedly would have been 83% (¶132(b)) or 84% (¶173(b)).  Plaintiff does not claim that

10  the statements about "roughly 60% penetration"—which addressed paid UCAN memberships—

11  were themselves inaccurate, but instead contends that a different percentage should have been

12  provided that included account sharing.  The UCAN market penetration statements, however, were

13  not about account sharing; they were about paid memberships, and thus omission of the number of

14  households that *do not* pay cannot render those statements incomplete or misleading.  *Supra* at 7-9.

15      Plaintiff also fails to plead facts showing that Mr. Neumann's statements opining about

16  various factors impacting growth and market penetration were false or misleading when made.

17  ¶¶158, 168.  Plaintiff does not, for example, plead any contemporaneous facts contradicting Mr.

18  Neumann's statements regarding price increases and macroeconomic factors.  *Id*.  Moreover, Mr.

19  Neumann acknowledged that the UCAN and LATAM markets were more "mature" and

20  "penetrated" and thus growth in those markets was "expect[ed] to be just a little bit harder to work

21  for."  ¶158.  That these markets were "more penetrated" did not mean that the UCAN market was

22  not "still growing" (¶131; *see also* ¶172) or there was not still "a lot of runway for growth in both

23  of those regions" (¶158) as Mr. Neumann opined.  For example, in 4Q2021, Netflix reported the

24  "UCAN region added 1.2m paid memberships in Q4'21 (vs. 0.9 last year), marking our strongest

25  quarter of member growth in this region since the early days of COVID-19 in 2020."  Ex. 13 at 2.

26      **F.    Plaintiff Fails to Plead the Falsity of the "Metrics" Statements**

27      Plaintiff alleges that general statements regarding engagement/viewing and churn were

28  misleading because the engagement/viewing metrics allegedly were "artificially inflated" by non-

member viewing and churn was "artificially suppressed" by account sharing.  ¶140(c); *see* ¶139 ("Our engagement, our viewing per household was up year-over-year in Q1.  Our churn was down year-over-year . . . ."); ¶148 ("Our viewing . . . our engagement is up nearly 20% over that period."); ¶160 ("churn at low levels"); ¶160 ("viewing was up"); ¶¶149(c), 161(c).  Plaintiff fails, however, to plead facts showing that any of the "metrics" statements was false or misleading.

Plaintiff theorizes, for example, that churn "was artificially suppressed" (¶140(c)) because members "maintained their accounts because they saw value in the ability to share their accounts" (¶90).  Plaintiff's speculation as to why members around the globe may or may not have wanted to maintain their Netflix accounts is just that—speculation and not a particularized fact.  *See, e.g.*, *In re Fastly, Inc. Sec. Litig.*, No. 20-cv-06024-PJH, 2021 WL 5494249, at *12 (N.D. Cal. Nov. 23, 2021) ("Plaintiff's reliance on unsupported hindsight speculation does not plead a misleading omission.") (citation omitted).  Plaintiff's claim that the engagement/viewing metrics were inflated by non-members also lacks the requisite factual support.  ¶¶140(c), 149(c), 161(c).  To the extent that Plaintiff alleges that account sharing remained roughly the same in FY2021 (at the time the challenged "metrics" statements were made), any alleged effect on viewing would have remained the same and would not have rendered statements regarding viewing "being up" false when made.

## III.   PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  *Intuitive Surgical*, 759 F.3d at 1061 (citation omitted).  It is not enough to allege facts from which an inference of scienter "*could* be drawn," but rather, Plaintiff must "plead with particularity facts that give rise to a 'strong' – *i.e.*, a powerful or cogent – inference" that each defendant knowingly or with deliberate recklessness made false statements.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).  Courts must assess "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter" and must also "take into account plausible opposing inferences," *i.e.*, "nonculpable explanations for the defendant's conduct."  *Id.* at 323-24.  Where, as here, a plaintiff fails to plead falsity, it "necessarily means [he] has failed to plead scienter as well," *In re Intrexon Corp. Sec. Litig.*, No. 16-cv-02398-RS, 2017 WL 732952, at *6 (N.D. Cal. Feb. 24, 2017), and the Complaint should be dismissed.

