Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Jason L. Krajcer (SBN 234235)
  *jkrajcer@glancylaw.com*
Christopher R. Fallon (SBN 235684)
  *cfallon@glancylaw.com*
Pavithra Rajesh (SBN 323055)
  *prajesh@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NETFLIX, INC. SECURITIES LITIGATION | Case No. 4:22-cv-02672-JST<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Date:        June 22, 2023<br>Time:       2:00 p.m.<br>Judge:     Hon. Jon S. Tigar<br>Courtroom: 6, 2nd Floor |

**TABLE OF CONTENTS**

GLOSSARY OF DEFINED TERMS ........................................................................................ vi

STATEMENT OF ISSUES TO BE DECIDED ........................................................................ vii

I.    PRELIMINARY STATEMENT ................................................................................... 1

II.   STATEMENT OF FACTS .......................................................................................... 1

III.  THE COMPLAINT ALLEGES MATERIAL MISREPRESENTATIONS.................... 4

      A.    Defendants' Threshold Falsity Arguments Fail ................................................. 5

      B.    Defendants' Market Penetration Statements Were Materially Misleading ....... 7

            1.    Defendants' Market Penetration Estimates Are Actionable .................... 7

            2.    Defendants' Qualitative Penetration Statements Are Actionable............. 8

      C.    Defendants' Statements Concerning Netflix's Underlying Growth Metrics And Long-Term Growth Trajectory Were Materially Misleading ............................................ 10

      D.    Defendants' Statements Attributing Its Growth Slowdown To The COVID Pull-Forward And The Pandemic's Aftereffects Were Materially Misleading .............................. 12

      E.    Netflix's Risk Disclosures About Account Sharing Were Materially Misleading .......... 13

      F.    Defendants' Additional Account Sharing Statements Were Materially Misleading ........ 14

IV.   THE PSLRA SAFE HARBOR DOES NOT PROTECT DEFENDANTS' STATEMENTS...... 15

      A.    The Challenged Statements Were Present, Historical Or Mixed Statements .................. 15

      B.    Defendants' Cautionary Language Was Not Meaningful................................................ 16

      C.    The Complaint Pleads A Strong Inference That Defendants Had Actual Knowledge Of The Facts That Rendered Their Statements Misleading ........................................ 17

V.    THE COMPLAINT ALLEGES SCIENTER.................................................................. 18

      A.    Defendants' Own Statements Support A Strong Inference Of Scienter ........................... 18

      B.    Defendants' Testing In Q1'21 Supports Inference Of Scienter........................................ 20

      C.    The Core Operations Doctrine Supports A Strong Inference Of Scienter........................ 21

      D.    The Timing Of Defendants' Statements Supports A Strong Inference Of Scienter ........ 22

      E.    Defendants' Misleading COVID Narrative Supports An Inference Of Scienter.............. 23

      F.    The Absence Of Financial Motive Allegations Does Not Undermine Scienter .............. 23

      G.    A Balancing Of The Inferences Weighs In Favor Of A Finding Of Scienter.................. 25

VI.   THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY.............................. 25

VII.  CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
    532 F. Supp. 3d 189 (E.D. Pa. 2021) ................................................................................... 19

*Azar v. Yelp, Inc.*,
    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ........................................................ 9, 13, 20

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ............................................................................................ 8, 13

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ................................................................................................... 4

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ................................................................................................... 9

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ............................................................................................... 25

*Flecker v. Hollywood Entm't Corp.*,
    1997 WL 269488 (D. Or. Feb. 12, 1997) ............................................................................... 6

*Flynn v. Sientra, Inc.*,
    2016 WL 3360676 (C.D. Cal. June 9, 2016) .......................................................................... 5

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    --- F. 4th ---, 2023 WL 2532061 (9th Cir. Mar. 16, 2023) ........................................... *passim*

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ........................................................................................ 8, 13, 14

*In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) .................................................................................. 6

*In re Amgen Inc. Sec. Litig.*,
    2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ...................................................................... 18

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) ................................................................................................. 6

*In re Apple Inc. Sec. Litig.*,
    2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ....................................................................... 24

*In re Bear Stearns Cos., Inc. Sec., Derivative and ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) .................................................................................. 17

*In re BioMarin Pharm. Inc. Sec. Litig.*,
  2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ...................................................... 17

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........................................................ 21

*In re eHealth Inc. Sec. Litig.*,
  2021 WL 5855864 (N.D. Cal. Aug. 12, 2021) .............................................. 22

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  643 F. Supp. 2d 562 (S.D.N.Y. 2009).......................................................... 10

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015)........................................................................ 17

*In re Iso Ray, Inc. Sec. Litig.*,
  189 F. Supp. 3d 1057 (E.D. Wash. 2016) .................................................. 6, 7

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ........................................................................ 17

*In re Plantronics, Inc. Sec. Litig.*,
  2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ............................... 11, 12, 22, 23

*In re Portal Software, Inc. Sec. Litig.*,
  2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) .............................................. 16

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ............................................................. *passim*

*In re Salix Pharm., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)................................................... 8

*In re Shopko Sec. Litig.*,
  2002 WL 32003318 (E.D. Wis. Nov. 5, 2002)............................................... 23

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ................................................. 9

*In re Snap Inc. Sec. Litig.*,
  2018 WL 2972528 (C.D. Cal. June 7, 2018) ................................................. 13

*In re Spiegel Inc. Sec. Litig.*,
  382 F. Supp. 2d 989 (N.D. Ill. 2004) .............................................................. 9

*In re Splunk Inc. Sec. Litig.*,
  592 F. Supp. 3d 919 (N.D. Cal. 2022) ............................................. 11, 18, 24

*In re STEC Inc. Sec. Litig.*,
  2011 WL 2669217 (C.D. Cal. June 17, 2011) ................................................................ 8

*In re Twitter, Inc. Sec. Litig.*,
  2021 WL 4166725 (N.D. Cal. Sept. 14, 2021) ............................................................ 16

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ........................................................................ 19

*In re Vaxart, Inc. Sec. Litig.*,
  576 F. Supp. 3d 663 (N.D. Cal. 2021) ......................................................................... 9

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
  282 F. Supp. 3d 1074 (N.D. Cal. 2017) ................................................................. 9, 10

*In re Zillow Grp., Inc. Sec. Litig.*,
  2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) ......................................................... 19

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ....................................................................................... 19

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...................................................................................... 13

*Lewis v. Straka*,
  535 F. Supp. 2d 926 (E.D. Wis. 2008) ....................................................................... 24

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
  2011 WL 2444675 (D. Del. June 14, 2011) ................................................................ 19

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) ........................................................................................ 9

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...................................................................................... 24

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..................................................................................................... 24

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ....................................................................... 16

*Mulligan v. Impax Labs.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................................... 9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) .............................................................................................. 9, 12

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ................................................................................ 7

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ....................................................................... 18, 22

*S. Ferry LP No. 2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009)............................................. 19, 21

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...................................................................... 18, 21

*Schueneman v. Arena Pharm., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ............................................................................. 5

*Shah v. Zimmer Biomet Holdings, Inc.*,
   348 F. Supp. 3d 821 (N.D. Ind. 2018) ................................................... 12, 23

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................. *passim*

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ........................................................................ 13

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
   545 F. Supp. 3d 120 (S.D.N.Y. 2021)............................................................ 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................. 18

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ........................................................................ 16

## STATUTES

15 U.S.C. §78u-4(b)(2) ......................................................................................... 18

15 U.S.C. §78u-5(c)(1) ................................................................................... 16, 17

# GLOSSARY OF DEFINED TERMS

| TERM | DESCRIPTION |
| --- | --- |
| APAC | Asia-Pacific |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class Period | January 19, 2021 – April 19, 2022 |
| COO | Chief Operating Officer |
| EMEA | Europe, Middle East, and Africa |
| Exchange Act | Securities Exchange Act of 1934 |
| FE1 | Former Employee 1 |
| FE2 | Former Employee 2 |
| LATAM | Latin America |
| MTD | Defendants' Notice of Motion and Motion to Dismiss Amended Class Action Complaint, ECF No. 31 |
| Netflix or NFLX | Netflix, Inc. |
| Pl. RJN Obj. | Plaintiff's Response and Partial Objection to Defendants' Notice of Incorporation by Reference and Request for Judicial Notice, filed concurrently herewith |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| TAM | Total Addressable Market |
| UCAN | United States and Canada |

## STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))

Plaintiff agrees with and incorporates by reference Defendants' statement of issues to be decided. *See* MTD 1.

