UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIYYAZ PIRANI,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>NETFLIX, INC., et al.,<br><br>　　　　　Defendants. | Case No. 22-cv-02672-JST<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: ECF No. 31 |

Before the Court is Defendants Netflix, Inc. ("Netflix" or the "Company"), Reed Hastings, Ted Sarandos, Spencer Neumann, and Gregory Peters's motion to dismiss the consolidated amended class action complaint ("CAC"). ECF No. 31. The Court will grant the motion.

I.   **BACKGROUND**[1]

Lead Plaintiff Fiyyaz Pirani, as a trustee of Imperium Irrevocable Trust, brings this action individually and on behalf of all other persons and entities that purchased or otherwise acquired Netflix common stock between January 19, 2021 and April 19, 2022, inclusive ("Class Period"). ECF No. 30 ¶¶ 1, 25 . Pirani alleges that Netflix and certain of its officers—Hastings (co-founder and co-Chief Executive Officer), Sarandos (co-Chief Executive Officer), Neumann (Chief Financial Officer), and Peters (Chief Operating Officer) (collectively "Individual Defendants")—violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and United States Securities and Exchange Commission ("SEC") Rule 10b-5 by making false and misleading statements and omissions about Netflix's business, operations, and prospects that artificially inflated the price of Netflix stock during the Class Period. *Id.* ¶¶ 213–223.

---

[1] For purposes of resolving the present motion, the Court accepts as true the factual allegations in the CAC, ECF No. 30.

Netflix is an entertainment company that primarily operates a subscription-based streaming service offering a wide array of television, film, and mobile games in over 190 countries. *Id.* ¶ 36. Netflix derives its revenue principally from its streaming service's monthly membership fees. *Id.* ¶ 38. Unlike some of its competitors, Netflix does not derive its subscription-based streaming service's revenue from advertisers. *Id.* ¶ 47. Thus, its revenue depends on its ability to acquire and retain subscribers. *Id.*

During the Class Period, Netflix would issue quarterly guidance regarding the expected "paid net membership additions or 'paid net adds.'" *Id.* ¶ 39. The paid net adds were calculated by subtracting the memberships that were cancelled during a quarter from the number of paid new memberships added during a quarter, "or more simply acquisition minus churn." *Id.* Netflix also reported information regarding user engagement with its service. Until the end of 2021, Netflix measured user engagement "by the number of accounts that viewed a title." *Id.* In 2022, Netflix measured engagement by "the number of hours viewed per title." *Id.* Netflix "considered acquisition, churn, and engagement important metrics to gauge the health of the business." *Id.* ¶ 40.

During and before the Class Period, Netflix's guidance and reports categorized its members into four geographic regions: (1) the United States and Canada ("UCAN"); (2) Europe, the Middle East, and Africa ("EMEA"); (3) Latin America ("LATAM"); and (4) Asia-Pacific ("APAC"). *Id.* ¶ 41. Additionally, during the Class Period, Netflix estimated that its total addressable market ("TAM") outside of China was approximately 800 million to 900 million broadband households, and "the TAM in the UCAN was estimated to be approximately 125 million broadband households." *Id.*

Pirani's allegations center around account sharing, which occurs when a paying Netflix member shares their account credentials (username and password) with a non-paying user who does not reside in the subscriber's household so that the non-paying user can access and use Netflix's platform. Netflix's members engaged in account sharing before and during the Class Period. *Id.* ¶ 48. Between 2013 and 2018, Hastings, Peters, and other Netflix officers dismissed analysts' concerns regarding account sharing and its impact on Netflix's revenue and potential

2

growth. *See, e.g.*, *id.* ¶ 49 (Hastings stating in 2013 that Netflix "really [did not] think that there[] [was] much going on of the 'I'm going to share my password with a marginal acquaintance'"); *id.* ¶ 50 (then-CEO David Wells stating in 2013 that account "sharing is not quite as large as has been . . . floated out there"); *id.* ¶ 55 (Wells stating in 2016 that Netflix did not "feel like [account sharing was] a material inhibitor to [its] growth" (emphasis omitted)); *id.* ¶ 59 (Peters stating in 2017 that "password sharing isn't a huge issue for us right now" (emphasis omitted)).

