1   Robert V. Prongay (SBN 270796)
      *rprongay@glancylaw.com*
2   Jason L. Krajcer (SBN 234235)
      *jkrajcer@glancylaw.com*
3   Christopher R. Fallon (SBN 235684)
      *cfallon@glancylaw.com*
4   Pavithra Rajesh (SBN 323055)
      *prajesh@glancylaw.com*
5   GLANCY PRONGAY & MURRAY LLP
6   1925 Century Park East, Suite 2100
    Los Angeles, California 90067
7   Telephone: (310) 201-9150
    Facsimile: (310) 201-9160
8

9   *Attorneys for Plaintiff*

10  [Additional Counsel on Signature Page]

11                  **UNITED STATES DISTRICT COURT**

12                **NORTHERN DISTRICT OF CALIFORNIA**

13
    *In re Netflix, Inc. Securities Litigation*  |  Case No. 4:22-cv-02672-JST
14
                                                 |  **SECOND AMENDED CLASS ACTION**
15                                               |  **COMPLAINT FOR VIOLATIONS OF**
                                                 |  **THE FEDERAL SECURITIES LAWS**
16
17                                               |  <u>DEMAND FOR JURY TRIAL</u>

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION AND OVERVIEW ..................................................1

II.     JURISDICTION AND VENUE ........................................................................8

III.    PARTIES ....................................................................................................8

IV.     RELEVANT NON-PARTIES ........................................................................10

V.      BACKGROUND ........................................................................................11

      A.    Company Background ......................................................................11

      B.    Netflix Monitored Account Sharing And Claimed It Was Not A Problem ............15

            1.    Historically, Netflix Claimed That Account Sharing Was Not A "Material Inhibitor" To Subscriber Acquisition ..........................................15

            2.    In 2019, Netflix Identified Account Sharing As A Major Factor Adversely Affecting Netflix's Growth, But Management Delayed A Crackdown Once COVID Struck ....................................................................19

      C.    COVID Pulls Forward Subscriber Growth ............................................23

VI.     CLASS PERIOD EVENTS ............................................................................24

      A.    Netflix Issues Disappointing Paid Net Add Guidance For Q1'21, But Claims Long-Term Growth Prospects Are "As Strong As Ever" .................................24

      B.    While Testing A Solution To Limit Account Sharing, Netflix Attributes Underwhelming Subscriber Growth To Residual Effects of the COVID Pull-Forward ....................................................................................27

            1.    Netflix Begins Testing Methods to Limit Account Sharing, While Omitting the Extent of Account Sharing ....................................................27

            2.    Netflix Misses Q1'21 Guidance, But Blames The COVID Pull-Forward ...29

            3.    Netflix Continues To Blame Declining Subscriber Growth On COVID Pull-Forward In Q2'21 ....................................................................31

            4.    Netflix Claims It Reached The Tail End Of COVID Pull-Forward, But Growth In UCAN And LATAM Continue To Lag ..................................32

            5.    Netflix Q4'21 Results And Q1'22 Guidance Partially Reveal Acquisition Challenges; Management Assures There Are No Structural Issues .............34

            6.    Netflix Assures Investors It's Not Done Growing .....................................39

C.    Netflix Reveals That 45% Of Its Paid Members Engage in Account Sharing, Revealing That The Company Was Far More Penetrated In Markets Than Investors Had Been Led To Believe ................................................................42

VII.    POST-CLASS PERIOD EVENTS................................................................48

VIII.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS .....50

A.    Fourth Quarter and Full Year Results For 2020......................................50

B.    First Quarter of 2021 Financial Results ................................................55

C.    Second Quarter 2021 Financial Results ................................................63

D.    Third Quarter 2021 Financial Results ...................................................69

E.    Fourth Quarter & Full Year 2021 Financial Results .................................74

F.    March 8, 2022 Morgan Stanley Technology, Media & Telecom Conference .........84

IX.    LOSS CAUSATION ..............................................................................86

X.    ADDITIONAL SCIENTER AND FALSITY ALLEGATIONS ........................87

A.    Board And Committee Materials Disclosed In Shareholder Derivative Actions Support A Strong Inference Of Scienter ................................................92

1.    October 18, 2021 Audit Committee Meeting................................93

2.    December 1, 2021 Board Meeting ..............................................95

3.    March 2, 2022 Board Meeting ...................................................99

B.    The December 21, 2022 WSJ Article Reported That Defendants Had Known Since 2019 That Account Sharing Inhibited Subscriber Growth, But They Delayed Efforts To Limit It Due To The Subscriber Boom Amid COVID ...................................101

C.    Defendants Were Concerned That Attempts To Limit Account Sharing Would Lead To More Cancellations ......................................................................102

D.    The Pandemic Did Not Obscure The Impact Of Account Sharing To Defendants ........................................................................................103

XI.    ADDITIONAL MATERIALITY ALLEGATIONS .....................................106

XII.    CLASS ACTION ALLEGATIONS.........................................................112

XIII.    UNDISCLOSED ADVERSE FACTS ......................................................113

XIV.   APPLICABILITY OF PRESUMPTION OF RELIANCE ................................................114

XV.    NO SAFE HARBOR.........................................................................................................116

XVI.   CLAIMS............................................................................................................................116

XVII.  PRAYER FOR RELIEF....................................................................................................120

XVIII. JURY TRIAL DEMANDED ...........................................................................................120

Plaintiff Fiyyaz Pirani, as Trustee of Imperium Irrevocable Trust, ("Plaintiff") individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Netflix, Inc. ("Netflix" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Netflix; and (c) review of other publicly available information concerning Netflix.

## I.      NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Netflix common stock or call options, or sold put options, between January 19, 2021 and April 19, 2022, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Netflix is an entertainment company that primarily operates a streaming platform that offers TV series, documentaries, feature films, and mobile games across a variety of genres and languages in over 190 countries. It has one operating segment that derives revenues from monthly membership fees for streaming services. While its competitors earned revenue from advertising on their platforms or offering an ad-free plan, Netflix proudly remained free of advertising prior to and during the Class Period, so its revenue growth depended entirely on increasing membership.

3.      Indeed, though Netflix measured the health of its business using acquisition, retention, and engagement metrics, the one metric that was the critical focus to investors was "paid net adds," which is the number of paid new memberships added during the reporting period minus those lost due to cancellations.

4.      While the Company offered plans to allow for multiple simultaneous streams *within* a household, Netflix prohibited its paying members from sharing their password with non-paying users who did not reside in their household, which is called "account sharing" or "password sharing." At all relevant times, the Company acknowledged that account sharing existed but did not

disclose any data concerning the extent of that account sharing.  For years, Netflix management maintained a very permissive approach toward account sharing, claiming that sharing was not a significant problem and even a positive for the Company.  In 2016, then-CFO David Wells publicly stated that account sharing was not "a material inhibitor to [Netflix's] growth," but acknowledged "[t]hat might not be true forever."

5.     The first indication of a possible shift in Netflix's posture toward account sharing occurred in 2019, when media reported that Netflix had employed software by Synamedia "to keep a tab on the sharing activity across its streaming services."  Reportedly, the software could identify when a non-paying user logs into an account based on the viewing and location habits of paying members.  Netflix did not publicly acknowledge using Synamedia's software, but management admitted that they "continue[d] to monitor" account sharing during an earnings call in October 2019.

6.     Any plans to crack down on account sharing, however, were tabled during the onset of the COVID-19 pandemic in early 2020.  As mandated lockdowns confined people to their homes, the demand for streaming entertainment services grew and Netflix experienced a surge in paid net adds.  According to a former Netflix employee, an internal memo in approximately Q2'20 stated that the Company would not attempt to limit account sharing once the pandemic struck because it could be seen as exploiting the global pandemic, at a time when people were already losing so much (*e.g.*, health, jobs, housing), and the priority was to make the service available without interruption.

7.     According to management's public statements, the COVID-related surge in subscribers led to "a pull forward" of Netflix's membership growth from subsequent quarters.  Indeed, Netflix posted impressive results during the first half of 2020, with 15 million paid net adds in Q1'20 and 10 million paid net adds in Q2'20.  Defendants predicted that the second half of 2020 would be "light" relative to prior years, and, though Q1'21 would experience some residual effect from the COVID pull-forward, this effect would "wash out" and not be "permanent or long term."

8.     The Class Period begins on January 19, 2021 when Netflix announced its financial results for Q4'20 and issued underwhelming guidance for paid net adds in Q1'21.  Because Netflix had outperformed expectations for Q4'20, an analyst questioned whether the lower-than-expected guidance reflected an undisclosed weakness.  The Company's Chief Financial Officer, Spencer

Neumann, responded that "there's probably still a little bit of that pull-forward dynamic in the early parts of 2021," but flatly rejected the analyst's contention that Netflix was saturated in the United States and Canada ("UCAN") market.  Neumann assured that in the UCAN market, Netflix was "roughly 60% penetrated, and . . . *still growing*."[1]  The promise of continued growth in the UCAN market was enticing to investors because it was the Company's most tenured market, providing the highest average revenue per member and contributing most to Netflix's revenues.  More broadly, Neumann claimed that "we've got a lot of headroom in all these markets" in which Netflix offered its streaming services to consumers.

9.     Notwithstanding Neumann's representation that Netflix was only 60% penetrated into the UCAN market, the actual rate of market penetration was substantially higher due to account sharing.  In addition to the roughly 74 million UCAN subscribers that Netflix reported at the time of Neumann's statements, unbeknownst to investors, there were almost 25 million additional households that were using Netflix's services without paying for them through account sharing. This amount vastly exceeded any of the public estimates of account sharing that had been circulated by third parties.  The effective rate of market penetration in the UCAN market, therefore, was roughly 79%, making it extremely difficult for Netflix to materially increase its subscriber base. Globally, Netflix was significantly less penetrated than in the UCAN market, but extensive account sharing still caused a degree of market penetration that was substantially larger than investors had been led to believe.  As detailed *infra*, Netflix reported roughly 204 million global subscribers as of the end of Q4'20, implying a global market penetration of roughly 24%, but Netflix failed to disclose that there were more than 90 million additional households that used Netflix's services through account sharing.  The effective degree of market penetration, therefore, was around 35%.  Reaching higher levels of penetration outside UCAN, and thus globally, would require the Company to expand its library of local content for those markets, which was a longer-term prospect.  Thus, while there was still "headroom" to grow, Netflix was a lot closer to the ceiling of its potential growth than anyone in the market had reason to believe.

---

[1] Unless otherwise noted, all emphasis in this Complaint has been added.

10.    In March 2021, media reports indicated that some Netflix users were seeing the following warning: "If you don't live with the owner of this account, you need your own account to keep watching."  In the following days, analysts issued reports estimating that between 26% and 33% of Netflix subscribers shared their account.  Even the worst-case estimates, however, substantially underestimated the degree of account sharing that Netflix was experiencing.

11.    When asked why Netflix was testing methods to limit account sharing and why this was "right time to start tightening the screws" on this long-standing issue, Defendants claimed that the testing was not "new" but part of Netflix's continuing approach to offer plans that meet the broad sets of needs of its members.  Specifically, during the April 20, 2021 Q1'21 earnings call, the Company's Chief Operating Officer Gregory Peters stated that Netflix is "really seeking that sort of flexible approach to make sure that we are providing the plans with the right features and the right price points," and while the Company wanted to ensure that only paying members use the service, the testing was "not necessarily a new thing" and "[w]e've been doing this for a while."

12.    Over the next several quarters, Defendants claimed that "the underlying business metrics are really healthy," and any weakness was attributable to "choppiness" caused by the COVID pull-forward.  Even when acknowledging that the UCAN and the Latin American regions "grew paid memberships more slowly" because "[t]hese regions have higher penetration," Defendants assured there was still "ample runway for growth."

13.    Certain documents presented to Netflix's Board of Directors and Audit Committee, excerpts of which were recently made public in derivative litigation against Netflix's insiders, paint a starkly different picture.  For example, on October 19, 2021, during the Company's earnings call for Q3'21, Neumann claimed that Netflix's "business remained healthy" with "churn at low levels," that "retention was very healthy," and that the UCAN and LATAM regions had "ample runway for growth."  Just one day earlier, however, Neumann attended an Audit Committee meeting at which the distributed materials indicated that the UCAN market exhibited "worse than expected churn" due to "more absolute cancellations coming from the now larger member base."  These facts suggest that Netflix's ability to retain existing subscribers while acquiring new ones was weakening and that Netflix was reaching a saturation point in UCAN.

14.    In fact, by no later than December 1, 2021, Netflix's Co-Chief Executive Officer ("Co-CEO") Reed Hastings, Neumann, and Peters knew that Netflix's market penetration in UCAN was "close to 80%" due to the high rate of account sharing.  According to materials distributed in connection with a December 1, 2021 Board meeting attended by Hastings, Neumann, Peters, among others, the UCAN market had grown to 74 million subscriber households, representing 59% market penetration.  However, the Board materials indicated that this figure "understated" the effective degree of market penetration, because there were over 25 million account sharing households, and considering those additional user households, the market penetration was "close to 80%."  The Board materials also stated that "deepening penetration" had led to "slower membership growth" and that account sharing was a "bigger issue" posing a material threat to the Company's growth. While Netflix management had been closely monitoring account sharing for years and had diagnosed it as a serious threat to the Company's growth prospects by the latter half of 2019, the alarming materials presented at the December 1, 2021 Board meeting reflected an escalation of the issue to the attention of the entire Board and the inevitability that Defendants would have to disclose it.

15.    The truth began to emerge on January 20, 2022, albeit only partially and in a backhanded fashion, when Netflix released its financial results for Q4'21 after the market closed. On that date, Netflix announced that it had missed its guidance for paid net adds in Q4'21 by 200,000 subscribers and that it only expected 2.5 million paid net adds in Q1'22 (compared to 4 million during the comparable period a year ago).  Defendants misleadingly attributed the shortfall to "the ongoing Covid overhang and macro-economic hardship" and acknowledged that "acquisition growth has not yet re-accelerated to pre-Covid levels," but failed to disclose that account sharing was a significant driver of the miss and that the extremely high level of market penetration due to account sharing presented an enormous headwind limiting the Company's growth going forward.

16.    On this news, the Company's stock price fell $110.75, or 21.7%, to close at $397.50 per share on January 21, 2022, on unusually heavy trading volume.  This drop wiped out approximately $49 billion of market capitalization in one day.

17.    Analysts were alarmed that the weak Q1'22 guidance reflected undisclosed

underlying problems, but Defendants continued to issue materially false and/or misleading statements and deflected analyst questions about market saturation and account sharing. During the January 20, 2022 Q4'21 earnings call, an analyst specifically asked whether management had "any concerns . . . about anything structural, whether it's competition or saturation." Neumann posited that "[i]t's tough to say exactly why our acquisition hasn't kind of recovered to pre-COVID levels" but attested that there was "[n]o structural change in the business." Hastings also dismissed concerns, stating that "COVID has introduced so much noise." Co-CEO Ted Sarandos similarly cited "bumpiness" caused by the COVID pull-forward as affecting predictions and stated that "all the fundamentals of the business are pretty solid." Neumann answered an analyst's question about market penetration in Latin America by saying "there's a long runway of growth there" and evaded a portion of the question that asked about account sharing.

18.    The truth was revealed on April 19, 2022, after the market closed, when the Company admitted to the true extent of account sharing and acknowledged that account sharing caused Netflix to be highly penetrated in the applicable markets, thereby inhibiting subscriber growth. Specifically, Netflix stated that "in addition to our 222m paying households, we estimate that Netflix is being shared with over 100m additional households, including over 30m in the UCAN region." Moreover, "***our relatively high household penetration - when including the large number of households sharing accounts*** – combined with competition, ***is creating revenue growth headwinds***." Excluding the impact of a service suspension in Russia, Q1'22 paid net adds totaled 0.5 million, significantly missing guidance of 2.5 million.

19.    The market was shocked. Analysts expressed astonishment at the extent of the account sharing and the degree of market saturation that the Company had now admitted to, and what those facts meant about the Company's future prospects. For example, J.P. Morgan issued a report stating that the Q1'21 results represented "a sea change quarter for NFLX in which the company essentially conceded to every key point of the bear thesis[.]" Beyond the disappointing quarterly results themselves, J.P. Morgan observed that "the bigger factor is management's acknowledgement of relatively high household penetration when including account sharing[.]" Similarly, Bank of America stated, "Management now concedes that between paying subscribers

and password sharers, most of the key markets, UCAN and EMEA likely, have saturated and it will be very hard to find new many subscribers in these markets in the near to medium term."  Analyst Michael Nathanson of MoffettNathanson LLC said, "Everything they've tried to convince me of over the last five years was given up in one quarter.  It's such [an] about face."

20.    Following Netflix's April 19, 2022 disclosures, the Company's share price fell $122.42, or over 35%, to close at $226.19 per share on April 20, 2022, on unusually heavy trading volume, wiping out approximately $54 billion in market capitalization.

21.    On December 21, 2022, The Wall Street Journal ("WSJ") reported that the Company knew account sharing was materially inhibiting subscriber growth by 2019, *i.e.* before the Class Period.  In an article entitled "The End of Netflix Password Sharing is Nigh," the WSJ reported that "[r]esearchers inside Netflix Inc. identified password sharing as *a major problem eating into subscriptions in 2019*."  After Netflix "reported a rare loss in U.S. subscribers in the second quarter of that year," the Company's "researchers . . . investigate[d] why growth was slowing.  That team found that password sharers were among the culprits."  However, efforts to limit password sharing were deferred because management was afraid of churn resulting from a crackdown and the immediacy of the issue "waned as a concern as the pandemic supercharged the company's growth in 2020."  In a meeting with senior executives in early 2022, however, Hastings acknowledged that "they had waited too long to deal with it [*i.e.*, password sharing]."

22.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors, *inter alia*: (1) that during the Class Period, between 90 million and 100+ million households were using Netflix globally through account sharing without paying Netflix for its services; (2) that during the Class Period, between roughly 25 million and 30+ million households were using Netflix in the UCAN region without paying Netflix for its services; (3) that, as a result of the foregoing, Netflix was substantially more penetrated in the applicable markets than investors were led to believe by Netflix's reported subscriber data and public statements concerning market penetration; and (4) that, as a result of the foregoing, Netflix's ability to acquire new paying members was severely hindered.

23.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

27.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

28.     Plaintiff Fiyyaz Pirani, as Trustee of Imperium Irrevocable Trust, as set forth in the previously-filed certification (ECF No. 1 at 21-23) and declaration (ECF No. 19-4), incorporated by reference herein, purchased or otherwise acquired Netflix common stock or call options, or sold Netflix put options, during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

29.     Defendant Netflix is incorporated under the laws of Delaware with its principal executive offices located in Los Gatos, California.  Netflix's common stock trades on the NASDAQ exchange under the symbol "NFLX."

30.     Defendant Reed Hastings ("Hastings") is the co-founder of Netflix and served as the Chief Executive Officer ("CEO") from 1997 until July 2020, Co-Chief Executive Officer ("Co-CEO") from July 2020 through December 2022, President of the Company from 1997 through December 2022, and Chairperson of the Board of Directors since 1997.  Hastings stepped down from his role as Co-CEO and President and was named the Executive Chairman of the Company in January 2023.  In 1991, Hastings founded Pure Software, which was acquired by Rational Software in 1997.  Hastings served on the board of Facebook, Inc. from 2011-2019.  Hastings received a B.A. from Bowdoin College in 1983, and an MSCS in Artificial Intelligence from Stanford University in 1988.

31.     Defendant Ted Sarandos ("Sarandos") served as the Co-CEO since July 2020, Chief Content Creator since 2000, and a director of the Company since 2020.  Sarandos also serves on the Film Advisory Board for the Tribeca and Los Angeles Film Festivals, is an American Cinematheque board member, and serves on the Board of Spotify Technology S.A.  Sarandos previously served as Vice President of Product and Merchandising at Video City/West Coast video and Western Regional Director of Sales and Operations at video distributor ETD.

32.     Defendant Spencer Neumann ("Neumann") served as the Company's Chief Financial Officer ("CFO") since January 2019.  Previously, he served as Activision Blizzard's CFO from May 2017.  Prior to that, Neumann held a number of positions of increasing responsibility at The Walt Disney Company, most recently serving as the CFO and executive vice president of Global Guest Experience of Walt Disney Parks and Resorts, from 2012 to 2017.  From 2005 to 2012, Neumann worked at the private equity firms of Providence Equity Partners and Summit Partners.  Prior to that, he held several other roles with Disney, which he initially joined in 1992, including executive vice president of the ABC Television Network from 2001 to 2004 and CFO of the Walt Disney Internet Group from 1999 to 2001.  Neumann holds both a B.A. degree in economics and an M.B.A. degree from Harvard University.

33.     Defendant Gregory Peters ("Peters") served as the Company's Chief Operating Officer from July 2020 and Chief Product Officer from 2017 until January 2023 when he was named Co-CEO and a director of the Company.  Peters served in a variety of others positions at Netflix

since 2008.  He is on the Board of Directors of Door Dash and 2U, Inc.  Prior to joining Netflix, Peters was Senior Vice President of consumer electronics products for Macrovision Solutions Corp. (later renamed to Rovi Corporation) and held positions at digital entertainment software provider, Mediabolic Inc., Red Hat Network, the provider of Linux and Open Source technology, and online vendor Wine.com.  He holds a degree in physics and astronomy from Yale University.

34.     Defendants Hastings, Sarandos, Neumann, and Peters (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## IV.    RELEVANT NON-PARTIES

35.     Former Employee 1 ("FE1") began working in Program Management for Netflix in 2008 and was the Director of Program Management from January 2018 until FE1 departed the Company in March 2021.  During FE1's last year of employment with the Company, FE1 concurrently held the role of Chief of Staff for Rochelle King, Vice President of Creative Production.  King reported to Defendant Peters, who reported to Defendant Hastings.

36.     FE1 worked closely with King to organize strategy sessions with various team members within Creative Production.  The results from the week-long strategy sessions would then be presented to the entire Creative Production team (approximately 700 employees globally) at the quarterly all-hands meetings.  As Director of Program Management, FE1 managed a team of approximately 12 to 15 Program Managers.  FE1's team was involved in all creative content that appeared on the website or mobile application and was responsible for making sure the release of

1    Netflix content was available on schedule.

2        37.    Former Employee 2 ("FE2") began working for Netflix as a Narrative Designer on

3    the Interactive Team in June 2019.  Netflix began scaling back its interactive program in February

4    or March 2021, and in July 2021, FE2's title changed to Product Designer, but FE2's responsibilities

5    remained the same.  FE2 reported to Director Dave Schlossman, who reported to Director of Design

6    Steve Johnson.  Johnson reported to Head of Product Todd Yellin who FE2 believed reported to

7    Hastings or Sarandos.

8        38.    As a Narrative Designer, FE2 was part of the Interactive Team which was exploring

9    ways to interact with the Netflix audience, including interactive movies or shows, trivia and games.

10   FE2 said the interactive movies included live action-scripted, live action-unscripted (reality), as well

11   as animation.  FE2 did not write any of the shows, but interacted with the content and storyteller

12   teams and reviewed and edited potential storylines.  During FE2's tenure, Netflix launched

13   approximately three to four titles each year.  However, these movies cost more money and took

14   more time to make than a typical studio movie and as a result, in February or March 2021, Netflix

15   scaled back to only one or two titles a year.  FE2 said Hastings did not like the interactive programs,

16   but Yellin was a strong proponent.  In or around June 2021, Yellin left Netflix and the other

17   Narrative Designers were terminated and the team was dissolved.  FE2's title was then changed to

18   Product Designer, and FE2 left the Company in June 2022.

19   **V.    BACKGROUND**

20       **A.    Company Background**

21       39.    Netflix primarily operates an entertainment streaming platform that offers TV series,

22   documentaries, feature films, and mobile games across a variety of genres and languages in over

23   190 countries.  It also offers a DVD-by-mail service in the U.S.

24       40.    The Company allowed members to watch as much as they want, anytime, anywhere,

25   on any internet-connected screen.  During the Class Period, members could play, pause and resume

26   watching, all without commercials.  Netflix was a pioneer in the shift from linear tv to streaming

27   and Hastings expressed "very high confidence" that "[l]inear dissipates over the next 10 to 20 years"

28   on the Company's January 20, 2022 Q4'21 earnings call.

41.     Netflix has one operating segment.  During the Class Period, its revenues were primarily derived from monthly membership fees for services related to streaming content to its members.  Netflix defines a paid membership (also referred to as a paid subscription) as having "the right to receive Netflix service following sign-up and a method of payment being provided, and that is not part of a free trial or other promotional offering by the Company to certain new and rejoining members."  Voluntary cancellations generally become effective at the end of the prepaid membership period.  Involuntary cancellations of the service, as a result of a failed method of payment, become effective immediately.

42.     During the Class Period, Netflix provided quarterly guidance for paid net membership additions or "paid net adds."  Paid net adds was the number of paid new memberships added each quarter minus those it lost due to cancellations or, more simply, acquisition minus churn.  Netflix did not report specific figures for acquisition and churn, but paid net adds combined the two.  Churn was often discussed in terms of its counterpart – retention.  Netflix also reported on how users engaged with its platform.  Engagement was measured by the number of accounts that viewed a title until the end of 2021, when it changed the metric to measure the number of hours viewed per title.  Engagement was often discussed as viewing or views.

43.     The Company considered acquisition, churn, and engagement important metrics to gauge the health of the business.  For example, on the January 19, 2021 Q4'20 earnings call, Neumann noted, "[V]iewing is up in every region of the world. . . . Retention is better than it was a year ago.  Acquisition is strong.  So the underlying metrics are strong in the business[.]"  On the January 19, 2021 Q4'20 earnings call, Neumann explained that Netflix used these metrics to determine when to increase prices, stating, "So you think about engagement with the service and retention and churn characteristics, acquisition.  Those are the things that we're really looking for that are key to basically saying, 'okay, we've added more value in the service.  Now it's the right time to go back to those members and ask them to pay a little bit more so that we can reinvest it and keep adding it.'"  Later, at the March 8, 2022 Morgan Stanley Technology, Media & Telecom Conference, Neumann claimed that "the business is healthy" and noted that "engagement [was] up over the prior year and pre-COVID.  Retention or churn levels [were] lower than prior year in pre-

1   COVID, and that was everywhere around the world.  And so that -- those are the kind of metrics

2   we're looking at."

