1   Robert V. Prongay (SBN 270796)
      *rprongay@glancylaw.com*
2   Jason L. Krajcer (SBN 234235)
      *jkrajcer@glancylaw.com*
3   Christopher R. Fallon (SBN 235684)
      *cfallon@glancylaw.com*
4   Pavithra Rajesh (SBN 323055)
      *prajesh@glancylaw.com*
5   GLANCY PRONGAY & MURRAY LLP
6   1925 Century Park East, Suite 2100
    Los Angeles, California 90067
7   Telephone: (310) 201-9150
    Facsimile: (310) 201-9160
8

9   *Attorneys for Plaintiff*

10  [Additional Counsel on Signature Page]

11                  **UNITED STATES DISTRICT COURT**

12                  **NORTHERN DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| 14 IN RE NETFLIX, INC. SECURITIES LITIGATION | Case No. 4:22-cv-02672-JST |
| 15 | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| 16 | |
| 17 | |
| 18 | |
| 19 | Date:    August 1, 2024 |
| 20 | Time:    2:00 p.m. |
| | Judge:   Hon. Jon S. Tigar |

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

GLOSSARY OF DEFINED TERMS ....................................................................................... vi

STATEMENT OF ISSUES TO BE DECIDED ....................................................................... vii

I.    PRELIMINARY STATEMENT ................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................................... 3

    A.    Netflix Investigates Q2'19 Subscriber Loss And Determines That Account Sharing Was A Major Problem, But COVID Pull-Forward Delays Enforcement.......................... 3

    B.    Throughout The Class Period, Defendants Misrepresent The Level Of Market Penetration And Fail To Disclose That Account Sharing Was A Material Headwind....... 5

    C.    Defendants Reveal Level Of Account Sharing And Market Saturation To Netflix's Board Of Directors But Continue To Conceal These Facts From Investors ..................... 6

    D.    Defendants Finally Reveal Account Sharing Data To Public, But Blame COVID Pull-Through For Obscuring Negative Impact Of Account Sharing On Subscriber Growth..... 8

III.  THE COMPLAINT ALLEGES MATERIAL MISREPRESENTATIONS ................................. 9

    A.    Defendants Materially Misrepresented Netflix's Core Performance Metrics .................. 10

        1.    Defendants' Market Penetration Statements Were Materially Misleading .......... 10

        2.    Defendants' Statements About Netflix's "Underlying Growth Metrics" And "Long-Term Growth Trajectory" Were Materially Misleading ......................... 13

        3.    The Challenged Statements Are Not Puffery....................................................... 15

    B.    Defendants' Statements Attributing Netflix's Growth Slowdown To The COVID Pull-Forward Were Materially Misleading And Are Not Non-Actionable Opinions....... 17

    C.    Netflix's Risk Disclosures About Account Sharing Were Materially Misleading .......... 18

    D.    Defendants' Evasive Responses To Questions About Account Sharing And Market Saturation Were Materially Misleading ......................................................................... 19

IV.   THE PSLRA SAFE HARBOR DOES NOT PROTECT DEFENDANTS' STATEMENTS...... 21

    A.    The Challenged Statements Were Present, Historical Or Mixed Statements ................... 21

    B.    Defendants' Cautionary Language Was Not Meaningful................................................. 23

    C.    The Complaint Pleads A Strong Inference That Defendants Had Actual Knowledge Of The Facts That Rendered Their Statements Misleading............................................. 23

V.    THE COMPLAINT ALLEGES SCIENTER ................................................................. 24

      A.    The SAC Details Defendants' Knowledge Of The Level Of Account Sharing And Its Impact As A Material Headwind Throughout The Class Period ...................................... 24

      B.    Viewed Holistically, The SAC's Facts Support A Strong Inference Of Scienter ........... 29

VI.   CONCLUSION ............................................................................................................. 30

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>CASES</u>

3

*Aldridge v. A.T. Cross Corp.*,

4
    284 F.3d 72 (1st Cir. 2002) ................................................................................................ 27

5

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,

6
    532 F. Supp. 3d 189 (E.D. Pa. 2021) ............................................................................... 26

7

*Azar v. Yelp, Inc.*,

8
    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ............................................................... 25

9

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ....................................................................................... 11, 12

10

*Eminence Cap., LLC v. Aspeon, Inc.*,

11
    316 F.3d 1048 (9th Cir. 2003) ........................................................................................ 30

12

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F. 4th 747 (9th Cir. 2023) .......................................................................... 16, 18, 22, 23

13

*In re Alphabet, Inc. Sec. Litig.*,

14
    1 F.4th 687 (9th Cir. 2021) ............................................................................................ 19

15

*In re Apple Computer Sec. Litig.*,

16
    886 F.2d 1109 (9th Cir. 1989) ....................................................................................... 11

17

*In re Apple Inc. Sec. Litig.*,

18
    2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ............................................................... 30

19

*In re Bear Stearns Cos., Inc. Sec., Derivative and ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ........................................................................... 19

20

*In re BioMarin Pharm. Inc. Sec. Litig.*,

21
    2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ............................................................... 23, 24

22

*In re Daou Sys., Inc.*,

23
    411 F.3d 1006 (9th Cir. 2005) ....................................................................................... 12

24

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    643 F. Supp. 2d 562 (S.D.N.Y. 2009) ........................................................................... 14

25

*In re Honest Co. Inc. Sec. Litig.*,

26
    2022 WL 18584804 (C.D. Cal. Aug. 25, 2022) ........................................................... 17

27

*In re Oracle Corp. Sec. Litig.*,

28
    627 F.3d 376 (9th Cir. 2010) ....................................................................................... 24

*In re Plantronics, Inc. Sec. Litig.*,
    2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) .......................................................... 15, 17

*In re Portal Software, Inc. Sec. Litig.*,
    2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) .............................................................. 23

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ................................................................................ *passim*

*In re Snap Inc. Sec. Litig.*,
    2018 WL 2972528 (C.D. Cal. June 7, 2018) ................................................................. 19

*In re Splunk Inc. Sec. Litig.*,
    592 F. Supp. 3d 919 (N.D. Cal. 2022) ........................................................... 16, 17, 24

*In re Twitter, Inc. Sec. Litig.*,
    2021 WL 4166725 (N.D. Cal. Sept. 14, 2021) .............................................................. 22

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) ........................................................................ 16

*Lewis v. Straka*,
    535 F. Supp. 2d 926 (E.D. Wis. 2008) .......................................................................... 30

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
    39 F.4th 1092 (9th Cir. 2022) ....................................................................................... 17

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ........................................................................................ 29

*Miss. Pub. Emp. Ret. Sys. v. Boston Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008) ........................................................................................... 26

*Mulligan v. Impax Labs.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................................ 15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) .......................................................................................... 2, 13, 18

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ........................................................................................ 11

*SEC v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ........................................................................................ 9

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ....................................................................... 29

*Tricontinental Indus. Ltd. v. Anixter*,
   215 F. Supp. 2d 942 (N.D. Ill. 2002) ............................................................. 12

*Weston v. DocuSign, Inc.*,
   669 F. Supp. 3d 849 (N.D. Cal. 2023) ............................................................ 22

STATUTES

15 U.S.C. §78u-5(c)(1)(A)(i) ................................................................................ 23

15 U.S.C. §78u-5(c)(1)(B)(ii)(II) .......................................................................... 23

REGULATIONS

17 C.F.R. §240.10b-5(b) ....................................................................................... 28

# GLOSSARY OF DEFINED TERMS

| TERM | DESCRIPTION |
|---|---|
| Class Period | January 19, 2021 – April 19, 2022 |
| EMEA | Europe, Middle East, and Africa |
| FAC | Amended Class Action Complaint, ECF No. 30 |
| FAC Opp. | Plaintiff's Opposition to Defendants' Motion to Dismiss Plaintiff's Amended Class Action Complaint, ECF No. 39 |
| FE1 | Former Employee 1 |
| FE2 | Former Employee 2 |
| LATAM | Latin America |
| MTD | Defendants' Notice of Motion and Motion to Dismiss Second Amended Class Action Complaint, ECF No. 51 |
| Netflix | Netflix, Inc. |
| Order | Order Granting Motion to Dismiss, ECF No. 45 |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| SAC | Second Amended Class Action Complaint, ECF No. 48 |
| TAM | Total Addressable Market |
| UCAN | United States and Canada |
| WSJ | Wall Street Journal |
| WSJ article | Sarah Krouse and Jessica Toonkel, *The End of Netflix Password Sharing Is Nigh*, Wall St. J. (Dec. 21, 2022 10:34 AM), ECF No. 48-1 |

1

**STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))**

2    Plaintiff agrees with and incorporates by reference Defendants' statement of issues to be decided. *See*

3    MTD 1.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     PRELIMINARY STATEMENT

The Court previously dismissed Plaintiff's FAC for failure to plead falsity but stated that "the pleading could be cured by the allegation of other facts." Order at 17.[1] The Court explained that the facts lacking were "what level of account sharing monitoring Netflix was doing when, or what was known regarding the extent of account sharing when." *Id.* at 15. Based on evidence obtained by Plaintiff after the FAC, the SAC supplies precisely those facts, including detailing the information monitored by and known to Defendants about account sharing and market saturation at relevant times prior to and during the Class Period. These newly alleged facts are largely drawn from Netflix Board and Audit Committee meeting materials, as well as a Wall Street Journal article dated December 21, 2022, none of which was available when Plaintiff filed the FAC.

Materials prepared for a December 1, 2021 Board meeting stated that Netflix had 74 million subscriber households in the UCAN market and ***more than 25 million additional households who were account sharing without paying***. ¶¶226-27. These documents stated that Netflix's rate of market penetration in the UCAN market ***without counting account sharers*** was ***59%***, basically the "roughly 60%" figure for the UCAN market that Netflix consistently reported during the Class Period. ¶¶147, 188, 226. These documents admitted that the penetration metric "***[l]ikely understated***" the real level of market penetration, explaining "[i]f we consider these borrower households"—*i.e.*, account sharers—"penetration in the region is ***close to 80%***." ¶227. The documents also acknowledged that "account sharing may limit our continued growth" and that account sharing was a "threat[] to big growth" and a "bigger issue" posing a material threat to Netflix's growth prospects. *Id.*

Thus, by December 1, 2021, at the latest, Defendants not only knew that account sharing was a material headwind, they knew that the reported 60% market penetration metric understated and presented a materially misleading impression about existing market saturation to investors. Put another way, Defendants knew that more than 25 million of the UCAN total addressable market ("TAM") of 125 million households—a whopping 20% of all potential customers—were already using Netflix for free. Still, Defendants continued to mislead investors about market saturation in public statements on January 20, 2022 and March 8, 2022. ¶¶178-89.

