1  CAZ HASHEMI, State Bar No. 210239
   Email: chashemi@wsgr.com
2  KEITH E. EGGLETON, State Bar No. 159842
   Email: keggleton@wsgr.com
3  DIANE M. WALTERS, State Bar No. 148136
   Email: dwalters@wsgr.com
4  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
5  650 Page Mill Road
   Palo Alto, CA 94304-1050
6  Telephone: (650) 493-9300

7  FRED A. ROWLEY, JR., State Bar No. 192298
   Email: fred.rowley@wsgr.com
8  MATTHEW K. DONOHUE, State Bar No. 302144
   Email: mdonohue@wsgr.com
9  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
10 953 E. Third Street, Suite 100
   Los Angeles, CA 90013
11 Telephone: (323) 210-2900

12 *Attorneys for Defendants*
   *Netflix, Inc.*; *Reed Hastings*;
13 *Ted Sarandos*; *Spencer Neumann*;
   *and Gregory Peters*

14

15              **UNITED STATES DISTRICT COURT**

16            **NORTHERN DISTRICT OF CALIFORNIA**

17

18 *In re Netflix, Inc. Securities Litigation*    )    Master File No.: 4:22-cv-02672-JST
                                                 )
19                                               )    CLASS ACTION
                                                 )
20                                               )    **DEFENDANTS' REPLY**
                                                 )    **MEMORANDUM IN SUPPORT OF**
21                                               )    **MOTION TO DISMISS SECOND**
                                                 )    **AMENDED CLASS ACTION**
22                                               )    **COMPLAINT**
                                                 )
23                                               )    Date:      August 1, 2024
                                                 )    Time:      2:00 p.m.
24                                               )    Courtroom: 6
                                                 )    Before:    Hon. Jon S. Tigar
25                                               )
                                                 )
26 _____)

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 3

I.    PLAINTIFF FAILS TO PLEAD FALSITY ........................................................ 3

    A.    Plaintiff's Core Omission Theory of Falsity Still Fails ............................ 3

    B.    Plaintiff Fails to Allege Falsity as to the Challenged Statements ............ 5

        1.    Market Penetration Statements .................................................... 5

        2.    Statements About "Growth Metrics" ........................................... 8

        3.    Statements About COVID ........................................................... 11

        4.    Netflix's Risk Disclosures .......................................................... 12

        5.    Responses to Investor Questions ................................................. 12

II.   PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ............... 13

    A.    Plaintiff Fails to Plead Any Direct Evidence of Scienter ....................... 13

    B.    Plaintiff Fails to Establish a Strong and Cogent Inference of Scienter ............... 18

CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ................................................................................. 16

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
    532 F. Supp. 3d 189 (E.D. Pa. 2021) ................................................................. 16

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021)................................................................................. 12

*In re Am. Apparel, Inc. S'holder Litig.*,
    2013 WL 174119 (C.D. Cal. Jan. 16, 2013)................................................. 16, 19

*In re Apple Comput. Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989).............................................................................. 5

*Aramic LLC v. Revance Therapeutics, Inc.*,
    2024 WL 1354503 (N.D. Cal. Apr. 2, 2024) ................................................ 17, 18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................... 5

*Azar v. Yelp, Inc.*,
    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ................................................... 17

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ......................................................................................... 13

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ............................................................... 12

*Bodri v. GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017) ............................................................ 5, 9

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002)....................................................................... 7, 8, 11

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017)................................................................................ 3

*Colyer v. Acelrx Pharms., Inc.*,
    2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) ................................................... 13

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005)............................................................................. 8

*DSAM Glob. Value Fund v. Altris Software, Inc.*,
    288 F.3d 385 (9th Cir. 2002)............................................................................. 13

*In re Fastly, Inc. Sec. Litig.*,
    2021 WL 5494249 (N.D. Cal. Nov. 23, 2021)................................................. 4, 14, 17, 19

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023)................................................................................9

*Kaplan v. Charlier*,
    426 F. App'x 547 (9th Cir. 2011)........................................................................16

*Kong v. Fluidigm Corp.*,
    2023 WL 2134394 (9th Cir. Feb. 21, 2023)........................................................11

*Lewis v. Straka*,
    535 F. Supp. 2d 926 (E.D. Wis. 2008)................................................................18

*Lipton v. PathoGenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002)..............................................................................16

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
    39 F.4th 1092 (9th Cir. 2022)..........................................................................8, 11

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
    601 U.S. 257 (2024) ............................................................................................13

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008)................................................................................18

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ..............................................................................................13

*McGovney v. Aerohive Networks, Inc.*,
    2019 WL 8137143 (N.D. Cal. Aug. 7, 2019)......................................................17

*Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008)..................................................................................16

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020)................................................................................18

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014)..............................................................................15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ........................................................................................3, 11

*Plevy v. Haggerty*,
    38 F. Supp. 2d 816 (C.D. Cal. 1998)....................................................................3

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)........................................................................7, 8, 9

*In re Read-Rite Corp.*,
    335 F.3d 843 (9th Cir. 2003)..........................................................................10, 20

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012)................................................................................13

*Scandlon v. Blue Coat Sys., Inc.*,
    2013 WL 308879 (N.D. Cal. Jan. 25, 2013) ......................................................20

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ................................................................. 7, 8

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..................................................... 14, 18

*Tricontinental Indus. Ltd. v. Anixter*,
    215 F. Supp. 2d 942 (N.D. Ill. 2002) ............................................................ 8

*In re VeriFone Sec. Litig.*,
    11 F.3d 865 (9th Cir. 1993) ....................................................................... 3

*Waterford Twp. Police v. Mattel, Inc.*,
    321 F. Supp. 3d 1133 (C.D. Cal. 2018) ......................................................... 15

*Weston Family P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ...................................................................... 6

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .................................................................. 3, 4

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ......................................................... 15

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ......................................................... 14, 15, 16, 18

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(B) .......................................................................... 4

**INTRODUCTION**

In dismissing Plaintiff's prior complaint, this Court concluded that Plaintiff failed to allege facts supporting the "foundational premise of [his] claim" (Order 13): "that Defendants were aware that account sharing was 'creating revenue growth headwinds' throughout the Class Period." (Order 16.) Plaintiff confirms in his Opposition that this central theory remains both unchanged and unsupported by particularized allegations in his Second Amended Complaint ("SAC").