Even assuming, *arguendo*, that Plaintiff has sufficiently alleged falsity—he has not—the failure to plead a strong inference of scienter provides a separate ground for dismissal.  As the Ninth Circuit has explained, the "PSLRA's 'strong inference' requirement has teeth," and it is "an 'exacting' pleading obligation that 'present[s] no small hurdle'" for plaintiffs.  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (alteration in original) (citations omitted).  Plaintiff's scant scienter allegations fall far short of satisfying this requirement.[8]

### A.    Plaintiff Fails to Plead Any Direct Evidence of Scienter

To support a strong inference of scienter, Plaintiff must allege contemporaneous facts showing that each defendant who allegedly made false or misleading statements did so intentionally or with deliberate recklessness.  *Metzler*, 540 F.3d at 1066.  Plaintiff pleads no facts showing that Messrs. Hastings, Sarandos, Peters or Neumann made any false statements, much less that they did so with the intent to deceive, manipulate, or defraud.  Indeed, the Complaint lacks any facts – much less particularized facts – regarding the mental states of Messrs. Hastings, Sarandos, Neumann and/or Peters at the time of any statement.  And because Plaintiff fails to plead scienter as to any individual, he "cannot successfully plead scienter on the part" of Netflix.  *Pittleman v. Impac Mortg. Holdings, Inc.*, No. SACV 07-0970 AG (MLGx), 2009 WL 648983, at *3 (C.D. Cal. Mar. 9, 2009), *aff'd sub nom. Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714 (9th Cir. 2010).

#### 1.    The FE Allegations Fail to Support a Strong Inference of Scienter

Plaintiff relies on allegations attributed to two former employees ("FE") of Netflix (¶¶32-35, 67-68, 185, 189-191), but these allegations say nothing about the challenged statements, much less about the Individual Defendants' mental states when the statements were made.  *Id.*  The FE allegations suffer from the same critical defect:  neither FE claims to have had any direct interaction with the Individual Defendants, much less claims to have personal knowledge regarding the Individual Defendants' mental states at the time of any challenged statement.  *See Intuitive Surgical*, 759 F.3d at 1063 (allegations attributed to CW that "lack[ed] first hand knowledge regarding what the individual defendants knew or did not know about Intuitive's financial health" failed to plead

---

[8] It is not clear if Plaintiff also is asserting scheme liability claims under Rule 10b-5(a) and (c). Defendants thus move to dismiss under each subsection of Rule 10b-5 for failure to plead scienter.

scienter); *Elec. Workers Pension Fund, Local 103, I.B.E.W. v. HP Inc.*, No. 20-cv-01260-SI, 2021 WL 4199273, at *8 (N.D. Cal. Sept. 15, 2021) (CW allegations that "fail to provide information regarding Individual Defendants' mental state" insufficient). The FE allegations thus fail to plead a strong inference of scienter as to any Individual Defendant.

   **FE1**. Plaintiff alleges that FE1 worked in Program Management at Netflix from 2008 until March 2021. ¶¶32-33. FE1 claims to have read an internal memo in 2Q2020—before the start of the Class Period—that is described as "stating that the Company would not try to limit or reduce password sharing during the pandemic." ¶67. FE1 allegedly "recalled that Hastings specifically phrased the Company's approach during the pandemic as 'they did not want to appear as if they were taking something away' when people were losing so much at that time (*e.g.*, health, jobs, housing)." ¶185. Plaintiff makes no attempt to explain how this alleged internal pre-Class Period statement rendered any Class Period statement deliberately false when made. That Netflix allegedly did not seek to limit account sharing in 2020 says nothing about the mental state of Mr. Hastings (or any other Individual Defendant) during the Class Period.

   FE1's allegation that "password sharing was often discussed during FE1's tenure at Netflix" (¶67) is conclusory and lacks particularized facts. As an initial matter, that account sharing was discussed is hardly surprising. Plaintiff acknowledges that the market is and was well-aware of account sharing with streaming services (¶¶4, 48-61), and so of course Netflix would discuss it. In any event, FE1 does not say when account sharing was discussed, with whom, or what specifically was discussed. Plaintiff thus fails to plead how the unidentified discussions rendered any statement knowingly or deliberately false when made. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009) ("These generalized claims about corporate knowledge are not sufficient to create a strong inference of scienter, since they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state."); *Wozniak v. Align Tech., Inc.*, No. C-09-3671 MMC, 2011 WL 2269418, at *12 (N.D. Cal. June 8, 2011) ("Plaintiff alleges only the existence of the meetings, and the general topics discussed . . . . Such vague and conclusory allegations do not give rise to an inference, let alone a strong inference" of scienter.). Moreover, because FE1 left Netflix early in the Class Period, the FE1 allegations "offer[] 'little reliable insight

into what occurred during the class period.'" *Bao v. SolarCity Corp.*, No. 14-cv-01435-BLF, 2016 WL 4192177, at *9 (N.D. Cal. Aug. 9, 2016) (citation omitted), *aff'd sub nom. Webb v. SolarCity Corp.*, 884 F.3d 844 (9th Cir. 2018).