## I.   PRELIMINARY STATEMENT

This securities fraud class action alleges violations of Sections 10(b) and 20(a) of the Exchange Act against Netflix and certain of its current and former officers: former co-CEO Reed Hastings, co-CEO Ted Sarandos, CFO Spencer Neumann, and then-COO (now co-CEO) Greg Peters.[1] Throughout the Class Period, Defendants failed to disclose two critical sets of facts that Defendants were monitoring: (1) in the U.S.-Canada ("UCAN") market, between 29 million and 30+ million households were using Netflix through unauthorized account sharing without paying for the services, and (2) globally, between 91 million and 100+ million households were engaging in such unauthorized sharing. Due to this account sharing, Netflix was highly saturated among broadband households, and Netflix's ability to acquire new paying members was severely hindered. Aware of these facts, Defendants repeatedly misrepresented Netflix's degree of market penetration and the existing room left to grow within the total addressable market ("TAM"). Once the truth was revealed, Netflix's stock price dropped precipitously, wiping out billions of dollars in market capitalization and severely harming Netflix's shareholders.

## II.   STATEMENT OF FACTS

Netflix operates a streaming platform offering TV series, films, and mobile games in over 190 countries. ¶36. Since its inception and throughout the Class Period, Netflix remained free of advertising, so its revenues were based entirely on monthly fees paid by subscribers. ¶¶2, 47. One of Netflix's most critical performance metrics is "paid net adds," which is the number of paid new subscribers added during the reporting period minus those lost due to cancellations. ¶39.

Account sharing is when subscribers share their password with non-paying users who do not reside in the same household, which violates Netflix's terms of service. ¶4. Netflix has long acknowledged that account sharing occurred, but did not publicly disclose any data about its extent. *Id.* For years, Netflix maintained a very lax posture toward account sharing and insisted that it was not a problem. ¶¶48-55. In 2016, then-CFO David Wells stated that account sharing was not "a material inhibitor to [Netflix's] growth," but acknowledged "[t]hat might not be true forever." ¶55.

In January 2019, Cybersecurity Insiders reported Netflix's use of a sophisticated new software to

---

[1] Capitalized terms are defined in the Glossary. Unless otherwise noted, all emphasis is added, citations are "cleaned up" and "¶_" cites are to the Complaint. The Class Period is January 19, 2021 to April 19, 2022.

monitor users' viewing and location habits to track account sharing. ¶¶62-63. In October 2019, in response to a question about account sharing, Defendant Peters stated, "we continue to monitor it….But I think we've got no big plans to announce at this point in time in terms of doing something differently there." ¶64. While public sources speculated that a crackdown on account sharing might be forthcoming, any plans to do so were put on hold once COVID struck. ¶¶65-68. According to a former employee (FE1), an internal Netflix memo issued in approximately Q2'20 indicated that Netflix would not attempt to limit account sharing at that time. ¶¶67-68. FE1 stated that once COVID became a factor, Netflix's priority was to make service available without interruption, and the Company did not want to be seen as "taking something away" when people were already losing so much (like their health, jobs, and housing). *Id.*

Defendants had another, more practical reason to defer a crackdown. As people were confined to their homes by COVID, the demand for streaming entertainment services surged and so did Netflix's paid net adds. ¶69. This led to a "pull forward" of Netflix's subscriber growth from subsequent quarters. ¶70. Netflix posted impressive results during the first half of 2020, with 15 million paid net adds in Q1'20 and 10 million paid net adds in Q2'20. ¶¶69-71. Due to the pull-forward, Defendants predicted that growth in the second half of 2020 would be "light" relative to prior years and there would be some residual negative effect in Q1'21, but Defendants expected this effect would "wash out" and not be "permanent or long term." ¶¶70, 74.

The Class Period starts on January 19, 2021, when during the Q4'20 earnings call, an analyst asked Neumann about potential market saturation in the UCAN market. ¶79. Neumann responded by claiming that Netflix was "roughly 60% penetrated, and…still growing" in the UCAN market and had "a lot of headroom" to grow in all of Netflix's markets. *Id.* These representations were misleading because, at the time, almost 30 million UCAN households were account sharing. ¶¶132, 196. The effective rate of market penetration was thus about 83%, not 60%, and the "headroom" that Netflix had to grow was much more limited than investors were led to believe. *Id.*[2] Globally, almost 92 million households were account sharing at the time. ¶195. The effective rate of market penetration globally was thus about 35%, not the 24% implied by Netflix's reported subscriber totals and its public estimates of the TAM. *Id.* The gap between reported market penetration and effective market penetration was relatively consistent during the Class Period. ¶¶195-97.

---

[2] Plaintiff's estimates of the effective degree of market penetration and the methodology for calculating those estimates are set forth in ¶¶192-97. Defendants do not challenge the basis for these estimates in their motion.

In March 2021, media outlets reported that Netflix appeared to be testing methods to limit account sharing. ¶84. Users faced a pop-up message stating, "If you don't live with the owner of this account, you need your own account to keep watching." *Id.* Defendants were asked about these tests during Netflix's Q1'21 earnings call on April 20, 2021, and why this was the "right time to start tightening the screws" on the long-standing issue. ¶91. Peters responded by saying the testing was "not necessarily a new thing" and part of a "flexible approach" to help Netflix improve its service while ensuring that users were "authorized to do so." *Id.* Hastings said Netflix "would never roll something out that feels like turning the screws." *Id.*

During the same call, Defendants discussed a guidance miss for Q1'21 (by two million paid net adds), blaming the miss on the lingering effects of the COVID pull-forward. ¶¶88-89. Defendants assured investors that despite the miss, "the business remain[ed] healthy" and was "still growing." ¶89. Sarandos said "there's this clear catalyst to a reacceleration of growth" and Neumann claimed that Netflix had a "big long runway of growth" in front of it. ¶¶141-42. Defendants, however, failed to disclose that the high levels of account sharing presented a material constraint to growth independent of the COVID pull-forward and that the "long runway" was much shorter than Defendants made it appear, especially in the UCAN market.

Over the next several quarters, Defendants continued to attribute weakness in subscriber growth to residual effects of the COVID pull-forward and repeatedly assured that the "underlying metrics are very healthy." ¶¶88-89, 94-96, 98-100. Even when acknowledging that the UCAN and Latin American regions "grew paid memberships more slowly" because "[t]hese regions have higher penetration," Defendants assured there was still "ample runway for growth." ¶¶156, 158, 168.

The truth began to emerge on January 20, 2022, when Netflix announced it missed its guidance for paid net adds in Q4'21 by 200,000 subscribers and that it only expected 2.5 million paid net adds in Q1'22 (compared to 4 million during the same period a year prior). ¶¶105-06. Defendants attributed the shortfall to "the ongoing Covid overhang and macro-economic hardship," revealing that "acquisition growth has not yet re-accelerated to pre-Covid levels." ¶106. On this news, Netflix's stock price fell $110.75, or 21.7%, to close at $397.50 per share on January 21, 2022, wiping out ***$49 billion*** of market capitalization in one day. ¶14.

Defendants, however, continued to conceal and misrepresent the extent of the account sharing problem, even in response to specific analyst questions about market saturation. During the Q4'21 earnings call, an analyst asked whether Defendants had "any concerns...about ***anything structural***, whether it's competition or

1  *saturation*." ¶109. Neumann responded that there was "[***n]o structural change***." *Id.* The analyst asked

2  whether "[a]ccount sharing" or other factors were causing the Latin American market to "mature at a lower

3  level of penetration" than the UCAN market. ¶111. Neumann denied the Latin American market was

4  "maturing faster" and claimed there was still a "a long runway of growth" there, avoiding any mention of

5  account sharing. *Id.* On March 8, 2022, at a Morgan Stanley conference, Neumann repeated his claim that the

6  UCAN market was "roughly 60% penetrated" and said "we're not done growing in the U.S." ¶112.

7         Investors were thus stunned when, after market close on April 19, 2022, Netflix reported a net loss of

8  200,000 subscribers in Q1'22, significantly missing guidance of 2.5 million paid net adds. ¶115. Unable to

9  explain away these results by repeating the same story about COVID, Defendants finally admitted that account

10  sharing had caused Netflix to be highly saturated in the applicable markets, inhibiting subscriber growth.

11  ¶¶116-17. Netflix stated that "in addition to our 222m paying households, we estimate that Netflix is being

12  shared with over 100m additional households, including over 30m in the UCAN region." ¶116. Netflix also

13  stated, "our relatively high household penetration - when including the large number of households sharing

14  accounts – combined with competition, is creating revenue growth headwinds." ¶¶115-16. Netflix also

15  announced that it expected a net loss of two million subscribers in Q2'22. ¶124.

16         Analysts were shocked. J.P. Morgan stated that the Q1'21 results represented "a sea change quarter

17  for NFLX in which the company essentially conceded to every key point of the bear thesis." ¶125(c). J.P.