In January 2019, Cybersecurity Insiders reported that "Netflix has decided to use Synamedia's Credential Sharing behavioral analytics and machine learning software to keep a tab on the sharing activity across its streaming services." *Id.* ¶ 62. Synamedia's product was believed to be capable of differentiating between "legitimate" account sharing (sharing within a household) and "illegitimate" account sharing (sharing with people outside of the member's household). *Id.* ¶ 63. Cybersecurity Insiders' article also stated that this product was "capable of viewing habits and location habits of a user to identify when non-paying viewers log into an account"; "detect[ing] whether a user is 'viewing at their main home' or a 'holiday home'"; and "detect[ing] if a subscriber has 'grown-up children who live away from home' so streaming services won't punish the wrong people for account sharing." *Id.* Netflix never publicly confirmed that it was using this product, but in October 2019, Peters did state that Netflix "continue[s] to monitor" account sharing, but it has "no big plans to announce at this point in time in terms of doing something differently there." *Id.* ¶ 64 (emphasis omitted). Additionally, a former employee ("FE2"), who worked at Netflix as a narrative and product designer from 2019 until 2022, stated that "Netflix was tracking the various IP addresses used to determine the location of different users on the same account," which allowed Netflix "to determine password sharing was happening." *Id.* ¶ 191.

In 2019 and 2020, analysts and market observers estimated how pervasive account sharing was, as well as its impact on streaming services' revenue. *Id.* ¶ 61 (January 2019 Yahoo! Finance article stating that "[f]reeloading off other people deprives Netflix (NFLX) of at least $2.3 billion in revenue each year"); *id.* ¶ 65 (July 2019 MoffetNathanson research indicating that "about 14% of Netflix users report they are using a password from 'someone outside of my household'"); *id.*

3

(June 2020 Wall Street Journal article reporting that "[o]ne-third of subscribers to services like Netflix share their password with someone outside their household, according to a February survey of 2,235 subscribers by Magid, a market-research company"). Netflix purported to have "created guardrails to prevent abuse," but the only apparent "guardrail" it had implemented was curbing the number of simultaneous streams allowed per member. *Id.* ¶ 66. A former employee ("FE1"), who served as the Director of Program Management from January 2018 to March 2021, stated the problem of account sharing was discussed during his tenure at the Company. *Id.* ¶¶ 32, 67. However, any efforts to "crack[]down" on the problem were paused during early 2020 because of the COVID-19 pandemic. *Id.* ¶ 67. FE1 recalled that this approach was outlined in a Company-wide internal memorandum, *id.*, and that Hastings stated that Netflix "did not want to appear as if they were taking something away" during the pandemic "when people were losing so much at that time (e.g., health, jobs, housing)," *id.* ¶ 68 (emphasis omitted). Netflix's 2020 Form 10-K filed with the SEC on January 28, 2021 described "account sharing" as "multi-household usage" and added language discussing "efforts to restrict multi-household usage," specifically adding the phrase to its risk disclosure regarding account sharing: "if our efforts to restrict multi-household usage are ineffective." *Id.* ¶ 82 (emphasis omitted) . But Netflix "did not disclose any new measures that it was taking to restrict account sharing or discuss the impact account sharing was having on its acquisition efforts." *Id.* ¶ 83.

FE2 also attended "company-wide quarterly business review meetings where presentations about password sharing were shown" that were hosted by Hastings. *Id.* ¶ 189. FE2 also attended "design team meetings where password sharing was discussed, which were held either monthly, weekly, or bi-weekly." *Id.* At these meetings account "sharing was characterized as 'lost revenue' and was seen as limiting the Company's ability to meet its subscriber goals." *Id.* ¶ 190. FE2 stated that "these discussions made it clear that the Company had significant data about password sharing and were analyzing the data and quantifying it." *Id.* And "the size of the problem was noted in order to justify embarking on efforts to limit or 'crack down' on account sharing." *Id.*

Additionally, in March 2021, the Washington Post reported that some Netflix members

received a message that stated "[i]f you don't live with the owner of this account, you need your own account to keep watching." *Id.* ¶ 84. The article included the following statement from a Netflix spokesperson, "[t]his test is designed to help ensure that people using Netflix accounts are authorized to do so," but it also noted that Netflix "did not answer questions about the size of the test or if the company would adopt it more widely[.]" *Id.* The Bank of America, Benchmark Company, and J.P. Morgan issued reports that discussed Netflix's "crackdown" on account sharing. *Id.* ¶¶ 85–87.