3       44.    In reporting its results, the Company broke down its members into four geographic

4   regions: the Unites States and Canada ("UCAN"); Europe, Middle East, and Africa ("EMEA");

5   Latin America ("LATAM"); and Asia-Pacific ("APAC").  During the Class Period, the Company

6   estimated that its total addressable market ("TAM") outside of China was approximately 800 million

7   to 900 million broadband households, and the TAM in the UCAN was estimated to be approximately

8   125 million broadband households.

9       45.    UCAN was Netflix's most penetrated region – where it had captured the largest share

10   of the TAM.  During the January 19, 2021 Q4'20 earnings call, Neumann stated that in the "UCAN

11   market, we're roughly 60% penetrated," and he acknowledged on the October 19, 2021 Q3'21

12   earnings call that "Latin America and UCAN . . . are a bit more mature, more tenured, more

13   penetrated[.]"  Nevertheless, throughout the Class Period, the Defendants assured that there was "a

14   lot of headroom in all of these markets" and that in every region, including UCAN, there was "ample

15   runway for growth."

16       46.    Growing subscribers outside of UCAN required Netflix to expand its library of local

17   content in those respective markets, which was a longer-term prospect.  Hastings reflected on this

18   dynamic on the July 19, 2019 Q2'19 earnings call, stating, "Now do we have enough content in

19   each of those countries?  Most of that is local content that gets consumed. . . . So we'll just take it

20   year-by year and try to have our net adds continue to grow."  Neumann similarly noted at the March

21   2, 2020 Morgan Stanley conference "it's frankly quite early days in these non-U.S. regions in terms

22   of continuing to build that content market for that."

23       47.    Netflix's monthly membership prices varied by country.  For example, in 2021 its

24   Basic plan was $1.96 per month in Turkey and $12.86 per month in Switzerland, even though both

25   are within the EMEA.[2]  Based on its revenues and paid memberships reported on a regional basis

26   for fiscal year ending December 31, 2020 in its Form 10-K filed with the SEC on January 28, 2021,

27

28   _____

[2] https://beebom.com/how-much-netflix-costs-each-country-worldwide/.

Netflix's average revenue per member was $12.91 per month in UCAN, $9.71 per month in EMEA, $7.00 per month in LATAM, and $7.76 per month in APAC.  As a result of price increases, in 2021 Netflix's average revenue per member increased to $14.37 per month in UCAN, $10.92 per month in EMEA, $7.46 per month in LATAM, and $8.34 per month in APAC.[3]  Given these disparities, where Netflix was acquiring and losing members was critical to its revenue growth.  Throughout the Class Period, UCAN was responsible for ~43-45% of Netflix's total quarterly revenue.

48.     Netflix defined its competition broadly.  Its fiscal 2020 Form 10-K filed with the SEC on January 28, 2021 stated, "We compete against other entertainment video providers, such as multichannel video programming distributors ("MVPDs"), streaming entertainment providers (including those that provide pirated content), video gaming providers and more broadly against other sources of entertainment that our members could choose in their moments of free time."

49.     Many of Netflix's main competitors had been streaming content for years, including Hulu since 2007, HBO since 2010, and in 2011 Amazon included video streaming content in the price of its Prime membership.  Several major new players entered the streaming market in recent years.  In November 2019, Disney Plus began streaming Disney's huge library of content for only $6.99 per month, and for just $12.99 per month, viewers could get the "Disney Bundle" consisting of Hulu, Disney Plus, and ESPN.[4]  Apple TV also entered the market in November 2019 for only $4.99 per month and was seen as a major competitor due to the company's financial resources and wide distribution network, which included 900 million iPhone users.[5]  In July 2020, NBCUniversal launched Peacock, which offered some content for free with ads, and had additional content, including live sports, offered with its Premium package for $4.99 per month with ads and $9.99 per month without ads.[6]  In March 2021, ViacomCBS launched Paramount Plus for $4.99 per month

---

[3] Based on its revenues and paid memberships reported on a regional basis for fiscal year ending December 31, 2021 in its Form 10-K filed with the SEC on January 27, 2022.

[4] https://www.cnbc.com/2019/08/06/disney-espn-and-hulu-bundle-will-cost-12point99-per-month.html.

[5] https://www.cnbc.com/2019/11/01/apple-tv-launch-price-shows-how-to-subscribe.html.

[6] https://www.cnbc.com/2020/01/16/nbc-peacock-price-launch-date-and-shows.html.

with ads and $9.99 per month without ads.[7]

50.    While its competitors earned revenue from advertising on their platforms or offered an advertising-free package for an additional cost, Netflix proudly remained free of advertising, and, therefore, its revenue growth depended entirely on continued member acquisition and retention.  The Company's July 17, 2019 Letter to Shareholders proclaimed that remaining advertising free was "a deep part of our brand proposition" and "[w]e believe we will have a more valuable business in the long term by staying out of competing for ad revenue and instead entirely focusing on competing for viewer satisfaction."  The July 17, 2019 Letter to Shareholders told investors that "when you read speculation that we are moving into selling advertising, be confident that this is false."

**B.    Netflix Monitored Account Sharing And Claimed It Was Not A Problem**

**1.    Historically, Netflix Claimed That Account Sharing Was Not A "Material Inhibitor" To Subscriber Acquisition**

51.    Account sharing, also referred to as password sharing, is when paying members share their password with non-paying users who do not reside in their household.  Netflix permitted multiple users within the same household to share a single account.  On Netflix's April 22, 2013 Q1'13 earnings call, Hastings explained, "We usually like to think that a husband and wife can share an account and that that's perfectly appropriate and acceptable.  If you mean, 'hey, I got my password from my boyfriend's uncle' then that's not what we would consider appropriate.  And so, we focus on serving the immediate family."

52.    Historically, Netflix's standard plan allowed members two simultaneous streams. On Netflix's April 22, 2013 earnings call, Hastings discussed a new plan which provided members with four simultaneous streams for $11.99 per month, a 50% increase from its standard plan which was priced at $7.99 per month.  Hasting said, "we expect . . . fewer than 1% of our members to take that plan."  Hastings assured investors that the new plan was designed for people within the same household, noting that "we really don't think that there's much going on of the 'I'm going to share my password with a marginal acquaintance.'"

---

[7] https://www.techradar.com/news/paramount-plus-launch-time-free-trial-apps-movies-shows-and-everything-we-know-at-launch.

53.     The 4-stream plan was introduced to aid large households, and management acknowledged it would have "exacerbate[d]" account sharing; however, password sharing was not viewed as a significant problem at the time.  At a May 15, 2013 conference hosted by J.P. Morgan, Netflix's then-CFO David Wells ("Wells") was asked to reconcile the plans allowing "additional streams" with "the sharing of passwords not being an issue in your mind."  Wells replied:

> Well, we introduced the 4-streaming plan.  And it is a very, very small percentage of the base -- we said less than 2% that this would appeal to.  And that is based on observations of people actually running into the cap of two simultaneous streams and also calls to our customer service center.

> So it is a very small percentage of the base.  It solves a problem for very large families and households.  And with respect and relative to password sharing, honestly, ***if password sharing were a bigger problem, the 4-stream actually might exacerbate that because then -- now you are allowing even more people to share one common plan***.  So if we felt like that was a huge problem, it would have factored into the calculus of releasing a 4-stream plan.

> I don't -- our observation and our view is that ***password sharing is not quite as large as has been out there, floated out there***.

54.     When Netflix introduced a $6.99 plan, allowing streaming only on one screen, in December 2013, media speculated that the subscription tier "means you might have to say goodbye to 'sharing' accounts your friends and family."

55.     But management denied that the $6.99 plan was responsive to account sharing or Netflix's penetration in U.S.  On the January 22, 2014 Q4'13 earnings call, Hastings was asked who the $6.99 plan was targeting and if it was reflective of "your view in terms of penetration or maturity in the US?"  Hastings replied, "[w]e're testing lots of things. . . . One of the things is the $6.99 one stream, I don't think you should read too much into that other then [sic] we're probing around the edges.  There's no definite plan to do that.  I would say generally as we put in the letter we're trying to figure out some models of good, better, best price tiering that makes sense and provide some flexibility for our customers, at least for our new customers."

56.     As reflected in the chart below,[8] Netflix implemented numerous pricing increases for its Basic, Standard, and Premium plans in UCAN over the years.  The primary distinction between

---

[8] https://www.theverge.com/2022/3/24/22993562/netflix-price-increase-us-plans-2022.

Netflix's pricing plans was the number of simultaneous streams allowed, allowing anyone with access to the member's password to use their account, provided that the account had not reached its maximum number of simultaneous streams.



57.    In fact, "*[w]e love people sharing Netflix*" and ***"That's a positive thing, not a negative thing,"*** Hastings told reporters at the Consumer Electronics Show ("CES") on January 6, 2016.  Hastings assured these users would eventually become paying members, stating, "As kids move on in their life, they like to have control of their life, and as they have an income, we see them separately subscribe. . . . ***It really hasn't been a problem***."  CNET published an article discussing Hastings' CES comments on January 6, 2016, which acknowledged that the number of simultaneous streams did impose a limit on account sharing: "Netflix, of course, does try to curb how widely passwords are shared.  A standard account that costs $9.99 a month allows users to watch videos on two screens simultaneously.  For an additional $2 a month, you can upgrade to four screens."[9]

58.    Account sharing was not "a material inhibitor to [Netflix's] growth," according to Wells speaking at the January 6, 2016 Citi Internet, Media, and Telecommunications Conference.  He stated:

> ***[I]n terms of password protection, we haven't been as focused on it as you guys***

---

[9] https://www.cnet.com/tech/services-and-software/netflix-is-cool-with-you-sharing-your-account/.

*have. That isn't to say that we don't look at it and have a point of view.  **It is just we don't feel like it is a material inhibitor to our growth.  That might not be true forever.*  But even if we were to identify it and know it for sure when we see it, that is different than turning that person into a paid subscriber.

59.     At the same conference, Wells indicated that allowing multiple profiles enabled account sharing, but hoped the quality and low-cost of the service would encourage people to get their own account:

> And for us, we want to enable the allowed use cases of within household. Certainly having your 35-year-old daughter's boyfriend's cousin use Netflix is not in the acceptable use cases.  And so, it is a matter of trying to make our recommendations and a recommendation engine in that profile so compelling that for a low-cost service, 'my God, how cheap are you?  Can't you go get your own Netflix?'  That is the dialogue we would want to have happening in the household.

60.     Analysts continued to ask whether the Company would take steps to limit account sharing.  The analyst at the September 20, 2016 Goldman Sachs Conference noted that "adding individual profiles within a single account -- almost seems to encourage [password sharing]" and wondered if Netflix would need to "start tightening the noose in terms of things like simultaneous streams[.]"  Wells contended that "there is a hard constraint today in the number of concurrent streams" and reiterated "predominantly we just focused on making it -- the service doesn't cost that much, so why don't you get your own?"  Wells also noted "***We could crack down on it, but you wouldn't suddenly turn all those folks to paid users.***"

61.     Hastings again dismissed concerns about account sharing on an October 17, 2016 Q3'16 earnings call, stating "No plans on making any changes there.  ***Password sharing is something you have to learn to live with***, because there's so much legitimate password sharing like, you know, you sharing with your spouse, with your kids, so there's no bright line and we're doing fine as is."

62.     Similarly, on Netflix's October 16, 2017 Q3'17 earnings call, an analyst noted "the question I get asked a lot is whether password-sharing is an issue" and asked if price increases reflected that Netflix was "making password sharing more expensive?"  Peters denied this was the case stating, "***password sharing isn't a huge issue for us right now***.  It's not a huge priority to go try and take significant measure to try and stem it. ***We think that a broader spread in pricing better***

*reflects the value that we're delivering in the higher tiers*[.]"

63.     Underscoring the investing public's interest in account sharing and its impact on subscriber growth, market observers often estimated the amount of account sharing and the associated lost revenue.  An August 19, 2018 CNBC article[10] noted:

> An estimated 35 percent of millennials share passwords for streaming services. That's compared with 19 percent of Generation X subscribers and 13 percent of Baby Boomers.

*     *     *

> Media experts struggle to pinpoint an exact cost, and Netflix and HBO executives have gone on record to dispel concerns.  Netflix CEO Reed Hastings said in 2016 password sharing "hasn't been a problem" and could convince new users to buy in.

64.     A January 15, 2019 Yahoo Finance article discussed a survey conducted by cordcutting.com which asked 1,127 U.S. based people aged 18 to 81 about their streaming usage and estimated that 24 million people who used Netflix did not pay for it.  The article stated, "Freeloading off other people deprives Netflix (NFLX) of at least $2.3 billion in revenue each year[.]"[11]

> **2.     In 2019, Netflix Identified Account Sharing As A Major Factor Adversely Affecting Netflix's Growth, But Management Delayed A Crackdown Once COVID Struck**

65.     On January 9, 2019, Cybersecurity Insiders published an online article reporting that "In order to curb such [password sharing] practices and safeguard revenues, Netflix has decided to use Synamedia's Credential Sharing behavioral analytics and machine learning software to keep a tab on the sharing activity across its streaming services."[12]  The article stated: "Currently, the system is under trial on more than 5,650 Netflix users and based on its success rate, it will be rolled out onto the entire user base by March this year."

---

[10] https://www.cnbc.com/2018/08/19/millennials-are-going-to-extreme-lengths-to-share-streaming-passwords-.html.

[11] https://www.yahoo.com/now/password-sharing-costs-netflix-billions-thats-price-increase-160028395.html.

[12] https://www.cybersecurity-insiders.com/netflix-to-use-ai-to-track-down-password-sharing-users/.

66.     Synamedia, the largest independent video software provider, offered its Credentials Sharing Insight product, which was designed to help streaming service providers combat the rapid rise in account sharing between friends and families and turn it into a new revenue-generating opportunity.[13]  The product was thought to have the ability to differentiate between legitimate and illegitimate password sharing.  According to the January 9, 2019 article, Synamedia's product was "capable of viewing habits and location habits of a user to identify when non-paying viewers log into an account.  It can detect whether a user is 'viewing at their main home' or a 'holiday home.' It could also detect if a subscriber has 'grown-up children who live away from home' so streaming services won't punish the wrong people for account sharing."[14]

67.     In Q2'19, Netflix experienced a rare loss in U.S. subscribers.  Specifically, Netflix reported 60,103,000 domestic paid memberships as of June 30, 2019 compared to 60,229,000 domestic paid memberships as of March 31, 2019, "a loss of 126,000 domestic paid subscribers compared with analysts' expectations for a 352,000 gain."[15]  This was the first time that Netflix had reported a loss in U.S. subscribers since 2011.[16]  In its Q2'19 Letter to Shareholders, Netflix blamed this loss on a "pull-forward effect" of Netflix's particularly strong subscriber growth in Q1'19, consisting of 9.6 million net adds globally and 1.7 million net adds in the U.S.

68.     Internally, however, a Netflix research team determined that account sharing was a material factor that was "eating into" subscription growth.  According to a December 21, 2022 Wall Street Journal article entitled "The End of Netflix Password Sharing is Night" (the "December 21, 2022 WSJ article"):[17]

> ***Researchers inside Netflix Inc. identified password sharing as <u>a major problem eating into subscriptions in 2019</u>***, people familiar with the situation say, but the company was worried about how to address it.  . . .

---

[13] https://variety.com/2019/digital/news/password-sharing-ai-synamedia-1203098715/.

[14] https://www.howtogeek.com/413360/why-netflix-doesnt-care-if-you-share-your-account/.

[15] https://www.cnbc.com/2019/07/18/why-netflix-says-it-had-a-rare-subscriber-loss-in-q2-2019.html.

[16] *Id.*

[17] A copy of the December 21, 2022 WSJ article is attached hereto as Exhibit A.

Netflix saw the warning signals on password sharing in 2019.  The company reported a rare loss in U.S. subscribers in the second quarter of that year, and while top executives felt it was a blip, they asked researchers to investigate why growth was slowing.  That team found that password sharers were among the culprits.

***Mr. Hastings was eager to restrict the practice, but it quickly became clear that doing so would be difficult***, according to people familiar with the discussions.

69.     While Netflix did not publicly acknowledge that it had identified account sharing as a major factor that was dampening growth, it did admit that it was monitoring account sharing.  On the Company's October 16, 2019 Q3'19 earnings call, an analyst asked whether "a more mature growth trajectory in the U.S." makes it "important for [Netflix] to address" password sharing.  Peters replied "***we continue to monitor it***, so we're looking at the situation.  We'll see, again, those ***consumer-friendly ways to push on the edges of that.  But I think we've got no big plans to announce at this point in time in terms of doing something differently there***."

70.     Prior to the end of the Class Period, Netflix did not publicly disclose the extent of account sharing, and analysts' estimates of account sharing varied significantly.  A July 2019 research note by MoffettNathanson indicated that "about 14% of Netflix users report they are using a password from 'someone outside of my household.'"  On June 8, 2020, the Wall Street Journal reported that "[P]assword-sharing is rife.  One-third of subscribers to services like Netflix share their password with someone outside their household, according to a February survey of 2,235 subscribers by Magid, a market-research company."[18]  Even though Netflix had not announced any actions it was taking to address account sharing at that time, a May 7, 2020 article published by The Manifest claimed that "[i]n 2019, Netflix began to crack down on Netflix password sharing, calling the trend 'piracy.'"[19]

71.     While the Company claimed to have "created guardrails to prevent abuse" (according to a Netflix spokesperson quoted in the June 8, 2020 Wall Street Journal article), the only measure the Company had apparently implemented was limiting the number of simultaneous streams.  As

---

[18] https://www.wsj.com/articles/youve-shared-your-netflix-password-with-your-entire-family-now-you-cant-watch-netflix-11591636619.

[19] https://themanifest.com/app-development/streaming-statistics-2020-how-common-netflix-password-sharing.

reflected in the numerous surveys showing extensive account sharing, members were using these streams to share their account beyond their household.  A November 8, 2019 Yahoo Finance article[20] discussed Yahoo Finance's YFi PM's interview with Netflix Co-Founder, former CEO and former Board member Marc Randolph.  The article stated that "[i]t's common among streamers to share platform passwords with their friends and family to cut costs and ensure easy accessibility—but Randolph says now the time has come for a crackdown because of what he calls 'broad cases of flagrant abuse.'"

72.    According to FE1, any efforts to crackdown on password sharing were put on hold when the COVID pandemic struck.  In approximately Q2'20, FE1 read a Netflix internal memo stating that the Company would not try to limit or reduce password sharing during the pandemic. FE1 said when COVID became a factor, the priority was making the service available without interruption and the Company did not want to "crack down" on password sharing.  FE1 recalled that Hastings specifically phrased the Company's approach during the pandemic as "they did not want to appear as if they were taking something away" when people were losing so much at that time (*e.g.*, health, jobs, housing).  FE1 said password sharing was often discussed during FE1's tenure at Netflix, but any efforts that could be viewed as exploiting the global pandemic situation were put on hold.

73.    FE1 stated that this password sharing memo was available in Google Docs and that it was common within Netflix for company-wide memos to be available in Google Docs to any employee who wanted to access them.  FE1 said that the information in the memo about password sharing would have come from the Product Innovation group headed by Todd Yellin.  FE1 said all decisions about product and consumer-facing features were overseen by Product Managers within Yellin's team and went up the ladder to Yellin.

74.    As discussed below, Netflix's decision to defer a crackdown on account sharing during COVID was also based on a more practical consideration: the COVID pull forward.  As the December 21, 2022 WSJ article reported, following Netflix's identification of account sharing as a

---

[20] https://www.yahoo.com/lifestyle/password-sharing-crackdown-netflix-hbo-210830952.html.

major problem in the second half of 2019, the impetus to address account sharing (at least in the near term) dissipated due to a huge increase in subscribers arising from the stay-at-home effects of the pandemic:

> Then Covid lockdowns hit, ***bringing a wave of new subscribers, and the effort to scrutinize sharing petered out***. . . . The effort [to crack down on account sharing] waned as a concern as ***the pandemic supercharged the company's growth in 2020***. When shutdowns of movie theaters, arenas and restaurants left users looking for at-home entertainment, ***Netflix added nearly 16 million new subscribers in the first quarter of that year alone***. Company leaders' attention turned to Covid-related workforce safety and production shutdowns.

**C.     COVID Pulls Forward Subscriber Growth**

75.     In March 2020, the COVID-19 pandemic and resulting local government mandates of home confinement led to a massive boom in Netflix's subscriber growth. Netflix reported 15.77m paid net adds, more than double its 7.0m forecast, for Q1'20. The April 21, 2020 Q1'20 Letter to Shareholders provided guidance of 7.5 million global paid net additions in Q2'20.

76.     This phenomenon was termed by Netflix management the COVID "pull-forward" due to its effect on subscriber growth for subsequent quarters. On Netflix's April 21, 2020 Q1'20 earnings call, Hastings explained that COVID-19 "pull[ed] forward" subscriber growth, *i.e.*, that the pandemic caused a substantial number of new subscribers to sign up for Netflix earlier than the Company had projected and thus subscriber growth for the remainder of the year would decrease commensurately. Hastings stated, "We've had an increase in subscriber growth in March. It's essentially a ***pull forward of the rest of the year***. So our guess is that ***subs will be light in Q3 and Q4*** relative to prior years because of that."

77.     Netflix again exceeded its paid net add guidance in Q2'20. On Netflix's July 16, 2020 Q2'20 earnings call, Neumann reported that "we just added 10 million members, which is the largest growth we've ever had in a second quarter." Neumann assured that while Netflix had "seen some pull forward in our member growth . . . . the growth opportunity is as big as ever." The Company's July 16, 2020 Letter to Shareholders noted that "[i]n the first half of this year, we've added 26m paid memberships, nearly on par with the 28m we achieved in all of 2019. However, as

we expected . . . , growth is slowing as consumers get through the initial shock of Covid and social restrictions."

78.     Netflix expected that subscriber growth during the second half of 2020 would slow due to the higher-than-expected subscriber growth during the first half of the year.  The July 16, 2020 Q2'20 Letter to Shareholders provided a forecast of 2.5m paid net adds for Q3'20, stating, "we're expecting paid net adds will be down year over year in the second half as our strong first half performance likely pulled forward some demand from the second half of the year."  It went on to assure there were "many years of strong growth ahead."

79.     The Company's prediction that subscriber growth would slow in the second half of the year came true.  The October 20, 2020 Q3'20 Letter to Shareholders stated, "As we expected, growth has slowed with 2.2m paid net adds in Q3 vs. 6.8m in Q3'19.  We think this is primarily due to our record first half results and the pull-forward effect we described in our April and July letters."

80.     By the end of 2020, the COVID pull-forward was expected to have only a "modest" effect on subscriber growth in fiscal 2021.  On the October 20, 2020 Q3'20 earnings call, Hastings assured the slowdown in acquisition was not permanent, ***"So the pull-forward into next year is relatively modest. . . . So there's probably a little bit of the effect in Q1 from the pull-forward, maybe a little bit less in Q2, but it will wash out.  It's not permanent or long term[.]"***  Neumann similarly cautioned that "we shouldn't expect year-over-year first half to be comparable."

## VI.    CLASS PERIOD EVENTS

### A.    Netflix Issues Disappointing Paid Net Add Guidance For Q1'21, But Claims Long-Term Growth Prospects Are "As Strong As Ever"

81.     The Class Period begins on January 19, 2021 when Netflix issued its financial results for Q4'20 and provided guidance for Q1'21.  On that date, Netflix released a Letter to Shareholders issuing dramatically lower year-over-year guidance for Q1'21 paid net adds, which it attributed to COVID: "For Q1'21, we expect paid net adds of 6.0m vs. last Q1's 15.8m, which included the impact from the initial COVID-19 lockdowns."

82.     Citing Netflix's strong Q4'20 performance, an analyst during the January 19, 2021 earnings call was surprised by the low Q1'21 guidance, noting that it appeared the COVID "pull-

forward effect is more or less behind us."  Neumann responded that COVID was still impacting growth, but assured the long-term growth trajectory was "as strong as ever":

> ANALYST: . . . Sequentially, the first quarter tends to be higher in net additions than Q4.  ***But your guidance is lower despite the fact that you beat Q4 by a relatively large amount.  And it feels like the pull-forward effect is more or less behind us.*** So if you could just help us walk through the thought behind the guidance and the framework that you used for that, that would be a good place to start.

> NEUMANN: . . . So in terms of the guide, first of all, we guided to 6 million paid net adds for Q1, if you saw. . . . ***So I know you mentioned the pull-forward.  I don't think we're declaring that we're necessarily through that yet.***  So we think there's puts and calls every quarter.  But one that's still a meaningful factor for us in the guide is thinking through how we kind of grow through that growth from 2020.  ***So there's probably still a little bit of that pull-forward dynamic in the early parts of 2021.***

> . . . So it's more uncertain than we've ever seen, and we're trying to forecast through that.  But at the same time, one thing that's maybe counterbalancing that is that what COVID has done for that is it's accelerated that big shift from linear to streaming entertainment.  So the ***long-term growth trajectory is at least as strong as ever.*** There's just more short-term noise and uncertainty right now but still ***very strong underlying growth metrics***, and that's what you're seeing in the Q1 guide.

83.     The January 19, 2021 Q4'20 Letter to Shareholders reported that Netflix had surpassed 200 million paid members in Q4'20 and noted that Disney Plus had reported 87 million subscribers in 2020.  In just one year, Disney had reached nearly half the number of Netflix's subscribers, which Netflix had been growing for more than twenty years.

84.     Given Disney's success, an analyst during the January 19, 2021 Q4'20 earning call posited that "Netflix is underachieving versus its potential" and questioned whether there was any reason "the Company can't get there."  Defendants were quick to downplay the competition and tried to spin it as a positive for Netflix.  Hastings responded, "it shows that members are interested and willing to pay more for more content because they're hungry for great stories."  Sarandos similarly replied, "it does point to people have tremendously big appetite for great entertainment and all different kinds of it.  And the fact that they're willing to pay more for more programming, I think, is very encouraging."  Peters attempted to divert the focus from Disney's impressive subscriber acquisition results to revenue, stating, "it's also useful to look at it from a revenue lens, which, of course, is the fuel that we have to basically create more of that content to get that virtuous

cycle flowing more." Spencer Wang ("Wang"), Netflix's VP of Finance, Corporate Development & Investor Relations, likewise deflected that Netflix's average revenue per user was "more than double" that of Disney.