The SAC also pleads particularized facts showing that Defendants' earlier Class Period statements were materially misleading when made. For example, materials presented at an October 18, 2021 Audit

---

[1] Capitalized terms are defined in the Glossary. Unless noted, all emphasis has been added, citations are "cleaned up," and "¶_" cites are to the SAC. The Class Period is January 19, 2021 to April 19, 2022.

Committee meeting observed that Netflix experienced "*worse than expected churn*" in UCAN in Q3'21, that Netflix had missed its internal projections for paid net adds in that region by 63%, and that the drop in paid net adds was fueled by both "*lower acquisition*" and "*more absolute cancellations coming from the now larger member base*." ¶220. The very next day, Defendants assured investors that "*retention* was *very healthy*" and that "*churn* [was] at *low levels*." ¶176. They also claimed there was "*ample runway for growth*" in the UCAN and LATAM markets even though these markets were "a bit more mature, more tenured, more penetrated than some of our other markets." ¶¶172, 174. From these facts, a jury could find that Defendants' stated opinions about "very healthy" retention and an "ample runway for growth" were not sincerely held or omitted material facts in Defendants' possession that did not "fairly align[]" with their statements. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015).

More broadly, the SAC pleads new facts supporting a strong inference that Defendants knew account sharing was a material headwind *throughout* the Class Period. A December 2022 WSJ article (published shortly after the FAC) reported that a team of Netflix researchers concluded in the second half of 2019 that password sharing was "*a major problem eating into subscriptions*." ¶68. The WSJ article corroborates the FAC's allegations that by 2019, Defendants already had started to intensively monitor and quantify account sharing and knew that account sharing presented a substantial headwind to Netflix's subscriber growth.

The WSJ article also confirms that COVID temporarily boosted membership growth by bringing in a stream of new subscribers during the first half of 2020. ¶74. By mid-2020, however, growth began to slow. ¶¶75-80. According to new allegations by FE2, starting in roughly spring of 2020, Netflix initiated a multi-team "strike effort" to address account sharing. ¶¶206-07. This initiative combined the efforts of Accounts, Data Insights, and Design teams, and its work included developing messaging for Netflix subscribers in anticipation of a new enforcement effort. *Id.* Thus, about six months before the Class Period, Defendants understood that account sharing remained a major problem and that a reckoning on the issue was inevitable.

These new facts, among others, provide a detailed chronology and factual backdrop against which to assess Defendants' statements. The SAC pleads particularized facts showing that each of the challenged statements was materially misleading *when made*. And viewed holistically, the well-pleaded facts of the SAC support a strong inference that Defendants knew, or consciously disregarded, material adverse facts that rendered their statements misleading. Defendants' motion should be denied.

## II.     STATEMENT OF FACTS

Netflix operates an entertainment streaming platform in over 190 countries. ¶39. From inception and throughout the Class Period, Netflix remained free of advertising, so its revenues were based entirely on paid subscriber fees. ¶50. One of Netflix's most critical performance metrics is "paid net adds," which is the number of paid new subscribers added minus cancellations during each reporting period. ¶42. Throughout the Class Period, 43%-45% of Netflix's quarterly revenues were attributable to UCAN—more than any other region. ¶¶8, 47. While Netflix had room to grow outside UCAN, that was a longer-term prospect as the Company still needed to increase its local content to attract and retain subscribers. ¶¶9, 46.

Account sharing refers to subscribers sharing their password with non-paying users who do not reside in the same household. ¶51. Netflix has long acknowledged that account sharing occurred but did not publicly disclose any data about it until the end of the Class Period. ¶4. For years preceding the Class period, Netflix maintained a lax posture toward account sharing, insisting it was not a problem. ¶¶51-62.

### A.     Netflix Investigates Q2'19 Subscriber Loss And Determines That Account Sharing Was A Major Problem, But COVID Pull-Forward Delays Enforcement

In Q2'19, Netflix shockingly lost 126,000 U.S. subscribers—the first time Netflix reported a loss in U.S. subscribers since 2011. ¶67. According to the WSJ article, Netflix senior executives assigned a team of researchers inside Netflix to "investigate why growth was slowing" and those researchers "identified password sharing as a *major problem eating into subscriptions*." ¶68. This information, which was not publicly disclosed at the time, dovetails with an earlier article reporting that Netflix began to deploy sophisticated behavioral analytics and machine learning software called "Credential Sharing Insight" in or around January 2019, which allowed Netflix to differentiate between unauthorized account sharing and things like a subscriber using his password at a different address while on vacation. ¶¶65-66. Taken together, these reports show that by the end of 2019, Netflix was closely monitoring account sharing, had robust data and analytical capabilities to quantify it, and had already determined that it was a "major problem" for Netflix's long-term growth.

The WSJ article noted that "Hastings was eager to restrict the practice, but it quickly became clear that doing so would be difficult, according to people familiar with the discussions." ¶68. This concern was later echoed in the December 1, 2021 Board materials, which stated that Netflix's consumer research had "repeatedly found" that Netflix's members were unaware of the rules against account sharing. ¶229. Those

1    materials warned that a crackdown could "alienate" Netflix's subscribers. *Id.* In other words, Netflix was

2    worried that a crackdown would increase churn. *See* ¶¶243-49.

3        In early 2020, however, COVID struck and generated a huge new wave of subscribers as lockdowns

4    restricted people to their homes. ¶¶75-77. Defendants called this phenomenon the COVID "pull-forward."

5    ¶76. The pull-forward eased the immediate need for a crackdown on account sharing. According to the WSJ

6    article, the effort to reduce account sharing "waned" as the pandemic "supercharged" Netflix's growth during

7    the first half of 2020. ¶74. Likewise, according to a former employee (FE1), an internal Netflix memo issued

8    in approximately Q2'20 indicated that Netflix would not attempt to limit account sharing at the time because

9    it could be seen as exploiting the pandemic. ¶¶72-73. FE1 stated that once COVID became a factor, Netflix

10   did not want to be seen as "crack[ing] down" on account sharing. ¶72.

11       But Defendants also understood that the spike in subscriptions due to COVID was only temporary.

12   Defendants warned the market that after the strong initial boost from the COVID pull-forward during the first

13   two quarters of 2020, growth was expected to slow during the second half of 2020. ¶¶76-80. This expectation

14   came to fruition. ¶79. In October 2020, Hastings stated that the COVID pull-forward was also expected to

15   have a lingering effect on growth in 2021, but this effect was expected to be "relatively modest." ¶80. He

16   stated "there's probably a little bit of the effect in Q1 from the pull-forward, maybe a little bit less in Q2, but

17   it will wash out. It's not permanent or long term." *Id.*

18       Meanwhile, behind the scenes, Netflix continued to advance internal preparations for a crackdown on

19   account sharing. According to FE2, in approximately spring 2020, certain members of the Design team joined

20   a multi-team "strike effort" with members of the Accounts team and Data Insights team and began to present

21   information concerning account sharing to the broader Design team. ¶¶206-07. The strike team "was working

22   on the rollout and messaging of the Company's efforts to decrease password sharing without being obtrusive."

23   ¶207. FE2 stated that after this spring 2020 meeting, account sharing was continually discussed at Design team

24   meetings and quarterly business review meetings until the launch of the program to curb sharing in

25   approximately March 2021. ¶211. FE2 recalled that during these meetings, account sharing was characterized

26   as "lost revenue" and "theft," and data quantifying the level of account sharing was presented. ¶¶208-09. Thus,

27   well before the Class Period began, Defendants understood that account sharing was ***still*** a major problem

28   eating into subscriptions and a long-term drag on Netflix's subscriber growth, and that a crackdown on the

practice would be necessary.

**B.    Throughout The Class Period, Defendants Misrepresent The Level Of Market Penetration And Fail To Disclose That Account Sharing Was A Material Headwind**

The Class Period starts on January 19, 2021, when Netflix announced its results for Q4'20 and FY'20. During the earnings call that day, an analyst inquired about market saturation in the UCAN region. ¶85. Neumann responded by claiming that Netflix was "roughly 60% penetrated" and "still growing" in the UCAN market and that it still had "a lot of headroom" to grow in all of its markets. *Id*. These representations were materially misleading because, at the time, almost 25 million UCAN households were account sharing. ¶258. The effective rate of market penetration was therefore about 79%, not 60%, and the "headroom" that Netflix had to grow was much more limited than investors were led to believe. *Id*.[2] Globally, 90.6 million households were account sharing at the time. ¶259. The effective rate of market penetration globally was therefore about 35%, not the 24% implied by Netflix's reported subscriber totals and its public estimates of the total available market ("TAM"). *Id*. During the call, Neumann did not mention that Netflix had already determined that account sharing was a major problem eating into subscriptions or that it had deployed a strike team to prepare for stepped up enforcement efforts.

In March 2021, media reported that Netflix appeared to be testing methods to limit account sharing. ¶90. Users faced a pop-up message stating, "If you don't live with the owner of this account, you need your own account to keep watching." *Id*. Defendants were asked about it during Netflix's Q1'21 earnings call on April 20, 2021, and why this was the "right time to start tightening the screws" on the long-standing issue. ¶97. Peters responded that the testing was "not necessarily a new thing" and was part of a "flexible approach" to improve Netflix's service. *Id*. Hastings said Netflix "would never roll something out that feels like turning the screws." *Id*. Once again, Defendants omitted that they had already determined account sharing was a major problem and that they had been preparing for three quarters to address it.[3]

During the same call, Defendants discussed a guidance miss for Q1'21 (by two million paid net adds), blaming the miss on the lingering effects of the COVID pull-forward. ¶95. Defendants assured investors that

---

[2] Plaintiff's estimates of effective market penetration have been updated to reflect new data obtained from Board materials. ¶¶255-60. Defendants do not challenge the basis or reliability of these estimates.