Plaintiff's theory of falsity requires a logical leap, which Plaintiff consistently tries to obscure: that Netflix had determined, during the class period, that "account sharing was a material headwind" that was already "severely hinder[ing]," or about to severely hinder, subscriber growth. (Opp. 1, 9.) Neither the statements Plaintiff claims are false, nor the material he relies on to allege falsity, actually supports this theory. On the one hand, Plaintiff points to generically positive statements about Netflix's trajectory or accurate business metrics and claims they are misleading. On the other, he points to internal statements indicating Netflix knew account sharing was ongoing, and that Netflix was exploring ways to convert account sharers to paying customers. Yet, Plaintiff has failed, again, to adequately plead the one fact necessary to show a direct conflict between what Netflix *said* and what it *knew* about account sharing's impact–*viz.*, he still alleges no particularized facts establishing that Netflix *actually concluded*, during the class period, that account sharing was a "severe" growth hindrance (¶153(e)). Plaintiff's assumption that Netflix had drawn these conclusions is particularly speculative because the impacts of account sharing and other factors were "obscured by [Netflix's] COVID growth" (Order 16 (quoting FAC ¶117)), which reshaped Netflix's growth trajectory in addition to upending the global economy.

The disconnect between Plaintiff's theory of falsity and his factual allegations is hardly surprising. As Defendants have explained (Mot. 1-2), Plaintiff's theory posits singular foresight on the part of Netflix executives in the midst of a still-raging pandemic. Plaintiff's inability to support that extraordinary claim is illustrated by the very statement he touts as the "core" of his case: that Netflix was "roughly 60% penetrated" in the UCAN market during the class period. (Opp. 10; *see id.* 1, 9.) Plaintiff agrees that this statement is truthful "without counting account sharers" as the equivalent of paying customers, but insists Netflix *should have* considered account sharers as being

outside Netflix's reach as part of the potential market.  (Opp. 10-11.)  But that theory rests on the assumption that Netflix believed it would not be able to persuade sharers to purchase their own accounts.  Plaintiff neither acknowledges this load-bearing assumption nor pleads particularized facts showing that Netflix had such a dire view of account sharing.  To the contrary, much of the material Plaintiff cites shows that Netflix was continually looking for better ways to encourage account sharers to become paying customers, belying any suggestion that Netflix did not believe account sharers remained part of the potentially addressable market.

Apart from this penetration figure, Plaintiff devotes scant space to analyzing the actual statements Plaintiff claims are false.  Time and again, Plaintiff points to Netflix's efforts to investigate account sharing (*e.g.*, ¶¶148(a), 175(a), 185(a)) and explore ways to convert sharers to customers (*e.g.*, ¶¶68, 243-247) as though these facts somehow contradict Netflix's public statements.  Years before the class period, however, Netflix identified converting sharers as a goal (*e.g.*, ¶60), while recognizing sharing could potentially become a "material inhibitor to growth" in the future (¶4).  Netflix continued to note throughout the class period that account sharing was ongoing and that the company was making "efforts to restrict multi-household usage." (¶151.)  That is why Mr. Hastings could note account sharing was "not a new thing" (¶133) when Netflix acknowledged in April 2022 that it was now contributing, along with other factors, to "revenue growth headwinds" (¶130).

Even beyond the SAC's unsupported "foundational premise" (Order 13), fundamental defects remain.  Many of the challenged statements about growth constitute inactionable statements of opinion or protected forward-looking statements.  Other statements—like "we think we've got a lot of headroom in all these markets" (¶147)—have nothing to do with account sharing beyond the fact that sharing was one of many factors relevant to Netflix's growth.  And Plaintiff's allegations are still wholly insufficient to give rise to a strong inference that the Individual Defendants made any of the challenged statements with the intent to deceive.  Plaintiff's factual allegations suggest, at most, that account sharing remained a topic of internal discussion at Netflix during the class period, not that Netflix or any Individual Defendant had reached a firm conclusion about its effects.

Because Plaintiff has failed to remedy the deficiencies that scuppered his prior complaint,

1  this Court should dismiss the SAC with prejudice.

2  **ARGUMENT**

3  **I.    PLAINTIFF FAILS TO PLEAD FALSITY**

4  **A.    Plaintiff's Core Omission Theory of Falsity Still Fails**

5    As the Opposition makes clear, Plaintiff proceeds primarily on an omission theory.  While
6  the SAC contains pages of statements that Plaintiff claims to challenge as false or misleading,
7  Plaintiff's arguments boil down to a single theory:  Defendants *failed to disclose* the impact of
8  account sharing in projecting the Company's growth during the class period.  (Opp. 5-7.)

9    For this to be an actionable omission, Plaintiff must allege that Defendants had "come to
10  ground" on account sharing's impact on growth during the class period.  (Opp. 9.)  Defendants
11  cannot be liable for failing to disclose something that they *did not know for a fact* when making the
12  challenged statements.  After all, Rule 10b-5 only proscribes the deliberate "failure to include a
13  material *fact* [that] render[s] a published statement misleading."  *Omnicare, Inc. v. Laborers Dist.*
14  *Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015) (emphasis added); *City of Dearborn*
15  *Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 610 (9th Cir. 2017)
16  (adopting *Omnicare* standard for 10b-5 claims).  And the Supreme Court has defined "fact" as "[a]n
17  *actual* happening" and a "statement of fact" to "express[] *certainty* about a thing."  *Omnicare*, 575
18  U.S. at 183 (emphasis added).  Here, "the alleged omissions are not of material, *actual* facts."  *Plevy*
19  *v. Haggerty*, 38 F. Supp. 2d 816, 828 (C.D. Cal. 1998) (quoting *In re VeriFone Sec. Litig.*, 11 F.3d
20  865, 869 (9th Cir. 1993)) (emphasis added); *id.* (no liability for "failures to make a forecast of future
21  events").  Rather, the alleged omission—how account sharing *would* impact growth—is a subjective
22  guess about future events.  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188-89 (9th Cir. 2021).

23    Plaintiff's allegations do not establish that Netflix had determined that account sharing was
24  "severely hinder[ing]" growth (¶152(e)) or that account sharers could not contribute to future growth
25  by becoming paying subscribers (Mot. 8-12).  In fact, Plaintiff recognizes in the SAC that Netflix
26  faced unprecedented uncertainty during the Class Period due to the COVID pull-forward, even as it

27

28

pursued "investigational exploration" of ways to monetize account sharing.[1]  Both these factors were disclosed to investors (Ex. 6 at 13), as was the growing competition among streaming services (Ex. 15 at 4-5).  Defendants cannot be liable for failing to disclose account sharing's supposed impact on growth during this tumultuous period, when the Company itself had not yet figured out its impact relative to other factors.  The SAC thus fails to correct the core defect identified by the Court—the lack of particularized allegations establishing that "Defendants were aware that account sharing was 'creating revenue growth headwinds' throughout the Class Period."  (Order 16.)