*FE2*.  Plaintiff alleges that FE2 worked as a narrative designer and product designer at Netflix beginning in 2019.  ¶34.  FE2 allegedly attended quarterly business review meetings that were "hosted" by Netflix co-CEO Reed Hastings during which "presentations about password sharing" allegedly were shown.  FE2 also allegedly attended "design team meetings where password sharing was discussed, which were held either monthly, weekly, or bi-weekly."  ¶189.  FE2 alleges that, in "these" unidentified meetings, "password sharing was characterized as 'lost revenue' and was seen as limiting the Company's ability to meet its subscriber goals," and the unspecified "discussions made it clear that the Company had significant data about password sharing and were analyzing the data and quantifying it . . . in order to justify embarking on efforts to limit or 'crack down' on account sharing."  ¶190.  Like the FE1 allegations, the FE2 meeting allegations lack the requisite details: When did these "discussions" take place, and what specifically was discussed?  What did Mr. Hastings allegedly say in the quarterly review meetings about account sharing and when?  More important, Plaintiff fails to explain how the vague "meetings" allegations render any statement deliberately false when made.  *See Pivotal*, 2020 WL 4193384, at *17 ("General allegations of [] Defendants' 'interaction with other officers and employees, their attendance at meetings, . . . are insufficient' to create an inference of scienter 'more cogent or compelling than an alternative innocent inference.'") (citation omitted).

FE2's allegations that Netflix "was tracking the various IP addresses used to determine the location of different users on the same account" and that "there were ways to determine password sharing was happening" (¶191) also lack the particularized details – such as who, what, and when – necessary to plead scienter.  *See Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002) (no scienter based upon allegation that corporation "could regularly track its sales data," where plaintiff failed to "plead, in any detail, the contents of any such report or . . . data").

### 2.    The Pre-Class Period Statements Do Not Establish Scienter

Plaintiff alleges that, prior to the Class Period, Netflix "management claimed to 'monitor'

account sharing because it could impact subscriber growth."  ¶182.  Plaintiff mischaracterizes the statements on which he relies.  In the October 16, 2019 earnings call, an analyst asked whether account sharing was "something that's important . . . to address" as Netflix was "get[ting] to a more mature growth trajectory in the U.S." and asked how Netflix could "address it without alienating a certain portion of [Netflix's] user base."  Ex. 18 at 14.  Mr. Peters, who was then Chief Product Officer, responded:  "I think we continue to monitor it, so we're looking at the situation," including "consumer-friendly ways to push on the edges of that," "[b]ut I think we've got no big plans to announce at this point in time in terms of doing something differently."  *Id.*  Mr. Peters's statement thus reflects only that Netflix was "looking at" the complex issue of account sharing and possible "ways" to monetize account sharing in "consumer-friendly ways."  His response does not suggest that Netflix believed account sharing was "severely hinder[ing]" growth.  ¶19.

### 3.    The End of Class Period Statements Are Not "Admissions" of Fraud

Plaintiff's attempts to suggest that statements at the end of the Class Period regarding account sharing somehow constitute "admissions" that earlier statements were fraudulent when made are unavailing.  ¶183.[9]  Courts routinely reject such attempts to plead "[f]raud by hindsight." *Ronconi v. Larkin*, 253 F.3d 423, 430 n.12 (9th Cir. 2001) (citation omitted); *In re SunPower Corp. Sec. Litig.*, No. 16-cv-04710-RS, 2018 WL 1863055, at *3 (N.D. Cal. Apr. 18, 2018) ("Statements by defendants reflecting that they were aware of some signs of a slow down at points in time prior to the August 2016 adjusted guidance is not tantamount to an admission of wrongdoing . . . .").  As this Court has recognized, "[a]n after-the-fact statement does not constitute an admission unless it contradicts the substance of an earlier statement and essentially states 'I knew it all along.'" *Lopes*, 2020 WL 1465932, at *11.  Plaintiff points to no such admission here.