18  Morgan added, "the bigger factor is management's acknowledgement of relatively high household penetration

19  when including account sharing." *Id.* Bank of America stated, "Management now concedes that between

20  paying subscribers and password sharers, most of the key markets, UCAN and EMEA likely, have saturated

21  and it will be very hard to find new many subscribers in these markets in the near to medium term." ¶125(f).

22  Following the April 19 disclosures, Netflix's share price fell $122.42, or more than 35%, to close at $226.19

23  per share on April 20, 2022, wiping out an additional ***$54 billion*** in market capitalization. ¶18.

24  **III.**    **THE COMPLAINT ALLEGES MATERIAL MISREPRESENTATIONS**

25         A literally true statement "can be misleading and thus actionable under the securities laws" if it

26  "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that

27  actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). A complaint need

28  only raise a "reasonable inference" that a statement is false or misleading, not a strong one. *Glazer Cap. Mgmt.*,

*L.P. v. Forescout Techs., Inc.*, --- F. 4th ---, 2023 WL 2532061, at *11 (9th Cir. Mar. 16, 2023). "Only if reasonable minds could not disagree that the challenged statements were not misleading should the district court dismiss." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133 (N.D. Cal. 2017).

### A.     Defendants' Threshold Falsity Arguments Fail

Defendants raise four threshold issues. First, Defendants argue that the Complaint fails to identify exactly which statements it is challenging. MTD 7. Not so. The Complaint identifies each statement (and applicable subpart) and the reasons why each statement is challenged as false or misleading. ¶¶131-73. Block quotes were used to provide context as many statements involved colloquies between Defendants and analysts. Bold and italics were used to identify portions of the statements that were challenged. *See Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *9-10 (C.D. Cal. June 9, 2016) ("Plaintiffs set forth with some degree of clarity in the succeeding paragraphs why the bolded and italicized statements were false and misleading"); *Homyk v. ChemoCentryx*, No. 21-cv-03343-JST, at *9-12 (N.D. Cal. Feb. 23, 2023).

Second, Defendants argue that with three exceptions, "none of the challenged statements discusses account sharing" and most "relate to growth" and "the impact of the pandemic." MTD 8. The Complaint, however, pleads in detail how the account sharing omissions rendered each challenged statement misleading. For example, when Defendants were asked about UCAN market saturation, Defendants responded by assuring investors that the UCAN market was only 60% penetrated and there was "a lot of headroom" for growth. ¶131. This was misleading because the undisclosed existence of 30 million UCAN account sharing households rendered the effective market penetration to be 83%-84%, severely limiting the headroom for growth. "[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). The same rule applies to Defendants' statements about Netflix's long-term growth prospects and its ability to return to its pre-COVID growth trajectory. *E.g.*, ¶¶133, 141, 152. The omitted facts were highly material and directly relevant to these subjects, and Defendants provided misleading assurances while deliberately ignoring the 800-pound gorilla in the room.

Third, Defendants claim that their statements were not false or misleading, because "Netflix experienced growth during the Class Period." MTD 9. The gravamen of the Complaint, however, is not that Defendants promised Netflix would grow during the Class Period; it is that Defendants misled investors about

the **room left** to grow. Defendants represented that the UCAN market was 60% penetrated when the effective penetration rate was 83%-84%, and implied that the global market was 24%-25% penetrated when the effective penetration rate was 35%-36%. ¶¶195-96. Defendants' statements, therefore, created an impression about the degree of market saturation that differed in a material way from the one that actually existed, especially in the UCAN market but also in the total global market.

Though Defendants try to minimize the importance of the UCAN market (MTD 9), the UCAN market was vital to investors because it provided the highest average revenue per subscriber and contributed the most to Netflix's revenues. ¶8. There is a material difference between 60% and 83% when discussing this important market's saturation. While Netflix still had considerable room to grow internationally, its local content in regions outside of the UCAN market was limited, meaning its ability to grow in those regions was limited, and investors understood that growth in those regions was a long-term prospect. ¶¶9, 43. Even in those markets, 35% penetration leaves meaningfully less room for growth than 24% penetration. In sum, Defendants substantially understated the effective degree of market penetration in **all** markets.

Finally, Defendants argue that investors "were well aware of account sharing" and its risks due to media and analyst reports and other sources. MTD 7. This amounts to a "truth-on-the-market" defense, which requires Defendants to show that any material information they failed to disclose was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by [their] one-sided representations." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989). "As a general rule, the truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this basis." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008); *see also In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073 (E.D. Wash. 2016) (defendants "bear a heavy burden" in proving a truth-on-the-market defense).

Here, the conflicting third party estimates of account sharing were insufficient to counter-balance the misleading impression left by Defendants. At best, those estimates were speculative; they lacked the credibility and reliability of the hard data in Defendants' possession. ¶¶65, 85. Some estimates were contained in reports distributed to paying subscribers but not disseminated on a widespread basis. *See Flecker v. Hollywood Entm't Corp.*, 1997 WL 269488, at *6 (D. Or. Feb. 12, 1997) (rejecting truth-on-the-market defense where defendants "failed to come forward with evidence that [an analyst's] reports were transmitted to the public with a degree

1    of intensity and credibility sufficient to effectively counterbalance" defendants' statements); *Iso Ray*, 189 F.

2    Supp. 3d at 1073-74 ("debatable" that materials available for purchase were sufficiently public). Moreover,

3    even the worst-case third party estimates substantially understated the magnitude of the problem. *See* ¶¶86-87

4    (April 13, 2021 J.P. Morgan report suggested that up to 20 million UCAN households might be engaging in

5    account sharing). Had this estimate been correct, the effective degree of market penetration would have been

6    roughly 75%, worse than the 60% penetration reported by Defendants, but still materially better than the 83%

7    it was in reality. *Cf. Shenwick*, 282 F. Supp. 3d at 1141 (4% difference was material).

### B.   Defendants' Market Penetration Statements Were Materially Misleading

9    Defendants' first set of misrepresentations consists of their quantitative estimates and qualitative

10   assurances about Netflix's level of market penetration. *E.g.*, ¶131 ("***60% penetrated***" in UCAN and "***lot of***

11   ***headroom*** in all these markets"); ¶142 ("big long runway of growth"); ¶156 ("***ample runway for growth***" in

12   UCAN and LATAM); ¶158 ("lot of runway for growth" in UCAN and LATAM); ¶168 ("long runway of

13   growth" in LATAM); ¶172 ("***60% penetrated***" and "***not done growing in the U.S.***"). These statements are

14   similar to those found misleading by the Ninth Circuit in *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130,

15   1143-44 (9th Cir. 2017). In that case, an executive dismissed market saturation concerns, saying "greenfield

16   opportunities are plentiful" and "[m]ore than half the large practice market, more than 75% of the midsize

17   practice market is *still fair game for new system sales*." *Id.* at 1136, 1143. Here, Neumann's statements that

18   the UCAN market was "60% penetrated" (¶¶131, 172) essentially represented that 40% of the TAM was still

19   "fair game" for Netflix to capture. These statements were materially misleading, because 23%-24% of the

20   TAM was already using Netflix services without paying. Thus, the market was effectively 83%-84%

21   penetrated, leaving very little room for growth.[3]

### 1.   Defendants' Market Penetration Estimates Are Actionable

23   Defendants argue that the statement that Netflix was "60% penetrated" in the UCAN market (¶¶131,

24   172) was literally true because this claim was "not about account sharing; [it was] about paid memberships."

25   MTD 18. "But it's far from clear that a reasonable investor could have decoded this meaning at the time."

---

[3] Defendants' reliance on *Intuitive* is misplaced because that case did not involve concrete representations about the existing degree of market saturation or the size of the remaining addressable market. MTD 9 (citing *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014)). The challenged statements in this case are much closer to those in *Quality Systems* than those in *Intuitive*.

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). The qualifications Defendants now seek to impose appear nowhere on the face of Neumann's statements. Neumann never explained what he meant by "penetration" and did not disclose a specific figure for the TAM. ¶196(a). A reasonable investor would take the statements to mean that 40% of UCAN's TAM was available for capture. This was highly misleading. In fact, only about 16%-17% was readily available for capture because there were approximately 30 million non-paying account sharers. *See* ¶116. And Netflix had no easy way to convert account sharers into paying subscribers. Former CEO Wells admitted prior to the Class Period that "[w]e could crack down on it, but you wouldn't suddenly turn all those folks to paid users." ¶57. Moreover, any crackdown would risk an increase in churn. *Infra* at 11. That there were 30 million non-paying users in the UCAN market constituted a critical omission that rendered the 60% market penetration estimate materially misleading.