Netflix experienced higher-than-expected membership growth during the first half of 2020, which the Company termed the "COVID pull-forward" because government stay-at-home orders issued in the early days of the pandemic "caused a substantial number of new subscribers to sign up for Netflix earlier than the Company had projected." *Id.* ¶ 70. Netflix correctly predicted that this growth would slow in the second half of 2020 "as consumers get through the initial shock of Covid and social restrictions." *Id.* ¶¶ 71, 73. During the October 20, 2020 earnings call, Hastings stated that "the pull-forward into next year [would be] relatively modest," and explained that there would "probably [be] a little bit of the effect in Q1 from the pull-forward, maybe a little bit less in Q2, but it will wash out." *Id.* ¶ 74 (emphasis omitted).

At the beginning of the Class Period, Netflix forecasted paid net adds of six million in Q1 2021, which was lower than paid net adds for Q1 2020 because Q1 2020 "included the impact from the initial COVID-19 lockdowns." *Id.* ¶ 75. In the event, Netflix missed this guidance by two million. *Id.* ¶ 89. Netflix did exceed its guidance for Q2 2021 and Q3 2021, but that guidance was well below what was expected by analysts and market observers. *Id.* ¶¶ 94, 98. Defendants assured analysts and shareholders that business metrics remained healthy; that the Company had ample room for growth in all its geographical regions, including those regions with higher penetration like UCAN and LATAM; and attributed any slow growth to the COVID pull-forward. *Id.* ¶¶ 95–96, 99–102. During the October 19, 2021 earnings call, Neumann stated that the paid net adds results indicated that Netflix had reached the "tail end of the COVID choppiness, the pull-forward of sub growth into 2020 and those production delays that [Netflix was] working through as well." *Id.* ¶ 99.

5

On January 20, 2022, Netflix announced that it had missed its guidance for Q4 2021 and issued weak guidance for Q1 2022, which was lower than that of Q1 2021, because its "acquisition growth has not yet re-accelerated to pre-Covid levels." *Id.* ¶ 105 (emphasis omitted). During the earnings call that same day, an analyst asked Defendants whether the low guidance for the next quarter "raise[d] any concerns for [Netflix] about anything structural, whether it's competition or saturation?" *Id.* ¶ 109 (emphasis omitted). Neumann responded there was "[n]o structural change in the business that [they saw]," and that Netflix was "trying to pinpoint what" the problem is, but it was "tough to say exactly why [its] acquisition hasn't kind of recovered to pre-COVID levels." *Id.* (emphasis omitted). Hastings added that "COVID has introduced so much noise," but Netflix's "execution is steady and getting better." *Id.* (emphasis omitted). Additionally, in response to an analyst's concerns regarding Netflix's "flattish" paid net adds in the fourth quarter of 2021, Sarandos stated that COVID "created a lot of bumpiness . . . , which makes it a little tougher to predict, but all the fundamentals of the business are pretty solid." *Id.* ¶ 110 (emphasis omitted). Finally, in response an analyst's question about whether LATAM's "maturing at a lower level of penetration than . . . the U.S." was "due to competition, affordability . . . [a]ccount sharing [o]r something else," Neumann replied that he "wouldn't necessarily read through that it's maturing faster," the "business [was] still growing there," and "there's a long runway of growth there." *Id.* ¶ 111 (emphasis omitted). After this news, the Company's stock price fell "21.7%, to close at $397.50 per share on January 21, 2022, on unusually heavy trading volume." *Id.* ¶ 176.

During a Morgan Stanley Conference on March 8, 2022, Neumann stated that the UCAN market was roughly 60% penetrated, and Netflix was "not done growing in the U.S." *Id.* ¶ 112. Shortly after, on March 16, 2022, Netflix announced that paid account sharing features would be tested in Chile, Costa Rica, and Peru "before making changes anywhere else in the world." *Id.* ¶ 113. Specifically, Netflix stated that its plans allowing multiple simultaneous streams "'created some confusion about when and how Netflix can be shared,' and '[a]s a result, accounts are being shared between households – impacting [its] ability to invest in great new TV and films for [its] members.'" *Id.* Netflix also stated that it had been "working on ways to enable members who

6

1    share outside their household to do so easily and securely, while also paying a bit more." *Id.*
2    (emphasis omitted).