85.    Analysts were impressed that UCAN increased its subscribers during Q4'20. On the Company's January 19, 2021 earnings call, an analyst noted that "one thing that stood out during the quarter, of course, is UCAN, **where most of us thought the market was saturated but you guys keep accelerating growth** despite price increases, which is even more impressive" and asked about "the underlying trends in some of these markets[.]" Neumann rejected the notion that Netflix was nearing a saturation point in the UCAN market or other markets around the world, stating, "**UCAN market, we're roughly 60% penetrated, and we're still growing**. So we're still a very small share of even just pay-TV penetration in most markets around the world and small share of viewing. So we think **we've got a lot of headroom in all these markets**, and we're just trying to get a little better every day."

86.    In fact, as Defendants would later admit at the end of the Class Period, an extremely large number of subscribers were sharing passwords with users who did not reside in their household and were not paying any membership fees to Netflix. Counting these additional households, Netflix's effective penetration rate in the UCAN market in Q4'20 was approximately 79%, not 60%. *See* Section XI, *infra*. Globally, the effective penetration rate in Q4'20 was approximately 35%, not the 24% implied by Netflix's reported subscriber counts. *See id.* Thus, notwithstanding Neumann's assurance that there was "a lot of headroom in all these markets," the markets were much more saturated than Defendants had led investors to believe, and future growth would be much more difficult to achieve.

87.    Unaware of the extent of account sharing and the effective penetration rate, J.P. Morgan remained hopeful, stating "We think the 1Q guidance could prove conservative" in a report issued on January 20, 2021 discussing the Company's guidance. J.P. Morgan further stated:

**1Q guidance for 6.0M net adds was below our 6.9M estimate and investor expectations of ~6.5M-7M+.** We think the 1Q shortfall is driven by: 1) NFLX still working through COVID-19 driven pull-forward; 2) NFLX no longer offering free trial promos that were popular around the holidays & historically provided a sequential boost to 1Q net adds; & 3) price increases in some of NFLX's bigger int'l

markets including the UK & Germany.

88.     Shortly after, on January 28, 2021, Netflix filed a Form 10-K for the year ended December 31, 2020, which included a slightly revised risk disclosure about account sharing.  The revised disclosure now described "account sharing" as "multi-household usage" and added language discussing "efforts to restrict multi-household usage."  The emphasized language below shows those changes:

> Form 10-K for the year ended December 31, 2019 (filed with the SEC on January 29, 2020): While we permit multiple users within the same household to share a single account for non-commercial purposes, if **account sharing** is abused, our ability to add new members may be hindered and our results of operations may be adversely impacted.

> Form 10-K for the year ended December 31, 2020 (filed with the SEC on January 28, 2021): While we permit multiple users within the same household to share a single account for non-commercial purposes, if *multi-household usage* is abused *or if our efforts to restrict multi-household usage are ineffective*, our ability to add new members may be hindered and our results of operations may be adversely impacted.

89.     This revised disclosure subtly suggested an increased focus on cracking down on multi-household account sharing.  Despite the revised disclosure, however, the Company did not disclose any new measures that it was taking to restrict account sharing or discuss the impact account sharing was having on its acquisition efforts.

**B.     While Testing A Solution To Limit Account Sharing, Netflix Attributes Underwhelming Subscriber Growth To Residual Effects of the COVID Pull-Forward**

**1.     Netflix Begins Testing Methods to Limit Account Sharing, While Omitting the Extent of Account Sharing**

90.     In March 2021, news outlets reported that Netflix appeared to be testing methods to limit account sharing.  On March 11, 2021, the Washington Post reported, "Netflix is testing a new pop-up message that warns people who are sharing a password — and don't live with the password holder — that they need to pony up and pay for their own account."  Reportedly, some people saw on their TVs a warning: "If you don't live with the owner of this account, you need your own account to keep watching."  Netflix spokesperson Ebony Turner was quoted in the article as stating, "This test is designed to help ensure that people using Netflix accounts are authorized to do so."  The

article noted that "[t]he company did not answer questions about the size of the test or if the company would adopt it more widely. . . . Netflix hasn't seemed especially keen to restrict password sharing in the past."  The article warned that "[r]estricting people from sharing passwords could force some to pay for their own accounts— but it also might drive others to simply give up on Netflix and turn to one of the other myriad streaming options."

91.    In the days and weeks that followed the news of Netflix's tests to limit account sharing, numerous analysts issued reports reacting to the news and providing their estimates of account sharing:[21]

a.    On March 12, 2021, Bank of America issued a report discussing Netflix's potential crackdown on password sharing stating, "In our streaming survey, we asked a pool of Netflix subscribers if they shared the service with another household. ***26% said they did and 50% of these said it was shared with family in multiple locations.***"  The report noted that "***Netflix has not stopped password sharing until now***, and the company has only set limits on number of screens subscribers can simultaneously stream on.  The Standard ($13.99) monthly plan allows simultaneous streaming on two devices while the Premium ($17.99) plan allows up to four[.]"

b.    On March 15, 2021, the Benchmark Company issued a research report stating that the crackdown reflected a change in Netflix's position on password sharing, stating, "***[i]n the past management has taken a laissez faire attitude toward the practice[.]***"  Benchmark also noted an external estimate of account sharing, "Research company Magid has estimated that about ***33% of Netflix members share passwords***, but we believe that the beneficiaries of password sharing are more apt to be casual or economically sensitive users."

92.    While most research focused on the number of Netflix's members who were sharing their accounts, J.P. Morgan's April 13, 2021 report estimated the number of non-paying users that could be impacted by the crackdown on account sharing: "We expect the efforts to focus on UCAN,

---

[21] The December 21, 2022 WSJ article noted: "In early 2021, Netflix began to test messaging with some members that said 'if you don't live with the owner of this account, you need your own account to keep watching.' The language spurred negative press coverage and consumer blowback. Netflix never rolled out the messaging across its whole user base."

NFLX's most mature market (penetration —56% of UCAN BB HHs [broadband households]) & we believe *account sharing efforts could target up to ~20M UCAN users*."

93.     As detailed below, at the time that J.P. Morgan issued this report, Netflix likely had approximately 25 million non-paying account sharers in the UCAN market.  *See* Section XI, *infra*. J.P. Morgan's substantially lower estimate of up to ~20 million UCAN users reflects the market's lack of awareness of the true extent of account sharing and the corresponding level of penetration.

### 2.     Netflix Misses Q1'21 Guidance, But Blames The COVID Pull-Forward

94.     On April 20, 2021, Netflix announced its financial results for Q1'21, acknowledging that it missed its Q1'21 guidance for paid net adds by two million, despite having factored in the COVID-19 pull-forward of subscribers.  Netflix's April 20, 2021 Q1'21 Letter to Shareholders said "paid net additions of 4m were below our 6m guidance primarily due to acquisition," which it claimed "slowed due to the big Covid-19 pull forward in 2020 and a lighter content slate in the first half of this year, due to Covid-19 production delays."

95.     Defendants downplayed the significance of the guidance miss and assured that the underlying metrics were healthy.  The April 20, 2021 Q1'21 Letter to Shareholders stated, "engagement per member household grew solidly year over year in Q1'21" and "Q1'21 churn was below Q1'20 levels[.]"  Similarly, on Netflix's April 20, 2021 Q1'21 earnings call, Neumann stressed that the business remains healthy and is still growing, stating, "in terms of Q1 performance, it really boils down to COVID, frankly. . . . But *the key is the business remains healthy*.  Our engagement, our viewing per household was up year-over-year in Q1.  Our churn was down year-over-year, and *the business is still growing*."  Sarandos similarly touted that "*core underlying metrics are very healthy*" and assured "there's this clear catalyst to a reacceleration of growth and towards that back end of the year as those big titles start to launch and strength of slates and we come out of that pull forward."

96.     These statements about Netflix's metrics failed to disclose that the Company's engagement metric was being inflated every time a non-paying member who was sharing a member's account viewed a title that the member did not watch.  Given that the Company later disclosed ~100 million non-paying users on Netflix's platform (1 non-paying user for every 2.2

paying members), including ~30 million in UCAN, that inflation was significant. Moreover, churn was being positively impacted by the fact that members maintained their accounts because they saw value in the ability to share their accounts. *See* Section X.C, *infra*.

97.    An analyst on the April 20, 2021 Q1'21 earnings call asked about Netflix's tests to limit account sharing and the "size of the opportunity" and "why now is . . . the right time to start tightening the screws on that," given that account sharing has long existed. Rather than revealing that account sharing was a drag on the Company's efforts to acquire new members due to higher levels of penetration in certain markets, Peters and Hastings claimed that this testing was not "new" but part of Netflix's continuing approach to offer different plans to meet the needs of its broad range of consumers:

> ANALYST: . . . Greg, you've started to run some tests in certain markets, I think maybe just the U.S., on limiting account sharing. ***Can you talk about the size of the opportunity here, and why now is kind of the right time to start tightening the screws on that?***
>
> PETERS: Yes. First of all, we recognize that our members are in different positions, again, and they have different needs from us as an entertainment service. And ***we're really seeking that sort of flexible approach to make sure that we are providing the plans with the right features and the right price points*** to meet those broad set of needs.
>
> So we're going to keep doing that. We're going to keep working on that, working on accessibility across all of the countries that we serve. But ***we also want to ensure that while we're doing that, that we're good at making sure that the people who are using a Netflix account, who are accessing it are the ones that are authorized to do so.***
>
> ***And that's what this sort of line of testing is about***. ***It's not necessarily a new thing. We've been doing this for a while.*** You may see it pop up here and there in different ways, but it's sort of the ***same framework*** that we use. And I think you're familiar with and so much of how we think about continuously improving the service, which is we iteratively work. We use the tests and the test results to inform and guide how we proceed and just sort of continually try and make that better and better.
>
> HASTINGS: [W]e will test many things, but we would never roll something out that feels like turning the screws, as you said. It's got to feel like it makes sense to consumers that they understand. And ***Greg [Peters] has been doing a lot of great research on kind of how to try variants that harmonize with the way consumers think about it***.

98.    The analyst followed up with a question to determine whether the testing reflected

that Netflix was effectively highly penetrated in certain markets, which Peters deflected with a non-answer.  On the April 20, 2021 Q1'21 earnings call, the analyst asked, "are there any particular markets where . . . the *user to subscriber ratio* is particularly high?"  Peters simply claimed "every market, every country is different":

> I think different -- every market, every country is different, and so we see different ranges of behavior.  And I think just how people orient themselves to the service is different from country to country.  So I want to -- it's more than just sort of how they think about how maybe they're working the system or so, probably just how they think about sharing the service with an extended family or people that they love is a natural part of how they connect with the stories that we're telling.  So it's all different around the planet, and it's different within countries, too, as you might well expect.

99.    Pivotal Research Group ("Pivotal") issued a report on April 21, 2021, stating, "NFLX's 1Q subscriber results (+2M light of guidance) and 2Q subscriber guidance (+2M light our estimate and +4M light of frankly aggressive consensus) felt the hangover from their blowout 2020 and a relative lack of compelling content related to Covid production shutdowns."  However, Pivotal viewed testing limits on account sharing as a positive, stating, "We also believe recent experiments around piracy have the potential to significantly juice subscriber growth if successfully implemented (as an example using Nielsen data implies that there are *16-17M households effectively pirating NFLX in U.S. via password sharing*)."  Again, this figure severely underestimated the extent of account sharing, which Netflix eventually revealed to be ~30 million users in the UCAN market.

### 3.    Netflix Continues To Blame Declining Subscriber Growth On COVID Pull-Forward In Q2'21

100.    On July 20, 2021, Netflix released its financial results for Q2'21 and announced that Q2'21 paid net adds beat guidance but issued weak expectations for Q3'21.  Netflix's July 20, 2021 Q2'21 Letter to Shareholders reported, "We added 1.5m paid memberships in Q2, slightly ahead of our 1.0m guidance forecast."  The results provided little relief to investors concerned about member growth, considering that the "1.0m guidance forecast" had been well below consensus estimates of 4 million.  Moreover, the July 20, 2021 Q2'21 Letter to Shareholders reported that the UCAN market *lost* subscribers, stating "Q2 paid memberships in the UCAN region were slightly down sequentially (-0.4m paid net adds)."  For Q3'21, the letter "forecast paid net additions of 3.5m vs. 2.2m in the

prior year period."

101.    The July 20, 2021 Letter to Shareholders continued to attribute lower acquisition to the COVID pull-forward, stating that "[t]he pandemic has created unusual choppiness in our growth[.]"  Nevertheless, the July 20, 2021 Letter to Shareholders maintained that the Company's retention and engagement metrics were positive:

> In Q2'21, our ***engagement per member household*** was, as expected, down vs. those unprecedented levels but was still ***up 17%*** compared with a more comparable Q2'19. Similarly, ***retention continues to be strong*** and better than pre-COVID Q2'19 levels, even as average revenue per membership has grown 8% over this two-year period, demonstrating how much our members value Netflix and that as we improve our service we can charge a bit more.

102.    Neumann reinforced that message on the July 20, 2021 Q2'21 earnings call proclaiming that ***"the underlying business metrics are really healthy."***  Neumann explained, "Our churn is actually down relative to the more comparable 2-year-ago period in 2019, Q2 of '19 before COVID.  Our viewing and we've talked about in the letter, our engagement is up nearly 20% over that period."  Neumann attributed the slowing acquisition to COVID "choppiness," stating "we still feel a little bit of that drag in terms of our acquisition growth . . . what we hope is the tail end of this COVID choppiness where we see on the acquisition side as markets reopen, it does slow things down a little bit."

103.    Barclays issued a report on July 21, 2021, noting, "Netflix reported an expectedly weak net add quarter and a ***significantly weaker than expected 3Q guide***.  However, commentary during the call indicates that management expects meaningful acceleration in content amort in Q4 and above usual seasonality, due to an unusually heavy content slate."

### 4.    Netflix Claims It Reached The Tail End Of COVID Pull-Forward, But Growth In UCAN And LATAM Continue To Lag

104.    On October 19, 2021, Netflix announced its financial results for Q3'21 and reported that it had exceeded its weak Q3'21 paid net add guidance.  Netflix's October 19, 2021 Letter to Shareholders stated: "We under-forecasted paid net adds for the quarter (4.4m actual vs. our 3.5m projection)[.]"

105.    Netflix indicated that the Q3'21 results signaled that the Company had moved past

the COVID-19 pull-forward of acquisition.  On the October 19, 2021 Q3'21 earnings call, Neumann stated that the Q3'21 results were "what we expected."  He explained, "we hoped that we were getting towards that kind of tail end of the COVID choppiness, the pull-forward of sub growth into 2020 and those production delays that we're working through as well.  And that's kind of what we're seeing."

106.    On the October 19, 2021 Q3'21 earnings call, Neumann claimed "*the business remained healthy*" with "*churn at low levels*," that "*retention was very healthy*," and that "*viewing was up* . . . . maybe slightly down compared to the very COVID-distorted 2020 Q3, but up healthy compared to [the] 2019 comparable period."

107.    Defendants acknowledged that the UCAN and LATAM markets grew more slowly but claimed there was still room for growth.  The October 19, 2021 Letter to Shareholders stated that "[t]he UCAN and LATAM regions grew paid memberships more slowly" because "[t]hese regions have higher penetration of broadband homes," but assured, "we still have *ample runway for growth* as we continue to improve our service."  Similarly, Neumann stated on the October 19, 2021 Q3'21 earnings call that "both of those markets are a bit more mature, more tenured, more penetrated than some of our other markets.  So we would expect growth to be just a little bit harder to work for, but *still a lot of runway for growth in both of those regions*."

108.    Moreover, the October 19, 2021 Letter to Shareholders noted that Netflix was changing its key engagement metric, shifting its focus from the number of accounts that watch titles:

> Later in the year, we will shift to reporting on hours viewed for our titles rather than the number of accounts that choose to watch them.  There is some difference in rankings, as you see below, but we think engagement as measured by hours viewed is a slightly better indicator of the overall success of our titles and member satisfaction.  It also matches how outside services measure TV viewing and gives proper credit to rewatching.

109.    The revised engagement metric was also misleading because much of what Netflix claimed was "rewatching" was in fact non-paying account sharers watching titles that were also watched by members.  Whereas the prior metric only credited a title once per account no matter how many times a title was viewed, the revised metric credited all hours viewed by all users.  This had the effect of inflating the hours viewed metric with hours that were viewed by non-paying account

sharers, and thus gave investors false signals as to the popularity of Netflix's titles, the health of its business, and the ability to earn revenue for its content.

110.    The very day before these disclosures were made, Netflix's Audit Committee met and discussed Netflix's trends in membership growth and retention, among other topics.  Defendants Sarandos and Neumann were present at this meeting.  Contrary to Neumann's representations at the Q3'21 earnings call that "retention was very healthy" and that churn was at "low levels," the materials distributed to the Audit Committee indicated that Netflix experienced "***worse than expected churn***" in the UCAN market in Q3'21, causing Netflix to miss its internal projections for paid net adds in that region by 63%.  *See* Section X.A.1, *infra*.  In addition, an Audit Committee report stated that in the UCAN market, "we've seen ***net additions drop materially, fueled by lower acquisition*** . . . and ***more absolute cancellations coming from the now larger member base***."  *See id.*  These facts undercut Neumann's assertion that there was "ample runway for growth" in the UCAN, because they suggested that the higher level of churn in that market was due to the higher level of penetration, *i.e.*, "the now larger member base."  In other words, Netflix was approaching a saturation point in the UCAN market, where acquisition would struggle to outpace churn and the room for growth was rapidly diminishing.

### 5.    Netflix Q4'21 Results And Q1'22 Guidance Partially Reveal Acquisition Challenges; Management Assures There Are No Structural Issues

111.    On January 14, 2022, less than one week before releasing its FY'21 financial results (which would reveal that Netflix experienced its lowest member growth since 2015), Netflix announced it was increasing UCAN prices on its Standard plan $1.50 from $13.99 to $15.49 and $2 on its Premier plan from $17.99 to $19.99.[22]

112.    On January 20, 2022, Netflix partially revealed its acquisition challenges, reporting that it missed its paid net add guidance for Q4'21 and issuing weak Q1'22 guidance because "acquisition growth has not yet re-accelerated to pre-Covid levels."  Specifically, in its January 20, 2022 Letter to Shareholders, Netflix disclosed that it had missed its projection for paid net adds in

---

[22] https://www.reuters.com/technology/exclusive-netflix-raises-monthly-subscription-prices-us-canada-2022-01-14/.

Q4'21: "We slightly over-forecasted paid net adds in Q4 (8.3m actual compared to the 8.5m paid net adds in both the year ago quarter and our beginning of quarter projection)."

113.    Most surprising was the Company's Q1'22 paid net guidance, which was even lower than that of Q1'21 (when the Company had purportedly been negatively impacted by the COVID-19 pull-forward).  Despite having told investors in on the Q3'21 earnings call that they had seen the end of COVID "choppiness," the January 20, 2022 Letter to Shareholders admitted "acquisition growth has not yet re-accelerated" due to "the ongoing Covid overhang and macro-economic hardship":

> *For Q1'22, we forecast paid net adds of 2.5m vs. 4.0m in the year ago quarter*.  Our guidance reflects a more back-end weighted content slate in Q1'22 . . . . In addition, while retention and engagement remain healthy, *acquisition growth has not yet re-accelerated to pre-Covid levels*.  We think this may be due to several factors including the ongoing Covid overhang and macro-economic hardship in several parts of the world like LATAM.

114.    Neumann attributed the Q4'21 shortfall to acquisition challenges, stating during the January 20, 2022 earnings call that "we didn't grow acquisition quite as fast as we would have liked to see, and on our large subscriber base, a small change in acquisition can have a pretty big flow-through in paid net adds.  And again, our acquisition was growing, just not growing quite as fast as we were perhaps hoping or forecasting."

115.    On this news, the Company's stock price fell $110.75, or 21.7%, to close at $397.50 per share on January 21, 2022, on unusually heavy trading volume.

116.    The Q4'21 shortfall and the weak Q1'22 guidance raised concerns of underlying problems inhibiting Netflix's ability to acquire subscribers.  During the January 20, 2022 Q4'21 earnings call, an analyst specifically asked if there was "anything structural" such as "saturation" that led to the lower-than-expected guidance, but Defendants assured that there was "[n]o structural change in the business that we see" and "it's tough to say exactly why our acquisition hasn't kind of recovered to pre-COVID levels":

> ANALYST: Great.  And as we look ahead to Q1, *the guidance was a bit below kind of what was expected and what you've done in previous Q1s*.  Maybe just help us understand what some of the key considerations were that went into the guidance?  And *does it raise any concerns for you about anything structural, whether it's competition or saturation?*  Or does it give you any pause in terms of sort of your

return on content spend?

NEUMANN: Sure.  *No structural change in the business that we see*.  What's reflected in the guidance, we guided to 2.5 million paid net adds in Q1.  And what's reflected there is pretty much the same trends we saw in Q4: so healthy retention with churn down, healthy viewing and engagement with viewing up and acquisition just growing but a bit slower than pre-COVID levels, just hasn't fully recovered.

*And we're trying to pinpoint what that is.  It's tough to say exactly why our acquisition hasn't kind of recovered to pre-COVID levels.*  It's probably a bit of just overall COVID overhang that's still happening after 2 years of a global pandemic that we're still unfortunately not fully out of, some macroeconomic strain in some parts of the world like Latin American in particular.  While we can't pinpoint or point a straight line using -- when we look at the data on a competitive impact, there may be some kind of more on the marginal kind of side of our growth, some impact from competition but -- which, again, we just don't see it specifically.

*So overall, that's what's reflected in the guide.*  I'd say we – our big titles are also landing, at least our known big titles, a little bit later in the quarter with Season 2 of Bridgerton in March, The Adam Project also in March.  As you know, we also -- while we are taking -- changing prices in countries every quarter, in Q1 of this year, it happens to be our largest country, as we announced last week, actually our largest region with Canada as well.  So that's probably a little bit more impact than a typical quarter.

HASTINGS: But Nidhi, you're right to reflect on 2 years ago, we were 10 million above plan, which was a shock.  Last year, we were 10 million below or 9 million.  And so *the pull forward sort of makes it hard to read*.  In the prior years, we were very steady, so we can have confidence on incremental trends.  But as Spence said, when you – we reflect, of course, hey, that's a low guide, and we think it will be accurate.  It's not sandbagged at all, kind of what's going on.

And *there's a number of potential explanations with COVID*, but then we worry about hanging too much on that.  *There's more competition than there's ever been.  But we've had Hulu and Amazon for 14 years.  So it doesn't feel like any qualitative change there*.  And overall, confidence in streaming becomes all of entertainment.  Linear dissipates over the next 10 to 20 years.  Very high confidence in that thesis because everyone's coming into streaming.

So like market size, very large.  *Our execution is steady and getting better*.  So for now, we're just like staying calm and trying to figure it out.  *Again, the COVID has introduced so much noise.*  It just wants us to give it some pause as we work on everything we've always worked on.

117.    During the same call, the analyst noted that despite having great content in Q4'21, net adds were "flattish" compared to the last few Q4s.  Citing "bumpiness" caused by the COVID pull-forward, Sarandos dismissed concerns of competition hampering growth and claimed "the

fundamentals of the business are pretty solid:"

> ANALYST: . . . [T]his was probably the best content quarter you've had. And looking at sort of flattish subs versus previous Q4s, obviously, a great number, but it's kind of in line with what you've done the last few Q4s. What do you read from that? Is the customers sort of hurdle just higher in terms of the amount and quality of content that you need to deliver to get the same number of net adds?

> SARANDOS: Well, I think what, I guess, Spence was saying, we didn't see it -- we didn't see a hit to our engagement. We didn't see a hit to retention, all those things that would classically lead you to looking at competition. But it's a stew of all those things. Not only are we in a pandemic. We've kind of come in of and out of COVID at different levels in 2021, particularly the back half of 2021. *So it's created a lot of bumpiness* certainly and not steady linear growth, which makes it a little tougher to predict, but *all the fundamentals of the business are pretty solid*.

118.    During the same call, an analyst posited that Latin America was "maturing at a lower level of penetration" and wondered if it was due to account sharing. Neumann failed to address the question about account sharing and assured the region had a "long runway of growth":

> ANALYST: . . . Shifting gears to Latin America. *This region feels like it's maturing at a lower level of penetration than you've seen in the U.S. Is that due to competition, affordability? Account sharing [o]r something else?* Or maybe you disagree with the statement that it's actually maturing. But help us understand if there's anything you can do differently to sort of drive penetration levels there higher.

> NEUMANN: Well, first, I *just wouldn't necessarily read through that it's maturing faster*, Nidhi. I mean again, I just don't want to understate the impact of what we've been going through for the last 2 years. And Latin America, in particular, has been more strained. It has less kind of government funding and subsidization relative to many parts of the world to kind of fuel their economy. On top of that, we also continue to increase prices in that market last year across some big countries for us, Mexico, Brazil, Argentina.

> So between macroeconomic factors and general strain, *business is still growing there*. We grew by about 2.5 million members last year, so *under the kind of pre-COVID growth rates but still growing.* And it is a market where pay TV is healthy. Folks love film and TV. And so I think *there's a long runway of growth there*.

119.    The highly misleading nature of Defendants' statements made during the January 20, 2022 Q4'21 earnings call is underscored by several facts detailed in the minutes and Board materials for the December 1, 2021 meeting of Netflix's Board of Directors. *See* Section X.A.2, *infra*. That meeting was attended by Defendants Hastings, Neumann and Peters, among others. The Board discussed multiple topics at the meeting, including Netflix's "performance and growth

expectations," the "potential drivers of and opportunities for growth," the Company's "long term growth prospects," and the "the size of the Company's opportunity for growth."

120.    According to materials discussed at the December 1, 2021 Board meeting, Netflix not only experienced a significant slowing of growth in 2021, it also expected "continued slow member growth in the future." *See* ¶226, *infra*.  This expectation was based in significant part on the outlook for the UCAN market, "where high penetration rates and intensifying competition make growth increasingly challenging." *See* ¶225, *infra*.

121.    With respect to market penetration, the Board materials indicated that the UCAN market had grown to 74 million members, representing a 59% market penetration. *See* ¶226, *infra*. However, the materials also indicated that there were more than 25 million additional account sharing households, meaning that the effective degree of market penetration was around 80%:

> Likely understated penetration due to Multi household Usage: In highly penetrated markets like the US and CA, ***account sharing may limit our continued growth***. There are over 25M active borrowing households in UCAN -- defined as households that are borrowing Netflix and streaming 7 or more days in a 28 day period.  Roughly ~20% of all standard accounts and ~40% of all premium accounts have active borrowing.  ***If we consider these borrower households in addition to our paid members, BBHH penetration in the region is close to 80%.***

*See* ¶227, *infra*.