[3] During this call, comments by Peters and Hastings made clear that Peters was personally involved in the Company's research on different "variants" for ways to address account sharing. *Id*.

despite the miss, "the business remain[ed] healthy" and was "still growing." *Id.* Neumann claimed that Netflix had a "big long runway of growth" in front of it, "even in our biggest markets." ¶158. Defendants, however, failed to disclose that the high levels of account sharing presented a material constraint to growth independent of the COVID pull-forward and that the "long runway" was much shorter than Defendants made it appear, especially in the UCAN market. ¶159.

On July 21, 2021, Netflix announced results for Q2'21. Netflix's addition of 1.5 million subscribers globally, ahead of its guidance of 1.0 million paid net adds, fell far below consensus estimates of 4 million. ¶100. Moreover, the UCAN market *lost* subscribers, and the guidance that Netflix offered for Q3'21 was seen as "significantly weaker than expected." ¶¶100, 103. Defendants attributed the weak results to "unusual choppiness" due to COVID, but claimed that "retention continues to be strong" and that "the underlying business metrics are really healthy." ¶¶101-02. Again, Defendants made no mention of account sharing as a significant headwind that they knew they needed to address.

On October 19, 2021, Netflix announced its results for Q3'21, exceeding its weak guidance for paid net adds. Neumann stated that Netflix appeared to be "at the tail end of the COVID choppiness." ¶¶104-05. Neumann also stated that "*retention was very healthy*," that *churn* was at "*low levels*," and that both the UCAN and LATAM markets had "*a lot of runway for growth*," even though they were "more penetrated" than other regions. ¶¶106-07. The previous day, however, Neumann and Sarandos attended an Audit Committee meeting where the presentation materials stated that Netflix had experienced "*worse than expected churn*" in UCAN in Q3'21, causing Netflix to miss its internal projections for paid net adds in the region by *63%*. ¶110. The materials stated that this drop was "fueled by lower acquisition ... and more absolute cancellations coming from the now larger member base." *Id.*

### C. Defendants Reveal Level Of Account Sharing And Market Saturation To Netflix's Board Of Directors But Continue To Conceal These Facts From Investors

On December 1, 2021, Netflix's Board held a meeting attended by Hastings, Neumann, and Peters. ¶222. At the meeting, Netflix management informed the Board of market saturation and account sharing trends that had been occurring throughout the Class Period. Among other things, materials prepared for the meeting admitted that (1) Netflix had "experienced slower membership growth recently" in the UCAN market due to "deepening penetration" and Netflix expected "continued slow member growth" in that market; (2) in addition

to the 74 million reported subscriber UCAN households, there were approximately 25 million active account sharing households in the UCAN market; (3) market penetration in the UCAN market based on paying subscribers was ~59%, but effective market penetration including account sharers was "***close to 80%***," such that the reported level "***[l]ikely understated***" Netflix's true market penetration; (4) account sharing was one of "[m]any threats to big growth" and a "***bigger issue***" posing a material threat to Netflix; and (5) cracking down on account sharing could "alienate" subscribers and upset "pre-existing expectations" based on Netflix's "historical tolerance" of the practice. ¶¶225-29.

After market close on January 20, 2022, Netflix announced its results for Q4'21 and FY'21, revealing it missed guidance for Q4'21 (8.3 million net adds vs. 8.5 million forecasted). ¶112. More importantly, Netflix issued guidance for Q1'22 that was substantially below market expectations (2.5 million net adds forecasted for Q1'22 compared to 4.0 million net adds in Q1'21). ¶113. Investors were stunned. Netflix's stock price fell $110.75/share (21.7%), closing at $397.50/share on January 21, 2022, wiping out roughly ***$49 billion of market capitalization in one day***. ¶192. While the Q4'21 results and Q1'22 guidance revealed ***some*** of the truth about Netflix's acquisition challenges, Defendants continued to conceal material adverse facts showing the depth of Netflix's account sharing and market saturation problems.

Defendants attributed the disappointing news to "the ongoing Covid overhang and macro-economic hardship in several parts of the world like LATAM" (¶113), and studiously avoided any mention of account sharing or market saturation, despite receiving probing questions on these topics. ¶¶116, 118. An analyst asked why the guidance was so low and whether management had concerns "about anything structural, whether it's competition or ***saturation***." ¶116. Neumann responded that there was "[n]o structural change" and Hastings stated there was no "qualitative change" to competition. *Id*. Both offered a range of possible explanations, including COVID and "some impact from competition" (*id*.), but neither revealed the true facts about account sharing and market saturation that they knew from the December Board meeting. Since that meeting, the numbers only worsened, with almost 28 million account sharing UCAN households at the end of Q4'21 and an effective market penetration rate of 82%. ¶258. Ignoring these facts, Defendants assured "we're optimistic about our long-term growth prospects" and "all the fundamentals of the business are pretty solid." ¶¶178, 182.

On March 2, 2022, Netflix's Board held a meeting attended by all Individual Defendants. Materials for the meeting stated that Q1'22 was off to a "very weak start" and that Netflix now expected to miss its

guidance for paid net adds for the second quarter in a row. ¶¶234, 236. The materials stated that "high levels of account sharing" were part of a range of "potential contributing factors" responsible for Netflix's slowing growth. ¶235. The materials also stated that Netflix management had developed a plan to partially address account sharing by attempting to monetize multi-household account usage in four test markets (Costa Rica, Czech Republic, Finland, and Peru) beginning on March 16, 2022. *Id.*

On March 8, 2022, at a Morgan Stanley conference, Neumann repeated that the UCAN market was "roughly 60% penetrated" and said "we're not done growing in the U.S." ¶125. While Board materials from three months earlier had already admitted this figure "[l]ikely understated" real market penetration (80%), by the time of the conference the gap was even higher, with 28-30 million account sharing households and an effective market penetration of 82%-84% in the UCAN market. ¶¶227, 258.

On March 16, 2022, Netflix made a post on its website that introduced paid sharing features that would be tested in three test markets (Chile, Costa Rica, and Peru). ¶128.

**D.    Defendants Finally Reveal Account Sharing Data To Public, But Blame COVID Pull-Through For Obscuring Negative Impact Of Account Sharing On Subscriber Growth**

After market close on April 19, 2022, Netflix announced its Q1'22 results, revealing a shocking ***net loss*** of 200,000 subscribers, significantly missing guidance of 2.5 million paid net adds. ¶130. Unable to explain away these results by repeating the same story about COVID, Defendants finally admitted that account sharing had caused Netflix to be highly saturated in its markets, inhibiting subscriber growth. ¶¶131, 134. Netflix stated that "in addition to our 222m paying households, we estimate that Netflix is being shared with over 100m additional households, including over 30m in the UCAN region." ¶131. Netflix also admitted, "our relatively high household penetration – when including the large number of households sharing accounts – combined with competition, is creating revenue growth headwinds." ¶130. Netflix stated that it expected a net loss of two million subscribers in Q2'22. *Id.*

In trying to explain why Netflix waited so long to tell investors about the level of account sharing and its constraints on Netflix's growth, Defendants said that the impact of account sharing was "***obscured by our COVID growth***." ¶132. Defendants did not disclose, however, the relevant events leading up to their belated disclosure, including management's identification of a 20 point gap between reported penetration and effective penetration that was known to Defendants and the Board four months earlier.

1       Investors and analysts were shocked by Defendants' disclosures. J.P. Morgan stated that Q1'21 was

2   "a sea change quarter … in which the company essentially conceded to every key point of the bear thesis."

3   ¶140(c). J.P. Morgan added, "the bigger factor is management's acknowledgement of relatively high

4   household penetration when including account sharing." *Id.* Bank of America stated, "Management now

5   concedes that between paying subscribers and password sharers, most of the key markets, UCAN and EMEA

6   likely, have saturated and it will be very hard to find new many subscribers in these markets in the near to

7   medium term." ¶140(f). Netflix's share price plummeted by $122.42, more than 35%, to close at $226.19 per

8   share on April 20, 2022, wiping out ***$54 billion in market capitalization***. ¶141.

9   **III.   THE COMPLAINT ALLEGES MATERIAL MISREPRESENTATIONS**

10       Defendants cast the SAC's allegations as fraud by hindsight. But Plaintiff's core theory of falsity is

11   ***not*** about Defendants' ***predictions*** of future growth; it is about Defendants' misleading statements of Netflix's

12   ***existing level of market penetration***. Defendants' failure to disclose the high levels of account sharing and

13   effective saturation rendered their statements about "headroom" and "runway" materially misleading because

14   Netflix had significantly less ***room*** to grow than Defendants led investors to believe.

15       Defendants argue that the SAC fails to plead sufficient facts to show that they had "come to ground"

16   or reached a firm "***conclusion***[]" about account sharing's impact on membership growth. MTD 3, 8. But that

17   is not the correct inquiry. For one thing, falsity does not depend on Defendants' mental states; it is an objective

18   inquiry based on whether a reasonable shareholder could have been misled. But even incorporating

19   Defendants' scienter into the falsity analysis, Plaintiff need not show that Defendants had "come to ground"

20   or reached a formal ***conclusion*** that "the potential risks related to account sharing had bloomed into a severe

21   hindrance on UCAN growth." MTD 3, 9. It is enough that Defendants (a) were aware of undisclosed facts that

22   substantially increased the magnitude of those risks and (b) knew (or were deliberately reckless in not

23   knowing) that the failure to disclose those facts carried a material risk of misleading investors. "When the

24   defendant is aware of the facts that made the statement misleading, he cannot ignore the facts and plead

25   ignorance of the risk." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010).