Plaintiff's mantra is to quote his conclusory allegation, borrowed from the *WSJ* article, that because certain researchers "identified password sharing as a major problem eating into subscriptions in 2019," Netflix's management must have arrived at the same conclusion.  (¶68; *see* Opp. 2-5, 10, 15, 18-20, 24-25.)  Of course, copying a conclusion from a news article is not a shortcut to pleading fraud with particularity, especially where, as here, the article lacks the kinds of details that would be necessary to state a claim, such as details about the researchers and their conclusions.  *See In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *12 (N.D. Cal. Nov. 23, 2021) ("The media plaintiff cites … are thin on specifics and provide no information regarding a specific reduction[.]").  And, of course, whatever assessment was made by the unidentified "researchers" was shortly, and dramatically, nullified by the COVID pandemic.  But the most glaring deficiency with Plaintiff's *WSJ* refrain is that the article offers no basis to suggest Defendants agreed with the "researchers" who purportedly "identified" account sharing as a "major problem."  (Mot. 24); *see Wochos,* 985 F.3d at 1194 (affirming dismissal where, among other things, "Plaintiffs failed to plead any facts showing that [the defendant executive] ever accepted … employees' views that the goal was impossible").  Plaintiff insists that Netflix must prove a negative, arguing that there is "no indication" in the article "that Defendants *disagreed* with the researchers' conclusions."  (Opp. 15.)  It is *Plaintiff's* burden, however, to plead particularized facts establishing falsity, 15 U.S.C. § 78u-

---

[1] *See, e.g.*, SAC Ex. A at 3 ("Some product executives warned against making the service too complex and not consumer friendly"); *id.* at 4 ("Netflix considered allowing users to rent pay-per-view content through their subscriptions"); *id.* at 5 (Netflix "has been running tests in Latin American countries … let[ting] subscribers pay to share accounts with up to two people outside of their homes" and was "weighing similar plans for the U.S."); *id.* at 6 ("Netflix also debated how to address families in which children split time between two parents' homes").

4(b)(1)(B), and that showing requires more than "facts that are 'merely consistent with'" liability, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

### B.    Plaintiff Fails to Allege Falsity as to the Challenged Statements

The failure of Plaintiff's falsity theory becomes more glaring in the context of the specific statements Plaintiff challenges.  While the Court organized Plaintiff's challenged statements into four categories (Order 13; *see* Mot. 12-17), Plaintiff tacks on a fifth: (1) statements about market penetration (Opp. 10-12), (2) growth metrics (Opp. 13-15), (3) statements about COVID (Opp. 17-18), (4) risk disclosures (Opp. 18-19) and (5) allegedly "evasive responses to questions" from investors (Opp. 19-20).  Plaintiff offers argument on only a small number of statements, in each case distorting the statement into a claim Netflix did not make.

### 1.    Market Penetration Statements

Despite characterizing Netflix's statements about market penetration as the "core" of his case (Opp. 10), Plaintiff fails to engage with their substance.  Plaintiff discusses only two statements about market penetration:  Mr. Neumann's statements in January 2021 and March 2022 that Netflix was "roughly 60% penetrated" in UCAN.  (*Id.*)  As Netflix has explained, those statements were true:  Mr. Neumann's comments plainly, and only, referred to *paid* subscribers.  (Mot. 13.)  This is clear from the comments' specific context—discussions about paid subscriptions—and underscored by their general context:  during the class period, Netflix's "public guidance on *paid* net adds" "capture[d] the number of new, *paid* subscribers in a given reporting period less any lost due to cancellations" (SAC Ex. C ¶37 (emphasis added)) and Netflix "did not publicly disclose the extent of account sharing" (¶70).[2]

Nor did the challenged statements "misleadingly impl[y] that the remaining 40% of the TAM was readily available for capture," as Plaintiff suggests.  (Opp. 10.)  No reasonable investor could

---

[2] Plaintiff's characterization of Defendants' reference to the context of Mr. Neumann's statements as a "truth on the market" defense (Opp. 11 n.4), baselessly seeks to invert Plaintiff's burden to plead falsity.  The issue is not that the market knew information that Mr. Neumann misrepresented or withheld.  *Cf. In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1114-16 (9th Cir. 1989).  Rather, it is that "a reasonable investor, reading the statement[s] fairly and in context" would not understand Mr. Neumann's reference to 60% market penetration to be quantifying Netflix account sharing.  *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017).

believe that the entire remaining addressable market was "readily" available for capture. Far from making that suggestion, Mr. Neumann told investors that while he expected Netflix could continue to add users in more "mature" or "penetrated" markets, he also expected it would be "harder to work for" that growth. (¶107.) More broadly, Plaintiff's use of the word "readily" belies the basic flaw in his theory of falsity, which turns not on supposed misrepresentations about the existence or amount of account sharing, but on Defendants' *conclusions* about account sharing's impact on future growth, Netflix's prospects for addressing or monetizing sharing, and the timing of any negative effects. Plaintiff does not adequately allege Netflix actually drew any of these conclusions. (*See* Mot. 8-12; *infra* 13-20; *see also* Order 16.) Account sharers were certainly "available for capture" (Opp. 10), and the questions were whether Netflix could capture them and how difficult it would be. Plaintiff offers no particularized allegations showing that, during the class period, Netflix came to firm answers to those questions, much less that it had isolated account sharing's effects.

Plaintiff insists that Defendants somehow "admitted" (Opp. 11) that the 60% penetration figure was false by noting in the December 2021 board materials that "*[i]f* we consider these borrower households *in addition to our paid members*, BBHH [broadband household] penetration in [UCAN] is close to 80%" (¶121 (emphasis added)). That hypothetical calculation was based on the number of account-sharing households in UCAN at an unspecified time in 2021. (¶227.) From these figures, Plaintiff seeks to retroactively impute knowledge to Defendants, throughout the class period, of the impact that the number of account sharers might have on market penetration in UCAN. (¶¶148(c)-(d), 150(c)-(d), 152(c)-(d), 154(c)-(d), 156(c)-(d), 159(c)-(d), 161(c)-(d), 163(c)-(d), 165(c)-(d), 167(c)-(d), 169(c)-(d), 171(c)-(d), 173(c)-(d), 175(c)-(d), 177(c)-(d), 255-260 (explaining Plaintiff's hypothetical calculations).) Plaintiff has failed, however, to plead any particularized facts showing that Defendants actually came to the conclusion, based on these purported numbers, that account sharing had developed into a severe, and not just potential, drag on growth. *See Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 622 (9th Cir. 2022) (no falsity where "[p]laintiffs ha[d] not adequately alleged that [defendants] even knew about these [adverse facts] when" they made the challenged statements).