### 4.    The Changes to the Form 10-K Risk Disclosure Do Not Show Scienter

Plaintiff claims that changes that were made to the risk disclosures in the FY2020 Form 10-K filed on January 28, 2021 from previous years somehow give rise to an inference of scienter. ¶184.  In particular, Plaintiff claims that the addition of the language "if our efforts to restrict multi-

---

[9] *See* ¶¶134(e), 138(e), 140(f), 143(e), 145(e), 147(e), 149(f), 153(e), 155(e), 157(d), 159(d), 165(d), 167(e), 169(d).

household usage are ineffective" supports an inference of "knowledge" that account sharing was materially hindering subscriber growth.  *Id.*  This updated language, combined with Plaintiff's allegation that Netflix was conducting testing relating to account sharing in 2021 (¶84),  undermines, rather than supports, Plaintiff's fraudulent concealment claims: Netflix, having undertaken efforts to identify potential methods of controlling account sharing, appropriately updated the Risk Factor section of the January 2021 Form 10-K to disclose that those efforts were underway.  Plaintiff's Complaint also reveals the fallacy of his claim that account sharing was "severely hinder[ing]" (¶19) subscriber growth, as memberships continued to grow in 2021.  *Supra* at 3-5.[10]

### B.      The Allegations Fail Both Individually and Holistically

"When conducting [a] holistic review," courts must "'take into account plausible opposing inferences' that could weigh against a finding of scienter."  *Zucco*, 552 F.3d at 1006 (quoting *Tellabs*, 551 U.S. at 323).  There are competing and compelling inferences of nonfraudulent conduct that further weigh against any inference of scienter here.

Plaintiff alleges that the Individual Defendants engaged in a "scheme" to "deceive the investing public" and inflate Netflix's stock price.  ¶214.  Plaintiff does not, however, allege any facts showing that the Individual Defendants sought to profit from the purported fraudulent scheme in any way, or otherwise explaining why the Individual Defendants would have engaged in securities fraud.  Although the absence of a motive is not "fatal," *Tellabs*, 551 U.S. at 325, "the lack of a plausible motive certainly makes it much less likely that a plaintiff can show a strong inference of scienter," *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1108 (9th Cir. 2021).  Many courts have recognized that the absence of compelling motive allegations may undermine a plaintiff's theory of fraud.  *See, e.g.*, *Nguyen*, 962 F.3d at 415 ("If defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium, the theory might have more legs."); *Pivotal*, 2020 WL 4193384, at *18 ("the Ninth Circuit has held that an absence of malicious gains does indeed 'detract from a scienter finding'") (citation omitted); *but*

---

[10] Plaintiff's attempts to plead scienter based on purportedly "evasive" answers to analysts' questions also are unavailing.  ¶¶187-188.  As a review of the statements regarding COVID-19, testing, competition, and LATAM penetration makes clear, the responses were neither evasive nor false or misleading.

*cf. In re Splunk, Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 949 (N.D. Cal. 2022) (absence of stock sale allegations did not "impact" the scienter analysis because plaintiff's theory was not "predicated" on stock sale gains).  While the Ninth Circuit will "overlook the failure to allege a plausible motive" when a plaintiff "asserts compelling and particularized facts showing fraudulent intent or deliberate recklessness," *Prodanova*, 993 F.3d at 1108, Plaintiff alleges no such facts here.

Further undermining any inference of scienter is the fact that Netflix repurchased 1,182,410 Netflix shares in FY2021 totaling $600 million.  Ex. 15 at 57.  These share repurchases "undercut[] a finding of intent, 'since it is illogical that [a company] would have been repurchasing its shares had it been aware of facts that would indicate the price would fall.'"  *Bodri*, 252 F. Supp. 3d at 933 (citation omitted); *In re Tibco Software, Inc. Sec. Litig.*, No. C 05-2146 SBA, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006) (stock repurchases "actually *negate* a finding of scienter").

## IV.    THE SECTION 20(a) CLAIM ALSO FAILS

Because the Section 10(b) claim fails, the Section 20(a) claim should also be dismissed.  *See Intuitive Surgical*, 759 F.3d at 1064 n.6.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Complaint be dismissed.

Dated:  February 10, 2023

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:   */s/ Keith E. Eggleton*
Keith E. Eggleton
Email: keggleton@wsgr.com

*Attorneys for Defendants*
Netflix, Inc., Reed Hastings, Ted Sarandos, Spencer Neumann, and Gregory Peters