One confirmation of the misleading nature of Defendants' penetration estimates is the reaction of analysts. ¶125. Following disclosure of the omitted data at the end of the Class Period, analysts immediately concluded that the effective rate of market penetration was much higher than what had been implied by Defendants' previous figures. For example, Morgan Stanley observed on April 20, 2022 that "adding 30mm sharers in UCAN to its 75mm members suggests [Netflix's] ***UCAN penetration is not 60% (75/125) but rather 85% (105/125)***" and concluded "Netflix has ***limited room for additional member growth*** in the UCAN region given password sharing." ¶125(e). Guggenheim commented that the newly disclosed data "means ***effective TAM penetration … is as much as 50% higher than penetration based on reported member levels***." ¶125(d). These statements support a plausible inference that Defendants' market penetration statements were misleading to a reasonable investor. *See In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) (statements by analysts supported conclusion that defendants' statements conveyed a misleading impression); *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (similar). The stock market's sharp reaction to the disclosure of the previously withheld data further confirms the materiality of the omission. ¶18; *see In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("market reaction" to disclosure of security vulnerabilities "support[ed] the materiality of the misleading omission").

## 2. Defendants' Qualitative Penetration Statements Are Actionable

Defendants argue that their qualitative penetration assurances (*e.g.*, a "lot of headroom" and "long runway of growth") are non-actionable puffery. MTD 15. But "in deeming a statement puffery at the motion

---

1   to dismiss stage, courts must exercise great caution." *Mulligan v. Impax Labs.*, 36 F. Supp. 3d 942, 966 (N.D.

2   Cal. 2014). Whether a statement is puffery "presents a mixed question of law and fact and requires delicate

3   assessments of the inferences a reasonable shareholder would draw from a given set of facts and the

4   significance of these facts to him." *In re Spiegel Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1028 (N.D. Ill. 2004).

5          Here, Defendants' qualitative statements about "headroom" and "runway" were not vague expressions

6   of optimism, but actionable misrepresentations about specific aspects of Netflix's business. These statements

7   were "opinion-based statements…***anchored in misrepresentations of existing facts***." *In re Wells Fargo &*

8   *Co. S'holder Deriv. Litig.*, 282 F. Supp. 3d 1074, 1097 (N.D. Cal. 2017). For example, Neumann's claim that

9   there was "a lot of headroom in all of these markets" was grounded in, and qualified by, his simultaneous

10  statement that the UCAN market was only 60% penetrated. ¶131. Likewise, Defendants' statements about a

11  "long" or "ample" runway for growth were anchored in the prior estimate of 60% UCAN penetration, as well

12  as Defendants' statements concerning the global TAM and Netflix's subscriber data for the various markets.

13  ¶¶142, 156, 158, 168, 196; *see In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670 (N.D. Cal. 2021)

14  (statements misleading when "when considered together and ***in the context of [defendant's] prior***

15  ***statements***"). Moreover, many of the challenged statements were made in direct response to analysts' pointed

16  questions about market saturation, weakness in particular markets, or whether account sharing was a factor

17  driving these trends. *E.g.*, ¶¶131, 158, 168, 172; *see Glazer*, 2023 WL 2532061, at *15 (statements not puffery

18  when "made in response to specific questions asked by financial analysts").[4]

19         Defendants also claim that Neumann's statements about the "runway" for growth are non-actionable

20  opinions under *Omnicare* and *Align*.[5] MTD 16-18. But opinions are actionable if, *inter alia*, (1) they "contain

21  embedded statements of facts," or (2) the speaker omitted material facts "whose omission makes the opinion

22  statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*,

23  575 U.S. at 185, 194-95. Here, the qualitative penetration statements were materially misleading because

24  (1) they were based on the embedded factual claim that the UCAN market was only 60% penetrated and

25

---

26  [4] *See also Azar v. Yelp, Inc.*, 2018 WL 6182756, at *12 (N.D. Cal. Nov. 27, 2018) (similar); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597-98 (7th Cir. 2006) (similar), *vacated on other grounds*, 551

27  U.S. 308; *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018) (similar).

28  [5] *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

(2) they omitted account sharing data necessary to render those statements not misleading when read fairly and in context. *See Glazer*, 2023 WL 2532061, at *15 (opinions actionable where defendants' "assurances did not fairly align with the information in [defendant's] possession at the time").

## C.   Defendants' Statements Concerning Netflix's Underlying Growth Metrics And Long-Term Growth Trajectory Were Materially Misleading

Defendants' positive statements about Netflix's metrics and long-term growth also were misleading. *E.g.*, ¶133 ("very strong underlying growth metrics" and "long-term growth trajectory is at least as strong as ever"); ¶139 ("viewing per household was up" and "churn was down year-over-year"); ¶141 ("core underlying metrics are very healthy" and "clear catalyst to a reacceleration of growth"); ¶160 ("business remained healthy," "churn at low levels" and "viewing was up"); *see also* ¶¶148, 150, 152, 166.

These statements were materially misleading because Netflix's engagement metrics were inflated by account sharing, the extent of which was concealed from investors. ¶¶39, 90. Netflix measured engagement "by the number of accounts that viewed a title until the end of 2021, when it changed the metric to measure the number of hours viewed per title." ¶39. Under both measures, views by account sharers were counted as views by subscribers, and the metrics thus presented a misleading picture of the popularity of Netflix's content on a per-subscriber basis. ¶¶90, 139-40, 148-49, 160-61; *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 566, 569-70 (S.D.N.Y. 2009) (popularity metrics for game were inflated by inclusion of "gold farmers"—"companies that hire people to play online games so that they can generate online currency which is then sold on third-party websites for real cash to actual players"); *Wells Fargo*, 282 F. Supp. 3d at 1096 (defendants' inclusion of unauthorized accounts inflated cross-selling metrics: "that a critical performance metric was based on a significant number of fraudulent accounts would certainly give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists").

Defendants argue that the viewing metrics were not misleading because "account sharing remained roughly the same in FY2021" and thus the "effect on viewing would have remained the same and would not have rendered statements regarding viewing 'being up' false when made." MTD 19. The viewing metrics, however, were inflated during the entire Class Period and therefore not a reliable basis for Defendants' positive statements about Netflix's financial health and long-term growth prospects. ¶90. In addition, Defendants' argument about the precise degree of inflation on a quarterly basis is not appropriate for resolution on a motion

1  to dismiss because Defendants have not disclosed the number of account sharing households on a period-by-

2  period basis. *Cf. In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *13 (N.D. Cal. Aug. 17, 2022)

3  ("specific impact of the practice at particular times" unnecessary).

4         In addition, Defendants' statements touting a low churn rate were misleading because they failed to

5  disclose that this low rate was maintained, at least in part, by Netflix's decision not to crack down on account

6  sharing. ¶¶90, 139-40, 160-61. Defendants argue that this allegation relies on speculation. MTD 18-19.

7  Plaintiff's allegation, however, is supported by well-pleaded facts, including Defendants' own statements and

8  actions. Viewed in context, the Q2'20 memo suggests that Netflix wanted to delay a crackdown on account

9  sharing while the COVID pull-forward was driving growth. ¶¶67-68. Even when Netflix began to test warning

10 messages in March 2021, Defendants stressed to the market that their actions should not be seen as "turning

11 the screws." ¶91. Defendants were aware that taking hard measures—like service interruptions or restricting

12 access from certain IP addresses—carried an obvious risk of churn. But without taking such hard measures,

13 Netflix's ability to convert account sharers into paying subscribers was extremely limited.

14        Moreover, no matter how strong Netflix's viewing and churn metrics were, it was misleading to cite

15 those metrics as a basis to believe that Netflix's long-term growth trajectory was "as strong as ever" without

16 disclosing the omitted account sharing data. *See In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 939 (N.D.

17 Cal. 2022) (where defendants "conveyed positive information regarding the company's efforts to build

18 'adequate pipeline'" and "'very healthy' underlying growth," they "were obligated to disclose adverse

19 information that cut against their positive representations in order to make such positive statements not

20 misleading"). Because account sharers accounted for 23%-24% of the TAM in the UCAN market and 11% of

21 the TAM globally, the markets were much more highly penetrated than investors had been led to believe, and

22 there were severe limitations to Netflix's long-term growth trajectory. ¶¶195-97.