3           However, Defendants knowingly withheld adverse facts during the Class Period.
4    Specifically, during the Class Period, between approximately 91.7 million and 100 million
5    households globally were using Netflix's platform through account sharing, including between
6    approximately 29.7 million and 30.3 million in UCAN. *Id.* ¶¶ 132a, 134a, 136a, 138a, 140a, 143a,
7    145a, 147a, 149a, 151a, 153a, 155a, 157a, 159a, 161a, 163a, 165a, 167a, 169a, 171a, 173a.  The
8    market penetration rate in UCAN was between 83% and 84% rather than 60%. *Id.* ¶¶ 132b, 173b.
9    Thus, "Netflix was substantially more penetrated in the applicable markets than investors were led
10   to believe" because of account sharing. *Id.* ¶¶ 132b, 134b, 136b, 138b, 140b, 143b, 145b, 147b,
11   149b, 151b, 153b, 155b, 157b, 159b, 161b, 163b, 165b, 167b, 169b, 171b, 173b.  This "severely
12   hindered Netflix's ability to acquire new paying members." *Id.* ¶¶ 132c, 134c, 136c, 138c, 140d,
13   143c, 145c, 147c, 149d, 151c, 153c, 155c, 157c, 159c, 161d, 163c, 167c, 169c, 171c, 173c.  And
14   "[t]he principal reason for the slowdown in Netflix's membership growth was the degree of
15   market saturation due to account sharing[.]" *Id.* ¶¶ 138d, 140f, 143e, 147e, 149f, 153e, 155e,
16   157d, 159d, 161d, 165d, 167e, 169d.

17          The market learned the extent of Netflix's members' account sharing in April 2022.  On
18   April 19, 2022, Netflix reported its financial results for the Q1 2022, and announced that it did not
19   meet its paid net add guidance and that for Q2 2022 it expected that paid net adds would be "-2.0m
20   vs. +1.5m in the year ago quarter." *Id.* ¶¶ 115 (emphasis omitted).  Netflix also stated that its
21   "relatively high household penetration - when including the large number of households sharing
22   accounts - combined with competition, is creating revenue growth headwinds." *Id.* (emphasis
23   omitted).  Netflix revealed for the first time that it "estimate[d] that Netflix [was] being shared
24   with over 100m additional households, including over 30m in the UCAN region," and "[a]ccount
25   sharing as a percentage of our paying membership hasn't changed much over the years." *Id.* ¶ 116
26   (emphasis omitted).  Netflix claimed that the issue of account sharing "was obscured by [its]
27   COVID growth." *Id.* ¶ 117(emphasis omitted).  During the April 19, 2022 earnings call, Peters
28   stated that Netflix had "been working on [efforts to restrict account sharing] for about almost 2

7

years," and "a little bit over a year ago, [Netflix] started doing some light test launches that . . . informed [its] thinking and helped [it] build the mechanisms that [it was] deploying[.]" *Id.* ¶ 122 (emphasis omitted).

In response to this news, analysts and investors expressed surprise at the extent of the issue of account sharing. *Id.* ¶ 125. And Netflix's stock price fell "over 35%, to close at $226.19 per share on April 20, 2022, on unusually heavy trading volume." *Id.* ¶ 126.

Multiple shareholders filed class action complaints, which were consolidated into a single action. ECF No. 37. Pirani filed the operative CAC on December 12, 2022. ECF No. 30. Defendants filed the instant motion to dismiss on February 10, 2023. ECF No. 31. Pirani filed an opposition, ECF No. 39, and Defendants filed a reply, ECF No. 41.

## II.     JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

## III.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the [plaintiff]." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Securities fraud class actions must [also] meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act [("PSLRA")]." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Under Rule 9(b) and the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2)(A), with respect to the alleged false statements or omissions, and a party must "state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b). If the

complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

## IV. JUDICIAL NOTICE AND INCORPORATION BY REFERENCE

Defendants request that the Court consider eighteen documents under the incorporation-by-reference doctrine or take judicial notice of those documents: (1) Netflix's letters to its shareholders dated April 21, 2020, January 19, 2021, April 20, 2021, July 20, 2021, October 19, 2021, January 20, 2022, and April 19, 2022, all of which were filed with the SEC, ECF Nos. 30-2–30-3, 30-6, 30-9, 30-12, 30-14, 30-17; (2) transcripts of Netflix's Q3 2019, Q4 2020, Q1 2021, Q2 2021, Q3 2021, Q4 2021, and Q1 2022 earnings calls, ECF Nos. 30-4, 30-7, 30-10, 30-13, 30-15, 30-18, 30-19; (3) Netflix's Form 10-K for fiscal years 2020 and 2021, ECF Nos. 30-5, 30-16; and (4) Netflix's Form 10-Q for Q1 2021 and Q2 2021, ECF Nos. 30-8, 30-11. Defendants argue that these documents have been incorporated by reference into the complaint because they either "form the basis of [Pirani's] claims and/or are referred to in the" CAC. ECF No. 32 at 3–4. Additionally, Defendants argue the Court may take judicial notice of the documents because they were either filed with the SEC or are transcripts of Netflix's company conference calls. *Id.* at 6–9. Pirani partially opposes this request for two reasons: (1) the Court cannot assume the truth of the matters asserted in any of the documents that Pirani alleges made false or misleading statements, ECF No. 40 at 4, 7–8; and (2) Defendants' use of Netflix's Form 10-K for fiscal year 2021 is improper because "[t]hey seek to introduce facts about Netflix's stock repurchases, even though the Company makes no reference to any such repurchases and these repurchases are irrelevant to the allegations contains the Complaint," *id.* at 5.