122.    On information and belief, Plaintiff alleges that the foregoing figures—"over 25M active borrowing households in UCAN" and ~80% effective market penetration—are based on the numbers of paying subscriber households and non-paying sharer households as of the end Q3'21, *i.e.*, as of September 30, 2021.  Plaintiff's information and belief is based on, *inter alia*, (1) the 74 million subscriber households referred to in the Board materials matches the 74,020,000 subscriber households that Netflix reported for Q3'21, (3) Netflix reported 75,220,000 subscriber households for Q4'21, and (3) because Q4'21 was already two-thirds complete as of the December 1, 2021 Board meeting, if the Boards materials were using intermediate up-to-date subscriber data, the number of subscriber households would have been closer to 75 million than 74 million.  Therefore, at the time of the January 20, 2022 Q4'21 earnings call (when Q4'21 was already complete), there would have been approximately 27.8 million account sharing households, and the effective degree

of market penetration would have been approximately 82%.  *See* ¶258, *infra*.  The account sharing problem, therefore, would have been even worse than described in the Board materials for the December 1, 2021 meeting.

123.    The Board materials for the December 1, 2021 meeting identified account sharing as one of "[m]any threats to big growth" and a "bigger issue" posing a material threat to the Company's future growth prospects.  *See* ¶227, *infra*.  The materials also warned that a crackdown on account sharing could "alienate" Netflix's members and upset the "pre-existing expectations" of costumers based on Netflix's "historical tolerance" on sharing.  *See* ¶229, *infra*.

124.    In light of these facts, Defendants' failure to mention account sharing and market saturation concerns while discussing the reasons that Netflix's guidance was below market expectations was highly misleading.  Indeed, an analyst specifically asked what factors were driving the disappointingly low guidance and whether it "raise[d] any concerns . . . about ***anything structural***, whether it's competition or ***saturation***?"  Neumann and Hastings each gave lengthy answers, discussing factors ranging from COVID to competition and claiming it was difficult to "pinpoint" the reasons Netflix's growth was not returning to pre-COVID levels, but neither mentioned account sharing or market saturation, notwithstanding the direct prompt by the analyst and Defendants' internal assessment shared at December 1, 2021 Board meeting that account sharing represented one of the biggest threats to Netflix's future growth.

### 6.    Netflix Assures Investors It's Not Done Growing

125.    During a March 8, 2022 Morgan Stanley Conference, Neumann continued to claim that the U.S. market was only 60% penetrated and would continue growing (without disclosing that penetration was actually around 84% when including non-paying users that were account sharing, leaving little room for growth):

> ANALYST: Yes.  I was going to ask you about UCAN because yes, you guys have landed the plane nicely in the middle of your range from, I think, where you gave that 60 million to 90 million a long time ago.  But ***should we look at the U.S. business as a leading indicator to some extent of what this business could look like from a penetration point of view?***  And do you think you can keep growing the business from a revenue perspective here?
>
> NEUMANN: I think it would be great if it's a leading indicator, right?  So if we can

get to that level of penetration around the world, again, by the time we get there, there's probably 1 billion connected TVs around the world. And **you can see our penetration in the U.S. that you kind of do that math, we're roughly 60% penetrated today**. So that pretty quickly gets us to business that's over 0.5 billion members. And if we can do that, where we keep increasing value and drive kind of a reasonable monthly subscription price, that's a pretty large and healthy revenue model, and we think we can drive pretty big profit pools against it. So I would kind of love if that -- and again, at the end of the day, **we're not done growing in the U.S. So when we get there, we're also going to be a bigger business in the U.S.**

126. As of the March 8, 2022 Morgan Stanley conference, Neumann already knew, based on the materials discussed at the December 1, 2021 Board meeting, that the reported level of market penetration in the UCAN market materially "understated" the effective degree of market penetration when counting account sharers, and that account sharing presented a substantial risk to Netflix's future growth prospects. Moreover, as of March 8, 2022, the gap between the reported degree of market penetration of 60% and the effective degree of market penetration when counting account sharers was even greater, as by then Netflix had close to 30 million account sharing households in the UCAN market and effective degree of market penetration of 84%. *See* ¶258, *infra*.

127. In addition, just six days before the Morgan Stanley conference, on March 2, 2022, Netflix's Board of Directors held a meeting and discussed additional adverse facts that undermine the representations that Neumann subsequently made at the Morgan Stanley conference. *See* Section X.A.3, *infra*. A memo from Netflix management to the Board that was discussed at that Board meeting stated that Netflix had "**a very weak start in Q1** [*i.e.*, Q1'22]." *See* ¶234, *infra*. In addition, the materials for the March 2, 2022 Board meeting indicated that "high levels of account sharing" were part of "a range of . . . potential contributing factors" responsible for Netflix's stagnating subscriber growth. *See* ¶235, *infra*. The Board materials also indicated that Netflix management had developed a plan to partially address account sharing by attempting to monetize multi-household account usage ("MHU") in four test markets (Costa Rica, Czech Republic, Finland, and Peru) that Netflix intended to roll out on March 16, 2022. *See id.*

128. On March 16, 2022, Netflix made a post on its website[23] entitled "Paying to Share

---

[23] https://about.netflix.com/en/news/paying-to-share-netflix-outside-your-household.

Netflix Outside Your Household," which introduced paid sharing features that would be tested in Chile, Costa Rica, and Peru.  (That list of test markets partially overlapped with the list discussed at the March 2, 2022 Board meeting, but added Peru and removed Finland and the Czech Republic.) The March 16, 2022 web post stated that the Company's multi-stream plans had "created some confusion about when and how Netflix can be shared," and "[a]s a result, accounts are being shared between households – impacting our ability to invest in great new TV and films for our members." Netflix would test these features in three countries "before making changes anywhere else in the world."  The post stated, in greater part:

> We've always made it easy for people who live together to share their Netflix account, with features like separate profiles and multiple streams in our Standard and Premium plans.  While these have been hugely popular, they have also created some confusion about when and how Netflix can be shared.  As a result, accounts are being shared between households - impacting our ability to invest in great new TV and films for our members.
>
> ***So for the last year we've been working on ways to enable members who share outside their household to do so easily and securely, while also paying a bit more.*** And over the next few weeks, we'll launch and test two new features for our members in Chile, Costa Rica, and Peru:
>
> - **Add an Extra Member**: Members on our Standard and Premium plans will be able to add sub accounts for up to two people they don't live with - each with their own profile, personalized recommendations, login and password - at a lower price: 2,380 CLP in Chile, 2.99 USD in Costa Rica, and 7.9 PEN in Peru;
>
> - **Transfer Profile to a New Account**: Members on our Basic, Standard, and Premium plans can enable people who share their account to transfer profile information either to a new account or an Extra Member sub account - keeping the viewing history, My List, and personalized recommendations.
>
> We recognize that people have many entertainment choices, so we want to ensure any new features are flexible and useful for members, whose subscriptions fund all our great TV and films.  We'll be working to understand the utility of these two features for members in these three countries before making changes anywhere else in the world.

129.    Only after announcing this potential solution did Defendants disclose the extent of account sharing and its negative impact on subscriber growth.  The timing between the March 16, 2022 announcement of the proposed solution and the April 19, 2022 disclosure that account sharing led to "high household penetration" (discussed in the next section) suggests that Defendants did not

want to acknowledge the problem publicly until they could offer a proposed solution.  Supporting as much, the March 16, 2022 post concedes that Netflix was developing ways to monetize sharing "for the last year"—all the while Defendants had been claiming that the COVID pull-forward created "choppiness" in subscriber growth and, even as recently as the January 20, 2022 Q4'21 earnings call, Defendants had stated they were "trying to pinpoint . . . why our acquisition hasn't kind of recovered to pre-COVID levels."

**C.  Netflix Reveals That 45% Of Its Paid Members Engage in Account Sharing, Revealing That The Company Was Far More Penetrated In Markets Than Investors Had Been Led To Believe**

130.  On April 19, 2022, after the market closed, Netflix announced its financial results for Q1'22.  In its Letter to Shareholders on that date, Netflix revealed that "*our relatively high household penetration - when including the large number of households sharing accounts - combined with competition, is creating revenue growth headwinds.*"  Netflix reported that it had lost 200,000 subscribers during Q1'22, compared to prior guidance expecting the Company to add 2.5 million net subscribers.  The April 19, 2022 Letter to Shareholders blamed the results on "soft acquisition across all regions":

> *Paid net additions were -0.2m compared against our guidance forecast of 2.5m and 4.0m in the same quarter a year ago.*  The suspension of our service in Russia and winding-down of all Russian paid memberships resulted in a -0.7m impact on paid net adds; excluding this impact, paid net additions totaled +0.5m.  *The main challenge for membership growth is continued soft acquisition across all regions. Retention was also slightly lower relative to our guidance forecast*, although it remains at a very healthy level (we believe among the best in the industry).
>
> *          *          *
>
> As a reminder, the quarterly guidance we provide is our actual internal forecast at the time we report.  *For Q2'22, we forecast paid net additions of -2.0m vs. +1.5m in the year ago quarter.  Our forecast assumes our current trends persist (such as slow acquisition and the near term impact of price changes) plus typical seasonality (Q2 paid net adds are usually less than Q1 paid net adds).*  We project revenue to grow approximately 10% year over year in Q2, assuming roughly a mid-to-high single digit year over year increase in ARM [average revenue per member] on a F/X [foreign exchange] neutral basis.  We still target a 19%-20% operating margin for the full year 2022, assuming no material swings in F/X rates from when we set this goal in January of 2022.

131.  For the first time, Netflix disclosed the amount of account sharing, which far

exceeded third party estimates.  The April 19, 2022 Letter to Shareholders revealed that ***"in addition to our 222m paying households, we estimate that Netflix is being shared with over 100m additional households, including over 30m in the UCAN region."***  Significantly, Netflix admitted that ***"[a]ccount sharing as a percentage of our paying membership hasn't changed much over the years."***  Thus, during the entirety of the Class Period, there was an enormous body of Netflix users who were not paying for the service, and Defendants' reported rates of market penetration severely underestimated the actual degree of saturation.  As detailed in Section XI, *infra*, the global rate of market penetration was effectively 35%-36% throughout the Class Period, as compared to the 25% reported by Defendants.  In the UCAN market, the actual degree of market penetration was 79%-84%, rather than the 60% reported by Defendants.

132.     Moreover, the April 19, 2022 Letter to Shareholders admitted that the slowdown in growth in 2021 was due in material part to the higher penetration caused by account sharing, stating, "COVID clouded the picture by significantly increasing our growth in 2020, leading us to believe that most of our slowing growth in 2021 was due to the COVID pull forward.  ***Now, we believe there are four main inter-related factors at work***."  Specifically, the letter stated, in relevant part:

> *First*, it's increasingly clear that the pace of growth into our underlying addressable market (broadband homes) is partly dependent on factors we don't directly control, like the uptake of connected TVs (since the majority of our viewing is on TVs), the adoption of on-demand entertainment, and data costs.  We believe these factors will keep improving over time, so that all broadband households will be potential Netflix customers.

> *Second*, in addition to our 222m paying households, we estimate that Netflix is being shared with over 100m additional households, including over 30m in the UCAN region.  ***Account sharing as a percentage of our paying membership hasn't changed much over the years, but, coupled with the first factor, means it's harder to grow membership in many markets – an issue that was obscured by our COVID growth.***

> *Third*, competition for viewing with linear TV as well as YouTube, Amazon, and Hulu has been robust for the last 15 years.  However, over the last three years, as traditional entertainment companies realized streaming is the future, many new streaming services have also launched.  While our US television viewing share, for example, has been steady to up according to Nielsen, we want to grow that share faster.  Higher view share is an indicator of higher satisfaction, which supports higher retention and revenue.

*Fourth*, macro factors, including **sluggish economic growth, increasing inflation, geopolitical events** such as Russia's invasion of Ukraine, and some continued disruption from COVID are likely having an impact as well.

133.    During the April 19, 2022 Q1'22 earnings call, Hastings reiterated that "COVID created a lot of noise," but account sharing led to "pretty high market penetration," which "is driving the lower acquisition and lower growth." Specifically, he stated:

> **COVID created a lot of noise** on how to read the situation, boosted us a lot in 2020. And then in 2021, I think we thoughtfully said it was mostly pull forward, which was the logical conclusion.
>
> **But now, coming into 2022, that doesn't really hold.** So then pushing into it, we realized, with **all of the account sharing, which we've always had, that's not a new thing, but when you add that up together, we're getting pretty high market penetration.** And that, combined with the competition, is really what we think is driving the lower acquisition and lower growth.
>
> So on the 2 parts, we're working on how to monetize sharing. We've been thinking about that for a couple of years. **But when we were growing fast, it wasn't the high priority to work on. And now, we're working super hard on it.** And remember, these are over 100 million households that already are choosing to view Netflix. They love the service. We just got to get paid at some degree for them.

134.    During the April 19, 2022 Q1'22 earnings call, Neumann similarly stated that "the long-term addressable market, we believe, is unchanged" but "we have a better sense that COVID clouded in terms of these near-term limiters to penetrate that growth and capture that market." Peters elaborated that penetration in U.S. was "boosted" by COVID and admitted that that penetration includes account sharers:

> . . . [W]e have this addressable market that's expanding over time in every country that we're operating in. It's a bunch of enabling factors, like broadband and smart TVs. And then in some countries that we're operating in, **where we've been operating the longest, like the U.S. is a great example, we have a really significant high penetration of viewers into that near-term market potential.** And that was really boosted by sort of this growth at the beginning period of COVID and the lockdown.
>
> **Now that viewer penetration is made up of 2 groups. One is a group that's paying us, which is great. And then there is a group of viewers that are not paying us, and they're sharing someone else's account credential.** And we really see that second group is a tremendous opportunity because they're clearly well-qualified. . . . **And the principal way we've got of going after that is asking our members to pay a bit more to share the service with folks outside they're home.**

135.    The April 19, 2022 Letter to Shareholders stated the Company planned to "reaccelerate our revenue growth – through improvements to our service and more effective monetization of multi-household sharing[.]"  The Company acknowledged "[s]haring likely helped fuel our growth" and stated "we've always tried to make sharing *within* a member's household easy, with features like profiles and multiple streams."  Mirroring the language from the March 16, 2022 post, the April 19, 2022 Letter to Shareholders stated "While these have been very popular, they've created confusion about when and how Netflix can be shared with other households."  This so-called "confusion" was not new because, as the Company admitted, the level of account sharing "hasn't changed much over the years."

136.    What changed was that as the Company grew, key markets were increasingly penetrated when accounting for users who were account sharing, which slowed acquisition.  On the April 19, 2022 earnings call, Sarandos stated, "Now we've talked about being highly penetrated in some of those core markets with users, which means that it's harder to get them to join Netflix if they're already using Netflix.  So we got to figure out these different models that we're doing now to more effectively monetize that viewing."

137.    To effectively monetize sharing, the April 19, 2022 Letter to Shareholders noted that "early last year we started testing different approaches to monetize sharing and, in March, introduced two new paid sharing features, where current members have the choice to pay for additional households, in three markets in Latin America."  During the April 19, 2022 Q1'22 earnings call, Peters further confirmed that the Company had been developing a solution to account sharing throughout the Class Period because Netflix's high penetration inhibited subscriber growth.  Specifically:

> ANALYST: . . . [W]hen we think about account sharing, and just curious about the early testing that you're doing when you think about Chile and Costa Rica and Peru, I guess now, ***it's pretty clear to see why it's the right time to do this in a bigger way,*** but how do you think about rolling that out in the U.S.?  And what will the implementation actually look like?
>
> PETERS: ***Yes***.  I mean first, it's important to note that we're trying to find a balanced approach here, and we're trying to basically come up with a model that supports a customer-centric approach. . . .

So there's a bunch of factors that we're working through. That's why we've deployed the test that we have. *And frankly we've been working on this for about almost 2 years. We – about a year – a little bit over a year ago, we started doing some light test launches that we – informed our thinking and helped us build the mechanisms that we're deploying now.*

138.    The April 19, 2022 Letter to Shareholders also revealed that the Company was aware of the engagement of these non-paying users, stating "There's a broad range of engagement when it comes to sharing households from high to occasional viewing. So while we won't be able to monetize all of it right now, we believe it's a large short- to mid-term opportunity." The April 19, 2022 Letter to Shareholders stated, "As we work to monetize sharing, growth in ARM [average revenue per member], revenue and viewing will become more important indicators of our success than membership growth."

139.    Most surprising was that Netflix projected a shrinking customer base in Q2'22. The April 19, 2022 Letter to Shareholders stated, "*For Q2'22, we forecast paid net additions of -2.0m* vs. +1.5m in the year ago quarter. *Our forecast assumes our current trends persist (such as slow acquisition* and the near term impact of price changes) plus typical seasonality (Q2 paid net adds are usually less than Q1 paid net adds)."

140.    Analysts were uniformly shocked by the disclosures. While estimates of the total addressable market ("TAM") and corresponding penetration varied, the consensus was that the additional undisclosed account sharers dramatically increased penetration in markets, making additional growth difficult.

a.    On April 19, 2022 Evercore issued a report reacting to Netflix's disclosures, stating "Netflix estimates 100MM additional households are sharing Netflix (but not paying for it), including 30MM in UCAN that limit growth upside (*we think an esp. material factor for mature markets*)." Evercore noted that while Netflix claimed it had penetrated "approx. 60% of all North American broadband households," "[a]dd the additional 30MM North American households that Netflix estimates 'share' a Netflix account and *that's 80% penetration. It's not easy to raise penetration beyond that level*." Evercore lowered its target price for the stock from $525 to $300.

b.    On April 19, 2022, Pivotal Research Group issued a report calling it "a shocking 1Q subscriber miss and weak subscriber & financial guidance." The subscriber miss was

due to, among other things, "100M households pirating the service globally = **already high penetration w/ piracy**." Pivotal changed its rating from BUY to SELL and lowered its target price for the stock from $550 to $235.

c.    J.P. Morgan's April 20, 2022 report called the results "a sea change quarter for NFLX in which the company essentially conceded to every key point of the bear thesis[.]" The report recognized that "the bigger factor is management's acknowledgement of relatively high household penetration when including account sharing …." (Underlining in original.) J.P. Morgan noted that "NFLX's **newly disclosed account sharing metrics** takes global BB HH **penetration from 29%** as laid out in our recent TAM analysis report **up to 41%. And UCAN alone goes from 54% penetration to 76%."** J.P. Morgan lowered its rating from Overweight to Neutral and dropped its price target from $605.00 to $300.[24]

d.    Guggenheim's April 20, 2022 report posited that the recently disclosed 100 million account sharers "means effective TAM penetration (based on broadband accounts) is as much as **50% higher than penetration** based on reported member levels." Guggenheim lowered its price target for the stock from $555 to $350.

e.    Morgan Stanley's April 20, 2022 report offered a similar assessment: "adding 30mm sharers in UCAN to its 75mm members suggests its **UCAN penetration is not 60% (75/125) but rather 85% (105/125).**" As a result, "1) Netflix has limited room for additional member growth in the UCAN region given password sharing and 2) it has 30mm HH that are under-monetized." Morgan Stanley lowered its price target for the stock from $425 to $300.

f.    Bank of America issued a report on April 20, 2022 stating that one of the "Negatives" of the Company is that "Key markets are saturated" due to account sharing. It stated that "[m]anagement now concedes that between paying subscribers and password sharers, most of the **key markets, UCAN and EMEA likely, have saturated and it will be very hard to find new**

---

[24] In addition, on May 13, 2022, J.P. Morgan issued a report that stated "many still don't understand how NFLX flipped from interpreting recent soft subscriber numbers as pandemic hangover to a function of competition & higher penetration due to account sharing. The transition has left some more skeptical of management in a way they never have been before . . . ."

1    ***many subscribers in these markets in the near to medium term***."  Bank of America lowered its

2    rating of the stock from BUY to UNDERPERFORM and lowered its price objective from $605 to

3    $300.

4          g.     Credit Suisse's April 20, 2022 report noted "the real culprit relative to their

5    post-pandemic growth thesis is the lack of opportunity in mature markets due to 100m+ homes

6    sharing Netflix passwords."  Credit Suisse lowered its price target for the stock from $450 to $350.

7          h.     In a Bloomberg article dated April 20, 2022, analyst Michael Nathanson of

8    MoffettNathanson LLC was quoted as saying, "Everything they've tried to convince me of over the

9    last five years was given up in one quarter.  It's such [an] about face."[25]

10        141.    On this news, the Company's share price fell $122.42, or over 35%, to close at

11    $226.19 per share on April 20, 2022, on unusually heavy trading volume.

12    **VII.    POST-CLASS PERIOD EVENTS**

13        142.    On July 18, 2022, Netflix announced an "add a home" feature launched in certain

14    parts of Latin America because "today's widespread account sharing between households

15    undermines our long term ability to invest in and improve our service."  Though each Netflix

16    account would include one home, the new feature would allow accountholders to use the account in

17    additional homes for a fee.  It would launch in August 2022 in Argentina, the Dominican Republic,

18    El Salvador, Guatemala, and Honduras. The Company's announcement posted on its website stated,

19    in relevant part:

20            But today's widespread account sharing between households undermines our long
        term ability to invest in and improve our service.

21

22            So we've been carefully exploring different ways for people who want to share their
        account to pay a bit more.  In March 2022, we launched an "add extra member"

23            feature in Chile, Costa Rica, and Peru.  From next month, we will launch an
        alternative "add a home" feature in Argentina, the Dominican Republic, El Salvador,

24            Guatemala, and Honduras.

25            Here's how this "add a home" feature will work.

26            **One home per account:** Each Netflix account - whatever your plan - will include

27

28    ───────────────

[25] https://www.bloomberg.com/news/articles/2022-04-19/netflix-loses-200-000-customers-its-first-decline-in-a-decade?leadSource=uverify%20wall.

one home where you can enjoy Netflix on any of your devices.

**Buy additional homes:** To use your Netflix account in additional homes, we will ask you to pay an extra [219 Pesos per month per home in Argentina / $2.99 per month per home in the Dominican Republic / $2.99 per month per home in Honduras / $2.99 per month per home in El Salvador / $2.99 per month per home in Guatemala]. Members on the Basic plan can add one extra home, Standard up to two extra, and Premium up to three extra.

**Travel included:** You can watch while outside the home on your tablet, laptop or mobile.

**New manage homes feature:** You will soon be able to control where your account is being used - and remove homes at any time - from your account settings page.

143.    On October 18, 2022, Netflix announced that it decided to "sunset" this feature. The Company would "instead focus on making it easy for borrowers, i.e. people who do not live in your household, to _transfer their Netflix profile_ into their own account, and for sharers to manage their devices more easily and to create sub-accounts ('extra member'), if they want to pay for family or friends." (Emphasis in original.) These features would roll out "more broadly in early 2023."

144.    During a conference call held on October 18, 2022 in connection with Netflix's Q3'22 financial results, Defendant Peters stated that this account transfer feature "does enable a key thing that we learned around how we think about paid sharing." The Company launched the feature after "working really hard to try and find essentially a balanced position and approach towards this one that supports customer choice . . . but balancing that with making sure that as a business, we're sort of getting paid when we're delivering entertainment value to consumers." He confirmed that Defendants "tried a couple different approaches in different countries." Based on customer feedback, Defendants "landed on an approach towards paid sharing that we think strikes that balance." Defendant Peters explained this "balance," as follows:

And a key component of that [approach] is the ability for borrowers, people that are using somebody else's account right now to access Netflix, to be able to create their own separate account. And part of that is transferring their profile and their viewing history and all the great information that basically informs hopefully great recommendations for them. And we think that, that sort of separate account path will be especially attractive in countries where we're launching that lower-priced Basic with Ads plan. That lower price obviously makes that more attractive.

Another component of this, though, is allowing account owners to be able to pay for

Netflix for some friend or family, somebody they want to share the service with. And so they're able to create a sub-account, which we're calling extra member, to enable that model, too.

So we're trying to come up with a range of options that supports customer choice, balances those considerations but also ensures that we've got a sustainable business model that allows us to invest in more of that great entertainment that Ted's team has always focused on for all of our members. So we're looking forward to getting that out in early '23.

145.     During the same October 18, 2022 conference call, Defendants were pressed about their "decision to no longer provide guidance on subscribers starting next quarter." Spencer Wang, Netflix's Vice President of Finance, Corporate Development and Investor Relations, stated that "now that we have such a wide range of price points, different partnerships all over the world, [the] economic impact of any given subscriber can be quite different. . . . So that's why we've been increasingly focused on revenue as our primary top line metric . . . ." He clarified that Netflix "will continue to report [its] global membership every quarter when [it] release[s] earnings as well as the paid net adds."

146.     On February 1, 2023, Netflix issued rules and exemptions to prevent account sharing outside household which confirmed that Netflix was identifying account sharing by using tools to identify geographical discrepancies with the IP addresses.[26]  These new terms ask subscribers to define a primary location through their TV. All the accounts and devices should be connected to the same Wi-Fi as the TV. If a user doesn't set a primary location or doesn't have a TV, Netflix automatically sets a primary location based on IP address, device IDs and activity.

## VIII.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS

### A.      Fourth Quarter and Full Year Results For 2020

147.     The Class Period begins on January 19, 2021. On that day, Netflix announced its financial results for Q4'20 and FY'20, and Defendants held an earnings call to discuss those results. During that call, Neumann told the analyst hosting the call that the UCAN market was "roughly

---

[26] *See* https://help.netflix.com/en/node/128339; *see also* https://thehill.com/homenews/nexstar_media_wire/3839989-how-will-netflix-end-password-sharing-updates-for-3-other-countries-offer-insight/.

60% penetrated" and that all markets had a "lot of headroom" for growth:

> ANALYST: . . . And if you could touch on a couple of regions, I mean, the one thing that stood out during the quarter, of course, is UCAN, where most of us thought the market was saturated but you guys keep accelerating growth despite price increases, which is even more impressive.  And then the other region which until Q3 seems to be – despite the benefit of COVID – seemed to have slower growth than 2019 despite the market not being saturated.  So if you could just talk about the underlying trends in some of these markets and what you're seeing, which is driving some of these trends, that might be useful.

> NEUMANN: . . . I think the story is pretty similar throughout the world.  Every country is a little bit different.  But what we're seeing in terms of our viewing trends are similar around the world . . . .