26       In any event, the SAC ***does*** plead sufficient facts to show that Defendants ***had concluded*** that account

27   sharing had "bloomed into a severe hindrance on UCAN growth." MTD 9. This is clearly true for the

28   statements made after December 1, 2021, but even for the statements made prior to that date, the SAC pleads

strong circumstantial evidence that Defendants knew facts that rendered their statements misleading. Defendants focus on hedging language in the Board materials ("account sharing **may limit** our continued growth" and was part of "a **range** of … **potential** contributing factors"), as if that language exculpates them. MTD 11. But pleading falsity does not require an unequivocal admission or even an admission at all. Defendants' damning concessions in the Board materials that Netflix had been experiencing "slower membership growth" in the UCAN market due to "deepening penetration" and that the reported penetration level "[l]ikely understated" the true level of market penetration due to 25 million undisclosed account sharing households are more than sufficient for a reasonable factfinder to infer that Defendants' statements were materially misleading. ¶¶226-27. While those admissions were not presented to the Board until December 1, 2021, roughly the same level of account sharing was present since the beginning of the Class Period, as was Defendants' identification of account sharing as a "major problem eating into subscriptions." ¶239.

### A.    Defendants Materially Misrepresented Netflix's Core Performance Metrics

#### 1.    Defendants' Market Penetration Statements Were Materially Misleading

The core misrepresentations in this case are Defendants' market penetration statements. On January 19, 2021, Neumann stated that the UCAN market was "**roughly 60% penetrated**" and "we've got a **lot of headroom** in all these markets." ¶147. On March 8, 2022, Neumann repeated that the UCAN market was "**roughly 60% penetrated**" and claimed "**we're not done growing in the U.S.**" ¶188. These statements were materially misleading when made because Netflix's UCAN market had roughly **25 million** undisclosed account sharing households and effective market penetration of **79%** as of January 19, 2021, which had grown to **30 million** account sharing households and effective market penetration of **84%** by March 8, 2022. ¶258.

The claim of ~60% market penetration provides critical context for Defendants' related statements about a "long" and "ample runway" for growth that Defendants made during the Class Period. *See* ¶158 (4/20/2021 call: "big long runway of growth" "even in our biggest markets"); ¶172 (10/19/2021 letter: "ample runway for growth" in UCAN and LATAM); ¶174 (10/19/2021 call: "still a lot of runway for growth" in UCAN and LATAM); ¶184 (1/20/2022 call: "long runway of growth" in LATAM). Defendants' assurances were materially misleading because they were anchored by the 60% penetration figure which misleadingly implied that the remaining 40% of the TAM was readily available for capture.

Defendants argue that the market understood that their market penetration estimates only included

subscribers and not account sharers. MTD 13. This argument fails for multiple reasons. First, nothing on the face of Defendants' statements indicates that the penetration estimates excluded account sharers. Defendants did not define market penetration, disclose the assumptions underlying the estimates, or provide an estimate for the TAM to allow investors to back out the numerator and compare it to the reported number of subscribers. ¶258(a) & n.33. The market's reaction to the disclosure of the truth at the end of the Class Period, including the reaction of analysts, provides strong circumstantial evidence that the market was in fact misled by Defendants' omissions. ¶¶140-41; *see* FAC Opp. 8.

Second, even if sophisticated market observers were able to infer that there was an unquantified delta between reported market penetration and effective market penetration including account sharers, Defendants' statements were still materially misleading. Literal accuracy is not the relevant yardstick. Rather, the question is whether Defendants' statements "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Defendants did not merely provide the 60% figure as an unadorned metric; they touted that figure as a reason to conclude that the UCAN market was ***not saturated*** and that there was a "***lot of headroom***" to grow further, including in the UCAN market. "[O]nce [D]efendants ch[o]se to tout positive information to the market, they [we]re bound to do so in a manner that wouldn't mislead investors, including [by] disclosing adverse information that cut[] against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). Thus, even if the 60% market penetration figure were not misleading by itself, Defendants' touting of that figure as a reason to believe there was a "lot of headroom" to grow in the UCAN market obligated Defendants to disclose other data that fundamentally cut against that assurance, including the huge number of account sharers, which increased effective market penetration from ~60% to ~80%.[4]

Third, and perhaps most importantly, Defendants internally ***admitted*** that the reported penetration figure "***[l]ikely understated***" the actual level of penetration in the December 1, 2021 Board materials. ¶121.

---

[4] Defendants' suggestion that the market appreciated the nature and scope of the account sharing issue due to other public information (MTD 13) presents a "truth-on-the-market" defense that is both premature and factually unsupported. Nothing indicates that this information was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by [Defendants'] one-sided representations." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989). And even the worst-case third party estimates substantially underestimated the level of account sharing. ¶92; *see also* FAC Opp. 6-7.

1    This admission recognizes that the reported penetration figure had the potential to mislead investors by

2    creating "an impression of a state of affairs that differ[ed] in a material way from the one that actually

3    exist[ed]." *Brody*, 280 F.3d at 1006. At a minimum, this admission establishes that a reasonable investor could

4    have been misled by the reported market penetration rate.

5           While Plaintiff currently does not have internal documents showing the exact number of account

6    sharing households at all points during the Class Period, Defendants' admission at the end of the Class Period

7    that "[a]ccount sharing as a percentage of our paying membership hasn't changed much over the years"

8    enabled Plaintiff to approximate the number of account sharers and effective penetration. ¶¶255-60. *Cf. In re*

9    *Daou Sys., Inc.*, 411 F.3d 1006, 1016-17 (9th Cir. 2005) (to plead falsity of financial statements, plaintiffs

10   should plead facts such as "***approximate amount*** by which revenues and earnings were overstated" and dates

11   of relevant transactions, but plaintiffs "need not allege each of those particular details"); *Tricontinental Indus.*

12   *Ltd. v. Anixter*, 215 F. Supp. 2d 942, 947 (N.D. Ill. 2002) ("Even under the PSLRA, a complaint need not …

13   allege the precise amount of overstatement on a period by period basis, especially where most of the evidence

14   necessary to prove these allegations is in the hands of the defendants."). The December 2021 Board materials

15   reflected the level of account sharing as of the end of Q3'21 (¶¶122, 228), so at a minimum those figures

16   establish the misleading nature of the statements made after September 30, 2021. More broadly, the SAC

17   reasonably estimates the level of account sharing and effective market penetration throughout the Class Period

18   based on data in the Board materials and Defendants' disclosures at the end of the Class Period. ¶¶255-60.

19   Defendants do not challenge the reliability of these estimates, and they are sufficient to plead falsity.

20          In sum, Plaintiff satisfies his burden of pleading falsity with particularity because (1) the December

21   Board materials show Defendants understood the ~20 point gap between reported market penetration and

22   effective market penetration as of the end of Q3'21 due to the undisclosed levels of account sharing, (2) this

23   20 point gap was roughly the same at the beginning of the Class Period and had grown to a 24 point gap by

24   the end of the Class Period, (3) Defendants were monitoring and quantifying the level of account sharing at

25   all times during the Class Period, and (4) Defendants understood that account sharing was a material constraint

26   on Netflix's growth before the Class Period even began. ¶¶65-74, 205-11, 222-32, 258.[5]

27   _____

28   [5] Defendants argue that Plaintiff has alleged no facts suggesting that Netflix's statements about growth
     potential in markets outside of UCAN were materially false or misleading. MTD 14. Not so. Even though the

### 2. Defendants' Statements About Netflix's "Underlying Growth Metrics" And "Long-Term Growth Trajectory" Were Materially Misleading

Defendants also made misleading statements about Netflix's metrics and long-term growth. *E.g.*, ¶149 ("very strong underlying growth metrics" and "long-term growth trajectory is at least as strong as ever"); ¶155 ("viewing per household was up" and "churn was down year-over-year"); ¶157 ("core underlying metrics are very healthy"); *see also* ¶¶164, 166, 168, 176, 182; FAC Opp. 10-12. These statements are best categorized in relation to Netflix's October 18, 2021 Audit Committee meeting.

**<u>Statements made after October 18, 2021 Audit Committee meeting</u>**. Defendants' statements about churn, retention, and long-term growth made after October 18, 2021 are misleading for reasons that go beyond account sharing. During an earnings call on October 19, Neumann stated that "the business remained healthy … with ***churn*** at ***low levels***" and "***retention was very healthy***." ¶176. But materials from an Audit Committee meeting attended by Neumann on October 18 stated that Netflix experienced "***worse than expected churn***" in UCAN in Q3'21, causing Netflix to miss internal projections for paid net adds in the region by ***63%***. ¶220.

Defendants argue that the Audit Committee materials did not attribute the increase in churn to account sharing. MTD 10-11. That is irrelevant. Regardless of account sharing's impact, these statements misrepresented management's views about the health of two key (inversely related) metrics: churn and retention. The Audit Committee materials provide a sufficient basis for a trier of fact to have grave doubts as to whether Neumann really believed that retention was "very healthy" and that churn was "low." Irrespective of Neumann's sincerity, a reasonable shareholder could find Newman's statement omitted material facts stated in the Audit Committee materials, rendering it misleading. Netflix's 63% miss of its internal projections for paid net adds and management's attribution of that miss to "worse than expected churn" are not minor "fact[s] cutting the other way" but material facts that a reasonable shareholder could view as not "fairly align[ing]" with Neumann's purported opinions that retention was "very healthy" and that churn was "low." ¶¶176-77, 220; *Omnicare*, 575 U.S. at 189.

---

markets outside of UCAN were not as saturated as UCAN, Defendants' statements about global market penetration and TAM, along with the reported subscriber totals, implied that the markets outside of UCAN had a market penetration of 18%-19%, whereas the effective market penetration in those markets counting account sharers was between 27% and 29%. ¶260. This roughly 10 point gap is material and left Netflix less room to grow in its global markets than investors were led to believe. Thus, Defendants' statements about "headroom" and "runway" were materially misleading as to all of Netflix's markets, not just UCAN.

---

While the Audit Committee materials did not explicitly tie the increase in churn to account sharing, they did tie the increase to market saturation concerns, noting that the drop in paid net adds was "fueled by *lower acquisition … and more absolute cancellations <u>coming from the now larger member base</u>*." ¶220. A reasonable inference that could be drawn from this statement is that Netflix was at or near a saturation point in the UCAN market where the absolute size of the member base was creating an inherent level of churn that would be difficult for acquisition to outpace. For this reason, Defendants' statements about an "ample runway for growth" (¶172) and "a lot of runway for growth" (¶174) are independently misleading, even if the Court were to find the SAC's allegations about account sharing insufficient. The failure to disclose the level of account sharing made the statements *more misleading*, but the Audit Committee materials alone support a securities fraud claim based on these statements.