The take-away concern expressed in the board materials quoted by Plaintiff was that

"account sharing *may* limit continued growth" in "highly penetrated markets like [UCAN]" (¶121 (emphasis added)), not that it necessarily *would*. This tracks Netflix's contemporaneous, and prior, acknowledgment that its "ability to add new members *may* be hindered" if "multi-household usage is abused." (Ex. 15 at 4-5; Ex. 4 at 4-5.) Nor is there anything revelatory about the fact that a standard measure of penetration based on paid subscribers would "understate" penetration compared to one that considers "borrower households" equivalent to paid subscribers. (Opp. 11.) Netflix and the public both openly acknowledged that account sharing was occurring and was not included in paid subscriber penetration figures (Mot. 12-13; *e.g.*, ¶¶51-53, 61-64; SAC Ex. C ¶¶37, 70), and the board materials do not suggest that Netflix believed 80% was somehow the *true* measure of penetration. Consistent with Mr. Neumann's estimate of "approximately 60%" paid penetration, the board materials begin by discussing the basic "59% BBHH penetration" metric for UCAN, reflecting that Netflix internally considered the 60% penetration figure to be meaningful and accurate (¶226), even if Netflix was also separately interested in quantifying sharing. While Plaintiff may wish Netflix had disclosed information about account sharers *in addition*, that does not make statements about paid subscriptions false. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (rejecting claim that optimistic statements about growth were misleading because they did not disclose "market saturation" and other negative trends and finding that merely "not providing a more fulsome report" was not demanded by "[t]he securities laws").

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002), and *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698 (9th Cir. 2016), confirm not that Plaintiff's allegations are sufficient (*see* Opp. 11), but that they come up short. The *Brody* plaintiffs claimed that statements about a stock repurchase program and expressions of interest by others in acquiring the defendant company were made misleading by the failure to disclose that potential acquirers had made actual offers for the company. 280 F.3d at 1006-07. In rejecting this theory, the Ninth Circuit noted that a merely "incomplete" statement will not give rise to liability; because the statements did not "affirmatively intimate[] that no merger was imminent," they were not false. *Id.* Here, similarly, Netflix's statements about paying subscribers "neither stated nor implied anything regarding" the number of non-paying account sharers nor their impact on growth. *Id.* at 1006.

By contrast, in *Schueneman*, the defendants were seeking FDA approval for a drug and falsely claimed "that animal studies supported [the drug's] safety," while failing to disclose a final rat study report confirming carcinogenicity. 840 F.3d at 707. The Ninth Circuit held that the defendant company "did more than just express its confidence in [the drug's] future"; it "affirmatively represented" that all animal studies had been favorable for approval. *Id.* at 708. In other words, the defendants' statement "affirmatively intimated" the absence of a fact they knew to be true: there was an unfavorable study. Because none of Netflix's statements similarly suggested the *absence* of account sharing, or that account sharing would *not* impact growth, Plaintiff's claim here is far more like *Brody* than *Schueneman*.[3]

While Plaintiff tries to recast other statements as addressing market penetration (Opp. 10), those fair no better. Most are statements about Netflix having "a lot of headroom" or "a lot of runway for growth." (*Id.*) These generic expressions of optimism, which are not "objectively verifiable," are textbook puffery. *See Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022). *Even if* only 20% of the market were still available for capture, that would not make statements about a "big long runway of growth" (¶158) *objectively* false, *see Macomb*, 39 F.4th at 1099 (statements that "China is a great growth market for us" constituted puffery); *Intuitive Surgical*, 759 F.3d at 1060 (statement that sales opportunity "is still very, very large" constituted puffery). Plaintiff's theory that these statements are "anchored in" representations about market penetration (Opp. 16) presupposes that Netflix believed account sharers would never become paying customers, thus categorically depriving Netflix of headroom for growth. That premise, again, remains unsupported in the SAC.

## 2. Statements About "Growth Metrics"

In discussing what Plaintiff characterizes as statements about growth metrics, the Opposition strays even further from the alleged misstatements, citing a string of allegations at the beginning of

---

[3] Plaintiff's reliance on *In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) and *Tricontinental Indus. Ltd. v. Anixter*, 215 F. Supp. 2d 942 (N.D. Ill. 2002), is even more misplaced. The portions of those cases relied upon concern the level of specificity with which a plaintiff must allege overstatement of corporate revenues, an issue irrelevant to this case where Plaintiff does not dispute that the 60% penetration statement was factually true as to paying subscribers. (*See* Opp. 11.)

the section and then saying almost nothing about them in the pages that follow. (Opp. 13-15.) Broadly, though, Plaintiff advances two separate theories:

*First*, Plaintiff suggests that essentially *any* positive statement about growth was misleading because Defendants did not also disclose metrics about account sharing. (Opp. 14-15.) This merely rehashes his core omissions theory, which, as discussed, is baseless. (*Supra* 3-5; Mot. 8-16.) These statements also consist generally of non-actionable puffery and forward-looking statements about growth that fall within the PSLRA's safe harbor. (Mot. 17-20.) Statements predicting, for example, that "we're still growing" and "got a lot of headroom in all these markets" (¶147) are both vague expressions of "corporate optimism," *Bodri*, 252 F. Supp. 3d at 924, and "forward-looking on their face," *Intuitive Surgical*, 759 F.3d at 1058.

Plaintiff's insistence that none of these statements could constitute puffery because they were "grounded in and built upon Defendants' misleading statements about the room Netflix had left to grow" is unsupported by any reasoned discussion of that purported "ground[ing]." (Opp. 16.) At best, this argument restates Plaintiff's market penetration theory (*supra* 5-8) by claiming that references to "headroom" and similar expressions of optimism necessarily invoke Defendants' statements about market penetration, which, as noted, are not themselves false or misleading.

Nor can Plaintiff remove these statements from the safe harbor merely by claiming that they concern "historical fact." (Opp. 21.) While the 60% market penetration figure was a (truthful) statement of fact, "growth and revenue projections … are forward-looking on their face." *Intuitive Surgical*, 759 F.3d at 1058. Notably, Plaintiff's objection to these growth statements rests not on supposedly misrepresented objective facts about current numbers of subscribers and non-subscribers, but on embedded conclusions as to how "readily" "the remaining 40% of the TAM" could become paying subscribers in the years to come. (Opp. 10.) That is necessarily a forward-looking analysis. Plaintiff's reliance on *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, is therefore misplaced, because the statements there allegedly were about the then-current state of the company's sales pipeline, not projections about how one factor would impact sales in future years. 63 F.4th 747, 774 (9th Cir. 2023).