23        These statements are not puffery (MTD 14-16) because Defendants were aware of facts that rendered

24 their optimistic statements about Netflix's long-term growth trajectory materially misleading, *viz.*, that 30

25 million UCAN households and more than 91 million households worldwide were account sharing without

26 paying. Several specific statements that Defendants claim are puffery are equivalent to statements this Court

27 has held to be actionable in analogous circumstances. *Compare Splunk*, 592 F. Supp. 3d at 938-39 ("underlying

28 growth within our business is very healthy") *with* ¶141 ("core underlying metrics are very healthy"); *compare*

*Plantronics*, 2022 WL 3653333, at *16 ("solid results") *with* ¶166 ("all the fundamentals of the business are pretty solid"). Similarly here, Defendants "were aware of material adverse facts that cut against the positive representations" and the omission of those facts gave investors an inaccurate impression of Netflix's underlying trends. *Plantronics*, 2022 WL 3653333, at *16. Moreover, many of these statements were responses to specific analyst questions about Netflix's long-term growth prospects and when (or if) Netflix expected to return to its pre-COVID levels of growth. *E.g.*, ¶¶133, 139, 141, 166; *see supra* at 9.

### D. Defendants' Statements Attributing Its Growth Slowdown To The COVID Pull-Forward And The Pandemic's Aftereffects Were Materially Misleading

Defendants also misleadingly attributed Netflix's slowed growth in 2021 to the COVID "pull forward" and the pandemic's aftereffects without acknowledging the role that account sharing and market saturation played in inhibiting growth. *E.g.*, ¶137 ("paid membership growth slowed due to the big Covid-19 pull forward in 2020" and "Covid-19 production delays"); ¶139 ("in terms of Q1 performance, it really boils down to COVID, frankly" which "creates just some short-term kind of choppiness"); ¶148 ("COVID choppiness … as markets reopen"); ¶162 ("ongoing Covid overhang"); *see also* ¶¶133, 141, 146, 148, 150, 154.

Defendants argue that these are non-actionable opinions (MTD 17), but these statements omitted critical facts that rendered them misleading when read "fairly and in context." *Omnicare*, 575 U.S. at 194. Specifically, they omitted that account sharing had resulted in severe market saturation, to the tune of 30 million UCAN households and 91+ million households globally who were not paying for Netflix. ¶116. As a result, it was very difficult for Netflix to acquire new members and not realistic to expect Netflix to return to its pre-COVID growth trajectory. *See* ¶125. Defendants' ongoing narrative—blaming Netflix's sputtering growth on the COVID "pull forward" and the "ongoing Covid overhang"—ignored the material role that market saturation and unaddressed account sharing played in inhibiting growth. Defendants' failure to disclose these facts, while attributing Netflix's poor performance to COVID-related issues, was materially misleading.

If a defendant provides a misleading explanation of the reasons for its poor performance, such an assertion can be actionable. *See Glazer*, 2023 WL 2532061, at *14 ("if a significant cause of the missed revenue guidance was the misclassification of illusory deals, it was misleading to blame the revenue miss entirely on EMEA conditions (even if EMEA conditions were also a factor in the financial performance)").[6]

---

[6] *See also Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 830-31, 833, 846 (N.D. Ind. 2018)

This is especially true when the defendant suggests that its poor performance is caused by short-term factors, like Defendants did here. *E.g.*, ¶74 (claiming pull-forward effect "will wash out. It's ***not permanent or long term***");[7] ¶139 (COVID "creates just some ***short-term kind of choppiness***"); *see Azar*, 2018 WL 6182756, at *11 (defendants' attribution of slowdown to election and vacation time "conveyed the impression that these were one-off aberrations rather than any kind of a systemic problem").

### E.   Netflix's Risk Disclosures About Account Sharing Were Materially Misleading

Netflix's risk warnings in its 2020 and 2021 10-Ks about the possible consequences of "multi-household usage"[8] were misleading because, at the time they were made, multi-household usage was already being abused, Netflix's efforts to restrict it were already ineffective, and Netflix's markets were already heavily saturated due to account sharing. These effects were already highly material, as they had resulted in roughly 30 million non-paying UCAN households and between 91 and 100 million non-paying households worldwide. ¶¶192-197. "Risk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors." *Alphabet*, 1 F.4th at 703-04; *see also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("risks of product liability claims in the abstract" actionable because it gave "no indication that the risk may have already come to fruition"), *aff'd*, 563 U.S. 27 (2011); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1016 (9th Cir. 2018) (similar); *Berson*, 527 F.3d at 986 (similar).

Defendants argue that these disclosures were not misleading because they "made clear that account sharing was happening, that Netflix was working to restrict it, and that account sharing might hurt results." MTD 10. These disclosures, however, gave no indication that account sharing had already ripened into a severe saturation problem that was already hindering Netflix's ability to add new members and adversely impacting Netflix's results. *See In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *6 (C.D. Cal. June 7, 2018) ("hypothetical risk disclosures … do not absolve Defendants of their duty to disclose ***known*** material adverse

---

(attribution of revenue miss to supply constraints misleading where defendants failed to disclose that problematic FDA inspection at key facility was driving product shortages).

[7] This statement, made three months before the Class Period, is "relevant in that [it] shed[s] light on the truth or falsity of Class Period statements." *Shenwick*, 282 F. Supp. 3d at 1134.

[8] ¶135 ("***if*** multi-household usage is abused or ***if*** our efforts to restrict multi-household usage are ineffective, our ability to add new members may be hindered and our results of operations may be adversely impacted"); ¶170 (same).

---

1  trends *currently affecting* Snap's user growth"). A key part of the analysis is not merely whether the

2  antecedent conditions for the risk existed, but whether the *consequences* of the risk had already materialized

3  in the form of actual harm to the company. *See Alphabet*, 1 4th at 703 (plaintiffs plausibly alleged that potential

4  risks of harm identified in warnings had already "*ripened into actual harm*").

5      **F.**    **Defendants' Additional Account Sharing Statements Were Materially Misleading**

6          Finally, the Complaint alleges Defendants made actionable statements that either directly addressed

7  account sharing in a misleading fashion, or avoided it despite being asked questions that clearly called on

8  Defendants to address it. First, on the Q1'21 earnings call, Peters was asked why Netflix was "tightening the

9  screws" on account sharing. ¶144. Rather than acknowledge that sharing had led to saturation, particularly in

10  the UCAN market, Peters responded that the testing was conducted to meet members' "broad set of needs"

11  and "improv[e] the service." *Id.* Defendants argue that Peters' statement was not inconsistent with the omitted

12  account sharing data. MTD 11. Peters' statement, however, was misleading in context. The statement was

13  made just one quarter after Defendants had assured investors that the UCAN market was only 60% penetrated.

14  ¶¶79, 88. In light of Defendants' representations about the room for growth, it was misleading for Peters to

15  discuss Netflix's increasing enforcement efforts on sharing as being rooted in a benign desire to "improve"

16  service without acknowledging the gorilla in the room—that sharing had caused severe market saturation.

17          Second, during the Q4'21 earnings call, an analyst asked why guidance for Q1'22 was lower than

18  expected and whether this raised concerns "about anything *structural*, whether it's competition or *saturation*."

19  ¶164. Neumann said there was "[n]o structural change in the business that we see." *Id.* He discussed COVID

20  and competition but carefully avoided mention of account sharing or saturation. *Id.* This statement was made

21  following a disastrous quarter in which Netflix missed its paid net add guidance for Q4'21 and gave weak

22  guidance for Q1'22, resulting in a 21.7% stock drop. ¶¶104-08. The statement also was made after four

23  quarters of Defendants' repeated assurances about Netflix's long-term growth trajectory and the *room* left for

24  Netflix to grow. Defendants argue that this statement was a non-actionable opinion (MTD 17-18), but the

25  statement is actionable because it omitted material information about account sharing that any reasonable

26  investor would have expected to be included in an honest response to a question that directly asked about

27  market saturation as a potential structural constraint on growth.

28          And finally, during the same Q4'21 conference call, an analyst asked about the Latin American market,

1    positing that this market might be "maturing at a lower level of penetration than you've seen in the U.S." and

2    asking what might be driving this phenomenon, including "**[a]ccount sharing**." ¶168. Neumann responded by

3    dismissing the view that Latin America was "maturing faster" and asserting that "there's a long runway of

4    growth there." *Id.* Perversely, Defendants claim that this statement is not actionable because ***it did not*** mention

5    account sharing and thus the alleged omission supposedly does not connect to the substance of the statement.

6    MTD 8. But this was a question that specifically asked about account sharing in connection with market

7    penetration, which demanded an honest answer about the impact account sharing was having on Netflix's

8    ability to add new members.

9    **IV.    THE PSLRA SAFE HARBOR DOES NOT PROTECT DEFENDANTS' STATEMENTS**

10       **A.    The Challenged Statements Were Present, Historical Or Mixed Statements**

11       Defendants' challenged statements are statements of present or historical fact or mixed statements

12   containing separable representations of present or past circumstances.[9] "[A] defendant may not transform non-

13   forward-looking statements into forward-looking statements that are protected by the safe harbor … by

14   combining non-forward-looking statements about past or current facts with forward-looking statements."

15   *Quality Sys.*, 865 F.3d at 1141.