"As a general rule, [courts] 'may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" *United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)). "When 'matters outside the pleading are presented to and not excluded by the court,' the 12(b)(6) motion converts into a motion for summary judgment under Rule 56," unless those matters satisfy the "incorporation-by-reference doctrine" or the standard for "judicial notice under Federal Rule of Evidence 201." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (quoting

Fed. R. Civ. P. 12(d)).  The Ninth Circuit has expressed concern with the practice of "exploiting these procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage."  *Id.*  The Ninth Circuit also cautioned that "[i]f defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief."  *Id.* at 999.

"Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute,'" i.e., the fact "is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Id.* (quoting Fed. R. Evid. 201(b)).  "Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself."  *Id.* at 1002.  Documents "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim," *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003), and "the documents' authenticity . . . is not contested," *Lee*, 250 F.3d at 688 (alteration in original) (quotation marks and citation omitted).  "[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document."  *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

The documents filed at ECF Nos. 30-4–30-7, 30-9–30-10, 30-12–30-19 have been incorporated by reference.  First, Pirani does not dispute the authenticity of any of these documents, and the CAC references them repeatedly.  *See* ECF No. 30 ¶¶ 5, 11, 13, 15–16, 37, 40, 42, 44–45, 64, 76, 78, 79, 82, 88–89, 91–92, 96, 98–102, 105–107, 109, 114–124, 131–169, 176–177, 182, 184, 186, 192, 194–196.  Second, Pirani alleges that each document either contains false or misleading statements or proves scienter.  *See id.*  Because each document forms the basis for a necessary element of Pirani claims, each is properly incorporated by reference.  *See Khoja*, 899 F.3d at 1002.

Pirani argues that the Court may only take judicial notice and not the assume the truth of the documents containing alleged false or misleading statements.  Courts in this district have disagreed on whether under the incorporation-by-reference doctrine, courts may assume the truth

10

of documents that contain alleged false and misleading statements. *Compare In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 988 (N.D. Cal. 2017) ("[T]he Court cannot [assume a document's contents to be true] when [p]laintiffs' complaint alleges that these documents contain false or misleading statements.") *with In re Ocera Therapeutics, Inc. Sec. Litig.*, No. 17-cv-06687-RS, 2018 WL 7019481, at *4–5 (N.D. Cal. Oct. 16, 2018), *aff'd*, 806 F. App'x 603 (9th Cir. 2020) (assuming the truth of documents with alleged false or misleading statements because they were incorporated by reference). However, as one court in this district explained, when the Ninth Circuit "refine[ed] the incorporation by reference doctrine to prevent defendants from hijacking a plaintiff's complaint [in *Khoja*], [it] focused on how extensively a plaintiff relies on a document in its complaint, not whether a plaintiff alleged the document contained material misrepresentations or omitted facts." *Ocera Therapeutics, Inc.*, 2018 WL 7019481, at *4–5 (citing *Khoja*, 899 F.3d at 1002–03). The Court thus finds the caselaw holding that courts may assume the truth of documents containing misleading statements that have been incorporated by reference more persuasive than the pre-*Khoja* authority holding otherwise. *Id.*