> As you know, there are certain countries around the world where we're just further along in our content market fit and our maturation, but we're seeing growth everywhere.  I mean even – like you pick Latin America as an example, one of our more mature markets.  You look over the past few years, and we've been steadily growing about 5 million to 6 million paid net adds a year.  As you mentioned, in the kind of U.S., ***UCAN market, we're roughly 60% penetrated, and we're still growing.***  So we're still a very small share of even just pay-TV penetration in most markets around the world and small share of viewing.  So we think ***we've got a lot of headroom in all these markets***, and we're just trying to get a little better every day.

148.    The statements in ¶147 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.    In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.    During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.    As of the end of Q4'20, in addition to Netflix's 203.66 million subscriber households

reported globally and 73.94 million subscriber households reported for the UCAN region, approximately 90.6 million additional households were using Netflix globally through account sharing and approximately 24.97 million additional households were using Netflix in the UCAN region through account sharing;

d.    As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe.  In particular, the effective degree of market penetration in the UCAN was approximately 79% rather than the "roughly 60%" represented by Neumann; and

e.    As a result of the foregoing, Netflix's ability to acquire new paying members was severely hindered and Neumann's assertion that "we've got a lot of headroom to grow in all these markets" was materially misleading.

149.    On the January 19, 2021 earnings call, in response to an analyst's question about the Company's relatively lower guidance for Q1'21, Neumann attributed the lower guidance to the COVID "pull forward dynamic", yet assured that there were "very strong underlying growth metrics" and "the long-term growth trajectory is at least as strong as ever":

> ANALYST: . . .  Sequentially, <u>the first quarter tends to be higher in net additions than Q4.  But your guidance is lower despite the fact that you beat Q4 by a relatively large amount.</u>  And it feels like the pull-forward effect is more or less behind us.  So if you could just help us walk through the thought behind the guidance and the framework that you used for that, that would be a good place to start.
>
> NEUMANN: . . . ***So I know you mentioned the pull-forward. I don't think we're declaring that we're necessarily through that yet.*** So we think there's puts and calls every quarter.  But one that's still a meaningful factor for us in the guide is thinking through how we kind of grow through that growth from 2020.  ***So there's probably still a little bit of that pull-forward dynamic in the early parts of 2021.***
>
> \*        \*        \*
>
> But at the same time, one thing that's maybe counterbalancing that is that what COVID has done for that is it's accelerated that big shift from linear to streaming entertainment. So ***the long-term growth trajectory is at least as strong as ever.*** There's just more short-term noise and uncertainty right now but still ***very strong underlying growth metrics***, and that's what you're seeing in the Q1 guide.

150.    The statements in ¶149 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to

disclose, among other things, the following adverse facts:

a.      In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.      During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.      As of the end of Q4'20, in addition to Netflix's 203.66 million subscriber households reported globally and 73.94 million subscriber households reported for the UCAN region, approximately 90.6 million additional households were using Netflix globally through account sharing and approximately 24.97 million additional households were using Netflix in the UCAN region through account sharing;

d.      As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe;

e.      As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered and Neumann's assertions that "the long-term growth trajectory is at least as strong as ever" and that Netflix had "very strong underlying growth metrics" were materially misleading;

f.      Neumann's assertions that "I don't think we're declaring that we're necessarily through that [pull-forward] yet" and "there's probably still a little bit of that pull-forward dynamic in the early parts of 2021" were materially misleading because they failed to disclose the material impact of account sharing on membership growth; and

g.      The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

151.     On January 28, 2021, Netflix filed its Form 10-K with the SEC reporting its financial results for the year ending December 31, 2020 (the "2020 Form 10-K").  The 2020 Form 10-K was signed by Defendants Hastings, Sarandos, and Neumann.  The 2020 Form 10-K stated in relevant part:

**If our efforts to attract and retain members are not successful, our business will be adversely affected.**

\*       \*       \*

While we permit multiple users within the same household to share a single account for non-commercial purposes, *if multi-household usage is abused or if our efforts to restrict multi-household usage are ineffective, our ability to add new members may be hindered and our results of operations may be adversely impacted*.

(First emphasis in original.)

152.     The statements in ¶151 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.     In Q2'19, Netflix reported a loss of 126,000 U.S. subscribers, the first time Netflix reported a loss of U.S. subscribers since 2011.  Following these results, senior Netflix executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management.  Defendants, therefore, already knew that multi-household usage had been abused, that it had hampered Netflix's ability to add new members, and that it had adversely impacted Netflix's results in Q2'19.  The risks that Defendants presented as merely hypothetical adverse events had already materialized in a significant way, and the failure to disclose this prior materialization of the risk made the disclosure misleading and caused investors to underestimate the likelihood and magnitude of a further (and more significant) materialization of this risk.

b.     During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but

understood that account sharing would remain a long-term constraint on growth unless and until it was addressed.  The failure to disclose these facts rendered the risk disclosure misleading because the deliberate delay in enforcement following management's determination that account sharing was a material constraint on growth increased the likelihood of a severe contraction in growth following the COVID pull-forward;

c.      As of the end of Q4'20, in addition to Netflix's 203.66 million subscriber households reported globally and 73.94 million subscriber households reported for the UCAN region, approximately 90.6 million additional households were using Netflix globally through account sharing and approximately 24.97 million additional households were using Netflix in the UCAN region through account sharing;

d.      As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe;

e.      As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered; and

f.      The risk warning concerning multi-household usage presented as mere hypothetical risks adverse events that had already materialized because multi-household usage was already being abused and Netflix's efforts to restrict it were ineffective in preventing approximately 90.6 million non-paying households globally and approximately 24.97 million non-paying households in the UCAN region from using Netflix's services.

**B.      First Quarter of 2021 Financial Results**

153.    On April 20, 2021, Netflix issued its Q1'21 Letter to Shareholders reporting its financial results for the quarter.  The letter stated in relevant part:

> We finished Q1'21 with ***208m paid memberships***, up 14% year over year, but below our guidance forecast of 210m paid memberships.  ***We believe paid membership growth slowed due to the big Covid-19 pull forward in 2020 and a lighter content slate in the first half of this year, due to Covid-19 production delays.  We continue to anticipate a strong second half*** with the return of new seasons of some of our biggest hits and an exciting film lineup.  In the short-term, there is some uncertainty from Covid-19; in the long-term, the rise of streaming to replace linear TV around the world is the clear trend in entertainment.

\*      \*      \*

As we discussed in past letters, ***these dynamics are also contributing to a lighter content slate in the first half of 2021, and hence, we believe slower membership growth. In Q1, paid net additions of 4m were below our 6m guidance (and the 16m net additions in the year ago quarter) primarily due to acquisition, as retention in Q1 was in line with our expectations.*** We don't believe competitive intensity materially changed in the quarter or was a material factor in the variance as the over-forecast was across all of our regions.

154.    The statements in ¶153 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.    In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth. That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.    During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.    As of the end of Q1'21, in addition to Netflix's 207.64 million subscriber households reported globally and 74.38 million subscriber households reported for the UCAN region, approximately 92.37 million additional households were using Netflix globally through account sharing and approximately 25.12 million additional households were using Netflix in the UCAN region through account sharing;

d.    As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe;

e.    As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered;

f.    The representation that "paid membership growth slowed due to the big Covid-19 pull forward in 2020 and a lighter content slate in the first half of this year, due to Covid-19

production delays" was materially misleading because it failed to disclose the material role that account sharing played in causing the slowdown in membership growth; and

g.      The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

155.    On April 20, 2021, Netflix held an earnings call to discuss its first quarter of 2021 financial results, during which Neumann attributed the Company missing its paid net add guidance to COVID, but assured that "the business remains healthy" and "is still growing":

> ANALYST:  . . . Obviously, you were comping a really big Q1 last year with 50 million net adds.  The net adds this quarter came in below your expectations and below the Street's expectations.  Any additional color you can provide on what caused this?

> NEUMANN: . . . But look, so *in terms of Q1 performance, it really boils down to COVID*, frankly.  As you know, the extraordinary events of COVID have had a big impact on the world, continue to have a big impact on the world.  *And for us, at a minimum, creates just some short-term kind of choppiness in some of the business trends that we see in our business.*

> *                    *          *          *

> *But the key is the business remains healthy. Our engagement, our viewing per household was up year-over-year in Q1.  Our churn was down year-over-year, and the business is still growing.*  So even at 4 million paid net adds, if you kind of take COVID out and look over the past 2 years, we've grown from 2 years ago at about 150 million members to almost 210 million now.  So that's nearly 40% growth and about just under 20% over an average of those 2 years, which is in line with the past couple of years.

> So the business remains healthy, and that's because *the long-term drivers*, this big transition from linear to streaming entertainment, and that *remains as healthy as ever*. But you do see *a little kind of noise in the near term, but a lot of long-term parity*.

156.    The statements in ¶155 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.      In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined

that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.      During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.      As of the end of Q1'21, in addition to Netflix's 207.64 million subscriber households reported globally and 74.38 million subscriber households reported for the UCAN region, approximately 92.37 million additional households were using Netflix globally through account sharing and approximately 25.12 million additional households were using Netflix in the UCAN region through account sharing;

d.      As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe;

e.      The viewing metric was artificially inflated by Netflix's inclusion of views by non-members, and churn was artificially suppressed by members' ability to share their accounts with non-members;

f.      As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered and Neumann's assertions that "the business remains healthy" and "is still growing" and that the "long-term drivers" of growth were "as healthy as ever" were materially misleading;

g.      Neumann's statements that COVID "creates just some short-term kind of choppiness in some of the business trends" and that Netflix's disappointing Q1'21 performance "really boils down to COVID" were materially misleading because they failed to disclose the material impact of account sharing on membership growth; and

h.      The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

157.    The analyst on the April 20, 2021 Q1'21 earnings call asked about "subscriber growth as the world reopens" and Sarandos stated the Company was "still working through that [COVID] pull forward" and assured "the core underlying metrics are very healthy and there's this clear catalyst to a reacceleration of growth":

> [S]pecific to your question on the Q2 guide, Nidhi, is related to that, it's very similar to what we saw in Q1 is what's reflected in Q2 in terms of ***still working through that pull forward***, still working through some of the pushed slate of some of those big titles into the latter half of the year.
>
> And also, it's a bit of a seasonally soft period for us.  So those are all playing into it.  But the good news, as we said, ***the core underlying metrics are very healthy and there's this clear catalyst to a reacceleration of growth*** and towards that back end of the year as those big titles start to launch and strength of slates and we come out of that pull forward.  So feeling good about the long-term trends.

158.    Neumann stated on the April 20, 2021 Q1'21 earnings call that "we're still less than 10% TV view share even in our biggest markets.  So there's just this ***big long runway of growth*** if we stay focused and keep getting better."

159.    The statements in ¶¶157-58 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.    In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.    During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.    As of the end of Q1'21, in addition to Netflix's 207.64 million subscriber households reported globally and 74.38 million subscriber households reported for the UCAN region, approximately 92.37 million additional households were using Netflix globally through

account sharing and approximately 25.12 million additional households were using Netflix in the UCAN region through account sharing;

d.      As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe;

e.      As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered, and Sarandos' statement that "the core underlying metrics are very healthy and there's this clear catalyst to a reacceleration of growth" and Neumann's statement that "there's just this big long runway of growth" were materially misleading;

f.      Sarandos' statement that the Company was "still working through that [COVID] pull forward" was materially misleading because it failed to disclose the material role that account sharing played in causing the slowdown in membership growth; and

g.      The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

160.      An analyst on the April 20, 2021 Q1'21 earnings call asked about Netflix's tests limits on account sharing and the "size of the opportunity" and "why now is . . . the right time to start tightening the screws on that," given that account sharing has long existed.  Peters claimed that this testing was not "new":

> ANALYST: . . . Greg, you've started to run some tests in certain markets, I think maybe just the U.S., on limiting account sharing.  <u>Can you talk about the size of the opportunity here, and why now is kind of the right time to start tightening the screws on that?</u>

> PETERS: Yes.  First of all, we recognize that our members are in different positions, again, and ***they have different needs*** from us as an entertainment service.  And ***we're really seeking that sort of flexible approach to make sure that we are providing the plans with the right features and the right price points to meet those broad set of needs***.

> So we're going to keep doing that.  We're going to keep working on that, working on accessibility across all of the countries that we serve.  But ***we also want to ensure that while we're doing that, that we're good at making sure that the people who are using a Netflix account, who are accessing it are the ones that are authorized to do so.***

And that's what this sort of line of testing is about. It's *not necessarily a new thing*. We've been doing this for a while. You may see it pop up here and there in different ways, but it's sort of the same framework that we use. And I think you're familiar with and so much of how we think about *continuously improving the service*, which is we iteratively work. We use the tests and the test results to inform and guide how we proceed and just sort of *continually try and make that better and better*.

161. The statements in ¶160 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a. In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth. That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b. During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c. As of the end of Q1'21, in addition to Netflix's 207.64 million subscriber households reported globally and 74.38 million subscriber households reported for the UCAN region, approximately 92.37 million additional households were using Netflix globally through account sharing and approximately 25.12 million additional households were using Netflix in the UCAN region through account sharing;

d. As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe. In particular, the effective degree of market penetration in the UCAN was approximately 80%;

e. As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered;

f. As a result, the Company was required to effectively monetize sharing to promote revenue growth;

g.      Peters' statement about wanting to ensure that Netflix is "good at making sure that the people who are using a Netflix account, who are accessing it are the ones that are authorized to do so" was materially misleading because Netflix had already failed to limit access to authorized users and Netflix's new efforts to restrict sharing were a belated attempt to address this already-known material problem  now that the COVID pull-forward was no longer a viable excuse for Netflix's slowing growth; and

h.      Peters' representations that testing measures were being implemented to meet members' "broad set of needs" and "improving the service" and making it "better and better" were materially misleading because they failed to disclose that the Company began such testing in early 2021 specifically in response to market saturation caused by account sharing, as admitted in the April 19, 2022 Letter to Shareholders and as Peters admitted during the April 19, 2022 Q1'22 earnings call.

162.    On April 22, 2021, Netflix filed a Form 10-Q reporting its results for the quarter ended March 31, 2021 ("Q1'21 10-Q").  The Q1'21 10-Q was signed by Defendants Hastings and Neumann.  The Q1'21 10-Q stated in relevant part:

> Paid net membership additions for the three months ended March 31, 2021 decreased 75% as compared to the three months ended March 31, 2020.  We believe ***the decrease in paid net membership additions can primarily be attributed to the COVID-19 pandemic*** which contributed to significant paid net membership additions in the first quarter of 2020, and resulted in less growth in the first quarter of 2021 as compared to the prior year.

163.    The statements in ¶162 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.      In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.      During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting

from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.      As of the end of Q1'21, in addition to Netflix's 207.64 million subscriber households reported globally and 74.38 million subscriber households reported for the UCAN region, approximately 92.37 million additional households were using Netflix globally through account sharing and approximately 25.12 million additional households were using Netflix in the UCAN region through account sharing;

d.      As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe;

e.      As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered;

f.      The representation that "the decrease in paid net membership additions can primarily be attributed to the COVID-19 pandemic" was materially misleading because it failed to disclose the material role that account sharing played in causing the slowdown in membership growth; and

g.      The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

**C.      Second Quarter 2021 Financial Results**

164.    On July 20, 2021, Netflix announced its second quarter 2021 financial results. During a conference call on that date, Neumann attributed the decline in acquisition growth to COVID "choppiness":

> So we delivered $1.5 million paid net adds relative to a guide of $1 million.  And what we're seeing is what we've sort of been talking about for the last couple of quarters and that ***there's still a bit of choppiness to our growth.***  We had the kind of big pull forward in 2020 of subscriber adds.
>
> We also had to push in production of some of our kind of key returning titles and big tent-pole new releases until the latter part of the year.  But overall, the business is performing well.  Our churn is actually down relative to the more comparable 2-year-

ago period in 2019, Q2 of '19 before COVID. ***Our viewing and we've talked about in the letter, our engagement is up nearly 20% over that period. But we still feel a little bit of that drag in terms of our acquisition growth*** as we're kind of working through what we hope is -- we can't be sure but ***what we hope is the tail end of this COVID choppiness where we see on the acquisition side as markets reopen,*** it does slow things down a little bit.

165.    The statements in ¶164 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.    In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth. That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.    During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.    As of the end of Q2'21, in addition to Netflix's 209.18 million subscriber households reported globally and 73.95 million subscriber households reported for the UCAN region, approximately 93.05 million additional households were using Netflix globally through account sharing and approximately 24.98 million additional households were using Netflix in the UCAN region through account sharing;

d.    As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe;

e.    The viewing metric was artificially inflated by Netflix's inclusion of views by non-members, and thus, presented a materially misleading measure of the health of the business and its ability to acquire and retain members;

f.    As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered;

g.      The attribution of the "choppiness" in Netflix's membership growth to issues related to COVID was materially misleading because it failed to disclose the material role that account sharing played in causing the slowdown in membership growth; and

h.      The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

166.      An analyst on the July 20, 2021 earnings call asked about the Company's Q3'21 guidance and Neumann claimed "the underlying business metrics are really healthy," and attributed the slowdown in acquisition to market reopenings after COVID:

> Well, the Q3 guide is actually -- it kind of reflects a lot of what we've seen in Q2 frankly.  So as I mentioned, *the underlying business metrics are really healthy*.  The one thing we do see with COVID is we don't see the big spikes that we saw in terms of engagement or acquisition or churn that we saw in the very early days of the pandemic.  *But on the margin, acquisition is impacted.*
>
> So for example, in Q2, *when things tightened up a little bit, say, in Brazil or India, we did see some increase in acquisition.*  And similarly, *as markets reopened, particularly in part -- in most of EMEA and the UCAN region, that did have a bit of a headwind on acquisition*.  And that's reflected basically in our Q3 guide as well, so similar business fundamentals that hopefully kind of starting to move a little bit further away from those market reopenings, which is why you do see some incremental growth, so a better seasonal period as well as moving a bit away from those market reopenings but not a big fundamental change and then hopefully into even more reacceleration as we get to the end of the year as we really get into the kind of heart of our kind of strong release schedule as well as peak seasonality.

167.      The statements in ¶166 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.      In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.      During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting

from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.    As of the end of Q2'21, in addition to Netflix's 209.18 million subscriber households reported globally and 73.95 million subscriber households reported for the UCAN region, approximately 93.05 million additional households were using Netflix globally through account sharing and approximately 24.98 million additional households were using Netflix in the UCAN region through account sharing;

d.    As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe;

e.    As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered, and Neumann's statement that "the underlying business metrics are really healthy" was materially misleading;

f.    Neumann's attribution of the slowdown in acquisition to market reopenings after COVID was materially misleading because it failed to disclose the material role that account sharing played in causing the slowdown in membership growth; and

g.    The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

168.    An analyst on the July 20, 2021 earnings call asked about returning to pre-COVID levels on net adds and Neumann said by the end of the year the Company would be on a "normalized growth trajectory":

ANALYST: I think a big question on investors' minds is just how do you feel about your ability to get back to pre-COVID levels of net adds as we get into 2022.

NEUMANN: . . . [E]ven with the Q3 guide and then into Q4, when -- if we deliver on our Q3 guide, we talk about in the letter, that's -- that will be -- the growth pattern in our business is -- over a long term is -- over the long trends is remarkably consistent and steady.  So we'll have -- if we deliver on our guide, it means we'll have added 54 million new members over that 2-year period or on average, 27 million a year, which is right in line with our past few years of growth in 2018 and '19.

***So we remain on that growth trajectory***.  And again, once we get into Q4, what we would expect is as we get through, hopefully, that tail end of the COVID choppiness, we get into the strength of that slate.  We get to kind of a high seasonal period for us.  ***We'd expect to end the year on a much more normalized growth trajectory***, but we kind of have to get there.

169.    The statements in ¶168 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.    In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.    During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.    As of the end of Q2'21, in addition to Netflix's 209.18 million subscriber households reported globally and 73.95 million subscriber households reported for the UCAN region, approximately 93.05 million additional households were using Netflix globally through account sharing and approximately 24.98 million additional households were using Netflix in the UCAN region through account sharing;

d.    As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe;

e.    As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered; and

f.    Neumann's statement that "we remain on that growth trajectory" that the Company was on in "2018 and '19" in response to the analyst's question about Netflix's "ability to get back to pre-COVID levels of net adds as we get into 2022" was materially misleading because it failed to disclose the material role that account sharing played in causing the

1    slowdown in membership growth; and

2    g.    The principal reason for the slowdown in Netflix's membership growth was the

3    degree of market saturation due to account sharing, as Defendants subsequently admitted in

4    Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

5    170.    On July 22, 2021, Netflix filed a Form 10-Q reporting its results for the quarter ended

6    June 30, 2021 ("Q2'21 10-Q").  The Q2'21 10-Q was signed by Defendants Hastings and Neumann.

7    The Q2'21 10-Q stated in relevant part:

8    Paid net membership additions for the three months ended June 30, 2021 decreased
     85% as compared to the three months ended June 30, 2020. We believe **the decrease
9    in paid net membership additions can primarily be attributed to the COVID-19
     pandemic** which contributed to significant paid net membership additions in the
10   second quarter of 2020, and resulted in less growth in the second quarter of 2021 as
     compared to the prior year.
11

12   171.    The statements in ¶170 were materially false and/or misleading when made and/or

13   omitted to state materially facts to make the statements not misleading because they failed to

14   disclose, among other things, the following adverse facts:

15   a.    In the second half of 2019, Netflix's senior executives tasked a research team with

16   investigating the reasons for Netflix's slowing subscription growth.  That team determined

17   that account sharing was a major factor eating into subscription growth and reported this

18   finding back to management;

19   b.    During 2020, Netflix management intentionally delayed a crackdown on account

20   sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting

21   from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but

22   understood that account sharing would remain a long-term constraint on growth unless and

23   until it was addressed;

24   c.    As of the end of Q2'21, in addition to Netflix's 209.18 million subscriber households

25   reported globally and 73.95 million subscriber households reported for the UCAN region,

26   approximately 93.05 million additional households were using Netflix globally through

27   account sharing and approximately 24.98 million additional households were using Netflix

28   in the UCAN region through account sharing;

d.      As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe;

e.      As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered;

f.      The representation that "the decrease in paid net membership additions can primarily be attributed to the COVID-19 pandemic" was materially misleading because it failed to disclose the material role that account sharing played in causing the slowdown in membership growth; and

g.      The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

**D.      Third Quarter 2021 Financial Results**

172.    On October 19, 2021, Netflix announced its third quarter 2021 financial results in a Letter to Shareholders.  The letter was attached as Ex. 99.1 to a Form 8-K filed with the SEC on October 19, 2021 and signed by Defendant Neumann.  The letter stated, in relevant part, "We added 4.4m paid net adds (vs. 2.2m in Q3'20) to end the quarter with 214m paid memberships."  It also stated: "The UCAN and LATAM regions grew paid memberships more slowly.  These regions have *higher penetration of broadband homes although we believe we still have ample runway for growth* as we continue to improve our service."

173.    The statements in ¶172 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.      In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.      During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting

1    from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but

2    understood that account sharing would remain a long-term constraint on growth unless and

3    until it was addressed;

4        c.      As of the end of Q3'21, in addition to Netflix's 213.56 million subscriber households

5    reported globally and 74.02 million subscriber households reported for the UCAN region,

6    approximately 95 million additional households were using Netflix globally through account

7    sharing and approximately 25 million additional households were using Netflix in the UCAN

8    region through account sharing;

9        d.      As a result, Netflix was substantially more penetrated in the applicable markets than

10   investors were led to believe.  In particular, the effective degree of market penetration in the

11   UCAN was approximately 79%;

12       e.      As a result of the foregoing, Netflix's ability to acquire new paying members was

13   severely hindered, and the assertion that Netflix still had "ample runway for growth" was

14   materially misleading;

15       f.      Materials distributed to Netflix's Audit Committee in connection with its meeting on

16   October 18, 2021 further undercut the assertion that Netflix had "ample runway for growth,"

17   particularly in the UCAN market.  Those materials indicated that Netflix experienced "worse

18   than expected churn" in the UCAN region, due in substantial part to "more absolute

19   cancellations coming from the now larger member base."  In other words, the very high level

20   of market penetration, which was materially higher than reported due to account sharing,

21   was making it difficult for acquisition to outpace churn; and

22       g.      The principal reason for the slowdown in Netflix's membership growth was the

23   degree of market saturation due to account sharing, as Defendants subsequently admitted in

24   Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

25   174.    On October 19, 2021, the Company held an earnings call to discuss its Q3'21

26   financial results.  During the call, an analyst asked about "the weakness . . . in Latin America."

27   While Neumann acknowledged that the LatAm and UCAN "markets are a bit more mature, more

28   tenured, more penetrated" markets, making the "growth . . . a little bit harder to work for," he assured

there was "a lot of runway for growth":

> ANALYST: And can you talk a little bit about the <u>weakness that you saw in Latin America?  What drove that?</u>  And how is that making you think about the longer-term prospects there?

> NEUMANN: . . . For Latin America, we saw that growth was a little bit soft in the quarter.  It was primarily -- we took some price increases in Brazil in Q3.  And as not unexpected, that tends to -- when we do those things, slow down growth a little bit for the short term.  The good news is we only take pricing like that, as Greg speaks to a lot, when we believe we're increasing the value to our members.  And we believe we've done that.  So there's – it's a sort of a ***short-term slowdown in growth***, but good for our business.  And we're already continuing to grow through it.

> But it did slow us down a little bit in Latin America in Q3.  And so we also talked about in the letter ***for Latin America and UCAN, both of those markets are a bit more mature, more tenured, more penetrated than some of our other markets.  So we would expect growth to be just a little bit harder to work for, but still a lot of runway for growth in both of those regions.***

175.    The statements in ¶174 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.    In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.    During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.    As of the end of Q3'21, in addition to Netflix's 213.56 million subscriber households reported globally and 74.02 million subscriber households reported for the UCAN region, approximately 95 million additional households were using Netflix globally through account sharing and approximately 25 million additional households were using Netflix in the UCAN region through account sharing;

d.     As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe, and Netflix's ability acquire new paying members was severely hindered.   In particular, the effective degree of market penetration in the UCAN was approximately 79%, and the statement that there was "still a lot of runway for growth" for Netflix even in its "more mature, more tenured, more penetrated" markets was therefore materially misleading;

e.     Materials distributed to Netflix's Audit Committee in connection with its meeting on October 18, 2021 further undercut the assertion that Netflix still had "a lot of runway for growth" even in its "more mature, more tenured, more penetrated" markets.  Those materials indicated that Netflix experienced "worse than expected churn" in the UCAN region, which was due in substantial part to "more absolute cancellations coming from the now larger member base."   In other words, the very high level of market penetration in the UCAN region, which was materially higher than reported due to account sharing, was making it difficult for acquisition to outpace churn; and

f.     The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

176.    On the October 19, 2021 earnings call, Neumann stated that the "business remained healthy," citing engagement and churn metrics:

[T]hroughout the quarter, **the business remained healthy** as it had been throughout the year with **churn at low levels**, down prior to the comparable periods both in 2020 and two years ago, pre-COVID in 2019.  So **retention was very healthy**.  And **viewing was up**.  Viewing per member, maybe slightly down compared to the very COVID-distorted 2020 Q3, but up healthy compared to 2019 comparable period.