**<u>Statements made before October 18, 2021</u>**. Defendants' statements about Netflix's performance metrics and long-term growth from earlier in the Class Period were also materially misleading because account sharing artificially boosted viewing and suppressed churn. Defendants argue that these statements are not misleading because they "had nothing to do with account sharing." MTD 13. But a statement does not have to be about account sharing for an omission about account sharing to render the statement misleading. FAC Opp. 5. Views by account sharers were counted as views by members, which inflated the viewing metric and gave a misleading impression of the popularity of Netflix's content. ¶¶96, 109; *see In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 566, 569-70 (S.D.N.Y. 2009) (popularity metrics for game were inflated by inclusion of "gold farmers"—"companies that hire people to play online games so that they can generate online currency which is then sold on third-party websites for real cash to actual players"); FAC Opp. 10.

With respect to churn, Defendants argue that the SAC pleads no facts showing that "Netflix would not be able to convert account sharers to subscribers." MTD 15. The December 2021 Board materials, however, stated that Netflix's consumer research had "repeatedly found" that members were not aware that they could not share their accounts outside their households and that a crackdown risked alienating subscribers. ¶248. The WSJ article confirms that Defendants delayed a crackdown on sharing for this reason. ¶¶243-49; FAC Opp. 11. Defendants' failure to disclose that Netflix was delaying a crackdown on sharing due to a fear of churn is sufficient to render their statements touting Netflix's low churn rate misleading.

Finally, Defendants' failure to disclose the level of account sharing rendered Defendants' statements

about Netflix's "long-term growth trajectory" misleading. ¶149. Defendants contend that they did not believe account sharing was a severe hindrance to growth, pointing to a statement in the WSJ article that Netflix's top executives believed that the subscriber loss in Q2'19 was a "blip" and suggesting that Defendants did not agree with researchers that account sharing was a major problem. MTD 10. This mischaracterizes the reporting. According to the WSJ, Netflix's top executives initially believed the Q2'19 loss was a blip, but then asked researchers to investigate why growth was slowing. ¶68. The researchers determined that account sharing was a material factor eating into growth, and "Hastings was eager to restrict the practice, but it quickly became clear that doing so would be difficult, according to people familiar with the discussions." *Id*. There is no indication that Defendants disagreed with the researchers' conclusions, only that Defendants did not see an easy solution to the problem.

Relatedly, Defendants argue that even if they did believe that Netflix had "hit a subscriber ceiling created by account sharing" in 2019, that belief was "dispelled" by the COVID pull-forward during the first two quarters of 2020. MTD 10. This argument ignores subsequent events. Defendants knew that the boost from the COVID pull-forward was temporary. ¶76. Defendants' launch of a multi-team strike effort in spring 2020 to prepare for a crackdown shows that they saw account sharing as a long-term structural drag on growth and believed that it still was "*a major problem eating into subscriptions*." ¶¶207, 239.

### 3.   The Challenged Statements Are Not Puffery

Whether a statement is puffery is a question of materiality generally reserved for the jury and rarely decided on a motion to dismiss. *See Mulligan v. Impax Labs.*, 36 F. Supp. 3d 942, 966-67 (N.D. Cal. 2014) (dismissal on puffery grounds only appropriate if "the statement is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance"). "The context in which the statements were made is key to determining whether they are inactionable puffery." *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *16 (N.D. Cal. Aug. 17, 2022). "[E]ven general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017). "In other words, optimistic statements are *not* inactionable puffery and may form a basis for a securities fraud claim where the plaintiff pleads allegations raising the inference that the defendants were aware of facts that rendered the optimistic statements false or misleading."

1  *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 941 (N.D. Cal. 2022) (emphasis in original).

2      The challenged statements are not puffery. First, Defendants' qualitative assurances about the level of

3  market penetration (*e.g.*, "lot of headroom" and "big long runway of growth") were not puffery because those

4  qualitative statements were anchored in and qualified by Netflix's quantitative representation of 60% market

5  penetration in the UCAN market. *See* ¶¶147, 158, 172, 174, 184; *In re Wells Fargo & Co. S'holder Deriv.*

6  *Litig.*, 282 F. Supp. 3d 1074, 1097 (N.D. Cal. 2017) ("there is a difference between enthusiastic statements

7  amounting to general puffery and opinion-based statements that are ***anchored in misrepresentations of***

8  ***existing facts***"). In *Quality Systems*, the Ninth Circuit sustained claims based on both the quantitative

9  representation that "[m]ore than half the large practice market, more than 75% of the midsize practice market

10  is still fair game for new system sales" and the related qualitative representation that "greenfield opportunities

11  are plentiful." 865 F. 3d at 1136. The same result should obtain here.[6]

12      Second, Defendants' statements about Netflix's long-term growth trajectory, underlying fundamentals,

13  and growth metrics are similarly misleading. *See, e.g.*, ¶¶149, 155, 157, 166, 168, 176, 178, 182, 188. These

14  statements were grounded in and built upon Defendants' misleading statements about the room Netflix had

15  left to grow. Many of these statements were made in response to analyst questions pressing Defendants about

16  specific areas in which Netflix was performing poorly. *E.g.*, ¶155 (in response to question about why Q1'20's

17  performance was below expectations, Neumann assured that "the long-term drivers … remain[] as healthy as

18  ever"); ¶168 (in response to question about Netflix's ability to get back to pre-COVID levels of net adds,

19  Neumann stated "we remain on that growth trajectory" and "expect to end the year on a much more normalized

20  growth trajectory"); *see also* ¶¶149, 157, 166, 180, 182, 188; *Glazer Cap. Mgmt., L.P. v. Forescout Techs.,*

21  *Inc.*, 63 F. 4th 747, 770-71 (9th Cir. 2023) (assurances about strength of sales pipeline were not puffery when

22  most were made "during earnings conference calls after [defendant] announced disappointing financial

23  predictions or results, and … in response to specific questions asked by financial analysts").

24      As discussed *supra*, Neumann's statements that "retention was very healthy" and that churn was at

25  "low levels" during the Q3'21 earnings call were made with knowledge of specific facts that rendered those

26  statements misleading. And many of the statements that Defendants insist are *per se* immaterial are nearly

27

28  ───────────────
[6] This Court distinguished *Quality Systems*, concluding that the plaintiffs in that case alleged more specific facts about defendants' knowledge than Plaintiff did here. Order 17. The SAC's new facts close that gap.

identical to statements this Court has held not to be puffery in analogous contexts. *Compare Splunk*, 592 F. Supp. 3d at 938-39 ("underlying growth within our business is very healthy") *with* ¶157 ("core underlying metrics are very healthy"); *compare Plantronics*, 2022 WL 3653333, at *16 ("solid results") *with* ¶182 ("all the fundamentals of the business are pretty solid").

Defendants' reliance on *Macomb County Employees' Retirement System v. Align Technology, Inc.*, 39 F.4th 1092 (9th Cir. 2022) is unavailing. MTD 19-20. *Macomb* did not alter the rule that "general statements of optimism" may be actionable if, in context, they "address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143. *Macomb* merely held that the plaintiff in that case had failed to sufficiently allege such context. 39 F.4th at 1099; *see also In re Honest Co. Inc. Sec. Litig.*, 2022 WL 18584804, at *2 (C.D. Cal. Aug. 25, 2022) (denying motion for reconsideration and holding *Macomb* did not change Ninth Circuit law on puffery). Here, when Defendants claimed there was "a lot of headroom" in the UCAN market and "a big long runway for growth" even in Netflix's biggest markets (¶¶147, 158), Netflix was already ~80% saturated in its single biggest market (UCAN) due to account sharing. As industry experts, Defendants would have understood that "[i]t's not easy to raise penetration beyond that level," as Evercore observed in a stunned analyst report following Defendants' April 19, 2022 disclosure of the truth about account sharing and its material negative impacts on Netflix. ¶140(a). Reasonable investors would have found the fact of Netflix's effective penetration level of 80% in the UCAN market material in the context of statements discussing its room for growth. Analysts certainly did. ¶¶140(a)-(h).

## B. Defendants' Statements Attributing Netflix's Growth Slowdown To The COVID Pull-Forward Were Materially Misleading And Are Not Non-Actionable Opinions

Defendants also misleadingly attributed Netflix's slowing growth to the COVID pull-forward and the pandemic's aftereffects without acknowledging the impact of account sharing and market saturation. *E.g.*, ¶153 (in Q1'21, "paid membership growth slowed due to the big Covid-19 pull forward in 2020" and "Covid-19 production delays"); ¶155 ("in terms of Q1 [2021] performance, it really boils down to COVID, frankly"); ¶164 ("COVID choppiness"); ¶178 ("ongoing Covid overhang"); *see also* ¶¶149, 157, 162, 164, 166, 170.

Defendants argue that their statements concerning COVID impacts are non-actionable opinions. MTD 20-21. An opinion statement is actionable, however, if the speaker omits material facts "whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in

context." *Omnicare*, 575 U.S. at 194. When a speaker offers an opinion, a reasonable investor expects "not just that the [speaker] believes the opinion … but that it fairly aligns with the information in the [speaker's] possession at the time." *Id.* at 188-89. Thus, for example, when Defendants opined that Netflix's disappointing performance "really boils down to COVID" (¶155), a reasonable investor would expect that Defendants did not have information in their possession suggesting that other material factors were driving those results.

Indeed, the Ninth Circuit has made clear that when a defendant attributes poor performance to one factor, but fails to disclose other significant causes, the statement may be misleading. *Glazer*, 63 F. 4th at 770 ("if a significant cause of the missed revenue guidance was the misclassification of illusory deals, it was misleading to blame the revenue miss entirely on EMEA conditions … even if EMEA conditions were also a factor in the financial performance"). Thus, even if COVID was a material factor causing Netflix's growth to slow, the high level of market saturation due to account sharing was another material factor eating into subscriptions, and Defendants' failure to disclose the latter rendered their statements misleading because the statements did not "fairly align[]" with the information in Defendants' possession. *Omnicare*, 575 U.S. at 189.