*Second*, Plaintiff presents a series of contradictory and unsupported theories that Netflix

somehow misrepresented the amount or effect of user "churn" that Netflix experienced.  (Opp. 13-14.)  Plaintiff appears to argue that, before October 2021, Netflix's growth metrics misled investors by acknowledging the platform's low churn rates because account sharing supposedly "suppressed churn."  (Opp. 14.)  Yet he simultaneously claims that, after October 2021, Netflix failed to disclose that account sharing was somehow *increasing* its "inherent level of churn."  (*Id.*)  Plaintiff fails to identify any factual support for his claim that account sharing was actually having, or that Netflix believed it had, these effects on churn.

With nothing but speculation supporting the link between churn and sharing, Plaintiff suggests, in passing, that he has alleged a *separate* fraud claim based on statements about churn.  (Opp. 14.)  This stand-alone theory is equally meritless.  Plaintiff relies entirely on an artificial dichotomy between Mr. Neumann's reference in October 2021 to "churn at low levels" for Netflix's business *globally* and a statement in the October 2021 audit committee materials that *UCAN* experienced "worse than expected churn" in Q3'21.  (Opp. 13; ¶¶13, 110.)  When read in context, there was nothing inaccurate or misleading about Mr. Neumann's statement, which was in response to an analyst's request that he "dissect the outperformance" for subscriptions overall, which "came in better than expected."  (Ex. 12 at 5.)  It is clear the analyst was asking about subscriptions globally, and not UCAN specifically, because Netflix only projected net adds globally (Ex. 11 at 2), and the analyst shortly thereafter asked about a specific market, LatAm (Ex. 12 at 5).  Mr. Neumann accurately responded that the business in general "remained healthy as it had been throughout the year with churn at low levels, *down prior to the comparable periods*, both in 2020 and … 2019.  So retention was very healthy."  (*Id.* (emphasis added).)  And when asked about the specific "weakness" in LatAm on the same earnings call, Mr. Neumann noted that LatAm and UCAN were "a bit more mature, more tenured, more penetrated than some of our other markets.  So we would expect growth to be just a little bit harder to work for, but still a lot of runway for growth in both those regions."  (Ex. 12 at 5.)

Nothing in Mr. Neumann's statement that "churn" was, in general, "low" compared to 2020 and 2019 levels "directly contradicts" the committee materials' finding that churn *in UCAN* was "worse than expected" internally.  *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003).  Mr.

Neumann's characterization of UCAN performance said nothing about churn and is entirely consistent with the information in the audit committee materials. Although the audit committee materials allegedly showed Netflix missed its internal projections for net adds *in UCAN* (¶110), its net adds for Q'3 21 *globally* came in above external expectations (Ex. 11 at 2), and Plaintiff does not allege what information was provided in the audit committee materials about global-wide churn. Even apart from these falsity deficiencies, "churn at low levels" and "retention was very healthy" (¶176) are precisely the kind of "generalized, optimistic remark[]" that courts routinely characterize as puffery, *Kong v. Fluidigm Corp.*, 2023 WL 2134394, at *2 (9th Cir. Feb. 21, 2023) (statements that the company had a "very deep" product funnel were puffery); *see also Macomb*, 39 F.4th 1099 (that statements were not "objectively verifiable" supports puffery determination).

Finally, Plaintiff claims, in passing, that Netflix somehow artificially "inflated [its] viewing metric[s]." (Opp. 14.) This separate theory is entirely unalleged: Plaintiff fails to identify any statements by Defendants *about viewership* that he claims are false,[4] allege with particularity *why* they are false, or satisfy the remaining elements for a securities fraud claim.

### 3.    Statements About COVID

Plaintiff acknowledges that the COVID pull-forward materially affected Netflix's growth, and does not dispute that the challenged statements about COVID constitute statements of opinion. (Opp. 17-18.) Plaintiff nonetheless argues that statements regarding COVID were misleading because Netflix did not *also* "acknowledge[e] the impact of account sharing and market saturation." (Opp. 17.) Once again, this argument illustrates the fundamental problem with Plaintiff's falsity theory: it depends on conclusions about the relative "*impact* of account sharing" (*id.* (emphasis added)) that Plaintiff does not and cannot show Netflix actually drew (*supra* 3-5; Mot. 8-12). Because Plaintiff offers nothing to support the baseless assertion that Netflix did not actually believe the statements of opinion at issue, his arguments still fail. *See Omnicare*, 575 U.S. at 194 (pleading falsity of opinion "is no small task"); (*see also* Order 16).

---

[4] To the extent that Plaintiff challenges general statements about health, growth or engagement (¶¶95, 108), those statements are not misleading because they do not "affirmatively intimate[]" the absence of password sharers using an account to view content. *Brody*, 280 F.3d at 1006.

1              **4.    Netflix's Risk Disclosures**

2        Plaintiff attempts to recast Netflix's disclosures about the risks of "multi-household usage"

3   (¶151) and similar warnings as misstatements by claiming they failed to disclose that the risks had

4   "ripened into actual harm."  (Opp. 19 (quoting *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th

5   Cir. 2021)).)  But unlike the warnings at issue in *Alphabet*, Netflix did not discuss account sharing

6   as merely something "that 'could' or 'may' occur."  1 F.4th at 704.  Netflix was clear that account

7   sharing was ongoing, and that it was pursuing "efforts to restrict multi-household usage," but that

8   the effects of account sharing and efficacy of Netflix's efforts remained uncertain.  (¶151; *see also*

9   ¶¶11, 55, 69, 90, 97; Mot. 2.)  Plaintiff again blurs the line between account sharing and its impacts,

10  claiming that Netflix should have disclosed that a "massive level of account sharing … was clearly

11  hindering Netflix's ability to add new members."  (Opp. 19.)  This restates Plaintiff's faulty core

12  theory, which does not grow stronger with repetition.  (*See* Mot. 8-12.)

13       To the extent Plaintiff suggests that risk disclosures create an additional obligation to

14  disclose facts weighing on "the magnitude of the risk described," that is not the law.  (Opp. 19.)