16       The penetration statements are not forward-looking. Defendants do not deny that the estimate of 60%

17   penetration in the UCAN market was a statement of present condition. ¶131. Instead, Defendants argue that

18   Neumann's related statement that "we think we've got a lot of headroom in all these markets" was forward-

19   looking. MTD 13 n.3. That statement, however, was about the *existing* room within the TAM that remained

20   available for capture. *See Quality Sys.*, 856 F.3d at 1143, 1147 (estimate that "75% of the midsize practice

21   market is still fair game" and related qualitative statement that "greenfield opportunities are plentiful" were

22   both *not* forward-looking). The same is true for Defendants' statements about a "long" or "ample runway" for

23   growth. ¶¶142, 156, 158, 168. A reasonable investor would take these statements *not* as predictions of how

24   much Netflix *would* grow but as representations of how much *room* was left in which Netflix *could* grow. *See*

25   *Glazer*, 2023 WL 2532061, at *18 (statement that "pipeline was large, healthy, and continuing to grow" was

26   description of current conditions).

27

28   ---
     [9] Defendants do not challenge as forward-looking any statements in ¶¶135, 139, 144, 146, 148, 154, 160, 166, 170, or 172 and have thus waived any argument that these statements are protected by the safe harbor.

Other statements that Defendants claim are forward-looking are mixed with statements purporting to explain what factors caused poor results in *prior* quarters or why the metrics in those quarters showed Netflix's *current* financial health. *E.g.*, ¶137 ("paid membership growth slowed due to the big Covid-19 pull forward in 2020"); ¶141 ("core underlying metrics are very healthy"); *see also* ¶¶133, 150, 162. These statements are not protected. *See Glazer*, 2023 WL 2532061, at *18 (attribution of prior quarter's results to "slipped deals" was not forward-looking); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1021 (N.D. Cal. 2020) (no safe harbor protection where "defendants' enthusiastic, specific financial forecasts were intertwined with …. misleading statements" that "misrepresented or omitted material past or present facts").

Defendants note that some statements were responses to questions about Netflix's guidance or future prospects. MTD 13 (citing *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021)). However, even when a statement is made in response to such a question, specific representations of historical or present fact are actionable. *See In re Twitter, Inc. Sec. Litig.*, 2021 WL 4166725, at *3 (N.D. Cal. Sept. 14, 2021) (statement that "MAU trend has already turned around" was not forward-looking statement or "future assumption[]," but description of "specific, concrete circumstances that had already occurred");[10] *cf.* ¶150 ("as markets reopened, particularly…in most of EMEA and the UCAN region, that did have a bit of a headwind on acquisition" described specific past events); ¶158 ("still a lot of runway for growth" was statement of existing headroom within TAM); ¶164 ("No structural change" was statement of existing conditions, not future assumption).

## B.   Defendants' Cautionary Language Was Not Meaningful

For protection under the safe harbor's "cautionary language" prong, the cautionary language must be "meaningful." 15 U.S.C. §78u-5(c)(1)(A)(i). "Mere boilerplate or generic warnings … are insufficient; the cautionary warning ought to be precise and relate directly to the forward-looking statements at issue." *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *13 (N.D. Cal. Aug. 10, 2005). For mixed statements, the caution "must accurately convey appropriate, meaningful information about not only the forward-looking statement ***but also the non-forward-looking statement***." *Quality Sys.*, 865 F.3d at 1148. "If the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language—short of an

---

[10] *See* Defendants' Motion for Leave to File Motion for Reconsideration in *Twitter*, Case No. 4:16-cv-05314-JST (SK), ECF No. 611 (filed July 29, 2021) at *9 (arguing that statement was protected by safe harbor because it was made in response to question asking about "assumptions reflected in … Twitter's prediction").

1  outright admission of the false or misleading nature of the non-forward-looking statement—would be

2  sufficiently meaningful to qualify the statement for the safe harbor." *Id.* at 1146-47.

3  Nothing in Defendants' risk disclosures alerted investors to the fact that the historical and present

4  portions of Defendants' mixed statements were materially misleading. For example, when Neumann stated

5  that the UCAN market was roughly 60% penetrated, nothing in Netflix's cautionary language indicated that

6  this materially understated the effective rate of market penetration based on ***current*** levels of account sharing.

7  *See In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *8 (N.D. Cal. Jan. 6, 2022) (warnings not

8  adequate because they were "not targeted or tailored to cautioning investors that [the challenged] statements

9  were ***qualified, incomplete***, *untrue, or otherwise misleading*"); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791

10  F.3d 90, 102 (D.C. Cir. 2015) ("cautionary language cannot be meaningful if it is misleading in light of

11  historical facts that were established at the time the statement was made").

12  As discussed *supra* at 13-14, Defendants' risk disclosures were themselves misleading because they

13  failed to disclose that the risks had already materialized to such a degree that account sharing had already

14  resulted in a high level of market saturation. Thus, the *ultimate* risks that Netflix had warned about—that

15  account sharing could hinder Netflix's ability to add new members and might adversely affect Netflix's

16  operating results—had already come to pass. *See Glazer*, 2023 WL 2532061, at *23 ("cautionary language is

17  not meaningful if it discusses as a mere possibility a risk that has already materialized"); *In re Bear Stearns*

18  *Cos., Inc. Sec., Derivative and ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) ("Warnings of specific

19  risks do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the

20  magnitude of the risks described.").

21  **C.**  **The Complaint Pleads A Strong Inference That Defendants Had Actual Knowledge Of The Facts That Rendered Their Statements Misleading**

22  The safe harbor does not protect Defendants' statements because they were made "with actual

23  knowledge" that they were false or misleading. 15 U.S.C. §78u-5(c)(1)(B)(ii)(II). In this context, actual

24  knowledge does not require knowledge that a projection is impossible to meet. Rather, a forward-looking

25  statement is made with actual knowledge if "the speaker is aware of undisclosed facts tending seriously to

26  undermine the statement's accuracy." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010); *see*

27  *BioMarin*, 2022 WL 164299, at *8 (safe harbor did not protect statements where defendants had actual

28

1  knowledge of facts that "cut directly against" the statements); *Splunk*, 592 F. Supp. 3d at 944. As detailed

2  *infra*, the Complaint pleads a strong inference that Defendants had actual knowledge of the omitted data.

3  **V.   THE COMPLAINT ALLEGES SCIENTER**

4      The PSLRA requires a complaint to state particularized facts "giving rise to a strong inference that the

5  defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). This mental state includes not only

6  an "intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Quality Sys.*, 865 F.3d at 1144.

7  "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were

8  misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so

9  without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014).

10      A strong inference exists if a "reasonable person would deem the inference of scienter cogent and at

11  least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor*

12  *Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Under this rule, "a tie goes to the Plaintiff." *In re Amgen Inc.*

13  *Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). In determining scienter, a court must review

14  "all the allegations holistically." *Tellabs*, 551 U.S. at 326. This determination may be based principally, or

15  even entirely, on circumstantial evidence. *See, e.g.*, *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 781, 785-

16  86 (9th Cir. 2008).

17      **A.   Defendants' Own Statements Support A Strong Inference Of Scienter**

18      Defendants' own statements support a strong inference that they knew the omitted account sharing

19  data throughout the Class Period. First, Defendants admitted they were monitoring account sharing before the

20  Class Period began. In October 2019, Peters answered a question about account sharing by saying "we

21  continue to monitor it." ¶64. Defendants argue this statement "reflects only that Netflix was looking at the

22  complex issue of account sharing and possible ways to monetize [it] in consumer-friendly ways" and "does

23  not suggest that Netflix believed account sharing was severely hindering growth." MTD 23. The statement,

24  however, supports an inference that Defendants had access to and were monitoring account sharing data. This

25  inference is bolstered by a media report that Netflix was using sophisticated software to monitor account

26  sharing and the corroborating account of FE2, who stated that Netflix tracked users' IP addresses and described

27  account sharing as "lost revenue" at quarterly meetings. *See* ¶¶62-63, 190-91. Together, these facts support an

28  inference that Defendants used sophisticated methods to monitor and quantify account sharing since at least

2019 and knew about the magnitude of the problem throughout the Class Period. *See In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *19-20 (W.D. Wash. Apr. 19, 2019) ("scienter can be inferred where a corporate officer states that he or she … was monitoring the subject of the misleading statements"); *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (defendants' statements that they "closely monitored" advertiser cancellations supported scienter).