However, the Court will disregard the facts about Netflix's stock repurchases in its Form 10-K for fiscal year 2021. ECF No. 30-16 at 57. Pirani has not alleged any insider trading by Individual Defendants or that a financial motive establishes scienter. Court have declined to consider facts regarding stock sales in the absence of allegations regarding financial motives. *Smith v. NetApp, Inc.*, No. 19-cv-04801-JST, 2021 WL 1233354, at *3 (N.D. Cal. Feb. 1, 2021), *appeal dismissed sub nom. Derouin v. NetApp, Inc.*, No. 21-15566, 2021 WL 4437682 (9th Cir. Aug. 2, 2021) (declining to consider facts regarding stock sales because the plaintiff did not allege a financial motive); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1123–24 (N.D. Cal. 2017) (same and collecting cases). Considering Netflix's stock repurchases would permit Defendants to engage in the exact behavior that the Ninth Circuit warned "is not the purpose of judicial notice or the incorporation-by-reference doctrine": "present their own version of the facts at the pleading stage."[2] *Khoja*, 899 F.3d at 999. Accordingly, because "[t]he only purpose of th[is] fact[] is to

---

[2] Courts do not speak with one voice on this issue, however. *See, e.g., Veal v. Lendingclub Corp.*, No. 18-cv-02599-BLF, 2020 WL 3128909, at *5 (N.D. Cal. June 12, 2020), *aff'd*, No. 20-16603,

1   create an alternative narrative . . . and the Court disregards [it]." *Smith*, 2021 WL 1233354, at \*3.

2   Additionally, Defendants do not rely on Netflix's Form 10-Q for Q1 2021 and Q2 2021,

3   ECF Nos. 30-8, 30-11, in their motion to dismiss. Because neither the Court nor Defendants rely

4   upon these documents, the Court denies as moot Defendants' notice of incorporation by reference

5   and request for judicial notice for these documents. *See SEB Inv. Mgmt. AB v. Align Tech., Inc.*,

6   485 F. Supp. 3d 1113, 1121 (N.D. Cal. 2020).

7   Finally, the documents filed at ECF Nos. 30-2, 30-3, and 30-9 have not been incorporated

8   by reference. These documents serve only to provide background and do not form the basis of any

9   claim. However, "[c]ourts routinely take judicial notice of . . . documents [filed with the SEC] for

10  the purpose of determining what information was available to the market." *In re Splunk Inc. Sec.

11  Litig.*, 592 F. Supp. 3d 919, 930 (N.D. Cal. 2022). Accordingly, the Court will take judicial notice

12  of these documents for the purpose of considering what information was available the market.

## V.   DISCUSSION

### A.   Claim under Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act declares it "unlawful . . . to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "Rule 10b-5 implements Section 10(b) by making it unlawful '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (quoting 17 C.F.R. § 240.10b-5(b)). To plead a claim under Section 10(b) and Rule 10b-5, "a plaintiff must allege: '(1) a material misrepresentation or omission by the defendant [(falsity)]; (2) scienter; (3) a connection between the misrepresentation or omission and

---

2021 WL 4281301 (9th Cir. Sept. 21, 2021) (considering facts regarding stock sales in its scienter analysis despite the absence of financial motive allegations); *Kong v. Fluidigm Corp.*, No. 20-cv-06617-PJH, 2022 WL 445764, at \*4 (N.D. Cal. Feb. 14, 2022), *aff'd*, No. 22-15396, 2023 WL 2134394 (9th Cir. Feb. 21, 2023) (same).

the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Id.* (alteration in original) (quoting *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014)).

Defendants move to dismiss Plaintiff's Section 10(b) and Rule 10b-5 claim because Pirani fails to plead facts to support the elements requiring a material misrepresentation or omission and scienter. ECF No. 31 at 12–31. Because the question of whether Pirani has adequately pleaded falsity is dispositive, the Court decides the motion on that basis.

Section 10(b) and Rule 10b-5 require a plaintiff to show that the defendant made a statement that was false or misleading as to a material fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008. "Even if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008–09. "[A] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (alteration in original) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)). "Courts apply the objective standard of a 'reasonable investor' to determine whether a statement is misleading." *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d at 932. There is no requirement of a "strong inference of fraud." *Glazer Cap. Mgmt., L.P.*, 63 F.4th at 766. Instead, "[f]alsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*[.]" *Id.* (emphasis in original).

Pirani challenges four overlapping categories of Defendants' statements as misleading due to omitted facts regarding the extent of the account sharing problem: (1) statements about Netflix's market penetration; (2) statements about Netflix's metrics and long-term growth; (3) statements that attributed Netflix's slow growth to the COVID pull forward and the aftereffects of COVID; and (4) statements that specifically addressed account sharing. ECF No. 30 ¶¶ 131–173. The foundational premise of Pirani's claim is that because between 91.7 million and 100 million households were not paying and using Netflix's platform through account sharing, Defendants

13

knew that the Company's ability to acquire new customers was "severely hindered," and thus their statements regarding Netflix's market penetration, metrics and long-term growth, attributing Netflix's slow growth to COVID, and regarding account sharing were materially misleading. *See id.*

Defendants argue that Pirani fails to plead with particularity that the statements were false or misleading because (1) Pirani fails to identify each allegedly false or misleading statement; (2) Pirani fails to plausibly allege that Defendants knew about the extent of the account sharing problem at the time the statements were made; and (3) the challenged statements are non-actionable statements of opinion, corporate optimism, or forward-looking statements. ECF No. 31 at 12–31.