177.    The statements in ¶176 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.     In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this

finding back to management;

b.       During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.       As of the end of Q3'21, in addition to Netflix's 213.56 million subscriber households reported globally and 74.02 million subscriber households reported for the UCAN region, approximately 95 million additional households were using Netflix globally through account sharing and approximately 25 million additional households were using Netflix in the UCAN region through account sharing;

d.       As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe.  In particular, the effective degree of market penetration in the UCAN was approximately 79%;

e.       The statements that "retention was very healthy" and that churn was at "low levels" conflicted with statements in the Audit Committee materials for the October 18, 2021 Audit Committee meeting, which indicated that Netflix experienced "worse than expected churn" in the UCAN region, due in substantial part to "more absolute cancellations coming from the now larger member base."  In other words, the very high level of market penetration in the UCAN region, which was materially higher than reported due to account sharing, was making it difficult for acquisition to outpace churn.

f.       The level of churn would have been even worse if Netflix enforced its policies against account sharing, so the churn metric was being artificially suppressed;

g.       The viewing metric was artificially inflated by Netflix's inclusion of views by non-members, and thus, presented a materially misleading measure of the health of the business and its ability to acquire and retain members; and

h.       As a result of the elevated level of market penetration, Netflix's ability acquire new paying members was severely hindered, and the statement that "the business remained

healthy" markets was materially misleading.

**E.    Fourth Quarter & Full Year 2021 Financial Results**

178.    After the market closed on January 20, 2022, Netflix announced its fourth quarter and full year 2021 financial results in a Letter to Shareholders.  The letter was attached as Ex. 99.1 to a Form 8-K filed with the SEC on January 20, 2022 and signed by Defendant Neumann.  The letter stated in relevant part:

> We finished Q4 with 222m paid memberships (with 8.3m paid net adds in Q4). Even in a world of uncertainty and increasing competition, ***we're optimistic about our long-term growth prospects*** as streaming supplants linear entertainment around the world.
>
> *            *            *
>
> We slightly over-forecasted paid net adds in Q4 (8.3m actual compared to the 8.5m paid net adds in both the year ago quarter and our beginning of quarter projection). For the full year 2021, paid net adds totaled 18m vs 37m in 2020. ***Our service continues to grow globally***, with more than 90% of our paid net adds in 2021 coming from outside the UCAN region.
>
> *            *            *
>
> ***For Q1'22, we forecast paid net adds of 2.5m vs. 4.0m in the year ago quarter.***  Our guidance reflects a more back-end weighted content slate in Q1'22 (for example, *Bridgerton* S2 and our new original film *The Adam Project* will both be launching in March).  In addition, while retention and engagement remain healthy, ***acquisition growth has not yet re-accelerated to pre-Covid levels.  We think this may be due to several factors including the ongoing Covid overhang and macro-economic hardship in several parts of the world like LATAM.***

179.    The statements in ¶178 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.    In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.    During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting

from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.     As of the end of Q4'21, in addition to Netflix's 221.84 million subscriber households reported globally and 75.22 million subscriber households reported for the UCAN region, approximately 99.39 million additional households were using Netflix globally through account sharing and approximately 27.83 million additional households were using Netflix in the UCAN region through account sharing;

d.     As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe.  In particular, the effective degree of market penetration in the UCAN was approximately 82%;

e.     As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered, and the statement that "we're optimistic about our long-term growth prospects" was therefore materially misleading;

f.     Materials distributed to Netflix's Board of Directors in connection with its meeting on December 1, 2021 admitted that (1) Netflix had "experienced slower membership growth recently" in the UCAN market due to "deepening penetration" and Netflix expected "continued slow member growth" in that market; (2) in addition to the 74 million reported subscriber households in the UCAN market, there were approximately 25 million active account sharing households; (3) market penetration in the UCAN market, based solely on paying subscribers, was approximately 59%, but effective market penetration, including account sharers, was "close to 80%" and therefore the reported level of market penetration "[l]ikely understated" the effective level of penetration; (4) account sharing was one of "[m]any threats to big growth" and a "bigger issue" posing a material threat to the Company's growth prospects; and (5) attempting to crackdown on account sharing could "alienate" Netflix's members and upset "pre-existing expectations" based on Netflix's

"historical tolerance" of account sharing.[27]

g.      The attribution of the failure of Netflix's subscriber growth to re-accelerate to pre-COVID levels to "the ongoing Covid overhang and macro-economic hardship in several parts of the world" was materially misleading because it failed to disclose the material role that account sharing played in causing the slowdown in membership growth.

h.      The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

180.    An analyst on the January 20, 2022 earnings call stated that "guidance was a bit below kind of what was expected" and asked why the guidance was low and whether management had concerns "about anything structural, whether it's competition or saturation."   Neumann responded that there was "[n]o structural change" and Hastings assured there was no "qualitative change" to competition:

> ANALYST: Great.  And as we look ahead to Q1, <u>the guidance was a bit below kind of what was expected and what you've done in previous Q1s.</u>  Maybe just help us understand what some of the key considerations were that went into the guidance?  And <u>does it raise any concerns for you about anything structural, whether it's competition or saturation?</u>  Or does it give you any pause in terms of sort of your return on content spend?
>
> NEUMANN: Sure.  ***No structural change in the business that we see***.  What's reflected in the guidance, we guided to 2.5 million paid net adds in Q1.  And what's reflected there is pretty much the same trends we saw in Q4: so healthy retention with churn down, healthy viewing and engagement with viewing up and acquisition just growing but a bit slower than pre-COVID levels, just hasn't fully recovered.
>
> ***And we're trying to pinpoint what that is.  It's tough to say exactly why our acquisition hasn't kind of recovered to pre-COVID levels.***  It's probably a bit of just overall COVID overhang that's still happening after 2 years of a global pandemic that we're still unfortunately not fully out of, some macroeconomic strain in some parts of the world like Latin American in particular.  While ***we can't pinpoint or***

---

[27] Plaintiff is informed and believes that the data shared at the December 1, 2021 Board meeting refers to Netflix's subscriber and account sharing figures as of the end of Q3'21, *see* ¶¶122, 228, *infra*, so the level of account sharing and effective market penetration as of the end of Q4'21 (which Defendants continued to closely monitor) was even higher.  In any case, the December 1, 2021 Board materials clearly demonstrate Defendants' knowledge of facts that rendered their statements on January 20, 2022 materially misleading.

*point a straight line using -- when we look at the data on a competitive impact, there may be some kind of more on the marginal kind of side of our growth, some impact from competition but -- which, again, we just don't see it specifically.*

*So overall, that's what's reflected in the guide.*  I'd say we – our big titles are also landing, at least our known big titles, a little bit later in the quarter with Season 2 of Bridgerton in March, The Adam Project also in March.  As you know, we also -- while we are taking -- changing prices in countries every quarter, in Q1 of this year, it happens to be our largest country, as we announced last week, actually our largest region with Canada as well.  So that's probably a little bit more impact than a typical quarter.

HASTINGS: But Nidhi, you're right to reflect on 2 years ago, we were 10 million above plan, which was a shock.  Last year, we were 10 million below or 9 million.  And so *the pull forward sort of makes it hard to read*.  In the prior years, we were very steady, so we can have confidence on incremental trends.  But as Spence said, when you – we reflect, of course, hey, that's a low guide, and we think it will be accurate.  It's not sandbagged at all, kind of what's going on.

And *there's a number of potential explanations with COVID*, but then we worry about hanging too much on that.  *There's more competition than there's ever been. But we've had Hulu and Amazon for 14 years.  So it doesn't feel like any qualitative change there*.  And overall, confidence in streaming becomes all of entertainment.  Linear dissipates over the next 10 to 20 years.  Very high confidence in that thesis because everyone's coming into streaming.

So like market size, very large.  *Our execution is steady and getting better*.  So for now, we're just like staying calm and trying to figure it out.  *Again, the COVID has introduced so much noise.*  It just wants us to give it some pause as we work on everything we've always worked on.

181.    The statements in ¶180 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.      In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.      During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but

understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.    As of the end of Q4'21, in addition to Netflix's 221.84 million subscriber households reported globally and 75.22 million subscriber households reported for the UCAN region, approximately 99.39 million additional households were using Netflix globally through account sharing and approximately 27.83 million additional households were using Netflix in the UCAN region through account sharing;

d.    As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe.  In particular, the effective degree of market penetration in the UCAN was approximately 82%;

e.    As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered;

f.    Materials distributed to Netflix's Board of Directors in connection with its meeting on December 1, 2021 admitted that (1) Netflix had "experienced slower membership growth recently" in the UCAN market due to "deepening penetration" and Netflix expected "continued slow member growth" in that market; (2) in addition to the 74 million reported subscriber households in the UCAN market, there were approximately 25 million active account sharing households; (3) market penetration in the UCAN market, based solely on paying subscribers, was approximately 59%, but effective market penetration, including account sharers, was "close to 80%" and therefore the reported level of market penetration "[l]ikely understated" the effective level of penetration; (4) account sharing was one of "[m]any threats to big growth" and a "bigger issue" posing a material threat to the Company's growth prospects; and (5) attempting to crackdown on account sharing could "alienate" Netflix's members and upset "pre-existing expectations" based on Netflix's "historical tolerance" of account sharing.

g.    Neumann's and Hastings' listing of multiple possible explanations for the slowdown in Netflix's subscriber growth, without mentioning account sharing or market saturation, was materially misleading, particularly in light of the analyst's specific question about

"anything structural" like "saturation." The materials distributed to the attendees of the December 1, 2021 Board meeting indicated that account sharing was one of the "bigger issue[s]" negatively affecting Netflix's growth, and the ~20 point gap between reported market penetration and effective market penetration due to account sharing was a "structural" issue affecting Netflix's growth prospects. Accordingly, Neumann's statements that there was "[n]o structural change" and that it was "tough to say exactly why our acquisition hasn't kind of recovered to pre-COVID levels" were materially misleading. Similarly, Hastings' statements that "the pull forward sort of makes it hard to read," that "there's a number of potential explanations with COVID," and that "COVID has introduced so much noise" were misleadingly incomplete and obfuscatory.

f.      The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

182.    An analyst on the January 20, 2022 earnings call asked if the "hurdle [is] just higher in terms of the amount and quality of content that you need to deliver to get the same number of net adds." Sarandos responded assuring "all the fundamentals of the business are pretty solid":

> ANALYST: . . . [T]his was probably the best content quarter you've had. And looking at sort of flattish subs versus previous Q4s, obviously, a great number, but it's kind of in line with what you've done the last few Q4s. What do you read from that? Is the customers sort of hurdle just higher in terms of the amount and quality of content that you need to deliver to get the same number of net adds?

> SARANDOS: [W]e didn't see a hit to our engagement. We didn't see a hit to retention, all those things that would classically lead you to looking at competition. But it's a stew of all those things. ***Not only are we in a pandemic. We've kind of come in of and out of COVID at different levels in 2021, particularly the back half of 2021. So it's created a lot of bumpiness certainly and not steady linear growth***, which makes it a little tougher to predict, but ***all the fundamentals of the business are pretty solid***.

183.    The statements in ¶182 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.      In the second half of 2019, Netflix's senior executives tasked a research team with

investigating the reasons for Netflix's slowing subscription growth. That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.       During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.       As of the end of Q4'21, in addition to Netflix's 221.84 million subscriber households reported globally and 75.22 million subscriber households reported for the UCAN region, approximately 99.39 million additional households were using Netflix globally through account sharing and approximately 27.83 million additional households were using Netflix in the UCAN region through account sharing;

d.       As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe. In particular, the effective degree of market penetration in the UCAN was approximately 82%;

e.       As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered, and Sarandos's statement that "all the fundamentals of the business are pretty solid" was materially misleading;

f.       Materials distributed to Netflix's Board of Directors in connection with its meeting on December 1, 2021 admitted that (1) Netflix had "experienced slower membership growth recently" in the UCAN market due to "deepening penetration" and Netflix expected "continued slow member growth" in that market; (2) in addition to the 74 million reported subscriber households in the UCAN market, there were approximately 25 million active account sharing households; (3) market penetration in the UCAN market, based solely on paying subscribers, was approximately 59%, but effective market penetration, including account sharers, was "close to 80%" and therefore the reported level of market penetration "[l]ikely understated" the effective level of penetration; (4) account sharing was one of

"[m]any threats to big growth" and a "bigger issue" posing a material threat to the Company's growth prospects; and (5) attempting to crackdown on account sharing could "alienate" Netflix's members and upset "pre-existing expectations" based on Netflix's "historical tolerance" of account sharing.

g.     The attribution of the "bumpiness" in Netflix's membership growth to the pull-forward associated with COVID was materially misleading because it failed to disclose the material role that account sharing played in causing the slowdown in membership growth; and

h.     The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

184.     The analyst on the January 20, 2022 earnings call also asked if competition or account sharing were impacting penetration in Latin America and Neumann denied the premise and assured "there's a long runway of growth":

> ANALYST: . . . ***Shifting gears to Latin America. This region feels like it's maturing at a lower level of penetration than you've seen in the U.S. Is that due to competition, affordability? Account sharing[?] Or something else?*** Or maybe you disagree with the statement that it's actually maturing. But help us understand if there's anything you can do differently to sort of drive penetration levels there higher.
>
> NEUMANN: Well, first, ***I just wouldn't necessarily read through that it's maturing faster***, Nidhi. I mean again, I just don't want to understate the impact of what we've been going through for the last 2 years. And Latin America, in particular, has been more strained. It has less kind of government funding and subsidization relative to many parts of the world to kind of fuel their economy. On top of that, we also continue to increase prices in that market last year across some big countries for us, Mexico, Brazil, Argentina.
>
> So between macroeconomic factors and general strain, ***business is still growing there***. We grew by about 2.5 million members last year, so under the kind of pre-COVID growth rates but still growing. And it is a market where pay TV is healthy. Folks love film and TV. And so I think ***there's a long runway of growth there***.

185.     The statements in ¶184 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.      In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.      During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.      As of the end of Q4'21, in addition to Netflix's 221.84 million subscriber households reported globally and 75.22 million subscriber households reported for the UCAN region, approximately 99.39 million additional households were using Netflix globally through account sharing and approximately 27.83 million additional households were using Netflix in the UCAN region through account sharing;

d.      As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe;

e.      As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered, and Neumann's statement that "there's a long runway of growth" in Latin America was materially misleading;

f.      Materials distributed to Netflix's Board of Directors in connection with its meeting on December 1, 2021 admitted that (1) account sharing was one of "[m]any threats to big growth" and a "bigger issue" posing a material threat to the Company's growth prospects; and (2) attempting to crackdown on account sharing could "alienate" Netflix's members and upset "pre-existing expectations" based on Netflix's "historical tolerance" of account sharing.

g.      The principal reason for the slowdown in Netflix's membership growth was the degree of market saturation due to account sharing, as Defendants subsequently admitted in Netflix's April 19, 2022 Letter to Shareholders and the April 19, 2022 earnings call.

186.    On January 27, 2022, Netflix filed its annual report on Form 10-K with the SEC for the period ended December 31, 2021 ("2021 Form 10-K"), affirming the previously reported financial results.  The 2021 Form 10-K was signed by Hastings, Neumann and Sarandos.  Regarding risks affecting the business, the 2021 Form 10-K stated in relevant part:

> ***If our efforts to attract and retain members are not successful, our business will be adversely affected.***
>
> \*        \*        \*
>
> . . . While we currently permit multiple users within the same household to share a single account for non-commercial purposes, ***if multi-household usage is abused or if our efforts to restrict multi-household usage are ineffective, our ability to add new members may be hindered and our results of operations may be adversely impacted***. . . .

(First emphasis in original.)

187.    The statements in ¶186 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.    In Q2'19, Netflix reported a loss of 126,000 U.S. subscribers, the first time Netflix reported a loss of U.S. subscribers since 2011.  Following these results, senior Netflix executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth.  That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management.  Defendants, therefore, already knew that multi-household usage had been abused, that it had hampered Netflix's ability to add new members, and that it had adversely impacted Netflix's results in Q2'19.  The risks that Defendants presented as merely hypothetical adverse events had already materialized in a significant way, and the failure to disclose this prior materialization of the risk made the disclosure misleading and caused investors to underestimate the likelihood and magnitude of a further (and more significant) materialization of this risk.

b.    During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but

understood that account sharing would remain a long-term constraint on growth unless and until it was addressed.  The failure to disclose these facts rendered the risk disclosure misleading because the deliberate delay in enforcement following management's determination that account sharing was a material constraint on growth increased the likelihood of a severe contraction in growth following the COVID pull-forward;

c.      As of the end of Q4'21, in addition to Netflix's 221.84 million subscriber households reported globally and 75.22 million subscriber households reported for the UCAN region, approximately 99.39 million additional households were using Netflix globally through account sharing and approximately 27.83 million additional households were using Netflix in the UCAN region through account sharing;

d.      As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe;

e.      As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered; and

f.      The risk warning concerning multi-household usage presented as mere hypothetical risks adverse events that had already materialized because multi-household usage was already being abused and Netflix's efforts to restrict it were ineffective in preventing approximately 99.39 million non-paying households globally and approximately 27.83 million non-paying households in the UCAN region from using Netflix's services.

**F.      March 8, 2022 Morgan Stanley Technology, Media & Telecom Conference**

188.    Neumann told the Morgan Stanley analyst that U.S. was "roughly 60% penetrated today" and "not done growing":

> ANALYST: Yes.  I was going to ask you about UCAN because yes, you guys have landed the plane nicely in the middle of your range from, I think, where you gave that 60 million to 90 million a long time ago.  But should we look at the U.S. business as a leading indicator to some extent of what this business could look like from a penetration point of view?  And do you think you can keep growing the business from a revenue perspective here?
>
> NEUMANN: I think it would be great if it's a leading indicator, right?  So if we can get to that level of penetration around the world, again, by the time we get there, there's probably 1 billion connected TVs around the world.  ***And you can see our***

***penetration in the U.S. that you kind of do that math, we're roughly 60% penetrated today.*** So that pretty quickly gets us to business that's over 0.5 billion members. And if we can do that, where we keep increasing value and drive kind of a reasonable monthly subscription price, that's a pretty large and healthy revenue model, and we think we can drive pretty big profit pools against it. So I would kind of love if that -- and again, at the end of the day, ***we're not done growing in the U.S.*** So when we get there, ***we're also going to be a bigger business in the U.S.***

189.     The statements in ¶188 were materially false and/or misleading when made and/or omitted to state materially facts to make the statements not misleading because they failed to disclose, among other things, the following adverse facts:

a.     In the second half of 2019, Netflix's senior executives tasked a research team with investigating the reasons for Netflix's slowing subscription growth. That team determined that account sharing was a major factor eating into subscription growth and reported this finding back to management;

b.     During 2020, Netflix management intentionally delayed a crackdown on account sharing due to (1) a large but temporary boost in subscriptions in Q1'20 and Q2'20 resulting from COVID-related lockdowns and (2) a fear of churn arising from a crackdown, but understood that account sharing would remain a long-term constraint on growth unless and until it was addressed;

c.     As of the date of this statement, an additional (approximately) 100.0 million households were using Netflix globally through account sharing and an additional (approximately) 30.0 million households were using Netflix in the UCAN region through account sharing;

d.     As a result, Netflix was substantially more penetrated in the applicable markets than investors were led to believe. In particular, the effective degree of market penetration in the UCAN was approximately 84% rather than 60%;

e.     As a result of the foregoing, Netflix's ability acquire new paying members was severely hindered and Neumann's assertion that "we're not done growing in the U.S." was materially misleading; and

f.     Materials distributed to Netflix's Board of Directors in connection with its meeting

on December 1, 2021 admitted that (1) Netflix had "experienced slower membership growth recently" in the UCAN market due to "deepening penetration" and Netflix expected "continued slow member growth" in that market; (2) in addition to the 74 million reported subscriber households in the UCAN market, there were approximately 25 million active account sharing households; (3) market penetration in the UCAN market, based solely on paying subscribers, was approximately 59%, but effective market penetration, including account sharers, was "close to 80%" and therefore the reported level of market penetration "[l]ikely understated" the effective level of penetration; (4) account sharing was one of "[m]any threats to big growth" and a "bigger issue" posing a material threat to the Company's growth prospects; and (5) attempting to crackdown on account sharing could "alienate" Netflix's members and upset "pre-existing expectations" based on Netflix's "historical tolerance" of account sharing.

## IX.    LOSS CAUSATION

190.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Netflix's stock price throughout the Class Period until Defendants began to disclose the truth regarding the extent of account sharing and its impact on subscriber growth to the market.

191.    The truth regarding account sharing on Netflix's platform was partially revealed, and/or the concealed risks materialized, on or about January 20, 2022 and April 19, 2022.

192.    On January 20, 2022, after the market closed, Netflix announced that it had missed its guidance for paid net adds in Q4'21 by 200,000 subscribers and that it only expected 2.5 million paid net adds in Q1'22 (compared to 4 million during the comparable period a year ago).  Defendants attributed the shortfall to "the ongoing Covid overhang and macro-economic hardship," revealing that "acquisition growth has not yet re-accelerated to pre-Covid levels."  On this news, the Company's stock price fell $110.75, or 21.7%, to close at $397.50 per share on January 21, 2022, on unusually heavy trading volume.

193.    On April 19, 2022, after the market closed, Netflix reported that it lost 200,000 subscribers during the first quarter of 2022, compared to prior guidance expecting the Company to add 2.5 million net subscribers.  The Company admitted to the true extent of account sharing and acknowledged that account sharing caused Netflix to be highly penetrated in the applicable markets, thereby inhibiting subscriber growth.  Specifically, Netflix stated that "in addition to our 222m paying households, we estimate that Netflix is being shared with over 100m additional households, including over 30m in the UCAN region."  Moreover, "*our relatively high household penetration - when including the large number of households sharing accounts* – combined with competition, *is creating revenue growth headwinds*."  On this news, the Company's share price fell $122.42, or over 35%, to close at $226.19 per share on April 20, 2022, on unusually heavy trading volume.

194.    During the Class Period, Plaintiff and the Class purchased Netflix's common stock or call options, or sold put options, at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

X.    ADDITIONAL SCIENTER AND FALSITY ALLEGATIONS

195.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Netflix, their control over, and/or receipt and/or modification of Netflix's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Netflix, participated in the fraudulent scheme alleged herein.

196.    As a subscriber-based company, Netflix only has one operating segment, and it relies on monthly membership fees to generate revenue.  The 2020 10-K states that Netflix's "*core*

**strategy is to grow [its] streaming membership business** globally within the parameters of [its] operating margin target," emphasizing that managing subscriber growth is part of the Company's core operations.  Similarly, the 2020 10-K purports to warn that "[i]f our efforts to attract and retain members are not successful, our business will be adversely affected."

197.    Defendants have long acknowledged that account sharing exists, but maintained that it did not present a problem for the growth of Netflix's business.  For example, during a conference on January 6, 2016, Netflix's then-CFO David Wells was asked about the impact of password sharing to the Company's subscriber penetration, and he replied that "we don't feel like it is a material inhibitor to our growth."  He conceded "[t]hat might not be true forever," acknowledging that there was a risk that subscriber growth would be inhibited by the extent of account sharing but representing that it had not materialized.  Later that year, during the Q3'16 earnings call, Defendants Hastings stated that "[p]assword sharing is something you have to learn to live with, . . . and **we're doing fine as is.**"

198.    More recently, management claimed to "monitor" account sharing because it could impact subscriber growth.  According to Cybersecurity Insiders, Netflix's efforts to curb password sharing began in January 2019 with a trial of Synamedia's Credential Sharing software on 5,650 Netflix users.  Later that same year, management claimed to "monitor" account sharing because it could impact subscriber growth.  For example, during the Q3'19 earnings call on October 16, 2019, an analyst specifically asked whether account sharing was "something that's important for [Netflix] to address" now that the Company was "get[ting] to a more mature growth trajectory in the U.S."  Defendant Peters assured that Netflix "**continue[s] to monitor it** [*i.e.*, account sharing], so we're looking at it.  We'll see, again, those consumer-friendly ways to push on the edges of that.  But I think we've got no big plans to announce at this point in time in terms of doing something differently there."

199.    At the end of the Class Period, Defendant Hastings admitted during the Q1'22 earnings call that "account sharing [is something] which we've always had, that's not a new thing."  There was even some account sharing that Netflix encouraged.  During the Q3'16 earnings call, Defendant Hastings said "[T]here's so much legitimate password sharing like, you know, you

1    sharing with your spouse, with your kids, so there's no bright line . . . ."  During a Consumer

2    Electronics Show in January 2016, Defendant Hastings said "We love people sharing Netflix.

3    That's a positive thing, not a negative thing."[28]

4       200.    Defendants Hastings, Sarandos and Neumann signed the 2019 10-K filed on January

5    29, 2020 which stated that "if account sharing is abused," Netflix's subscriber growth may be

6    hindered, showing their knowledge that account sharing was an existential risk looming over

7    Defendants' ability to grow subscribers.  Supporting their knowledge that this risk later materialized,

8    Defendants Hastings, Sarandos, and Neumann signed the 2020 10-K filed on January 28, 2021

9    which changed the language to suggest that they were developing methods to limit account sharing,

10   stating "if *our efforts to restrict multi-household usage* are ineffective," subscriber growth would

11   be hindered.[29]

12      201.    When the COVID pandemic struck in 2020, any plans to crack down on password

13   sharing were put on hold, as explained in a company-wide internal memo FE1 reviewed in

14   approximately Q2'20.  FE1 recalled that Hastings specifically phrased the Company's approach

15   during the pandemic as "they did not want to appear as if they were taking something away" when

16   people were losing so much at that time (*e.g.*, health, jobs, housing).