As discussed above, the SAC pleads sufficient facts to support a strong inference that Defendants knew that account sharing was a major problem adversely affecting subscriber growth, even after the COVID pull-forward. *E.g.*, ¶206-211 ("strike effort" formed in spring 2020 to combat account sharing). While Defendants described the COVID pull-forward as a temporary and short-term issue (¶80), Defendants understood that account sharing was a significant and long-term problem. And both before and during the pandemic, Defendants expended considerable resources quantifying the extent of that problem. In light of these facts, Defendants' failure to disclose the role of account sharing and market saturation in driving Netflix's slower growth in the UCAN market, while blaming it entirely on COVID, was materially misleading.

### C.    Netflix's Risk Disclosures About Account Sharing Were Materially Misleading

In both its 2020 10-K and 2021 10-K, Netflix stated "***if*** multi-household usage is abused or ***if*** our efforts to restrict multi-household usage are ineffective, our ability to add new members may be hindered and our results of operations may be adversely impacted." ¶¶151, 186. These statements were materially misleading because they failed to inform investors of the significant extent to which the risks had already come to pass.

As of the date of the 2020 10-K, Netflix had roughly 25 million account sharing UCAN households

1 and an effective market penetration rate of 79%, compared to the 60% Defendants reported. ¶¶147, 258. By

2 the time Netflix filed its 2021 10-K, account sharing UCAN households market had grown to 27.8 million,

3 with an effective market penetration of 82%, yet Defendants still reported 60%. ¶¶147, 258. At the time of

4 both 10-Ks, Netflix had already realized high degrees of market saturation in the UCAN market due to account

5 sharing. Moreover, Defendants had already determined that account sharing was a "major problem eating into

6 subscriptions" in 2019. ¶239. And the initiation of the multi-team strike effort in spring 2020 indicates that

7 Defendants knew that account sharing was still causing a material adverse effect on Netflix's results in 2020.

8 ¶¶205-11. The problem clearly continued during 2021, with Defendants alerting the Board of these adverse

9 account sharing and market penetration trends in December 2021. ¶¶119-23. Thus, Plaintiff sufficiently alleges

10 that Defendants, in making purported risk disclosures about account sharing, failed to disclose the "hard facts

11 critical to appreciating the magnitude of the risks described." *In re Bear Stearns Cos., Inc. Sec., Derivative*

12 *and ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011).

13         Defendants argue that these risk factors were not misleading because they were worded in a way to

14 make clear that there was some level of account sharing going on. MTD 16. But there is a big difference

15 between the existence of some level of account sharing and the massive level of account sharing that existed

16 at the times of these statements, which was clearly hindering Netflix's ability to add new members. Because

17 the account sharing had already ripened into actual harm to Netflix's operations, a reasonable shareholder

18 could find the risk disclosures misleading. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021)

19 (plaintiffs plausibly alleged that risk warnings were misleading because the potential risks of harm identified

20 in warnings had "***ripened into actual harm***"); *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *6 (C.D. Cal.

21 June 7, 2018) ("hypothetical risk disclosures … do not absolve Defendants of their duty to disclose ***known***

22 material adverse trends ***currently affecting*** Snap's user growth").

23         **D.    Defendants' Evasive Responses To Questions About Account Sharing And Market**
24                **Saturation Were Materially Misleading**

25         Finally, Defendants misled investors during conference calls by both (1) addressing account sharing

26 in a misleading fashion and (2) avoiding discussion of account sharing despite being asked questions that

27 clearly called on Defendants to address it. First, following media reports in March 2021 about new pop-up

28 warnings to users about account sharing, during the Q1'21 earnings call Peters was asked "why now is kind

of the right time to start tightening the screws" on account sharing. ¶160. Peters responded that the action was "not necessarily a new thing" and was intended to meet members' "broad set of needs" and "improv[e]" the service." *Id.* Peters did not disclose that Defendants had long ago determined that account sharing was a major problem eating into subscriptions, that the new testing followed 8+ months of quiet preparations by Netflix's strike team, and that the UCAN market was by then roughly 80% penetrated due to account sharing. In context, the analyst was asking whether the apparent ratcheting-up of enforcement signaled an inflection point on account sharing, and Peters' anodyne response amounted to "Nothing to see here." The failure to acknowledge the elephant in the room—that account sharing had caused severe market saturation and Defendants knew they needed to address it—was materially misleading.

Second, during the Q4'21 earnings call, an analyst asked why guidance for Q1'22 was lower than expected and whether it reflected concerns "about anything ***structural***, whether it's competition or ***saturation***." ¶180. Neumann responded that there was "[n]o structural change in the business that we see" and that "[i]t's tough to say exactly why our acquisition hasn't kind of recovered to pre-COVID levels." *Id.* He mentioned an "overall COVID overhang" and "some impact from competition" as possible causes for the slowdown but avoided any mention of account sharing or saturation. *Id.* Hastings added that "[t]here's more competition than there's ever been" but "it doesn't feel like any qualitative change" regarding competition, and he concluded that "COVID has introduced so much noise." *Id.* Hastings, like Neumann, made no mention of account sharing or saturation. These statements, which posited COVID-related factors and competition as possible causes for the slowdown but did not mention account sharing or saturation (despite being specifically asked about saturation), were materially misleading. The statements were made about seven weeks after the December 1, 2021 Board meeting (attended by both Hastings and Neumann), where management reported to the Board that (1) Netflix had "experienced slower membership growth recently" in UCAN due to "deepening penetration" and expected "continued slow member growth" in that market; (2) the reported level of market penetration had "[l]ikely understated" the effective level of market penetration because, when counting the roughly 25 million account sharing households, market penetration in UCAN was "close to 80%"; and (3) account sharing was a "bigger issue" posing a material threat to the Company's growth prospects. Since that meeting, the problem had only worsened with the UCAN market having grown to roughly 27.8 million account sharing households and an 82% effective market penetration by the time of the Q4'21 earnings call. In light

---

1  of these staggering numbers and their obvious significance (as reflected in management's report to the Board),

2  Defendants' failure to disclose the scope of account sharing and the attendant level of effective market

3  penetration rendered their responses to this question misleading.

4      During the same Q4'21 conference call, an analyst asked about the Latin American market, positing

5  that this market might be "maturing at a lower level of penetration than you've seen in the U.S." and asking

6  what might be driving this phenomenon, including "[*a*]*ccount sharing*." ¶184. Neumann responded by

7  dismissing the view that Latin America was "maturing faster" and asserting that "there's a long runway of

8  growth there." *Id.* He made no mention of account sharing, even though the analyst specifically asked about

9  it. While Defendants have never disclosed the specific level of account sharing in the LATAM market (or any

10  other specific region other than UCAN), it is reasonable to infer that there was also a high level of account

11  sharing there, because (1) Defendants described the LATAM market, along with UCAN, as one of Netflix's

12  "more mature, more tenured, more penetrated" markets (¶174); (2) when Netflix adopted paid sharing features

13  in certain test markets near the very end of the Class Period, all three of the markets selected (Chile, Costa

14  Rica, and Peru) were located in Latin America (¶128);[7] and (3) generally, Netflix's markets outside of the

15  United States had a higher level of account sharing as a percentage of paid membership than UCAN, even

16  though their overall levels of market penetration were lower. ¶¶255-60. Given these factors, Neumann's

17  representation that there was a "long runway of growth" in LATAM, without disclosing the high levels of

18  account sharing, was materially misleading.

19  **IV.    THE PSLRA SAFE HARBOR DOES NOT PROTECT DEFENDANTS' STATEMENTS**

20      **A.    The Challenged Statements Were Present, Historical Or Mixed Statements**

21      The majority of the challenged statements in this case are (1) statements of present or historical fact,[8]

22  or (2) mixed statements containing both forward-looking elements and separable representations of present or

23  historical fact. With respect to mixed statements, the non-forward-looking portions of such statements "are

24  not protected by the safe harbor." *Quality Sys.*, 865 F.3d at 1142.

25

26  ───────────────

27  [7] It makes sense that Netflix would test paid sharing in markets with relatively high levels of sharing because those markets would present the biggest opportunities for monetization.

28  [8] Defendants do not challenge as forward-looking any statements in ¶¶151, 155, 160, 162, 164, 170, 176, 182, or 186 and have thus waived any argument that these statements are protected by the safe harbor.

The market penetration statements were not forward-looking. The two representations that the UCAN market was "roughly 60% penetrated" were statements of present fact. ¶¶147, 188. Defendants do not dispute this but argue that related statements that there was "a lot of headroom" or "an ample runway for growth" were forward-looking. *See* MTD 17-18 & n.4; ¶¶147, 158, 172, 174, 184. But these statements were not predictions that Netflix would grow; they were representations of the then-current ***room left to grow*** within the estimated TAM. The Ninth Circuit has held that analogous statements are not forward-looking. *See Quality Sys.*, 865 F. 3d at 1143, 1147 (statements that "more than 75% of the midsize practice market is still fair game for new system sales" and "greenfield opportunities are plentiful" were both *not* forward-looking). While certain of the penetration statements included forward-looking elements ("we're still growing" (¶147) or "we're not done growing in the U.S." (¶188)), the representations about "headroom" and "runway" were separable and concrete descriptions of the existing level of market penetration.

Other statements Defendants claim are forward-looking were mixed with statements purporting to explain what factors caused poor results in *prior* quarters or why the metrics in those quarters showed Netflix's *current* financial health. *E.g.*, ¶153 ("paid membership growth slowed due to the big Covid-19 pull forward in 2020"); ¶178 (growth had not yet reaccelerated due to "the ongoing Covid overhang and macro-economic hardship in several parts of the world like LATAM"); ¶157 ("core underlying metrics are very healthy"); *see also* ¶¶149, 166. These statements are not protected. *See Glazer*, 63 F. 4th at 774 (attribution of prior quarter's results to "slipped deals" was not forward-looking); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 874-75 (N.D. Cal. 2023) (statements about impact of COVID on billings growth and statements about historical churn rates were not forward-looking).