15  Plaintiff's reliance on *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp.

16  2d 423 (S.D.N.Y. 2011) is misplaced, for that case addressed only whether certain cautionary

17  statements were sufficient to entitle the defendant to safe-harbor protection for *other* statements

18  alleged to be misleading.  *Id.* at 492-95.  As *Alphabet* instructs, where the warning itself is

19  challenged, the question is the same as with any other alleged misrepresentation: whether it "is

20  misleading to a reasonable investor."  1 F.4th at 704.  Netflix's risk disclosures were not.

21              **5.    Responses to Investor Questions**

22       Plaintiff's final set of supposed misstatements largely duplicates what comes before.  In a

23  section of the Opposition citing no legal authority whatsoever, Plaintiff argues that Defendants

24  committed fraud either by "(1) addressing account sharing in a misleading fashion," or "(2) avoiding

25  discussion of account sharing."  (Opp. 19.)

26       As to the first category, Plaintiff simply repeats his arguments that statements about COVID

27  or Netflix's "runway for growth" were misleading because Defendants did not also discuss account

28  sharing.  (Opp. 20-21.)  Plaintiff fails to allege falsity as to these statements in this context for the

1  same reasons discussed under Plaintiff's other headings.  (*Supra* 5-11.)

2         As to the second category, there is nothing fraudulent about merely "avoiding discussion of"

3  a topic.  (Opp. 19.)  A securities fraud claim may not be predicated upon "[s]ilence, absent a duty

4  to disclose."  *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 265 (2024)

5  (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).  Disclosure is not required merely

6  because "investors would consider the omitted information significant."  *Colyer v. Acelrx Pharms.,*

7  *Inc.*, 2015 WL 7566809, at *8 (N.D. Cal. Nov. 25, 2015) (quoting *In re Rigel Pharms., Inc. Sec.*

8  *Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012)); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563

9  U.S. 27, 45 (2011) ("Even with respect to information that a reasonable investor might consider

10 material, companies can control what they have to disclose under these provisions by controlling

11 what they say to the market.").  Tellingly, Plaintiff offers no support for his theory that statements

12 that do *not* in any way address account sharing could be false or misleading simply because investors

13 would have wanted Netflix to speak about that topic.

14 **II.    PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER**

15        Despite being given the chance to amend, Plaintiff has still failed to allege facts sufficient to

16 support a strong inference that "Defendants were aware of the extent of the account sharing

17 problem" (Order 16)—*i.e.*, that it was now "severely hinder[ing]" growth (¶152(e))—and either

18 intentionally hid it or acted with "deliberate recklessness," *DSAM Glob. Value Fund v. Altris*

19 *Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002) (citation omitted).

20        **A.     Plaintiff Fails to Plead Any Direct Evidence of Scienter**

21        Plaintiff attempts to fill the scienter gaps Defendants identified by pointing to his contentions

22 about the October 2021 Audit Committee and December 2021 Board meetings.  But whether

23 considered in isolation or together with Plaintiff's other allegations, these contentions fail to

24 establish a reasonable, much less *strong*, inference that Defendants acted with scienter.

25        ***October 2021 Audit Committee Meeting***:  Plaintiff has failed to plead facts showing that

26 Mr. Neumann's statements about "churn" on the October 2021 earnings call were false, much less

27 intentionally or recklessly so.  (Opp. 27.)  As noted, there is no inconsistency between Mr.

28 Neumann's statements, which addressed churn on a *global* basis relative to prior years, and the

October 2021 audit committee materials, which allegedly addressed churn in the *UCAN region* relative to internal expectations. In any case, the audit committee materials are a red herring because the statements about churn did not discuss account sharing at all. Plaintiff does not allege, beyond conclusory assumptions (¶¶175(e), 177(e)), that the audit materials contained any data on whether or how account sharing was driving the alleged churn in UCAN.

*December 2021 Board Meeting*: The December 2021 materials are inadequate to show that "Defendants were aware that account sharing *was 'creating revenue growth headwinds'* throughout the Class Period." (Order 16 (emphasis added).) Although the materials stated that "account sharing *may* limit … continued growth" in "highly penetrated markets like the US and CA," they do not purport to quantify the potential impact of account sharing on revenue growth (¶227 (emphasis added)). That account sharing *may* affect revenue growth was a risk that Netflix regularly disclosed to investors (*e.g.*, ¶151), negating any inference of scienter.

Plaintiff again emphasizes the theoretical calculation that *if* "borrower households" were added to "*paid* members," that would raise UCAN penetration from the existing 60% to "close to 80%." (Mot. 13; ¶227.) As noted, there no indication that this assessment meant Defendants thought account sharers were beyond reach. (*See supra* 5-8.) In fact, the materials discussed potential ways to tackle account sharing and accompanying risks, suggesting Netflix was still figuring out how to—but "genuinely believed" it could—convert sharers into paying customers. (¶229); *see Fastly*, 2021 WL 5494249, at *12. This is consistent with the company's repeated and open recognition of account sharing's risks and opportunities. (¶¶151, 160, 182.)

*Former Employee Statements*: Once the SAC's new contentions are placed in their proper, and deficient, light, it is clear that Plaintiff has still failed to establish scienter. Plaintiff continues to rely heavily on the FE statements but fails to remedy the problems identified by the Court. (Order 15.) *First*, the FEs are not "described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Although the SAC describes the FEs' roles (¶¶35-38), neither FE is alleged to have "communicat[ed] directly" with any Individual Defendant. *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017). Nor did the FEs work on account sharing or high-level company

strategy so as to be "in a position to be personally knowledgeable of the information alleged." *Zucco*, 552 F.3d at 996; *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1061 (9th Cir. 2014) (discounting witness who "worked in an area unrelated to" the product failures at issue). Indeed, FE1's statements should be disregarded entirely: FE1 left Netflix in March 2021 (¶35), at the very beginning of the class period, *see Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1154 (C.D. Cal. 2018) (disregarding statements of witness who left before the class period), and FE1's knowledge is primarily derived from a hearsay internal memo in Q2'20 (¶¶72-73, 201).

    *Second*, none of the FE statements are "indicative of scienter." *Zucco*, 552 F.3d at 995.  The memo referenced by FE1 establishes, at most, that Netflix paused efforts to crack down on account sharing at the beginning of the COVID pandemic, a fact the Company never disclaimed.  And FE1's statement that "password sharing was often discussed during FE1's tenure at Netflix" (¶72) is too vague to shed light on the Individual Defendants' states of mind.