Second, in April 2022, Defendants admitted that (1) "in addition to our 222m paying households, we estimate that Netflix is being shared with over 100m additional households, including over 30m in the UCAN region" and (2) "[a]ccount sharing as a percentage of our paying membership hasn't changed much over the years." ¶116. Defendants argue these statements are not "admissions" and that Plaintiff is alleging "fraud by hindsight." MTD 23. Netflix, however, was closely tracking account sharing since 2019 at the latest. That is not fraud by hindsight. Defendants' admissions at the end of the Class Period imply that about 92 million households were account sharing globally and about 29.7 million households were account sharing in the UCAN market ***at the beginning of the Class Period*** and that Defendants knew these numbers. ¶¶192-97.

Third, throughout the Class Period, when Defendants faced questions on the topics of saturation or account sharing, they consistently danced around the questions and avoided disclosure of the account sharing data, even though this information was clearly relevant. *E.g.*, ¶92 (no specifics in response to question about "user to subscriber ratio" in various markets); ¶131 ("60% penetrated" in response to question about saturation in UCAN and no mention of account sharing); ¶164 ("No structural change" in response to question about saturation); ¶168 (no mention of account sharing in response to question about whether sharing was causing lower level of penetration in LATAM). *See also* ¶¶144, 172; *see supra* at 9, 12, and 14-15. This pattern of deflection and non-disclosure supports a strong inference of scienter. *See, e.g.*, *S. Ferry LP No. 2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (scienter pled where CEO gave misleading assurances "in the face of direct questioning about the status of WaMu's technological woes"); *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 229 (E.D. Pa. 2021) ("purposefully evasive" responses to analyst questions supported inference of scienter).[11]

---

[11] *See also Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) (strong inference of scienter where CFO provided misleading answers in response to direct and repeated analyst questions); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) (scienter pled where CEO denied to analyst that "there were any unusual or special circumstances" affecting sales).

### B.      Defendants' Testing In Q1'21 Supports Inference Of Scienter

Defendants' testing of warnings about account sharing in March 2021 (¶84) and the events leading up to this test (¶¶62-83) support an inference that Defendants had already determined by the beginning of the Class Period, if not earlier, that account sharing was a material problem impacting Netflix's ability to grow. Two years earlier, Cybersecurity Insiders reported that Netflix had adopted Synamedia's Credential Sharing software to track account sharing. ¶62. In October 2019, Peters admitted that Netflix was monitoring account sharing. ¶64. In Q2'20, an internal Netflix memo indicated that management did not want to crack down on account sharing during the initial phase of COVID. ¶¶67-68. By January 2021, however, when Netflix filed its 2020 10-K, it included a subtly revised risk disclosure about account sharing, adding language for the first time about "efforts to restrict multi-household usage." ¶82.

This sequence of events supports an inference that Defendants had identified account sharing as a material problem in 2019, but delayed cracking down during the early phase of the pandemic while lockdowns were driving strong growth. By the start of 2021, however, growth was slowing, and Defendants knew that they could no longer wait before taking action. This explains the revision of the risk disclosure in January 2021 and the roll-out of testing in March 2021. That Defendants were finally taking steps to restrict account sharing (after years of non-enforcement) supports an inference that they knew that account sharing was hindering growth and serious corrective actions were required to remedy the issue. *See Azar*, 2018 WL 6182756, at *17 (company's formation of "recovery team" to confront decline in advertiser retention and acknowledgment that the company "addressed this...problem in January and February" meant "Defendants were already aware of the problem and working to remedy it by January").

Defendants dispute whether "saturation was the *sole reason* for past testing." MTD 12. That is irrelevant. The numbers disclosed at the end of the Class Period support a strong inference that the March 2021 testing was principally, if not entirely, driven by concerns about saturation. The level of saturation in Netflix's markets—and the difference between the reported and effective market penetration—was consistent throughout the Class Period. *See* ¶¶195-97. Thus, account sharing presented the same problem in March 2021 (when testing began) that it did in April 2022 (when saturation due to sharing was disclosed). ¶¶115-26.

Defendants argue that Netflix's revision of its risk factors in the 2020 10-K "undermines, rather than supports" an inference of scienter because it disclosed that efforts to control sharing were underway. MTD 24.

1  These warnings, however, gave no indication that account sharing had already resulted in a high degree of

2  market saturation. *Supra* at 14-15. Viewed in context, the subtle revision to the risk disclosures in the 2020

3  10-K supports an inference that Defendants knew by January 2021 that they needed to take corrective action

4  with respect to account sharing but did not want to reveal the magnitude of the problem.

5      **C.    The Core Operations Doctrine Supports A Strong Inference Of Scienter**

6          Under the core operations doctrine, allegations about a defendant's role in a company may support an

7  inference of scienter in three ways. *S. Ferry*, 542 F.3d at 785. First, such allegations may be combined with

8  other allegations and ***together*** give rise to the required inference. *Id.* "Second, such allegations may

9  ***independently*** satisfy the PSLRA where they are particular and suggest that defendants had ***actual access*** to

10  the disputed information." *Id.* at 786. Third, even without particularized allegations of actual access, core

11  operations allegations may satisfy the PSLRA if "the nature of the relevant fact is of such prominence that it

12  would be ***absurd to suggest that management was without knowledge of the matter***." *Id.*

13          In this case, Plaintiff has pled scienter under each of these three tests. First, the Complaint pleads that

14  managing subscriber growth was a key part of Netflix's core operations. ¶180. This allegation, however, does

15  not stand alone, and viewed holistically with Plaintiff's other scienter allegations, it supports a strong inference

16  of scienter. *See* Secs. V.A-B, *supra*; Secs. V.D-G, *infra*.

17          Second, the Complaint pleads facts showing the Individual Defendants—Netflix's Co-CEOs, CFO and

18  COO (¶¶27-31)— had "actual access" to the disputed information. Peters claimed Defendants were monitoring

19  account sharing, and he demonstrated familiarity with Netflix's user and subscriber data and its testing of

20  limits on sharing. ¶¶64, 91-92. Hastings indicated he knew about the testing and "research" done by Peters to

21  address sharing. ¶91. Neumann provided market penetration data and information about Netflix's growth

22  metrics while offering assurances in response to questions about saturation. ¶¶131, 164, 168, 172. Sarandos

23  claimed he was familiar with Netflix's "core underlying metrics." ¶141. *See S. Ferry*, 687 F. Supp. 2d at 1258

24  (scienter pled where CEO's "statements themselves suggest that he had actual knowledge of" company's

25  hedging operations); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1192-93 (C.D. Cal. 2008)

26  (scienter pled where CEO represented he was knowledgeable about company's underwriting standards).

27          Third, the nature of the omitted data is such that it would be absurd to suggest that Defendants were

28  unaware of it. This conclusion is underscored by the sheer magnitude of the numbers: 30 million sharing

---

households in the UCAN market (29.7 million to start Class Period) and 100 million sharing households globally (91.9 million to start Class Period). ¶116; *see* ¶¶195-97. These numbers are huge, and their disclosure wiped out $54 billion in market cap in one day. ¶18; *see Plantronics*, 2022 WL 3653333, at *18-19 (inferring scienter where "undisclosed sales practice and its effects … were significant based on the $65 million channel inventory reduction announced" at end of class period); *In re eHealth Inc. Sec. Litig.*, 2021 WL 5855864, at *11 (N.D. Cal. Aug. 12, 2021) (scienter supported by "magnitude of the operational expenses at issue").

      This inference is bolstered by the accounts of former employees. FE1 read a memo indicating that Netflix did not want to crack down on sharing in Q2'20, suggesting the problem was identified well before the Class Period. ¶¶67-68. FE2 stated that presentations about account sharing were given at quarterly meetings hosted by Hastings. ¶189. In these meetings, account sharing was characterized as "lost revenue." ¶190. FE2 said the presentations made clear that Netflix had significant data on account sharing, was analyzing it, and the magnitude of the sharing was used to justify efforts to "crack down." *Id.* FE2 stated that Netflix monitored users' IP addresses to track sharing. ¶191. Defendants argue that the FEs had no direct interactions with the Individual Defendants and thus they provide no direct evidence of scienter. MTD 20-21. FE2, however, was present at meetings hosted by Hastings where presentations about account sharing were made. ¶¶189-90. In any event, whether the FE allegations provide direct evidence of scienter, they support a core operations inference. *See Shenwick*, 282 F. Supp. 3d at 1149 (CW allegations did not "separately give rise to any inference of scienter," but did "support[] Plaintiff's core operations theory").