### 1. Identification of Statements

Defendants contend that "[i]t is unclear exactly which or how many statements [Pirani] is challenging because of the use of block quotes and 'scattered' bold and italics in the" CAC. ECF No. 31 at 13. Pirani responds that the CAC "identifies each statement (and applicable subpart) and the reasons why each statement is challenged as false or misleading," specifically by using "[b]old and italics . . . to identify portions of the statements that were challenged." ECF No. 39 at 13.

Here, although Pirani uses boldface and italics for statements other than those he is challenging as false and misleading, and uses block quotations, the paragraphs following the block quotations specify the statements Pirani is challenging, and explain why those statements were false or misleading.[3] *See* ECF No. 30 ¶¶ 131–173. Accordingly, the CAC "fulfills the purpose of Rule 8 by putting Defendants on notice of the true substance of the claims against them." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014). The Court denies the motion to dismiss on this ground.

---

[3] In one of the paragraphs that follow the block quotes, Pirani also alleges that statements "that the 'long-term' drivers of growth were 'as healthy as ever' were materially misleading," but those phrases do not appear in the block quote. ECF No. 30 ¶ 140d. For purposes of deciding the motion, the Court assumes that this is a typographical error. Any future amended pleading shall correct this error.

14

### 2. False or Misleading When Made

Defendants argue that Pirani fails to plead falsity because none of the facts alleged support that the statements were false or misleading when they were made. Specifically, Defendants contend that Pirani "has pled no facts establishing that Netflix had reached . . . a conclusion" that its "'ability to acquire new paying members [would be] severely hindered' by account sharing," ECF No. 41 at 7, or that it "had actually accurately predicted account sharing's impact, despite confounding factors like the pandemic and increasing competition," *id.* at 10, during the Class Period.

The Court finds that taken together and viewed in the light most favorable to Pirani, Pirani fails to allege with particularity that the statements made during the Class Period were false when made. Specifically, Pirani fails to allege with particularity what level of account sharing monitoring Netflix was doing when, or what was known regarding the extent of account sharing when.

To support his contention that the Company was extensively monitoring account sharing and knew that it was negatively impacting Netflix's ability to grow during the Class Period, Pirani relies upon statements from FE1 and FE2 regarding discussions about account sharing at Netflix. However, except for that the internal memorandum indicating that Netflix would pause efforts to "crack down" on account sharing was written in early 2020, the CAC does not specify when the FE1 and FE2 or anyone at the Company discussed account sharing. And it fails to allege what was specifically discussed about accounting or who discussed it. *Id.* ¶ 67 ("FE1 said password sharing was often discussed during FE1's tenure at Netflix," but failing to allege what was alleged discussed regarding account sharing other than that any efforts to restrict it would be paused in early 2020); *id.* ¶¶ 189–190 (noting that FE2 attended quarterly business review meetings hosted by Hastings and design team meetings that occurred monthly, weekly, or bi-weekly where account sharing was discussed, but failing to describe with particularity what was said about account sharing and who said it); *id.* ¶ 191 (alleging that "FE2 said Netflix was tracking the various IP addresses used to determine the location of different users on the same account," but failing to allege when this occurred or on what scale this was being done).