17      202.    As pandemic restrictions eased, Netflix resumed its efforts to counteract account

18   sharing and began testing methods to monetize sharing in March 2021.  During the Q1'21 earnings

19   call, Defendant Peters confirmed that this testing is "not necessarily a new thing. We've been doing

20   this for a while.  During the same call, Defendant Hastings said that "Greg [Peters] has been doing

21   a lot of great research on kind of how to try variants that harmonize with the way consumers think

22   about it," showing they knew that multiple methods to limit account sharing were tested.  The April

23

24   _____

25   [28] https://www.cnet.com/tech/services-and-software/netflix-is-cool-with-you-sharing-your-account/.

26   [29] It is reasonable to infer that Defendants began developing methods to counteract account sharing

27   because they knew that the extent of account sharing had, or was reasonably likely to, impact
     operations.  Consistent with this inference, the April 19, 2022 Letter to Shareholders admits that
     the extent of account sharing inhibited subscriber growth and that the Company began testing methods

28   to "monetize sharing" in early 2021.

19, 2022 Letter to Shareholders likewise confirms that "early last year we started testing different approaches to monetize sharing."

203.    Despite knowing the Company was actively testing ways to limit account sharing and grow subscribers, Defendants were evasive when asked about account sharing, supporting an inference of fraud.  For example, during the Q1'21 earnings call, when asked for "additional color" as to why "net adds this quarter came in below your expectations," Defendant Neumann explained that the COVID pull-forward and delayed launches "create some noise," making it "a difficult time to forecast the business," and Defendant Hastings reassured that "***there's no real change*** that we can detect in the competitive environment."  During the same Q1'21 earnings call, immediately following a discussion about testing ways to limit account sharing, an analyst asked "Are there any particular markets where the subscriber or the user to subscriber ratio is particularly high?"  Rather than admit that Netflix was testing approaches to monetize sharing in the UCAN market because of the extent of account sharing in the region, Defendant Peters responded vaguely that "[E]very market, every country is different, and so we see different ranges of behavior."  Similarly, during the Q4'21 earnings call when asked whether "competition, affordability, account sharing, or something else" is causing Latin America to "matur[e] at a lower level of penetration than you've seen in the U.S.," Defendant Neumann responds "I just wouldn't necessarily read through that it's maturing faster . . . . [I]t's not a fundamental change in strategy."

204.    Even when analysts attempted to understand whether there were underlying problems impacting subscriber growth during the Q4'21 earnings call, Defendant Neumann explicitly said there is "[n]o structural change in the business that we see" and avoided making a frank disclosure concerning market saturation.  Despite actively testing methods to effectively limit account sharing, he said "It's tough to say exactly why our acquisition hasn't kind of recovered to pre-COVID levels."

205.    To the contrary, Defendants knew password sharing was impacting acquisition.  FE2 said Hastings hosted company-wide quarterly business review meetings where presentations about password sharing were shown.  FE2 attended these quarterly business review meetings, as well as

Design Team meetings where password sharing was discussed, which were held either monthly, weekly, or bi-weekly.

206.    FE2 recalled first hearing about password sharing in Design Team meeting in approximately Spring 2020, shortly after the COVID lockdown, as FE2 recalled working from home when it was first discussed.  FE2 said the Design Team had weekly "Design Shows" in which different teams within the department would make presentations about the projects they were working on.  FE2 said there was essentially an open invite for the entire department with a rotating schedule.  FE2 compared it to a "show and tell" and FE2 learned a lot about what other teams were working on during these hour-long presentations.

207.    FE2 said that there was a group within the Design Team working to combat or reduce password sharing as part of a multi-team "strike effort" with the Accounts team and Data Insights team.  FE2 said the team was working on the rollout and messaging of the Company's efforts to decrease password sharing without being obtrusive.  FE2 said there were discussions of how to log people out when password sharing was suspected.

208.    FE2 said the Design Team went into detail and quantified the amount of account sharing in terms of number of accounts, although FE2 could not recall the specific figures.  FE2 recalled it being a large figure and explained that it was expressed as we have x million subscribers and y million more devices logged in, such that there were millions of shared accounts.

209.    FE2 said that in these meetings password sharing was characterized as "lost revenue" and "theft" and was seen as limiting the Company's ability to acquire new subscribers and meet its subscriber goals.  FE2 said these discussions made it clear that the Company had significant data about password sharing and were analyzing the data and quantifying it.  FE2 said the size of the problem was noted in order to justify embarking on efforts to limit or "crack down" on account sharing.

210.    FE2 learned from the Spring 2020 Design Team meeting presentation that Netflix was tracking the various IP addresses used to determine the location of different users on the same account.  FE2 noted that while Netflix subscribers could log in from different devices, by examining the IP addresses, there were ways to determine password sharing was happening.  FE2 said if there

were geographical discrepancies with the IP addresses when the same account logged in from different devices, it was indicative of password sharing. FE2 noted that Netflix was mindful that if there was a login for a short period of time it may have been because the subscriber was staying in a hotel. FE2's description of tracking IP addresses is consistent with the capabilities of the Synamedia's Credential Sharing software that Netflix had reportedly started to use in January 2019.

211.    FE2 said that shortly after first hearing about password sharing in the Design Team meeting, it was discussed in the quarterly business meetings. FE2 said the approach, messaging and impact of password sharing was continually discussed in both the Design Team meetings and quarterly business review meetings from Spring 2020 until it was launched. FE2 recalled that over time it was presented as a more serious issue. FE2 was uncertain of the exact timing of the launch of the program to curb password sharing, but recalled that Netflix wanted to provide subscribers with some warning and there were press releases and articles referencing efforts to crack down on password sharing. FE2 specifically recalled an article referencing password sharing in March 2021.

### A.    Board And Committee Materials Disclosed In Shareholder Derivative Actions Support A Strong Inference Of Scienter

212.    Between August and October 2023, two shareholder derivative actions were filed against Netflix and certain of its current and former officers and directors.[30] The first of these two actions, *McNeil, et al. v. Barton, et al.*, Case No. 5:23-cv-04264 (N.D. Cal.), was filed in the United States District Court for the Northern District of California on August 21, 2023 (the "*McNeil* action"). The second of these actions, *Madison Kyle Realty Corp. v. Barton, et al.*, Case No. 2023-1033-PAF (Del Ch.), was filed in the Delaware Court of Chancery on October 18, 2023 (the "*Madison Kyle* action").

213.    Both of these actions were based heavily on documents that the respective derivative plaintiffs had obtained from Netflix pursuant to books and records inspection demands under Title 8, Section 220 of the Delaware General Corporation Law. While the initial public complaints in

---

[30] A number of other shareholder derivative actions concerning substantially the same subject matter were previously filed and consolidated and are pending before this Court. *See In re Netflix, Inc. Stockholder Derivative Litig.*, Lead Case No. 22-cv-04134-JST (N.D. Cal.) (the "Consolidated Derivative Action").

these actions contained substantial redactions, the plaintiffs in these respective actions subsequently filed public unredacted versions of the complaints, revealing to the public limited excerpts of minutes of certain meetings of Netflix's Board of Directors and Audit Committee and other related Board and Committee materials.  Notably, while both the *McNeil* complaint and *Madison Kyle* complaints were ultimately filed publicly in unredacted form, many of the underlying materials that Netflix produced pursuant to the 220 demands were themselves heavily redacted.  Therefore, material information contained in the underlying documents is still unavailable to both the derivative plaintiffs and Plaintiffs in this action.

214.    A copy of the public unredacted version of the *McNeil* complaint, filed on October 5, 2023, is attached hereto as Exhibit B.  A copy of the public unredacted version of the *Madison Kyle* complaint, filed on November 3, 2023, is attached hereto as Exhibit C.

215.    As detailed below, the facts alleged in the *McNeil* and *Madison Kyle* actions and their excerpts of the internal Netflix documents produced pursuant to the 220 demands demonstrate Defendants' knowledge of material facts and information that they withheld from the investing public that rendered their contemporaneous public statements materially false and misleading.

### 1.    October 18, 2021 Audit Committee Meeting

216.    On October 18, 2021, at approximately 8:30 a.m. Pacific time, the Audit Committee of Netflix's Board of Directors met via telephonic and/or videoconference to discuss Netflix's financial results for the third quarter of 2021, *i.e.*, the quarter ended September 30, 2021.  Ex. B at ¶57.  The meeting was attended by Netflix directors Richard Barton, Ann Mather, Jay C. Hoag, and Leslie Kilgore, and was also attended by Defendants Sarandos and Neumann.  *Id.*  During the meeting, a number of Netflix executives assisted the Audit Committee and/or briefed it concerning Netflix's Q3'21 results, including Spencer Wang, Vice President, Finance and Investor Relations; JC Berger, Vice President, Finance and Controller; Renee Rodriguez, Vice President, Corporate Controller; Stephen Zager, Vice President, Associate General Counsel, Corporate and Finance; Hilary Ware, Vice President, Associate General Counsel; and others.  *Id.*

217.    Before the October 18, 2021 Audit Committee meeting, attendees received written materials on key topics, including Netflix's "third quarter financial results, as well as accounting,

tax, internal audit, cybersecurity and FCPA/regulatory matters." *Id.* at ¶58.  After the meeting was called to order, the "Committee acknowledged receipt of, reviewed and referenced the materials previously distributed to the members." *Id.*

218.    According to the minutes of this meeting, the members of the Audit Committee and Defendants Neumann and Sarandos received and reviewed the materials concerning Netflix's Q3'21 results and "reviewed the financial results for the third quarter ended September 30, 2021, including the Company's performance for the quarter relative to the articulated guidance." *Id.* at ¶59.  The minutes memorialize that the Audit Committee and Defendants Neumann and Sarandos "discussed financial performance," including the metric of "paid net membership additions." *Id.*  The minutes further indicate that the Audit Committee and Defendants Neumann and Sarandos received information "noting ***the trends in membership growth***, retention and the impact of content releases; average revenue per paid membership; revenue; and operating income, margin and free cash flow." *Id.* at ¶60.  In addition, the Audit Committee and Defendants Neumann and Sarandos "discussed the upcoming quarter forecast," *i.e.*, the forecast for Q4'21, the quarter ending on December 31, 2021. *Id.*

219.    The *Madison Kyle* complaint provided additional details concerning the October 18, 2021 Audit Committee meeting.  According to that complaint, "[t]he committee discussed the troubling fact that the critically-important UCAN market was struggling with subscriber growth, having gained only 70,000 new users in the third quarter of 2021—down a whopping 58% from the same period in 2020.  Of all of Netflix's global markets, UCAN was the only one to show a downward trend from the prior year."  Ex. C at ¶62.

220.    An Audit Committee report distributed before or during this meeting indicated that Netflix was "maintaining a pattern" of most of its growth coming from outside the United States:

> In UCAN we grew by 0.1M net additions in Q3 – maintaining a pattern of seeing most of our global growth come from outside the US. Compared to Q3'19 (pre-Covid) ***we've seen net additions drop materially, fueled by lower acquisition*** (down 15% this Q3 vs. Q3'19) ***and more absolute cancellations coming from the now larger member base***.

*Id.* at ¶63.  In addition, the Audit Committee materials state that Netflix experienced "***worse than expected churn***" in the UCAN, which caused Netflix to miss its internal projections for paid net adds in the UCAN by 63%.  *Id.* at ¶64.

221.     This internal assessment of "worse than expected churn" resulting from "more absolute cancellations from the now larger member base" stands in stark contrast to Defendants' public statements made the very next day after the October 18, 2021 Audit Committee meeting.  On October 19, 2021 Defendant Neumann stated during Netflix's Q3'21 earnings call that "the business remained healthy as it had been throughout the year with ***churn at low levels***" and that "***retention was very healthy***."  In addition, the Q3'21 Letter to Shareholders, issued on October 19, 2021 and signed by Neumann, stated that "we believe we still have ***ample runway for growth***" in the UCAN and LATAM regions.  The Audit Committee materials, however, indicate that the runway for growth in the UCAN was not so "ample," as churn was "worse than expected" and a larger number of cancellations was resulting from "the now larger member base."  These facts suggest that Netflix's ability to retain existing subscribers while acquiring new subscribers was weakening in comparison to prior periods and that Netflix's degree of market penetration in the UCAN was reaching a saturation point.

## 2.     December 1, 2021 Board Meeting

222.     On December 1, 2021, at approximately 8:00 a.m. Pacific Time, Netflix's Board of Directors held a meeting to discuss "the Company's performance and growth expectations," including "the Company's historic subscriber, revenue and operating margin growth rates."  Ex. B at ¶64.  The meeting was attended by Netflix directors Hastings, Barton, Mather, Hoag, Kilgore, Brad Smith, Timothy M. Haley, Anne M. Sweeney, Rodolphe Belmer, and Mathias Döpfner, and was also attended by Defendants Neumann and Peters.  *Id.*  During the meeting, a number of Netflix executives assisted the Board and/or briefed it concerning Netflix's performance and growth expectations for Q4'21 and beyond, including Rachel Whetstone, Chief Communications Officer; Bozoma Saint John, Chief Marketing Officer; Sergio Ezama, Chief Talent Officer; and others.  *Id.*

223.     Before the December 1, 2021 meeting, the members of Board "acknowledged receipt of, reviewed and referenced the memo previously distributed to directors, which included

information and discussion of business performance, including review of forecasts, as well as operational metrics and title performance." *Id.* at ¶65.  According to the minutes of this meeting, the attendees, including Defendants Hastings, Neumann, and Peters, "discussed the Company's performance and growth expectations," including "potential drivers of and opportunities for growth." *Id.* at ¶66.  These individuals also "discussed the Company's continued focus on creative excellence in content production as the primary self-influenced driver of growth," and "discussed the stickiness metric and other metrics used to assess content performance." *Id.*  The minutes also indicate that Defendant Neumann "led a discussion about the Company's ***long term growth prospects***" and that the "Board discussed the Company's historic subscriber, revenue and operating margin growth rates" and "***the size of the Company's opportunity for growth*** and discussed ways the Company prioritizes its opportunities." *Id.*

224.    One of the documents distributed to the Board prior to this meeting was a memo from Netflix management dated November 30, 2021. *Id.* at ¶¶3, 33, 52, 67.  In this memo, Netflix executives warned the Board: "Big picture: we need more subscription revenue growth." *Id.*  The memo further stated: "As Squid Game acquisition strength fades, however, we are seeing global acquisition growth slowing (vs comparable pre-Covid 2019 period) from 40% in early October to the latest 7%." *Id.* at ¶¶3, 67.  The memo further stated that in "FY21 net additions will total 18M (vs. 37M in FY20), the lowest since 2016." *Id.*

225.    Board materials discussed at the December 1, 2021 Board meeting stated that Netflix expected "continued slow member growth in the future." Ex. C at ¶66.  According to these materials, this expectation of slow growth was based on the fact that the UCAN market was the Company's "most mature region[, …] where high penetration rates and intensifying competition make growth increasingly challenging […]." *Id.* (alterations by *Madison Kyle* plaintiff).

226.    The Board materials also included a "UCAN Spotlight" in which Netflix management analyzed challenges to growth in the UCAN market.  According to this document, one of the main causes of slowing growth in the UCAN market was the high level of market penetration:

> UCAN has grown to 74M members, representing 59% BBHH penetration, the highest across all regions. ***With deepening penetration***, unpredictable engagement among members, pricing increases, and intensifying competition, ***we have***

*experienced slower membership growth recently*. [...] [W]e expect continued slow member growth at 1-2M annual net additions compared to ~5M pre-COVID.

*Id.* at ¶67 (emphasis and alterations by *Madison Kyle* plaintiff).

227.    Board materials for the December 1, 2021 meeting also indicated that Netflix's reported market penetration was "[l]ikely understated" due to the effect of account sharing:

> <u>Likely understated penetration due to Multi household Usage</u>: In highly penetrated markets like the US and CA, **account sharing may limit our continued growth**. There are over 25M active borrowing households in UCAN – defined as households that are borrowing Netflix and streaming 7 or more days in a 28 day period. Roughly ~20% of all standard accounts and ~40% of all premium accounts have active borrowing. **If we consider these borrower households in addition to our paid members, BBHH penetration in the region is close to 80%**.

*Id.* at ¶69 (underlining in original; italicization and bolding added by *Madison Kyle* plaintiff). Board materials also identified account sharing as one of the "[m]any threats to big growth" and a "bigger issue" posing a material threat to the Company's future growth prospects. *Id.* at ¶71.

228.    On information and belief, Plaintiff alleges that the foregoing figures—"over 25M active borrowing households in UCAN" and ~80% effective market penetration—are based on the numbers of paying subscriber households and non-paying sharer households as of the end Q3'21, *i.e.*, as of September 30, 2021. Plaintiff's information and belief is based on, *inter alia*, (1) the 74 million subscriber households referenced in the Board materials matches the 74,020,000 subscriber households that Netflix reported for Q3'21, (3) Netflix reported 75,220,000 subscriber households for Q4'21, and (3) because Q4'21 was already two-thirds complete as of the December 1, 2021 Board meeting, if the Boards materials were using intermediate up-to-date subscriber data, the number of subscriber households would have been closer to 75 million than 74 million. Therefore, as of the time of the December 1, 2021 Board meeting, the number of account sharing households and the effective degree of market penetration would have been even higher. *See* Section XI, *infra*.

229.    Board materials for the December 1, 2021 meeting also warned about risks associated with a change in Netflix's practices to crack down on account sharing. The materials stated that enforcement of the rule against account sharing could "alienate" Netflix's members, noting that "[c]onsumer research has repeatedly found that members are surprised and unaware that

1  Netflix is not allowed to be shared outside of the household.  Given our historical tolerance on

2  sharing, shifting pre-existing expectations represents the biggest risk." *Id.* at ¶72.

3       230.  Thus, by December 1, 2021 at the latest, Defendants were aware that (1) global

4  acquisition growth was slowing; (2) acquisition growth was particularly slow in the UCAN region;

5  (3) acquisition growth was expected to continue to be slow in the future; (4) one of the material

6  factors constraining growth, particularly in the UCAN region, was the high degree of market

7  penetration and account sharing; (4) there were over 25 million active account sharing households

8  in the UCAN region who used Netflix's services without paying for them; (5) the degree of market

9  penetration in the UCAN region, when counting paying subscriber households only, was

10  approximately 59%, roughly consistent with the market penetration figure of 60% that Defendants

11  had previously reported to the market; (6) the effective degree of market penetration in the UCAN

12  region, when including account sharing households, was at least 80%; (7) the reported degree of

13  market penetration, therefore, materially "understated" the effective degree of market penetration

14  and presented a misleading impression of the degree of market saturation and the "the size of the

15  Company's opportunity for growth"; (8) a crackdown on account sharing was expected to alienate

16  members and present a risk of significant churn; and (9) account sharing, therefore, presented a

17  significant headwind and posed a structural constraint on future acquisition growth.

18       231.  As of December 1, 2021, the effective degree of market penetration in the UCAN

19  region was already highly material and alarming: it was between 80% and 82%, which was between

20  33% and 36.6% higher than the reported market penetration of 60%, and sufficiently concerning to

21  Defendants that they reported this information to the Board of Directors.  However, the level of

22  account sharing only continued to grow following this date, as Defendants subsequently disclosed

23  to the market on April 19, 2022 (about four and a half months later), that there were ***over 30 million***

24  account sharing households in the UCAN region, which translated to an effective degree of market

25  penetration of 84%, which was 40% higher than the reported market penetration of 60%.  *See* ¶258,

26  *infra*.

27       232.  Therefore, all of the material adverse facts that Defendants knew as of December 1,

28  2021 had worsened and presented even greater risks as of January 14, 2022, when Defendants

presented Netflix's Q4'21 results and dismissed analyst concerns about market saturation, and as of March 8, 2022, when Defendants repeated the 60% market penetration figure for the UCAN region. *See* ¶¶178-89, *supra*. These statements omitted critical information necessary to render those statements not misleading and were significantly undercut by Defendants' own internal assessments.

### 3.    March 2, 2022 Board Meeting

233.    On March 2, 2022, Netflix's Board of Directors held a meeting to discuss a number of topics, including, *inter alia*, Netflix's subscriber growth and mid-quarter financial performance. Ex. C at ¶79. The meeting was attended by Netflix directors Hastings, Sarandos, Barton, Belmer, Döpfner, Haley, Hoag, Kilgore, Masiyiwa, Mather, Smith, and Sweeney. *Id.* Several members of Netflix management also attended the meeting, including Defendants Peters and Neumann. *Id.*

234.    A memo from Netflix management to the Board of Directors was discussed at the March 2, 2022 Board meeting. Ex. B at ¶56; Ex. C at ¶81.[31] That memo stated:

> Last year we had hoped that in 2022, given the prior 5 years' growth pattern (roughly 22, 29, 28, 37, and 18m net adds) that we would be back on track for 27 million net additions this year [2021], particularly since our Q4 content was strong. Now we are thinking for this year [2022] 18 is more likely, ***with a very weak start in Q1***.

Ex. B at ¶56 (emphasis and interlineations by *McNeil* plaintiffs).

235.    Furthermore, materials presented to the Board at or before the March 2, 2022 meeting indicated that "high levels of account sharing" were part of "a range of . . . potential contributing factors" responsible for Netflix's stagnating subscriber growth. Ex. C at ¶83. The Board materials also indicated that Netflix management had developed a plan to partially address account sharing by attempting to monetize multi-household account usage ("MHU") in four test markets (Costa Rica, Czech Republic, Finland, and Peru) beginning on March 16, 2022. *Id.* at ¶84. According to

---

[31] According to the *McNeil* Complaint, this memo was incorrectly dated March 1-2, 2021. Ex. B at ¶56. Several contextual factors, however, make clear that this memo was prepared in 2022, not 2021, including (a) the memo referenced prior Board memos dated March 2021, June 2021, September 2021, and December 2021; (b) the reference to "last year" must have referred to 2021, because the memo was talking about a projection for 2022; and (c) Netflix had approximately 18 million net adds in 2021. *See id.*; *see also* ¶259, *infra*. In addition, the *Madison Kyle* complaint quoted the same document and alleged that this document was discussed at the March 2, 2022 Board meeting. Ex. C at ¶81.

the minutes of the March 2, 2022 meeting, the Board discussed the "potential impacts arising from a successful transition from multi-household usage to pay-for-sharing." *Id.* at ¶85.[32]

236.    In addition, the Board discussed the fact that Netflix was expected to miss its guidance for paid net adds for the second quarter in a row. *Id.* at ¶86. At the time of the March 2, 2022 Board meeting, Netflix's internal guidance for Q1'22 had been revised from 2.5 million net adds to 2 million net adds. *Id.* However, the Board materials also indicated that Netflix could end up with even fewer net adds if "acquisition does not pick up in March and/or acquisition in India decays faster than we expect." *Id.* In fact, as Defendants ultimately revealed on April 19, 2022, Netflix actually recorded a ***net loss*** of 200,000 subscribers during Q1'22, identifying high levels of account sharing as one of the principal culprits for these extremely disappointing results. *See* ¶¶130-32, *supra*.

237.    The March 2, 2022 Board meeting, which was attended by all of the Individual Defendants, took place just one week before the March 8, 2022 Morgan Stanley Technology, Media & Telecom Conference, during which Defendant Neumann repeated his prior misrepresentation that the UCAN market was only 60% penetrated, even though he knew that this figure materially understated the effective rate of market penetration, which was well over 80%. Furthermore, Neumann assured investors at the March 8 conference that the "we're not done growing in the U.S." and that "we're also going to be a bigger business in the U.S.," even though he knew that Netflix had a "very weak start in Q1" and that account sharing was largely responsible for these negative growth trends, which had not yet been disclosed to the market. Neumann was also aware that a crackdown on account sharing presented a significant risk of churn and that the Company was about to unveil a plan to attempt to monetize multi-household account usage in a series of test markets before rolling out those enforcement and monetization efforts in Netflix's other markets, including the UCAN region.

238.    The adverse facts presented at the December 1, 2021 and March 2, 2022 Board

---

[32] Board materials presented at the March 2, 2022 meeting further elaborated: "Currently MHU distorts our pricing by either spreading the cost of one account over multiple households (effectively a lower list price) or by enabling households to access the service without paying (free)." *Id.* at ¶84.

meetings illuminate both the misleading nature of Defendants' statements on January 20, 2022 and March 8, 2022 and Defendants' states of mind when making those statements.  Defendants made repeated statements during those conferences that attempted to assure investors about Netflix's long-term growth trajectory and the room left in the total available market that Netflix had left to grow while omitting critical facts that undermined these statements.  In light of the information received and discussed by Defendants immediately prior to these statements, Defendants either knew or were incredibly reckless in not knowing that their statements were materially misleading.

**B.    The December 21, 2022 WSJ Article Reported That Defendants Had Known Since 2019 That Account Sharing Inhibited Subscriber Growth, But They Delayed Efforts To Limit It Due To The Subscriber Boom Amid COVID**

239.    On December 21, 2022, The Wall Street Journal published an article entitled, "The End of Netflix Password Sharing Is Nigh," which cited people at Netflix familiar with account sharing to report that Netflix had "identified password sharing as a major problem eating into subscriptions in 2019" (the "December 21, 2022 WSJ article").  After the Company reported a "rare loss in U.S. subscribers in the second quarter of that year," senior executives directed "researchers to investigate why growth was slowing. That team found that password sharers were among the culprits."

240.    Netflix's crackdown "effort waned as a concern" because "the pandemic supercharged the company's growth" as people turned to at-home entertainment amid government lockdowns that, among other things, shut down theaters.  Within Q1'20, Netflix added 16 million new subscribers.  As a result of this "wave of new subscribers," the Company's "effort to scrutinize sharing petered out."

241.    The December 21, 2022 WSJ article further reported that the Company resumed efforts to crackdown on account sharing in 2022 because "subscriber losses mounted." However, at a company gathering in early 2022, Hastings acknowledged to senior executives that Netflix had waited "too long to deal with it [*i.e.*, password sharing]."

242.    Therefore, by 2019, Defendants had identified password sharing as a material inhibitor to subscriber growth, but they deliberately delayed measures to limit it during the pandemic when Netflix benefited from increased subscribers.