Defendants note that some statements were responses to questions about Netflix's guidance. MTD 17-18, 17 n.4. However, even when a statement is made in response to such a question, specific representations of historical or present fact are actionable. *See In re Twitter, Inc. Sec. Litig.*, 2021 WL 4166725, at *3 (N.D. Cal. Sept. 14, 2021) (statement that "MAU trend has already turned around" was not forward-looking statement or "future assumption[]," but description of "specific, concrete circumstances that had already occurred"); *cf.* ¶166 ("as markets reopened, particularly … in most of EMEA and the UCAN region, that did have a bit of a headwind on acquisition" described specific past events); ¶180 ("No structural change" was statement of existing conditions, not future assumption).

### B.    Defendants' Cautionary Language Was Not Meaningful

Cautionary language must be "meaningful" for the safe harbor to apply. 15 U.S.C. §78u-5(c)(1)(A)(i). "Mere boilerplate or generic warnings … are insufficient; the cautionary warning ought to be precise and relate directly to the forward-looking statements at issue." *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *13 (N.D. Cal. Aug. 10, 2005). For mixed statements, the caution "must accurately convey appropriate, meaningful information about not only the forward-looking statement ***but also the non-forward-looking statement***." *Quality Sys.*, 865 F.3d at 1148. "If the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be sufficiently meaningful to qualify the statement for the safe harbor." *Id.* at 1146-47.

Defendants did not meaningfully warn investors as to the portions of Defendants' mixed statements that were materially misleading. For example, when Neumann stated that the UCAN market was roughly 60% penetrated, nothing in Netflix's cautionary language indicated that this materially understated the effective rate of market penetration based on current levels of account sharing. *See In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *8 (N.D. Cal. Jan. 6, 2022) (warnings not adequate because they were "not targeted or tailored to cautioning investors that [the challenged] statements were qualified, incomplete, untrue, or otherwise misleading"). As discussed *supra*, Defendants' risk disclosures were themselves misleading because they failed to disclose that the risks had already materialized in that account sharing had already resulted in a high level of market saturation. Thus, the ultimate risks that Netflix had warned about—that account sharing could hinder Netflix's ability to add new members and might adversely affect Netflix's operating results— had already materialized to a substantial degree. *See Glazer*, 63 F. 4th at 781 ("cautionary language is not meaningful if it discusses as a mere possibility a risk that has already materialized").

### C.    The Complaint Pleads A Strong Inference That Defendants Had Actual Knowledge Of The Facts That Rendered Their Statements Misleading

The safe harbor does not protect Defendants' statements because they were made "with actual knowledge" that they were false or misleading. 15 U.S.C. §78u-5(c)(1)(B)(ii)(II). In this context, actual knowledge does not require knowledge that a projection is impossible to meet. Rather, a forward-looking statement is made with actual knowledge if "the speaker is aware of undisclosed facts tending seriously to

---

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS SAC
Master File No. 4:22-cv-02672-JST                                                23

undermine the statement's accuracy." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010); *see BioMarin*, 2022 WL 164299, at *8 (safe harbor did not protect statements where defendants had actual knowledge of facts that "cut directly against" the statements); *Splunk*, 592 F. Supp. 3d at 944. As detailed *infra*, the Complaint pleads a strong inference that Defendants had actual knowledge of the omitted data.

## V.    THE COMPLAINT ALLEGES SCIENTER

### A.    The SAC Details Defendants' Knowledge Of The Level Of Account Sharing And Its Impact As A Material Headwind Throughout The Class Period

The Court held that the FAC did not "establish at what level Netflix monitored account sharing during the Class Period, or that Defendants were aware of the extent of the account sharing problem, *i.e.*, that Defendants were aware that account sharing was 'creating revenue growth headwinds' throughout the Class Period." Order 16. The SAC pleads substantial new facts showing Defendants' knowledge of both the ***degree*** of account sharing and its ***impact*** as a headwind throughout the Class Period. As the Class Period proceeded, the adverse facts compounded, and Defendants' scienter grew. As detailed below, the facts pled in the SAC support a strong inference of scienter at the beginning of the Class Period, but by the later portions of the Class Period, the inference of scienter is not just strong, but ***overwhelming***.

**Knowledge of level and impact of account sharing before the Class Period.** In January 2019, Cybersecurity Insiders reported that Netflix began to use Synamedia's sophisticated Credential Sharing Insight software to track account sharing. ¶¶65-66. According to the report, this product was understood to have the ability to differentiate between password sharing and things like a subscriber's use of his password at a different address while on vacation. ¶66. Several months later, following a loss of U.S. subscribers in Q2'19, Netflix's top executives ordered a team of researchers to investigate the causes for the slowing growth, and those researchers "identified password sharing *a major problem eating into subscriptions*." ¶68. That researchers were able to reach this determination, combined with the report on the Synamedia software, supports a strong inference that Defendants had a sufficient data and monitoring capability to reasonably quantify the level of account sharing by the end of 2019.

This conclusion is bolstered by the account of FE2, who learned in approximately spring 2020 that the Company had initiated a multi-team strike effort to curb account sharing. ¶¶205-11. FE2 said the team was working on the rollout and messaging of the Company's efforts to decrease password sharing without being

1   obtrusive. ¶¶207, 211. Shortly after the initial Design Team meeting when FE2 learned about the strike effort,

2   data concerning the level of account sharing was frequently presented at Design Team meetings and quarterly

3   business meetings hosted by Hastings, indicating that Netflix had millions of shared accounts. ¶¶205-08, 211.

4   At these meetings, password sharing was characterized as "lost revenue" and "theft" and was seen as limiting

5   the Company's ability to acquire new subscribers and meet subscriber goals. ¶209. FE2 said these discussions

6   made clear that Netflix had significant data about account sharing and was analyzing and quantifying the scope

7   of the problem. *Id*. FE2 said the size of the problem was noted in order to justify embarking on efforts to

8   "crack down" on account sharing, and the issue was presented as more serious over time. ¶¶209, 211.

9          In its Order, the Court criticized the FAC's allegations about FE2 as lacking specificity as to dates.

10  Order 15. The SAC's allegations, however, now make clear that the events described by FE2 took place

11  between spring 2020, when FE2 became aware of the effort, and March 2021, when the new messaging

12  prepared by the strike team was tested. ¶¶205-11. In other words, the events described by FE2 occurred largely

13  before the Class Period. That Defendants had initiated a multi-team strike effort to address account sharing in

14  2020 shows that they were well aware that account sharing was a material headwind, notwithstanding the

15  temporary boost from the pull-forward. *See Azar v. Yelp, Inc.*, 2018 WL 6182756, at *17 (N.D. Cal. Nov. 27,

16  2018) (Yelp's formation of "recovery team" to confront decline in advertiser retention and acknowledgment

17  that the company "addressed this ... problem in January and February" meant "Defendants were already aware

18  of the problem and working to remedy it by January").

19         Defendants attempt to rebut the inferences arising from the SAC's new allegations about the events

20  prior to the Class Period, but their arguments are inconsistent with the facts. First, Defendants argue that that

21  they believed the Q2'19 loss in subscribers was a "blip" and they did not adopt the researchers' conclusion

22  that account sharing was a material inhibitor to subscriber growth. MTD 10, 24. As discussed above, however,

23  the WSJ article does not support this narrative. The article reported that Netflix's top executives initially

24  believed the Q2'19 loss was a "blip" but then asked researchers to investigate why growth was slowing. ¶68.

25  The researchers determined that account sharing was a "major problem eating into subscriptions" and

26  "***Hastings was eager to restrict the practice***, but it quickly became clear that doing so would be difficult." *Id*.

27  Nothing in the article suggests that Defendants continued to believe that the account sharing problem was a

28  blip after receiving the researchers' conclusions or that Defendants disagreed with those conclusions. Second,

1    Defendants argue that the COVID pull-forward "dispelled" the belief that account sharing was creating a

2    ceiling on growth. MTD 10. However, Defendants cannot credibly argue that they thought that COVID was a

3    long-term solution to the problem. Indeed, even as the COVID pull-forward brought in new subscribers, it

4    also accelerated the absorption of the remaining portion of the TAM and heightened the level of market

5    saturation. Until and unless Netflix started to seriously crack down on account sharing, account sharing would

6    necessarily remain a long-term, structural drag on growth—and Defendants knew it.

7           Taken together, the foregoing facts are more than sufficient to support a strong inference that

8    Defendants knew the level of account sharing and that account sharing *still* constituted a material headwind

9    by the beginning of the Class Period. By that time, the UCAN market had close to 25 million account sharing

10   households, with an effective market penetration of roughly 79%. ¶258. That was roughly the same level of

11   effective penetration that Netflix had as of the end of Q3'21, as reflected in the December 2021 Board

12   materials, and it was the same ~20 point gap between reported and effective market penetration that led

13   Defendants to conclude that the former "[l]ikely understated" the latter. ¶121.

14           **Additional facts known prior to announcement of Q1'21 results on April 20, 2021.** In March 2021,

15   news outlets reported that Netflix appeared to be testing methods to limit account sharing. ¶90. Users faced a

16   pop-up message stating, "If you don't live with the owner of this account, you need your own account to keep

17   watching." *Id.* These messages were the culmination of months of work by the strike team. ¶¶205-11. Even

18   though these efforts to limit sharing were restrained to avoid churn, they were noticed by the market. During

19   the Q1'21 earnings call on April 20, 2021, an analyst asked "why now is ... the right time to start tightening

20   the screws" on account sharing, to which Defendants responded evasively, insisting that the testing was "not

21   necessarily a new thing" and part of a "flexible approach" to help Netflix improve its service. ¶160.

22           Defendants' failure to acknowledge the huge number of account sharing households or the substantial

23   resources that Netflix had dedicated over the prior months in trying to get their arms around the problem was

24   reflective of their desire to downplay the issue and avoid fulsome disclosure. *See Miss. Pub. Emp. Ret. Sys. v.*

25   *Boston Sci. Corp.*, 523 F.3d 75, 87 (1st Cir. 2008) ("Knowingly omitting material information is probative ...

26   of scienter."); *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 229 (E.D. Pa.

27   2021) ("purposefully evasive" responses to analyst questions supported inference of scienter). This is

28   particularly true in light of the context. Netflix had just missed its guidance for paid net adds in Q1'21 by two

---

1    million subscribers, despite having factored in the COVID pull-forward. ¶94. Defendants' "misleadingly

2    incomplete" responses about the reasons for ratcheting up enforcement are "classic evidence of scienter."

3    *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).

4          <u>**Additional facts known prior to announcement of Q3'21 results on October 19, 2021.**</u> Audit

5    Committee materials for an October 18, 2021 meeting stated that Netflix experienced "***worse than expected***

6    ***churn***" in UCAN in Q3'21, that Netflix had missed its internal projections for paid net adds in that region by

7    63%, and that the drop in net additions was fueled by both "***lower acquisition***" and "***more absolute***

8    ***cancellations coming from the now larger member base***." ¶220. Neumann knew about these adverse

9    undisclosed facts when he told investors about Netflix's supposed "very healthy" retention and "low" churn.

10          While the October 2021 Audit Committee materials did not explicitly mention account sharing, they

11    did tie the issue of churn to the absolute size of the member base and thereby implicated concerns about

12    saturation. The issue of saturation was obviously and inextricably tied to the issue of account sharing. In

13    addition, the account sharing and market penetration data that was later presented to the Board on December

14    1, 2021 reflected the account sharing levels as of the end of Q3'21 (¶¶227-28), which was more than two

15    weeks prior to the October 19 earnings call. Thus, Defendants clearly had available to them the data showing

16    25 million account sharing households in the UCAN market and an effective market penetration rate of 80%.

17          <u>**Additional facts known prior to announcement of Q4 and FY'21 results on January 20, 2022.**</u>

18    Presentation materials for Netflix's December 1, 2021 Board meeting admitted, among other things, that

19    Netflix's reported penetration levels for UCAN were "***[l]ikely understated***," with effective penetration

20    including account sharers "***close to 80%***." ¶227. The materials acknowledged that account sharing was a

21    "***bigger issue***" posing a material threat to the Company's growth prospects, but that attempting to crack down

22    on account sharing could "alienate" Netflix's members due to Netflix's "historical tolerance" of the practice.

23    ¶¶227-29. Defendants knew all of this, but mentioned none of it, when they spoke to the market about Netflix's

24    growth rates and "structural" issues during the January 20, 2022 call.

25          Defendants try to muddy the waters, noting that the Board materials identified account sharing as one

26    of "[m]any threats to big growth" and claiming that they had only concluded that account sharing "***may limit***

27    our continued growth." MTD 11. These attempts to evade the obvious import of their admissions fail. First,

28    even if account sharing was only one of many material factors adversely affecting Netflix's growth,

Defendants were still required to disclose it, particularly in response to questions that directly asked about market saturation. *E.g.*, ¶180. Defendants' answers clearly omitted relevant and material information from the Board materials that was directly responsive to the question about saturation.

Second, the impact of account sharing on market penetration was clearly preeminent among the other proffered explanations for Netflix's slowing subscriber growth. Indeed, when Defendants finally disclosed the account sharing data at the end of the Class Period, they once again offered a multivariate explanation, blaming the slowdown on factors like "the uptake of connected TVs," "data costs," "competition," and "macro factors, including sluggish economic growth, increasing inflation, geopolitical events such as Russia's invasion of Ukraine, and some continued disruption from COVID." ¶132. But analysts quickly honed in on account sharing and the related level of market saturation as the principal issue. ¶140. The reason is obvious: the market already knew the relevant facts about COVID, competition, and the macro-economic factors cited by Defendants. What the market did not know was that Netflix had more than 100 million account sharing households globally and more than 30 million account sharing households in the UCAN market and that the UCAN market therefore had a greater than 80% market penetration. These hard facts were what mattered to investors, not Defendants' purported "conclusions."

Defendants' apparent position is that unless they reached "***firm conclusions*** about the impacts of account sharing" (MTD 24) and, apparently, ***admitted*** those conclusions in Board documents, they were free to withhold the account sharing data, no matter how relevant it was to Defendants' statements about headroom and growth. This turns the law on its head. Rule 10b-5(b) requires Defendants to disclose ***any*** material facts—not just "firm conclusions"—that are necessary to make statements, in the light of the circumstances in which they were made, not misleading. 17 C.F.R. §240.10b-5(b).

One additional event is highly probative of Defendants' scienter during this time period. According to the WSJ article, "[a]t a company gathering outside Los Angeles ***early this year*** [2022], Co-Chief Executive Reed Hastings told senior executives that the pandemic boom had masked the extent of the password-sharing issue, and that ***they had waited too long to deal with it***, according to people who were at the meeting." ECF No. 83-1 at 2; *see* ¶¶21, 241. Admittedly, the WSJ article does not identify the date of this meeting with precision. Based on the description, however, it is likely that this meeting occurred prior to January 20 and, almost certainly, prior to March 8. But even if the meeting occurred after January 20, the materials from the

1  December 1, 2021 Board meeting support a strong inference that Hastings and the other Defendants knew by

2  that date that they had waited too long to deal with account sharing, and, even more importantly, that they had

3  waited too long to disclose the relevant facts to investors.

4        __Additional facts known prior to March 8, 2022.__ Materials for Netflix's March 8, 2022 Board

5  meeting admitted that (1) Q1'22 was off to a "very weak start" and Netflix now expected to miss its guidance

6  for paid net adds for two quarters in a row; (2) "high levels of account sharing" were part of a range of factors

7  "potential[ly] contributing" to Netflix's slowing growth; and (3) Netflix management had developed a plan to

8  partly address account sharing by attempting to monetize it in four test markets starting on March 16. ¶¶234-

9  36. These facts, combined with those learned earlier, support a strong inference of scienter with respect to

10  Neumann's statements at the March 8, 2022 Morgan Stanley conference.

11        **B.**     **Viewed Holistically, The SAC's Facts Support A Strong Inference Of Scienter**

12        The above-recounted facts show a strong inference that Defendants—when speaking to investors about

13  Netflix's market penetration, headroom, and the various reasons for the extended growth slow-down

14  experienced post-COVID—knew, or were extremely reckless in not knowing, that their omission of known

15  adverse facts about account sharing and its impacts risked materially misleading investors.

16        Defendants argue that the absence of a financial motive undermines the SAC's pleading of fraud. MTD

17  24-25. But the law is well-settled that the absence of insider trading or other concrete financial motives does

18  not undermine an otherwise strong inference of scienter. FAC Opp. 23-24. Executives may have other

19  motivations, including a desire to delay the disclosure of bad news for as long as possible. *See Makor Issues*

20  *& Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("The fact that a gamble—concealing bad

21  news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a

22  considered, though because of the risk a reckless, gamble."); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115,

23  1149 (N.D. Cal. 2017) (sustaining complaint where plaintiff did not allege improper financial motive but that

24  "Defendants were motivated by an attempt to live up to the overly optimistic promises made at Analyst Day").

25        Here, Plaintiff has offered three plausible motivations for Defendants' conduct: (1) that they were

26  worried about consumer backlash and churn resulting from a crackdown and thus wanted wait for as long as

27  possible before addressing the problem; (2) that they wanted to delay disclosure of the size of the problem

28  until they had a plan in place for a solution that they could explain to investors; and (3) that they hoped global

growth would accelerate sufficiently such that the extreme saturation conditions in UCAN would be less relevant. *See* ¶¶128-29, 220, 243-49; FAC Opp. 24; *Lewis v. Straka*, 535 F. Supp. 2d 926, 931 (E.D. Wis. 2008) (finding strong inference that defendant was aware of financial problems "but, in order to buy time to fix the problem, [he] opted not to initially disclose the truth"); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *13 n.12 (N.D. Cal. Nov. 4, 2020) ("defendants here may have hoped that the situation in China would improve, a hope that does not justify misleading investors").

Defendants' alternate explanation—that their understanding of the impact of account sharing was "obscured by [Netflix's] COVID growth" (¶132)—does not withstand scrutiny. The benefits of the COVID pull-forward lasted for two quarters (Q1'20 and Q2'20) and were finished more than six months before the Class Period began. Defendants correctly diagnosed the pull-forward by April 2020 and initiated a strike effort to address account sharing at roughly the same time. Logically, there would be no reason for COVID to present a long-term solution to the structural problem of account sharing, which created extreme saturation conditions. And Defendants' statements throughout the Class Period reflected a consistent pattern of evasion and deflection when addressing the topics of account sharing and saturation.

Ultimately, this case is not about Defendants "com[ing] to ground on whether account sharing would severely hinder UCAN growth." MTD 3. Defendants knew that account sharing was a severe problem, but they did not want to face the music. So they hesitated until things blew up in their face, all the while concealing the mounting risks. Investors lost billions as a result.

## VI.   CONCLUSION

Defendants' motion should be denied. If the Court grants any portion of the motion, Plaintiff requests leave to amend. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).[9]

Dated: May 31, 2024

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Jason L. Krajcer*
Robert V. Prongay
Jason L. Krajcer
Christopher R. Fallon
Pavithra Rajesh
1925 Century Park East, Suite 2100

---

[9] Plaintiff has adequately alleged primary violations under § 10(b). Plaintiff has thus rebutted Defendants' only challenge to control person liability under § 20(a). Control person liability is alleged.

1        Los Angeles, California 90067
Telephone: (310) 201-9150
2        Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
3        Email: jkrajcer@glancylaw.com
Email: cfallon@glancylaw.com
4        Email: prajesh@glancylaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel*

1

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

2

I, the undersigned say:

3

I am not a party to the above case, and am over eighteen years old.  On May 31, 2024, I served

4

true and correct copies of the foregoing document, by posting the document electronically to the ECF

5

website of the United States District Court for the Northern District of California, for receipt

6

electronically by the parties listed on the Court's Service List.

7

I affirm under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on May 31, 2024.

9

10

*s/ Jason L. Krajcer*
Jason L. Krajcer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28