    Although FE2 allegedly attended "company-wide quarterly business review meetings" that Mr. Hastings hosted where "presentations about password sharing were shown" (¶205), FE2 fails to "recount[] the particulars" of those presentations.  *Zucco*, 552 F.3d at 998; *accord Wozniak v. Align Tech.*, *Inc.*, 850 F. Supp. 2d 1029, 1043 (N.D. Cal. 2012) (discounting allegations about a presentation that provided "no detail as to the content of those slides, let alone data sufficient to contradict [Defendants'] statements").  The remaining meetings were Design Team meetings that no Individual Defendant allegedly attended (¶¶206-211), and for which FE2 fails to identify any speakers.  *See Zucco*, 552 F.3d at 998 (no "reliable personal knowledge of the defendants' mental state").  Nor do the FE statements contain specific facts contradicting any challenged statement by Defendants.  FE2 reports that "in these meetings password sharing was characterized as 'lost revenue' and 'theft' and was seen as limiting the Company's ability to acquire new subscribers and meet its subscriber goals" (¶209).  But because FE2 does not identify who offered or heard this characterization, it is a "conclusory assertion[] of scienter" that must be disregarded.  *Zucco*, 552 F.3d at 996.

    The FE statements demonstrate—at most—"only that there was some disagreement within the corporation over" how to address account sharing, not that "management was deliberately

reckless" or intentionally fraudulent. *Id*. at 998. That Netflix personnel discussed account sharing and ways to address it does not imply, much less strongly imply, that Defendants had actually determined account sharing to be the severe hinderance to growth that Plaintiff posits.

***"Monitoring" of Account Sharing***: The SAC remains devoid of any "specific information showing that [company] data informed defendants" concerning the *impact* of account sharing. *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002). "While the complaint makes … general allegation[s] that [the Company's] management knew about" the impact of account sharing on the company's ability to acquire new members (*e.g.*, ¶¶150(f), 152(a), 154(e), 156(g)), "it does not plead any facts to back up th[ese] conclusory statement[s]," *Kaplan v. Charlier*, 426 F. App'x 547, 549 (9th Cir. 2011); *Zucco*, 552 F.3d at 996 (disregarding "conclusory assertions of scienter"). Plaintiff does not allege, for example, that Defendants had specific data on the *impact* of account sharing on membership or revenue growth, let alone that Defendants had determined it to be an "unsolvable" problem or one more dire than rising competition or other potential factors. Consistent with this uncertainty, when making projections (¶¶151, 186), Defendants "framed their optimistic statements as predictions about the future, while acknowledging that the ultimate effect of [account sharing] had yet to be felt," *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 174119, at *29 (C.D. Cal. Jan. 16, 2013).[5]

***Efforts to Convert Account Sharers to Customers***: The Court previously found Plaintiff's allegations concerning the Company's "steps to restrict account sharing" insufficient to establish Defendants' awareness of "the extent of the account sharing problem" and its impact on "revenue growth headwinds." (Order 16.) Plaintiff adds nothing to fill this void. If anything, Netflix's continued interest in finding "consumer-friendly ways to push on the edges of" account sharing

---

[5] The out-of-circuit cases Plaintiff cites (Opp. 26-27) are inapposite because they involved operational problems on which the defendants had already come to ground. *See Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 87 (1st Cir. 2008) (defendants knew but failed to disclose "manufacturing defect, and [that] the company had *already determined how to fix that defect*" (emphasis added)); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002) (defendants knew but failed to disclose that "price protection or take back guarantees were in place" the prior year); *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 229 (E.D. Pa. 2021) (finding that defendant was "purposefully evasive" in answering direct question about the capacity of an interim pipeline where the limits were disclosed the very next day).

(¶69) indicated it did *not* see sharing as the insoluble problem Plaintiff paints it to be.

Although Netflix allegedly initiated a "strike effort" on password sharing in Spring 2020, Plaintiff does not address whether any Individual Defendants were involved or what account sharing impact data, if any, prompted that effort.  (¶207.)  Netflix allegedly paused the "strike effort" with the onset of COVID and began testing potential solutions in test markets in 2021.  (¶72; SAC Ex. A at 1.)  These experimental efforts are equally, if not more, consistent with the inference that Defendants *genuinely believed* Netflix could convert sharers to subscribers without curtailing revenue and were evaluating how best to do so.  *See Fastly*, 2021 WL 5494249, at *12 (deeming scienter allegations insufficient where "plaintiff fail[ed] to offer any particular fact to support that defendants did not genuinely believe they could make up the lost business").  That Defendants disclosed Netflix's "investigational exploration" of methods to curb account sharing[6] and cautioned that membership growth might be hindered if "efforts to restrict multi-household usage are ineffective" (¶88) "undermines an inference of a deliberate omission," *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *23 (N.D. Cal. Aug. 7, 2019).

*Azar v. Yelp, Inc.*, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018), is inapposite.  (Opp. 25.)  Although *Azar* acknowledged that the creation of a "recovery team" to address advertiser retention problems could show the defendants' awareness of said problems, *Azar* held that the defendants' statements concerning future operations and revenue were not actionable where they had no "actual knowledge … that the remedial actions taken … (*e.g.* the recovery team) could not be effective long-term."  2018 WL 6182756, at *8, *17.  As in *Azar*, even if Defendants "kn[ew] that a problem exist[ed]" with account sharing, Defendants are not liable "*if [they] could still have believed that the problem was surmountable*."  *Id.* at *8 (emphasis added).  Because Plaintiff fails to allege that Defendants *knew* any "crackdown" on account sharers would ineffective, there is no reasonable—and certainly no strong—inference of scienter.  *See also Aramic LLC v. Revance Therapeutics, Inc.*, 2024 WL 1354503, at *14 (N.D. Cal. Apr. 2, 2024) ("[E]ven if a company knows that a problem exists, it could still honestly and in good faith report that the company will continue to perform as

---

[6] *See, e.g.*, Ex. 6 at 13 ("we don't really know is most … often the case when we're sort of going down a path of innovation"); ¶160 ("this sort of line of testing" on "limiting account sharing" is "not necessarily a new thing"); ¶202 (noting "a lot of great research on … variants").

1  expected.  Management simply may have been confident that they could overcome the problems or

2  merely underestimated the severity of such problems." (citations omitted)).   To the contrary,

3  Defendants' alleged statements show that Defendants genuinely believed that account sharers could

4  be converted to paying customers.[7]

5     **B.**  **Plaintiff Fails to Establish a Strong and Cogent Inference of Scienter**

6    Even under a "holistic review," Plaintiff's allegations do not support an inference of

7  "scienter … as cogent or as compelling as an opposing innocent inference." *Zucco*, 552 F.3d at 991-

8  92.  Notably, Plaintiff still fails to identify any plausible motive for the alleged fraud beyond three

9  theories that all amount to "buying time."  (Opp. 29-30.)  As explained (Mot. 25), "the supposition

10  that defendants would rather keep the stock price high for a time and then face the inevitable fallout"

11  "does not make a whole lot of sense." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020)

12  (noting the lack of allegations that "defendants had sought to profit from this scheme in the interim,

13  such as by selling off their stock or selling the company at a premium").   Rather than address

14  *Nguyen*, Plaintiff cites inapposite cases (Opp. 29-30) finding scienter based on allegations of

15  intentional fraudulent conduct akin to "embezzling in the hope that winning at the track will enable

16  the embezzled funds to be replaced before they are discovered to be missing." *Makor Issues & Rts.,*

17  *Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).[8]  Plaintiff's allegations do not come close to

18  establishing such blatant misconduct.

19    The only cogent explanation is that during the class period, Defendants genuinely believed

20  that account sharing was not unsolvable and Netflix *could* persuade sharers to become subscribers,

21  with the measures Netflix was then investigating.  *See Aramic*, 2024 WL 1354503, at *14.

22    [7] *See, e.g.*, ¶133 ("[W]e're working on how to monetize sharing.  We've been thinking about

23  that for a couple of years. … "[R]emember, there are over 100 million households that are already choosing to view Netflix.  They love the service.  We just got to get paid at some degree for them.");

24  ¶134 (account sharers are "a tremendous opportunity because they're clearly well qualified" and "the principal way we've got of going after that is asking our members to pay a bit more to share

25  the service with folks outside the[ir] home").

26    [8] *See id.* at 706 (company had "flood[ed] its customers with tens of millions of dollars worth of [a product] that the customers had not requested, in order to create an illusion of demand" while

27  simultaneously touting the strength of that product's sales); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1130 (N.D. Cal. 2017) ("strategies to inflate" the company's metrics, including "fake

28  accounts"); *Lewis v. Straka*, 535 F. Supp. 2d 926, 930 (E.D. Wis 2008) (defendant "engaged in self-dealing, obtaining loans for himself and his family at favorable rates").

Plaintiff's allegations thus establish that "the company was still absorbing and evaluating the full effect of [account sharing] during this period, and that complete information about how severe its effects would be had not yet emerged," which is insufficient to show intentional conduct or deliberate recklessness. *Am. Apparel*, 2013 WL 174119, at *29.

This explanation is particularly reasonable, if not more plausible, given COVID's unprecedented effects on Netflix's business. (*Cf.* Order 16.) Although Plaintiff insists that "[t]he benefits of the COVID pull-forward lasted for two quarters (Q'1 20 and Q'2 20) and were finished more than six months before the Class Period began," he offers no factual basis to support that view, let alone that Defendants *shared it*. (Opp. 30.) More important, the duration and *benefits* of the COVID pull-forward were not the issue, but their after-effects: The meaning of the "pull-forward" was that growth that otherwise would have occurred in late 2020 or 2021 instead accelerated in early 2020, leading to lower growth in later periods. (*See* ¶76.) When Netflix saw subscriber growth fall, it could not disaggregate how much of the decline was due to the after-effects of the pull-forward. Defendants thus cautioned throughout the Class Period that the COVID pull-forward created "noise" and "bumpiness" that made it difficult to isolate the effect of other factors, including account sharing (*e.g.*, ¶¶149 (Jan. 2021); ¶¶153, 155, 157, 162 (Apr. 2021); ¶¶164, 166, 168, 170 (July 2021); Ex. 11 at 5 (Oct. 2021); ¶¶178, 180 (Jan. 2022); Ex. 20 at 5 (Mar. 2022)). *See Fastly*, 2021 WL 5494249, at *12 (no inference of scienter where the defendants "emphasized the unpredictable nature of revenues" and "the unpredictable Internet traffic patterns created by the Covid-19 pandemic").

Plaintiff alleges no facts from which to infer that Defendants were able to disaggregate the impact of account sharing from COVID and secretly hid this information from investors, and his conclusory allegations otherwise should be disregarded. (¶¶163(f), 165(g), 167(f), 171(f), 187, 253.) In speculating otherwise, Plaintiff relies on an alleged statement by Mr. Hastings to unspecified executives in "early" 2022[9] that "the pandemic boom had masked the extent of the password-sharing issue." (SAC Ex. A at 1.) But far from establishing the clairvoyance Plaintiff

---

[9] Contrary to Plaintiff's speculation (Opp. 28-29), it is unclear from the WSJ article, which says only that the meeting occurred "early" that year (SAC Ex. A at 1), whether the statement was made during the class period.

posits, this statement tends to confirm that COVID conditions left Defendants genuinely uncertain about the full extent of account sharing's impact on membership growth during the class period.  In any case, "[i]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood."  *Read-Rite*, 335 F.3d at 846 (citation omitted).  Nothing about Mr. Hastings's statement in early 2022 "directly contradicts" the earlier statements challenged by Plaintiff.  *Id.*

Mr. Hastings's statement that the Company "had waited too long to deal with" account sharing (¶21) is no more helpful to Plaintiff's case.  That the Company temporarily paused efforts to crack down on account sharing when the COVID pandemic struck is not indicative of scienter. (¶72; SAC Ex. A at 1 ("the effort to scrutinize sharing petered out" when COVID hit).)  In characterizing the COVID-induced pause on cracking down as a "*deliberate* delay in enforcement" (¶152(b) (emphasis added)), Plaintiff seems to imply that Defendants had an ulterior motive. Plaintiff's allegations, however, reveal a far blander explanation:  Defendants did not want to alienate customers during an unprecedented global pandemic by "taking something away" from them (¶72), and it was perfectly within the realm of Defendants' reasoned business judgment to make that trade-off, notwithstanding that account sharing was then a potential problem that might need to be addressed down the road.  To the extent Plaintiff challenges what he deems to be Defendants' "failure to analyze business conditions correctly," that is not a basis for securities fraud. *Scandlon v. Blue Coat Sys., Inc.*, 2013 WL 308879, at *4 (N.D. Cal. Jan. 25, 2013).[10]

## CONCLUSION

For the foregoing reasons, the Court should dismiss the SAC with prejudice.

Dated:  July 1, 2024

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:   */s/ Keith E. Eggleton*
      Keith E. Eggleton
      Email: keggleton@wsgr.com

*Attorneys for Defendants*

---

[10] Because the Section 10(b) claim fails, the Section 20(a) claim also fails.  (Mot. 25.)