**D.**    **The Timing Of Defendants' Statements Supports A Strong Inference Of Scienter**

      "Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter." *Reese*, 747 F.3d at 574. Defendants continued to mislead investors until very late in the Class Period. Netflix's Q4'21 earnings call was held on January 20, 2022, just three months before the April 20, 2022 admission of more than 30 million account sharing households in the UCAN market and more than 100 million worldwide. ¶¶107, 116. During the January 20 call, Newman dodged a direct question about saturation and claimed there was "[n]o structural change in the business." ¶164. He maintained that "all the fundamentals of the business are pretty solid" (¶166) and rejected an analyst's contention that the Latin American market was maturing at a lower level of penetration than the U.S., avoiding the portion of the analyst's question that asked about account sharing. ¶168. It is highly implausible that at this late stage in the

game—after closely monitoring account sharing for three years and fielding questions over four quarters about market saturation, account sharing and slowing growth—that Defendants did not know that account sharing was playing a material role in limiting Netflix's subscriber growth.

A few weeks later, at a March 8, 2022 conference, Neumann again claimed that Netflix was "60% penetrated" and "not done growing in the U.S." ¶172. The March 8 statement was just a month and a half before the April 20 corrective disclosures, when Netflix revealed data showing that the UCAN market was effectively 84% penetrated. ¶196. In light of all the events that preceded, the inference of scienter is particularly strong as to the challenged statements made on January 20 and March 8.

## E.   Defendants' Misleading COVID Narrative Supports An Inference Of Scienter

Defendants' repeated narrative attributing Netflix's slowing growth to the COVID pull-forward or other conditions related to COVID, while refusing to acknowledge market saturation due to account sharing, further bolsters the inference of scienter. *See Shah*, 348 F. Supp. 3d at 829-30, 845-46 (defendants' misleading explanation of reasons for supply shortages, where an analyst report suggested that there was "more to the story," supported strong inference of scienter); *In re Shopko Sec. Litig.*, 2002 WL 32003318, at *10 (E.D. Wis. Nov. 5, 2002) ("defendants' particular insistence that the problems lay with external factors, such as the economy, supports an inference of at least reckless disregard for the truth").

Defendants argue they genuinely believed that COVID was the root cause of Netflix's disappointing results at the time they made their statements. MTD 16-18, 23. Defendants, however, were closely monitoring account sharing, and the available data demonstrated a high level of market saturation during the entire Class Period. ¶¶195-97. Moreover, the challenged statements in this case were not about "predicting how the pandemic would impact [Netflix's] business" (MTD 1); they were about how much ***room*** in the existing TAM that Netflix had to potentially grow. No matter what effect COVID was having on consumer behavior or Netflix's production schedule, the numbers of account sharing households were objective, material facts that were highly relevant to Netflix's ability to add new members, and the failure to disclose those facts "created an obvious danger of misleading investors." *Plantronics*, 2022 WL 3653333, at *19.

## F.   The Absence Of Financial Motive Allegations Does Not Undermine Scienter

Defendants acknowledge that an absence of motive allegations is "not fatal," but insist that the lack of any personal financial motive undermines the inference of scienter in this case. MTD 24-25. But the law is

1   well-settled that the absence of suspicious insider stock sales does not negate an otherwise strong inference of

2   scienter. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). That is particularly true where,

3   as here, an allegation of improper financial motive is not the basis for plaintiff's pleading of scienter. *See*

4   *Shenwick*, 282 F. Supp. 3d at 1149 ("absence of allegations of relevant stock sales" did not undermine

5   inference of scienter where complaint did not allege financial motive or reference stock sales); *Splunk*, 592 F.

6   Supp. 3d at 949 (lack of sales did not impact scienter analysis where "Plaintiff's scienter theory is not

7   predicated on the theory that individual Defendants had an incentive to mislead investors").

8        Individual stock sales aside, the Complaint articulates a motive for Defendants' actions: they did not

9   want to admit to the magnitude of the account sharing problem until they rolled out something they could

10  claim was a potential solution. ¶114. In March 2022, just one month before Defendants admitted to the number

11  of account sharing households, Netflix announced a new paid sharing feature that it would be testing in four

12  Latin American markets. ¶113. "Only after announcing this potential solution did Defendants disclose the

13  extent of account sharing and its negative impact on subscriber growth." ¶114; *see Lewis v. Straka*, 535 F.

14  Supp. 2d 926, 931 (E.D. Wis. 2008) (finding strong inference that defendant was aware of company's financial

15  problems "but, in order to buy time to fix the problem, [he] opted not to initially disclose the truth").

16       Defendants also wanted to stall disclosure in the hope that global growth might accelerate and render

17  the extreme saturation in the UCAN market less relevant. *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014,

18  at *13 n.12 (N.D. Cal. Nov. 4, 2020) ("defendants here may have hoped that the situation in China would

19  improve, a hope that does not justify misleading investors"); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513

20  F.3d 702, 710 (7th Cir. 2008) (similar). It is not unusual for corporate executives to delay disclosure of bad

21  news, especially when they do not want to fall short of their own representations. *See Shenwick*, 282 F. Supp.

22  3d at 1149 ("Defendants felt pressure to live up to the targets announced at Analyst Day").

23       Defendants argue that Netflix's stock repurchases undermine any inference of scienter. MTD 25. This

24  argument is improper because the Court cannot consider Defendants' source for the truth of its contents and

25  Defendants cannot use incorporation by reference to introduce a collateral factual narrative into this motion.

26  *See* Pl. RJN Obj. at 2-6. Even if the Court were to consider Defendants' proffered evidence, the repurchases

27  fail to undermine Plaintiff's scienter allegations. *See Apple*, 2020 WL 6482014, at *13 (rejecting argument

28  that repurchases undermined scienter because "it is not [the CEO] himself who spent a billion dollars buying

1   back shares at inflated prices, but the Company"); *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F.

2   Supp. 3d 120, 146 (S.D.N.Y. 2021) (argument that repurchases negated scienter was "inapplicable" where

3   scienter allegations were not based on motive). Moreover, Netflix only repurchased shares during Q2'21 and

4   Q3'21; it did not repurchase shares during Q1'21, Q4'21, or Q1'22. ECF No. 31-16 at 18; ECF No. 31-17 at

5   5. Thus, even if the repurchases gave rise to some exculpatory inference (they do not), at best such inference

6   would be limited to Q2'21 and Q3'21. By Q4'21, Netflix had stopped repurchasing shares, even though $4.4

7   billion remained available for repurchases under the Board's existing authorization. ECF No. 31-16 at 18. To

8   the extent that repurchases are relevant, this discontinuation supports an inference that by October 2021 at the

9   latest, Defendants did not believe it was a good idea for Netflix to buy back any more of its own stock.

10          **G.   A Balancing Of The Inferences Weighs In Favor Of A Finding Of Scienter**

11          Viewing the Complaint's allegations holistically, Plaintiff's proffered inference—that Defendants

12   were aware of the magnitude of the account sharing problem and the material role it played in inhibiting

13   subscriber growth throughout the Class Period, but Defendants avoided admitting it until they had no choice—

14   is *at least as compelling* as any non-culpable inference. *See* Secs. V.A-F.  Defendants' competing inference—

15   that they honestly believed that Netflix's stagnating growth was due to the COVID "pull-forward" and they

16   were genuinely puzzled as to why Netflix's growth had not returned to pre-COVID levels, even as they were

17   monitoring account sharing—is not *more* compelling than Plaintiff's proposed inference. Under their theory,

18   Defendants were ignorant of the impacts of account sharing, even while they were closely monitoring it and

19   strategically avoiding questions about market saturation. It is implausible that they suddenly had an epiphany

20   after the March 8, 2022 conference—when Neumann repeated his assurance that the UCAN market was only

21   60% penetrated—just one week before announcing a proposed solution to curtail sharing on March 16, 2022

22   (¶¶113-14) and just six weeks before admitting to extreme saturation due to sharing on April 19, 2022. ¶116.

23   **VI.   THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY**

24          Plaintiff has adequately alleged primary violations under Section 10(b). Plaintiff has thus rebutted

25   Defendants' only challenge to control person liability under Section 20(a). Control person liability is alleged.

26   **VII.   CONCLUSION**

27          Defendants' motion should be denied. If the Court grants any portion of the motion, Plaintiff requests

28   leave to amend. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

---

1

Dated: March 27, 2023

2

GLANCY PRONGAY & MURRAY LLP

3

By:  *s/ Jason L. Krajcer*
Robert V. Prongay

4

Jason L. Krajcer
Christopher R. Fallon

5

Pavithra Rajesh
1925 Century Park East, Suite 2100

6

Los Angeles, California 90067
Telephone: (310) 201-9150

7

Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

8

Email: jkrajcer@glancylaw.com
Email: cfallon@glancylaw.com

9

Email: prajesh@glancylaw.com

10

11

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

12

**THE LAW OFFICES OF FRANK R. CRUZ**

13

Frank R. Cruz
1999 Avenue of the Stars, Suite 1100

14

Los Angeles, CA 90067
Telephone: (310) 914-5007

15

16

*Additional Counsel*

17

18

19

20

21

22

23

24

25

26

27

28