Pirani also relies upon statements from before, during, and after the Class Period about or from Defendants' regarding the Company's monitoring of account sharing and efforts to restrict account sharing. *Id.* ¶¶ 62–63, 84, 113, 116, 118, 122, 135, 144, 170. These allegations establish that Netflix took steps to restrict account sharing and did some monitoring of account sharing during the Class Period. They also establish that at the end of the Class Period, Netflix had determined that Netflix always had account sharing, "[a]ccount sharing as a percentage of [its] paying membership [had not] changed much over the years," and that the "relatively high household penetration—when including the large number of households sharing accounts—combined with competition, is creating revenue growth headwinds." *Id.* ¶¶ 115, 117 (emphasis omitted). However, without more, the allegations do not establish at what level Netflix monitored account sharing during the Class Period, or that Defendants were aware of the extent of the account sharing problem, i.e., that Defendants were aware that account sharing was "creating revenue growth headwinds" throughout the Class Period. This is especially true in light of the Defendants' explanation that the impact that account sharing was having on Netflix's growth was "obscured by [its] COVID growth." *Id.* ¶ 117 (emphasis omitted). Accordingly, "[t]he vagueness around timing," as well as around what was said and by whom, "means that [Pirani] has failed to state with particularity facts giving rise to a reasonable inference that the [challenged] statements . . . were false or misleading *when made.*" *In re Okta, Inc. Sec. Litig.*, No. 22-cv-02990-SI, 2023 WL 2749193, at *11 (N.D. Cal. Mar. 31, 2023) (emphasis in original); *see also Weston Family Partnership LLLP v. Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022) (affirming dismissal for failure to plead falsity where "[p]laintiffs ha[d] not adequately alleged that [defendants] even knew about these [adverse facts] when" they made the challenged statements); *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1055 (N.D. Cal. 2018) (holding that the plaintiffs "failed to plead facts to show [d]efendants' statements were false or misleading when made," including because the factual allegations did not "provide any information about . . . what [the defendants] allegedly knew about the" material adverse facts when defendants' statements were made); *In re Rackable Sys., Inc. Sec. Litig.*, No. C09-0222CW, 2010 WL 199703, at *5 (N.D. Cal. Jan. 13, 2010) (dismissing claims where the plaintiffs failed to "plead specific facts from which a

reasonable inference can be made that [d]efendants knew their projections . . . were false at the time that they made them").

*In re Quality Systems, Inc. Securities Litigation* is inapposite. 865 F.3d 1130 (9th Cir. 2017). There, the plaintiffs alleged that the defendants' statements regarding the company's sales pipeline were false or misleading based upon confidential witnesses with personal knowledge that (1) a defendant had "explained in internal . . . conference calls . . . that the market for [their products] 'had become saturated'"; (2) the company had experienced "a slowdown [in] . . . business"; (3) "the bonus portion of [a confidential witness's] compensation, which was based on [the company's] sales figures, had been eliminated"; and (4) a member of the company's board of directors stated that the "sales pipeline had been declining," and (5) "sales executives were falling short 'often by more than 50%[,]' and that [a confidential witness] 'believed other regions were similarly missing their targets by about 50%.'" *Id.* at 1144. Pirani does not rely upon similar, particularized facts, including those from FE1 and FE2, regarding Defendants' knowledge. *See In re Supercom Inc. Sec. Litig.*, No. 15 CIV. 9650 (PGG), 2018 WL 4926442, at *25 (S.D.N.Y. Oct. 10, 2018) (distinguishing *Quality Systems*).

Therefore, the Court will grant Defendants motion to dismiss for failure to plead falsity. The Court grants leave to amend because it appears "that the pleading could . . . be cured by the allegation of other facts." *OSU Student All. v. Ray*, 699 F.3d 1053, 1079 (9th Cir. 2012), *cert. denied*, 134 S. Ct. 70 (2013) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc)).[4]

### B. Section 20(a)

Section 20(a) of the Exchange Act, which forms the basis of Pirani's second cause of action, extends liability to persons who directly or indirectly control a violation of the securities laws. 15 U.S.C. § 78t(a). Under Section 20(a), "a defendant employee of a corporation who has

---

[4] In light of this conclusion and because Pirani's amendment will likely affect the Court's analysis, the Court does not address Defendants' remaining arguments as to why Pirani has failed to plead falsity. *See Westley v. Oclaro, Inc.*, No. C-11-2448 EMC, 2012 WL 1038647, at *6 (N.D. Cal. Mar. 27, 2012) ("Because [p]laintiffs' amendment may affect how the Court evaluates, *e.g.*, the safe harbor protection, scienter, and loss causation, the Court does not address those issues which were also briefed by the parties.").

17

violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 632 (9th Cir. 2017) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009)).

A claim under Section 20(a) can survive only if the underlying predicate Exchange Act violation also survives. *See id.* Because the Court dismisses Pirani's Section 10(b) claim, Pirani's second cause of action must also be dismissed.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss without prejudice. Leave to amend is granted solely to cure the deficiencies identified in this order. Any amended complaint shall be filed within 28 days.

**IT IS SO ORDERED.**

Dated: January 5, 2024

_____
JON S. TIGAR
United States District Judge