1

2

### C.    Defendants Were Concerned That Attempts To Limit Account Sharing Would Lead To More Cancellations

243.    Despite knowing that account sharing inhibited subscriber growth since 2019, Netflix did not immediately crack down on the practice because "the company was worried about how to address it without alienating customers," the December 21, 2022 WSJ article reported. Hastings reportedly "was eager to restrict the practice, but it quickly became clear that doing so would be difficult." According to the article, the Company's "crackdown risks squandering years of goodwill the company has built up over the years and angering consumers, who have a crowd of other streaming services to choose from."

244.    The December 21, 2022 WSJ article stated that Netflix weighed a range of alternatives "[t]o mitigate consumer backlash," including "dialing up the pressure on password sharing gradually." They also considered pay-per-view content, which would dissuade members from sharing their accounts "with others who might run up their bills," but decided against it because this tactic "would take away from the simplicity of the service."

245.    According to the December 21, 2022 WSJ article, Netflix executives were also careful to avoid "making the service too complex and not consumer friendly, a practice a few of them referred to internally as Comcastification, a dig at the cable giant," since the Company's subscription was touted as "the alternative to cable providers that tethered viewers to cable boxes and contracts."

246.    Indeed, Netflix long understood that account sharing was a difficult issue to address and that cracking down on the issue carried an inherent risk of churn. At a September 20, 2016 Goldman Sachs Conference, then-CFO David Wells stated, "*We could crack down on it, but you wouldn't suddenly turn all those folks to paid users.*" During the Company's October 16, 2019 Q3'19 earnings call, Peters stated that the Company was continuing to monitor account sharing, but that the Company had "no big plans . . . of doing something differently" and would only attempt "consumer-friendly ways to push on the edges of that."

247.    This concern was echoed in Defendants' comments following Netflix's testing of warning messages in the first quarter of 2021. As alleged *supra* at ¶90, Netflix began testing a

warning message to users in March 2021 that the content should be accessed only by accountholders. During the April 20, 2021 Q1'21 earnings call, Peters stated that this testing was to help ensure "that the people who are using a Netflix account, who are accessing it are the ones that are authorized to do so." Hastings claimed during the same call that this testing was "research on kind of how to try variants that harmonize with the way consumers think about it [*i.e.*, account sharing]," demonstrating that the March 2021 testing reflected Defendants' concern with the consumer response to a crackdown. Hastings also stated that "we would never roll something out that feels like turning the screws." According to the December 21, 2022 WSJ article, the warning messages that Netflix tested in early 2021 led to "consumer blowback," and the Company did not implement the messaging across its user base.

248.    The Board materials for the December 1, 2021 Board meeting further confirms management's concern that a crackdown on account sharing would lead to churn. Those materials stated that enforcement of the rules against account sharing could "alienate" Netflix's members, noting that "[c]onsumer research has repeatedly found that members are surprised and unaware that Netflix is not allowed to be shared outside of the household. Given our historical tolerance on sharing, shifting pre-existing expectations represents the biggest risk." Ex. C at ¶72.

249.    The paid sharing features that Defendants introduced on March 16, 2022 also shows the Company's concern with the consumer response. The March 16, 2022 post frames the paid sharing features to suggest that they "enable" account sharing, so long as members are "paying a bit more." Similarly, during the April 19, 2022 Q1'22 earnings call, Peters described account sharers as an "opportunity" and "the principal way we've go of going after that is asking our members to pay a bit more to share the service with folks outside their home." By asking members to pay more to share their account rather than prohibiting account sharing outright, Netflix struck a balance between limiting account sharing (which would increase subscription revenue) and alienating consumers (which would increase cancellations).

**D.    The Pandemic Did Not Obscure The Impact Of Account Sharing To Defendants**

250.    When Defendants revealed in the April 19, 2022 Letter to Shareholders that Netflix's "relatively high household penetration – when including the large number of households sharing

accounts – combined with competition, is creating revenue growth headwinds," they claimed that "***COVID clouded the picture***."   The Letter stated that Defendants "believe[d] that most of [Netflix's] slowing growth in 2021 was due to the COVID pull forward."   The Letter further stated that "[a]ccount sharing as a percentage of our paying membership hasn't changed much over the years, but, coupled with [other factors, like the uptake of connected TVs and data costs], means it's harder to grow membership in many markets – ***an issue that was obscured by our COVID growth***." Hastings reiterated during the April 19, 2022 Q1'22 earnings call that "COVID created a lot of noise" and "in 2021, I think we thoughtfully said it was mostly pull forward, which was the logical conclusion."

251.    However, Defendants' suggestion that the pandemic obscured the severe impact of account sharing is untenable.  As reported by the December 21, 2022 WSJ article, Defendants had "identified password sharing as a major problem eating into subscriptions in 2019."  Therefore, before the pandemic even began and before Netflix benefited from a boost in subscriptions, Defendants already knew that account sharing was a major problem inhibiting subscriber growth. Defendants also knew that by delaying a crackdown on account sharing during the COVID pull-forward, they were only kicking the can down the road and that the account sharing problem would need to be addressed once the boost from COVID dissipated.  Indeed, as early as July 2020, Defendants predicted that net adds during the second half of 2020 would worsen as a result of the strong initial benefits of the COVID pull-forward, stating in the July 16, 2020 Q2'20 Letter to Shareholders that "we're expecting paid net adds will be down year over year in the second half as our strong first half performance likely pulled forward some demand from the second half of the year."  On the October 20, 2020 Q3'20 earnings call, Hastings assured the slowdown in acquisition would not be not permanent, "So the pull-forward into next year is relatively modest. . . . So there's probably a little bit of the effect in Q1 from the pull-forward, maybe a little bit less in Q2, but it will wash out.  It's not permanent or long term."  Defendants, however, had no reason to believe that the account sharing problem, which had already been identified as a material long-term threat to growth, had magically gone away.

252.    To the contrary, as the number of subscribers dramatically increased in 2020, the

number of account sharers also increased because "[a]ccount sharing as a percentage of . . . paying membership hasn't changed much over the years." *See also* Section XI, *infra* (setting forth estimates of account sharing households over the course of the Class Period). Based on what Defendants already knew about account sharing before the pandemic, they had reason to know that the problem was exacerbated by the surge in subscribers amid COVID and that there was an increasing urgency to develop a "consumer-friendly" way to limit account sharing as Netflix reached its saturation point in mature markets like UCAN.

253.    Thus, while the role of account sharing in constraining Netflix's growth was "obscured" to the public, it was not "obscured" to Defendants. At the very latest, Defendants had a pellucidly clear understanding of the problem by December 1, 2021. The Board materials for the December 1, 2021 Board meeting frankly admitted that (1) Netflix had "experienced slower membership growth recently" in the UCAN market due to "deepening penetration" and Netflix expected "continued slow member growth" in that market; (2) in addition to the 74 million reported subscriber households in the UCAN market, there were approximately 25 million active account sharing households; (3) market penetration in the UCAN market, based solely on paying subscribers, was approximately 59%, but effective market penetration, including account sharers, was "close to 80%" and therefore the reported level of market penetration "[l]ikely understated" the effective level of penetration; (4) account sharing was one of "[m]any threats to big growth" and a "bigger issue" posing a material threat to the Company's growth prospects; and (5) attempting to crackdown on account sharing could "alienate" Netflix's members and upset "pre-existing expectations" based on Netflix's "historical tolerance" of account sharing. Notwithstanding their knowledge of these facts, Defendants continued to make materially misleading statements about the nature and causes of Netflix's slowing subscription growth and the level of market penetration at the January 20, 2022 Q4'21 earnings call and the March 8, 2022 Morgan Stanley conference, and did not reveal the truth until April 19, 2022, about a month after announcing a plan to monetize account sharing in three test markets.

254.    Moreover, while December 1, 2021 *may* have been the first time that Defendants formally elevated their concerns about account sharing and the extreme level of market saturation

in the UCAN region to the Board of Directors, Defendants themselves were aware of these problems much earlier.  As noted *supra*, the data presented in the December 1, 2021 referred to Netflix's subscriber and account sharing figures as of the end of Q3'21, *i.e.*, as of September 30, 2021. Defendants had been closely monitoring account sharing since early 2019 (at the latest), and a research team directed by Defendants had diagnosed account sharing as a material factor inhibiting subscriber growth by the second half of 2019.  FE2 also noted that that after first hearing about password sharing in a Spring 2020 Design Team meeting, password sharing was continually discussed in both Design Team meetings and quarterly business review meetings, during which management characterized password sharing as "lost revenue" and "theft" and presented data concerning the scope of account sharing.  On January 28, 2021, the Company issued a revised risk disclosure which subtly suggested an increased focus on cracking down on multi-household account sharing and shortly after, in March 2021, began testing ways to crack down on password sharing. Furthermore, as detailed in Section XI, *infra*, the roughly 20 point gap between reported market penetration and effective market penetration in the UCAN market was consistent throughout the Class Period.  Taken together, these facts support a strong inference that Defendants were aware of the level of account sharing and the gap between reported market penetration and effective market penetration throughout the entirety of the Class Period.

## XI.    ADDITIONAL MATERIALITY ALLEGATIONS

255.    At the end of the Class Period, Netflix admitted, in its April 19, 2022 Letter to Shareholders, that "[a]ccount sharing as a percentage of [Netflix's] paying membership hasn't changed much over the years."  While Defendants have not provided sufficient data to calculate the exact amount of account sharing at each point in the Class Period in each applicable market, the data that Defendants provided in the April 19, 2022 Letter to Shareholders, along with subscriber and market penetration data previously provided by Defendants, allows a reasonable approximation of the amount of account sharing and the corresponding level of market penetration in the UCAN market, the total global market, and the rest of the world ("ROW," *i.e.*, global market excluding UCAN).  Certain data provided in the Board materials distributed at the December 1, 2021 Board meeting, as excerpted in the *Madison Kyle* complaint, allow a further refinement of those estimates.

256.   The tables set forth below summarize Plaintiff's estimates of the number of account sharing households, and the corresponding levels of market penetration, in the three applicable markets (UCAN, Global, and ROW) as of the end of each of quarter for which Defendants published subscriber data during the Class Period.

257.   Each of the tables includes the following data fields:

a.   "**Reported Subscribers**" is the number of subscribers in each applicable region that was directly reported by Netflix in its shareholder letters for each quarter.

b.   "**TAM**" is the total addressable market for the region, which is an approximation of the total number of households with a broadband connection in each applicable region and represents the total possible market to which Netflix can sell its subscription service. The Company did not specifically report TAM in all instances, but it did provide data from which TAM can be derived and/or estimated.  For example, where Defendants provided an estimate of market penetration and reported the specific number of subscribers for a particular region, TAM may be solved for by dividing the number of subscribers by the market penetration percentage. Plaintiff's method for estimating the TAM in the applicable markets is further detailed below.

c.   "**Reported Market Penetration**" is either (a) the specific percentage of market penetration reported by Netflix or Defendants in their public statements or (b) the implied level of market penetration derived by dividing the reported number of subscribers by TAM.

d.   "**Additional User Households**" is the number of additional households that used Netflix's service through account sharing, but were not subscribers.  In its April 19, 2022 Letter to Shareholders, Netflix admitted that "in addition to our 222m paying households, we estimate that Netflix is being shared with over 100m additional households, including over 30m in the UCAN region."  In addition, materials distributed to the participants of the December 1, 2022 meeting of Netflix's Board of Directors state that "[t]here are over 25M active borrowing households in UCAN – defined as households that are borrowing Netflix and streaming 7 or more days in a 28 day period." Based on these statements, along with Netflix's admission that "[a]ccount sharing as a percentage of [Netflix's] paying membership hasn't changed much over the years," it is possible to approximate the number of additional user households in each applicable market at each relevant point during

the Class Period.  As detailed below, in the UCAN market, the number of additional user households at the time of the April 19, 2022 Letter to Shareholders was approximately 40.23% of reported subscribers; in the global market, the number of additional user households at the time of the April 19, 2022 Letter to Shareholders was approximately 45.12% of reported subscribers; and in the ROW, the number of additional user households at the time of the April 19, 2022 Letter to Shareholders was approximately 47.60% of reported subscribers.  These estimates are conservative because Netflix admitted that there were "*over* 100m" additional user households globally and "*over* 30m" additional user households in the UCAN region.

   e. "**Effective Market Penetration**" is the Company's penetration in each applicable region when both reported subscribers and additional user households are counted. Specifically, the effective market penetration is equal to the sum of the total reported subscribers and additional user households, divided by the TAM.

  258. The following table shows Netflix's penetration in the UCAN market, and the following sub-paragraphs provide certain explanatory notes regarding Plaintiff's estimates.

   a. In calculating **TAM** for the UCAN region, two reference points are applicable.  *First*, on the January 19, 2021 conference call concerning Netflix's Q4'20 results, Neumann stated the UCAN market was "roughly 60% penetrated."  Netflix reported 73,940,000 subscribers in the UCAN region as of the end of Q4'20; assuming that the UCAN market was exactly 60% penetrated as of this date, the TAM would be approximately 123,233,333 households (73,940,000 divided by 0.6).  *Second*, on the March 8, 2022 Morgan Stanley conference, Neumann stated that the US market was "roughly 60% penetrated."  This statement was made after Q4'21 but before the end of Q1'22.  Netflix reported 75,220,000 subscribers in the UCAN region as of the end of Q4'21 and 74,580,000 subscribers in the UCAN region as of the end of Q1'22.  Assuming that the UCAN market was exactly 60% penetrated during this period would imply a TAM between 124,300,000 households and 125,366,667 households.  Because each of the foregoing estimates of TAM are relatively close to one another (between approximately 123 million and 125 million households), and for purposes of simplicity, Plaintiff used a TAM of 125 million for the UCAN

1   region for the entirety of the Class Period.[33]  This assumption is consistent with the method used by

2   Morgan Stanley's April 20, 2022 report.  *See* ¶140(e), *supra*.

3           b.        In estimating the number of **Additional User Households**, Plaintiff started

4   with two "hard" data points.  First, in its April 19, 2022 Letter to Shareholders, Netflix stated that

5   there were "over" 30 million additional households in the UCAN region that were account sharing

6   without paying.  Plaintiff rounded this number down to 30 million additional user households and

7   used it for Q1'22, *i.e.*, as of March 31, 2022.  Second, the Board materials for the December 1, 2021

8   Board meeting indicate that there are "over 25M active borrowing households in UCAN – defined

9   as households that are borrowing Netflix and streaming 7 or more days in a 28 day period."  As

10  explained *supra* at ¶228, Plaintiff is informed and believes that this figure is as of the end of Q3'21,

11  *i.e.*, as of September 30, 2021.  Plaintiff rounded this number down to 25 million additional user

12  households and used it for Q3'21.

13          i.        The 25 million additional user households in Q3'21 is approximately 33.77%

14  of the 74,040,000 subscriber households reported for that period.  The 30 million additional user

15  households in Q1'22 is approximately 40.23% of the 74,580,000 subscriber households reported for

16  that period.  For Q4'21, Plaintiff used the midpoint of these two percentages (36.99%) to estimate

17  that there were 27,830,000 additional user households (36.99% of the 75,220,000 subscriber

18  households reported for that period).

19          ii.        For Q4'20 through Q2'21, Plaintiff used the 33.77% figure from Q3'21 to

20  estimate the number of additional user households.  This assumption is based on Netflix's admission

21  that "[a]ccount sharing as a percentage of [Netflix's] paying membership hasn't changed much over

22  the years."

23

24  [33] Had Plaintiff used a TAM of 123 million households, it would not have materially affected the

25  analysis.  Based on a TAM of 125 million households, the reported market penetration in the UCAN
    region ranged from 59% to 60% during the Class Period, and the effective market penetration in the

26  UCAN ranged from 79% to 84%.  Based on a TAM of 123 million households, the reported market
    penetration in the UCAN region ranged from 60% to 61% during the Class Period, and the effective

27  market penetration in the UCAN ranged from 80% to 85%.  In either event, there was a consistent,
    sizeable difference between reported market penetration and effective market penetration of about

28  20 to 24 percentage points.

| Period | UCAN Reported Subscriber Households | UCAN Addressable Market/TAM | Reported Market Penetration | Additional User Households | Effective Market Penetration |
|--------|-------------------------------------|------------------------------|------------------------------|-----------------------------|-------------------------------|
| Q4'20 | 73,940,000 | 125,000,000 | 59% | 24,970,000 | 79% |
| Q1'21 | 74,380,000 | 125,000,000 | 60% | 25,120,000 | 80% |
| Q2'21 | 73,950,000 | 125,000,000 | 59% | 24,980,000 | 79% |
| Q3'21 | 74,020,000 | 125,000,000 | 59% | 25,000,000 | 79% |
| Q4'21 | 75,220,000 | 125,000,000 | 60% | 27,830,000 | 82% |
| Q1'22 | 74,580,000 | 125,000,000 | 60% | 30,000,000 | 84% |

259.    The table below shows Netflix's penetration globally, and the following sub-paragraphs provide certain explanatory notes regarding Plaintiff's estimates:

a.    The **TAM** is drawn from Defendants' public statements. Specifically, during the conference hosted by Morgan Stanley on March 3, 2020, Neumann stated that Netflix's TAM during Q1'20 was 800 million broadband households. This increased over the next several quarters such that, during the January 20, 2022 Q4'21 earnings call, an analyst stated (and Defendants did not dispute) that Netflix is "25% penetrated" globally; using the reported subscribers for Q4'21, Netflix's TAM was 887.36 million broadband households (*i.e.*, 221.84 million subscribers divided by 0.25 penetration equals 887.36 million broadband households). Using these two reported figures as endpoints, Plaintiff calculated the TAM for the interim periods using the assumption that the addressable market increased at a constant rate between the two reported figures for Q1'20 and Q4'21.

b.    In estimating the number of **Additional User Households**, the starting point is Netflix's admission in its April 19, 2022 Letter to Shareholders there were "over" 100 million additional households globally that were account sharing without paying. Plaintiff rounded this number down to 100 million additional user households and used it for Q1'22, *i.e.*, as of March 31, 2022. The 100 million additional user households in Q1'22 is approximately 45.12% of the 221,640,000 global subscriber households reported for Q1'22.

i.    Unlike the UCAN market, where Plaintiff now has fixed data on the number of additional user households for two different dates (as of the end of Q1'22 and as of the end of Q3'21), Plaintiff only has global data on the number of additional user households as of the end of

Q1'22.  If Plaintiff assumes that global additional user households in Q3'21 were 45.12% of the 213,560,000 reported global subscriber households, that would imply that Netflix had 96,358,000 global additional user households in Q3'21.  However, based on the available data, the number of additional subscriber households in the UCAN region alone increased by about 5 million between Q3'21 and Q1'22, which would suggest that the number of global additional subscriber households increased by at least that amount, unless the number of additional subscriber households in the rest of the world decreased during that period.  For purposes of simplicity, therefore, Plaintiff assumed that there were 95 million global additional subscriber households in Q3'21.  This number is approximately 44.48% of the 213,560,000 global subscriber households reported for Q3'21.

ii.    For Q4'21, Plaintiff estimates that the number of global additional user households is 99,390,000, which is 44.80% of the 221,840,000 global subscriber households reported for Q4'21 (44.80% is the midpoint of the 44.48% for Q3'21 and the 45.12% for Q1'22).

iii.    For Q4'20 through Q2'21, Plaintiff estimates that the number of global additional user households is 44.18% of the number of reported global subscriber households (which is the same percentage as in Q3'21).

| Period | Global Reported Subscriber Households | Global Total Addressable Market/TAM | Reported Market Penetration | Additional User Households | Effective Market Penetration |
|--------|--------|--------|--------|--------|--------|
| Q4'20 | 203,660,000 | 837,440,000 | 24% | 90,600,000 | 35% |
| Q1'21 | 207,640,000 | 849,920,000 | 24% | 92,370,000 | 35% |
| Q2'21 | 209,180,000 | 862,400,000 | 24% | 93,050,000 | 35% |
| Q3'21 | 213,560,000 | 874,880,000 | 24% | 95,000,000 | 35% |
| Q4'21 | 221,840,000 | 887,360,000 | 25% | 99,390,000 | 36% |
| Q1'22 | 221,640,000 | 887,360,000 | 25% | 100,000,000 | 36% |

260.    The following table shows Netflix's penetration in the ROW, and the following sub-paragraphs provide certain explanatory notes regarding Plaintiff's estimates:

a.    To calculate the **Reported Subscribers** for the ROW, Plaintiff subtracted the Reported Subscribers from the UCAN region from the global Reported Subscribers.

b.    To calculate the **TAM** of the ROW, Plaintiff subtracted the TAM of UCAN from the global TAM.

c.    To calculate the **Additional User Households**, Plaintiff subtracted the Additional User Households of UCAN from the global Additional User Households.

| Period | ROW Reported Subscriber Households | ROW Addressable Market/TAM | Reported Market Penetration | Additional Households | Effective Market Penetration |
|---|---|---|---|---|---|
| Q4'20 | 129,720,000 | 712,440,000 | 18% | 65,630,000 | 27% |
| Q1'21 | 133,260,000 | 724,920,000 | 18% | 67,250,000 | 28% |
| Q2'21 | 135,230,000 | 737,400,000 | 18% | 68,070,000 | 28% |
| Q3'21 | 139,540,000 | 749,880,000 | 19% | 70,000,000 | 28% |
| Q4'21 | 146,620,000 | 762,360,000 | 19% | 71,560,000 | 29% |
| Q1'22 | 147,060,000 | 762,360,000 | 19% | 70,000,000 | 28% |

## XII.    CLASS ACTION ALLEGATIONS

261.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Netflix common stock or call options, or sold put options, between January 19, 2021 and April 19, 2022, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

262.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Netflix's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Netflix shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Netflix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

263.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

264.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

265.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Netflix; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

266.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.    UNDISCLOSED ADVERSE FACTS

267.    The market for Netflix's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Netflix's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Netflix's securities relying upon the integrity of the market price of the Company's securities and market information relating to Netflix, and have been damaged thereby.

268.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Netflix's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or

misleading because they failed to disclose material adverse information and/or misrepresented the truth about Netflix's business, operations, and prospects as alleged herein.

269. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Netflix's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XIV. APPLICABILITY OF PRESUMPTION OF RELIANCE

270. The market for Netflix's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Netflix's securities traded at artificially inflated prices during the Class Period. On November 17, 2021, the Company's share price closed at a Class Period high of $691.69 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Netflix's securities and market information relating to Netflix, and have been damaged thereby.

271. During the Class Period, the artificial inflation of Netflix's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Netflix's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Netflix and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and

1   when disclosed, negatively affected the value of the Company shares.  Defendants' materially false

2   and/or misleading statements during the Class Period resulted in Plaintiff and other members of the

3   Class purchasing the Company's securities at such artificially inflated prices, and each of them has

4   been damaged as a result.

5       272.   At all relevant times, the market for Netflix's securities was an efficient market for

6   the following reasons, among others:

7           (a)    Netflix shares met the requirements for listing, and was listed and actively

8   traded on the NASDAQ, a highly efficient and automated market;

9           (b)    As a regulated issuer, Netflix filed periodic public reports with the SEC

10  and/or the NASDAQ;

11          (c)    Netflix regularly communicated with public investors via established market

12  communication mechanisms, including through regular dissemination of press releases on the

13  national circuits of major newswire services and through other wide-ranging public disclosures,

14  such as communications with the financial press and other similar reporting services; and/or

15          (d)    Netflix was followed by securities analysts employed by brokerage firms who

16  wrote reports about the Company, and these reports were distributed to the sales force and certain

17  customers of their respective brokerage firms.  Each of these reports was publicly available and

18  entered the public marketplace.

19      273.   As a result of the foregoing, the market for Netflix's securities promptly digested

20  current information regarding Netflix from all publicly available sources and reflected such

21  information in Netflix's share price.  Under these circumstances, all purchasers of Netflix's

22  securities during the Class Period suffered similar injury through their purchase of Netflix's

23  securities at artificially inflated prices and a presumption of reliance applies.

24      274.   A Class-wide presumption of reliance is also appropriate in this action under the

25  Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

26  because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or

27  omissions.   Because this action involves Defendants' failure to disclose material adverse

28  information regarding the Company's business operations and financial prospects—information that

Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XV.    NO SAFE HARBOR

275.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Netflix who knew that the statement was false when made.

## XVI.    CLAIMS

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

276.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

277.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other

members of the Class to purchase Netflix's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

278.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Netflix's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

279.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Netflix's financial well-being and prospects, as specified herein.

280.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Netflix's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Netflix and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

281.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation,

1  development and reporting of the Company's internal budgets, plans, projections and/or reports;

2  (iii) each of these defendants enjoyed significant personal contact and familiarity with the other

3  defendants and was advised of, and had access to, other members of the Company's management

4  team, internal reports and other data and information about the Company's finances, operations, and

5  sales at all relevant times; and (iv) each of these defendants was aware of the Company's

6  dissemination of information to the investing public which they knew and/or recklessly disregarded

7  was materially false and misleading.

8      282.    Defendants had actual knowledge of the misrepresentations and/or omissions of

9  material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

10  ascertain and to disclose such facts, even though such facts were available to them. Such defendants'

11  material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose

12  and effect of concealing Netflix's financial well-being and prospects from the investing public and

13  supporting the artificially inflated price of its securities.  As demonstrated by Defendants'

14  overstatements and/or misstatements of the Company's business, operations, financial well-being,

15  and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the

16  misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by

17  deliberately refraining from taking those steps necessary to discover whether those statements were

18  false or misleading.

19      283.    As a result of the dissemination of the materially false and/or misleading information

20  and/or failure to disclose material facts, as set forth above, the market price of Netflix's securities

21  was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the

22  Company's securities were artificially inflated, and relying directly or indirectly on the false and

23  misleading statements made by Defendants, or upon the integrity of the market in which the

24  securities trades, and/or in the absence of material adverse information that was known to or

25  recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during

26  the Class Period, Plaintiff and the other members of the Class acquired Netflix's securities during

27  the Class Period at artificially high prices and were damaged thereby.

28

284.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Netflix was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Netflix securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

285.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

286.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

287.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

288.     Individual Defendants acted as controlling persons of Netflix within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

289.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

290.    As set forth above, Netflix and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XVII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XVIII.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: February 16, 2024          **GLANCY PRONGAY & MURRAY LLP**

By:    _/s/ Robert V. Prongay_

Robert V. Prongay
Jason L. Krajcer
Christopher R. Fallon
Pavithra Rajesh
1925 Century Park East, Suite 2100

Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: jkrajcer@glancylaw.com
Email: cfallon@glancylaw.com
Email: prajesh@glancylaw.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel*