UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIYYAZ PIRANI,<br><br>        Plaintiff,<br><br>    v.<br><br>NETFLIX, INC., et al.,<br><br>        Defendants. | Case No. 22-cv-02672-JST<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: ECF No. 51 |

Before the Court is Defendants Netflix, Inc., Reed Hastings, Ted Sarandos, Spencer Neumann, and Gregory Peters's motion to dismiss the second amended class action complaint ("SAC"). ECF No. 51. The Court will grant the motion.

I. **BACKGROUND**[1]

Lead Plaintiff Fiyyaz Pirani, as a trustee of Imperium Irrevocable Trust, brings this action individually and on behalf of all other persons and entities that purchased or otherwise acquired Netflix common stock between January 19, 2021 and April 19, 2022, inclusive ("Class Period"). ECF No. 48 ¶¶ 1, 261. Plaintiff alleges that Netflix and certain of its officers—Hastings (co-founder and co-Chief Executive Officer), Sarandos (co-Chief Executive Officer), Neumann (Chief Financial Officer), and Peters (Chief Operating Officer) (collectively "Individual Defendants")—violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and United States Securities and Exchange Commission ("SEC") Rule 10b-5 by making false and misleading statements and omissions about Netflix's business, operations, and prospects that artificially inflated the price of Netflix stock during the Class Period. *Id.* ¶¶ 29–34, 276–290.

---

[1] For purposes of resolving the present motion, the Court accepts as true the factual allegations in the SAC.

Netflix is an entertainment company that primarily operates a subscription-based streaming service offering a wide array of television, film, and mobile game content in over 190 countries. *Id.* ¶ 2. Netflix derives its revenue principally from its streaming service's monthly membership fees. *Id*. ¶¶ 2, 41. Unlike some of its competitors, Netflix does not derive its subscription-based streaming service's revenue from advertisers. *Id.* ¶ 2. Thus, its revenue depends on its ability to acquire and retain subscribers. *Id.*

Plaintiff's allegations center around account sharing, which occurs when a paying Netflix member shares their Netflix username and password with a non-paying user who does not reside in the subscriber's household so that the non-paying user can access and use Netflix's platform. *Id.* ¶ 51.

### A.     Pre-Class Period Events

Plaintiff alleges that for years preceding the Class period, Netflix maintained a lax posture toward account sharing, insisting it was not a problem. *Id.* ¶¶ 57–64.

According to a 2022 Wall Street Journal article titled "The End of Netflix Password Sharing is Nigh", in 2019 Netflix senior executives assigned a team of researchers inside Netflix to "investigate why growth was slowing" and those researchers "identified password sharing as a major problem eating into subscriptions." *Id.* ¶ 68. The article notes that by the end of 2019, Netflix was closely monitoring account sharing and maintained robust data and analytical capabilities to quantify its extent. *Id.*

Beginning in 2020, the COVID-19 pandemic generated a wave of new Netflix subscribers, a phenomenon that Defendants called the COVID "pull-forward." *Id.* ¶¶ 75–77. The effort to reduce account sharing "waned" as the pandemic "supercharged" Netflix's growth during the first half of 2020. *Id.* ¶ 74. Likewise, an internal Netflix memo issued in approximately Q2'20 indicated that Netflix would not attempt to limit account sharing at the time because it could be seen as exploiting the pandemic. *Id.* ¶¶ 72–73.

Plaintiff alleges that Defendants understood that the COVID subscriber spike was temporary. Behind the scenes, around spring 2020 certain members of the Design team joined a multi-team "strike effort" with members of the Accounts team and Data Insights team and began

2

to present information concerning account sharing to the broader Design team. *Id.* ¶¶ 206–07.

### B. Class Period Events

The Class Period starts on January 19, 2021, when Netflix announced its results for Q4'20 and FY'20. During the earnings call that day, an analyst inquired about market saturation in the UCAN region, which encompasses the markets for the United States and Canada. *Id.* ¶ 85. Defendant Neumann responded that Netflix was "roughly 60% penetrated" and "still growing" in the UCAN market and that it still had "a lot of headroom" to grow in all of its markets. *Id.* Plaintiff contends that if account sharing was included in this metric, the effective rate of market penetration was therefore about 79%, and the "headroom" that Netflix had to grow was more limited than investors were led to believe. *Id.*

In March 2021, media reports indicated that Netflix appeared to be testing methods to limit account sharing. *Id.* ¶ 90. During Netflix's Q1'21 earnings call, Defendant Peters stated that the testing was "not necessarily a new thing" and was part of a "flexible approach" to improve Netflix's service. *Id.* ¶ 97. Defendant Hastings said Netflix "would never roll something out that feels like turning the screws." *Id.* During the same call, Defendants pinned the guidance miss for Q1'21 on the effects of the COVID pull-forward. *Id.* ¶ 95. Defendants assured investors that despite the miss, "the business remain[ed] healthy" and was "still growing." *Id.* Defendant Neumann claimed that Netflix had a "big long runway of growth" in front of it, "even in our biggest markets." *Id.* ¶ 158. Plaintiff alleges that these representations omitted the material fact that account sharing presented a constraint to growth independent of the COVID pull-forward and that the "long runway" was much shorter than Defendants suggested, especially in the UCAN market. *Id.* ¶ 159.

On July 21, 2021, Netflix announced results for Q2'21, which fell far below consensus estimates. *Id.* ¶ 100. Netflix also announced that the UCAN market lost subscribers, and the guidance that Netflix offered for Q3'21 was seen as "significantly weaker than expected." *Id.* ¶¶ 100, 103. Defendants attributed the weak results to "unusual choppiness" due to COVID, but claimed that "retention continues to be strong" and that "the underlying business metrics are really healthy." *Id.* ¶¶ 101–02.

3

On October 19, 2021, Netflix announced its results for Q3'21. Defendant Neumann stated that Netflix appeared to be "at the tail end of the COVID choppiness." *Id.* ¶¶ 104–05. He further stated that "retention was very healthy," that churn was at "low levels," and that both the UCAN and LATAM markets had "a lot of runway for growth," even though they were "more penetrated" than other regions. *Id.* ¶¶ 106–07. Plaintiff alleges that one day before this announcement, Defendants Neumann and Sarandos attended an Audit Committee meeting where the presentation materials stated that Netflix had experienced "worse than expected churn" in UCAN in Q3'21, causing Netflix to miss its internal projections for paid net adds in the region by 63%. *Id.* ¶ 110. The materials stated that this drop was "fueled by lower acquisition . . . and more absolute cancellations coming from the now larger member base." *Id.*

Plaintiff alleges that materials for the December 1, 2021 Board meeting identified account sharing as one of "[m]any threats to big growth." *Id.* ¶ 227. The materials also warned that a crackdown on account sharing could "alienate" Netflix's members and upset the "pre-existing expectations" of costumers based on Netflix's "historical tolerance" on sharing. *Id.* ¶ 229.

After market close on January 20, 2022, Netflix announced its results for Q4'21 and FY'21, revealing it missed guidance for Q4'21. *Id.* ¶ 112. Netflix also issued guidance for Q1'22 below market expectations. *Id.* ¶ 113. Netflix's stock price fell $110.75 per share (21.7%), closing at $397.50 per share on January 21, 2022. *Id.* ¶ 192.

Defendants attributed the disappointing news to "the ongoing Covid overhang and macro-economic hardship in several parts of the world like LATAM." *Id.* ¶ 113. In response to a question on why guidance was so low and whether management had concerns "about anything structural, whether it's competition or saturation," Defendant Neumann responded that there was "[n]o structural change" and Defendant Hastings stated there was no "qualitative change" to competition. *Id.* ¶ 116. Both Neumann and Hastings offered a range of possible explanations, including COVID and "some impact from competition," but neither revealed information concerning account sharing and market saturation that they allegedly knew from the December Board meeting. *Id.* Defendants assured investors that "we're optimistic about our long-term growth prospects" and that "all the fundamentals of the business are pretty solid." *Id.* ¶¶ 178, 182.

4

1  On March 2, 2022, Netflix's Board held a meeting, which all Individual Defendants attended. Materials prepared for the meeting indicated that Q1'22 was off to a "very weak start" and that Netflix expected to miss its guidance for paid net adds. *Id.* ¶¶ 234, 236. The materials stated that "high levels of account sharing" were part of a range of "potential contributing factors" responsible for Netflix's slowing growth. *Id.* ¶ 235. On March 8, 2022, at a Morgan Stanley conference, Defendant Neumann repeated that the UCAN market was "roughly 60% penetrated" and said "we're not done growing in the U.S." *Id.* ¶ 125.

After market close on April 19, 2022, Netflix announced its Q1'22 results, revealing a net loss of 200,000 subscribers. *Id.* ¶ 130. Defendants explained that account sharing had caused Netflix to be highly saturated in its markets, inhibiting subscriber growth. *Id.* ¶¶ 131, 134. Netflix admitted that "our relatively high household penetration – when including the large number of households sharing accounts – combined with competition, is creating revenue growth headwinds." *Id.* ¶ 130. Netflix further stated that the impact of account sharing was "obscured by our COVID growth." *Id.* ¶ 132. Netflix's share price fell $122.42, more than 35%, to close at $226.19 per share on April 20, 2022. *Id.* ¶ 141.

### C. Procedural History

Plaintiff filed this action on May 3, 2022. ECF No. 1. The Court granted Defendants' motion to dismiss the Amended Class Action Complaint on January 5, 2024. ECF No. 45 ("CAC Order"). Plaintiff filed the SAC on February 16, 2024, ECF No. 48, which Defendants moved to dismiss in full on April 16, 2024. ECF No. 51.

## II. JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support

5

a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b). Under this section, the SEC promulgated Rule 10b-5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To prevail on a claim for violations of either Section 10(b) or Rule 10b-5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

At the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b-5 must not only meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Under Rule 9(b), claims alleging fraud are subject to a heightened pleading

1  requirement, which requires that a party "state with particularity the circumstances constituting
2  fraud or mistake." Fed. R. Civ. P. 9(b).  Additionally, all private securities fraud complaints are
3  subject to the "more exacting pleading requirements" of the PSLRA, which require that the
4  complaint plead with particularity both falsity and scienter.  *Zucco Partners, LLC v. Digimarc*
5  *Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009).

6  Under Section 20(a) of the Exchange Act, "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017) (citation omitted). A claim under Section 20(a) fails if the plaintiff does not plead a primary violation of federal securities law.  *See id.*

**IV.   DISCUSSION**

Plaintiff asserts a claim under Section 10(b) and a derivative claim under Section 20(a) premised on allegedly false or misleading statements made in press releases, investor presentations, and earnings calls.  Defendants move to dismiss the Section 10(b) claim, arguing that a number of statements are protected by the PSLRA safe harbor and that Plaintiff has not pleaded facts to support the elements of falsity, scienter, or loss causation.  Defendants move to dismiss the Section 20(a) claim on grounds that Plaintiff fails to plead a viable Section 10(b) claim.

      **A.   PSLRA Safe Harbor**

"The PSLRA exempts from liability any forward-looking statement that is 'identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' or that the plaintiff fails to prove was made 'with actual knowledge . . . that the statement was false or misleading.'" *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) (quoting 15 U.S.C. § 78u-5(c)(1)).  "That is, a defendant will not be liable for a false or misleading statement if it is forward-looking and either is accompanied by cautionary

7

language or is made without actual knowledge that it is false or misleading." *Id.* at 1141 (citing *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010). Where defendants make mixed statements containing non-forward-looking and forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA. *Id.*

### 1.     Forward-Looking Statements

Defendants contend that a number of statements are protected by the PSLRA safe harbor. Defendants first argue that statements concerning Netflix's growth are forward-looking. The Court finds the following statements concerning growth to be forward-looking: SAC ¶ 147 ("we're still growing"); *id.* ¶ 153 ("[w]e continue to anticipate a strong second half …"); *id.* ¶ 178 ("we're optimistic about our long-term growth prospects … . For Q1'22, we forecast paid net adds of 2.5m vs. 4.0m in the year ago quarter."); *id.* ¶ 188 ("we're not done growing in the U.S.").[2]

However, the following statements of fact concerning present or historical metrics or business conditions are not forward looking: *id.* ¶ 166 ("the underlying business metrics are really healthy"); *id.* ¶ 168 ("we remain on that growth trajectory … [w]e'd expect to end the year on a much more normalized growth trajectory"); *id.* ¶ 149 ("very strong underlying growth metrics, and that's what you're seeing in the Q1 guide"); *id.* ¶ 149 ("there's probably still a little bit of that pull-forward dynamic in the early parts of 2021"); *id.* ¶ 157 ("there's this clear catalyst to a reacceleration of growth").

Similarly, the Court interprets statements that Netflix had "a lot of headroom" for growth and that there was an "an ample runway for growth" as representations of the then-room left to grow within the estimated TAM. These statements of current fact are not protected under the safe harbor. *See Quality Sys.*, 865 F. 3d at 1143, 1147 (finding that statements that "more than 75% of

---

[2] Defendants also challenge mixed statements containing both forward-looking elements and separable representations explaining results in prior quarters or why the metrics in those quarters showed Netflix's current financial health. Non-forward-looking portions of such statements "are not protected by the safe harbor." *Quality Sys.*, 865 F.3d at 1142; *see* SAC ¶ 153 ("paid membership growth slowed due to the big Covid-19 pull forward in 2020"); *id.* ¶ 178 (growth had not yet reaccelerated due to "the ongoing Covid overhang and macro-economic hardship in several parts of the world like LATAM").

8

the midsize practice market is still fair game for new system sales" and "greenfield opportunities are plentiful" were not forward-looking). These statements include: SAC ¶ 147 ("we think we've got a lot of headroom in all these markets"); *id.* ¶ 158 ("[s]o there's just this big long runway of growth"); *id.* ¶ 172 ("[t]he UCAN and LATAM regions grew paid memberships more slowly. These regions have higher penetration of broadband homes although we believe we still have ample runway for growth as we continue to improve our service."); *id.* ¶ 174 ("[s]o we would expect growth to be just a little bit harder to work for, but still a lot of runway for growth in both of those regions"); *id.* ¶ 184 ("[a]nd so I think there's a long runway of growth there.").

## 2. Cautionary Language

Cautionary language must be "meaningful" for the safe harbor to apply. 15 U.S.C. §78u-5(c)(1)(A)(i). "Mere boilerplate or generic warnings . . . are insufficient; the cautionary warning ought to be precise and relate directly to the forward-looking statements at issue." *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *13 (N.D. Cal. Aug. 10, 2005). For mixed statements, the caution "must accurately convey appropriate, meaningful information about not only the forward-looking statement but also the non-forward looking statement." *Quality Sys.*, 865 F.3d at 1148. "If the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be sufficiently meaningful to qualify the statement for the safe harbor." *Id.* at 1146–47.

Netflix's SEC Form 10-K filings specifically warn about risks associated with the pandemic, competition, and multi-household usage. ECF No. 51-5 at 4–8; ECF No. 51-16 at 4–8.[3] Netflix's quarterly shareholder letters also incorporated the risk factors in Netflix's SEC Form 10-K filings. Such warnings are sufficient. Accordingly, the Court finds that the following statements are nonactionable under the PSLRA's safe harbor: SAC ¶ 147 ("we're still growing"); *id.* ¶ 153 ([w]e continue to anticipate a strong second half … ."); *id.* ¶ 166 (discussing Q3 guidance); *id.* ¶ 178 ("we're optimistic about our long-term growth prospects … For Q1'22, we

---

[3] The Court took judicial notice of these documents in the CAC Order. *See* CAC Order at 10–12.

9

forecast paid net adds of 2.5m vs. 4.0m in the year ago quarter."); *id.* ¶ 188 ("we're not done growing in the U.S.")).

### B. Falsity

For a statement to be actionable under the PSLRA, it must be both false or misleading and material. "Under Rule 10b-5, . . . a fraudulent omission is a failure to 'state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (quoting 17 C.F.R. § 240.10b-5(b)). A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

An omitted fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "The inquiry into materiality is 'fact-specific.'" *In re Alphabet, Inc. Sec. Litig.*, 1 F. 4th 687, 700 (9th Cir. 2021) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011)). As such, "resolving materiality as a matter of law is generally appropriate 'only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ.'" *Id.* (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)).

#### 1. Statements Directly Relating to Account Sharing

##### a. Defendants' Market Penetration and Headroom Statements

Plaintiff alleges that Defendants' statements that Netflix was "roughly 60% penetrated" in the UCAN market constitute material omissions because the figures understated the effective rate of market penetration based on then-current levels of account sharing. SAC ¶¶ 147, 188. Plaintiff further alleges that statements concerning the company's "headroom" and "runway" for growth were misleading because account sharing was a material headwind that limited growth. *Id.* ¶ 147 (stating that all markets had a "lot of headroom" for growth); *id.* ¶ 158 ("we're still less than 10% TV view share even in our biggest markets. So there's just this *big long runway of growth* if we

10

stay focused and keep getting better"); *id.* ¶ 172 (noting Netflix's "ample runway for growth"); *id.* ¶ 174 (stating that Netflix maintained a "lot of runway for growth"). Plaintiff also alleges that Defendants misled investors during conference calls by addressing account sharing in a misleading fashion and avoiding discussion of account sharing despite being asked questions that called on Defendants to address the issue. *Id.* ¶¶ 160, 180, 184.

The SAC provides new factual allegations in support of this theory of falsity. Plaintiff first points to Former Employee 2's account that the company formed a multi-team "strike effort" in spring 2020 to address account sharing and began to present information concerning account sharing to the company's broader Design team. *Id.* ¶¶ 206–07. Plaintiff next points to the December 2022 Wall Street Journal article, which noted that certain unspecified "researchers" had "identified password sharing as a major problem," that Netflix was working to monitor and possibly reduce account sharing, and that the company delayed a crackdown on account sharing to avoid potentially alienating customers. *Id.* ¶ 68. Plaintiff also cites the December 2021 board meeting materials, which allegedly identified account sharing as one of the "[m]any threats to big growth" and noted that "in highly penetrated markets like the US and CA, account sharing may limit our continued growth." *Id.* ¶ 227. These materials further stated that Netflix's consumer research had "repeatedly found" that members were not aware that they could not share their accounts outside their households and that a crackdown risked alienating subscribers. *Id.* ¶ 248.

The Court does not find the representations about market penetration to be false or misleading because these statements clearly referred to *paid* subscribers. Absent an explanation that Netflix treated account sharers as equivalent to subscribers in calculating such a figure, reasonable investors "reading the statement[s] fairly and in context" would not expect that the "penetrated market" figures would have accounted for anything but paid subscribers. *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017). Indeed, the cited board materials discuss the "59% BBHH [broadband household] penetration" metric for UCAN, suggesting that Netflix considered the 60% penetration figure to represent the relevant saturation measurement. SAC ¶ 226. Defendants' statements about a metric involving paid subscribers were not rendered false or misleading just because they did not also explain facts about account sharing. That is true

11

even if investors might have found information about account sharing material generally. *See Colyer v. Acelrx Pharms., Inc.*, 2015 WL 7566809, at *8 (N.D. Cal. Nov. 25, 2015) (internal citations and quotations omitted) (disclosure is not required merely because "investors would consider the omitted information significant"); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011) ("Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market.").

As for statements relating to Netflix's headroom for growth, the Court does not find that Defendants' statements implied that the remaining portion of the UCAN market was readily available for capture. For example, Defendant Neumann disclosed that although he expected Netflix could continue to add users in more "mature" or "penetrated" markets, he also noted that it would be "harder to work for" that growth. SAC ¶ 107. In light of other disclosures explaining that account sharing may "hinder" growth (SAC ¶¶ 88, 151, 186), it cannot be said that these vague statements "tout[ed] positive information to the market" such that it "[became] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1009; *see also Weston Fam. P'ship*, 29 F.4th at 621 ("Twitter's statements are so imprecise and noncommittal that they are incapable of objective verification"); *In re Cutera Sec. Litig.*, 610 F.3d at 1111 ("[M]ildly optimistic, subjective assessment hardly amounts to a securities violation").

More broadly, Defendants also contend Plaintiff cannot plead that these statements were false or misleading because Plaintiff fails to sufficiently allege that Defendants came to any conclusions regarding the impact of account sharing or determined that their efforts to curb account sharing would fail. Plaintiff responds that such an inquiry into Defendants' mental states should be reserved for the Court's scienter analysis. At issue here is the nature of the allegedly omitted facts relating to account sharing. On one hand, Plaintiff specifically alleges that Defendants failed to disclose concrete facts: the penetration figure including account sharing and the number of account sharers. These facts could plausibly be rendered false or misleading without reference to Defendants' conclusions about account sharing. On the other hand, to

12

plausibly allege falsity as for Defendants' alleged omission of details on efforts to curb account sharing, Plaintiff must allege that these efforts reflected Defendants' conclusions about account sharing's negative impact on growth. *See Khoja*, 899 F.3d at 1008 ("Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time"); *Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 622 (9th Cir. 2022) (no falsity where "[p]laintiffs ha[d] not adequately alleged that [defendants] even knew about these [adverse facts] when" they made the challenged statements.)[4]  On this point, Plaintiff's new allegations in the SAC at most suggest that Netflix took efforts to investigate and quantify account sharing and identified account sharing as one potential threat to growth among many.  But these allegations do not plead with the requisite particularity that Defendants concluded that account sharing would "severely hinder" growth, that account sharing was the "principal reason" for the slowdown in growth, or that Defendants had concluded that efforts to curb account sharing would fail.

### b.  Netflix's Risk Disclosures About Account Sharing

Plaintiff contends that statements in Netflix's risk disclosures were false and misleading because they did not sufficiently disclose the risks of account sharing.  Plaintiff specifically challenges Netflix's statements in its 2020 10-K and 2021 10-K that "if multi-household usage is abused or if our efforts to restrict multi-household usage are ineffective, our ability to add new members may be hindered and our results of operations may be adversely impacted." SAC ¶¶ 151, 186.

To challenge such a risk disclosure, Plaintiff must allege that the risk had materialized at the time of the warning.  *Habelt v. iRhythm Techs., Inc.*, 2022 WL 971580, at *14 (N.D. Cal. Mar. 31, 2022) (dismissing on falsity grounds where plaintiff had not alleged facts showing risk had already materialized); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 809 (N.D. Cal. 2019) (dismissing on falsity grounds where plaintiff did not allege risk had materialized "at the time the

---

[4] The Court's falsity analysis does not invoke the "strong inference" of plausibility required under scienter. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 778 (9th Cir. 2023) ("Plaintiffs are correct that falsity, unlike scienter, is not subject to the 'strong inference' pleading standard.  However, Plaintiffs confuse particularity (the level of detail required in the allegations) with plausibility (the strength of the inference that an element of the claim is satisfied based upon the facts alleged).")

13

risk disclosure statements were made" and that defendants were aware of such materialization). Plaintiff alleges facts suggesting that Netflix experienced a high degree of account sharing, but fails to allege facts suggesting that the company's "ability to add new members" was hindered or that its "operations" were necessarily adversely impacted. As such, Plaintiff does not adequately allege that these risks had materialized.

### 2. Defendants' Statements Attributing Netflix's Growth Slowdown to The COVID Pull-Forward

Plaintiff alleges that Defendants misleadingly attributed Netflix's slowing growth to the COVID pull-forward and the pandemic's aftereffects without acknowledging the impact of account sharing and market saturation. *See* SAC ¶ 153 (in Q1'21, "paid membership growth slowed due to the big Covid-19 pull forward in 2020" and "Covid- 19 production delays"); *id.* ¶ 155 ("in terms of Q1 [2021] performance, it really boils down to COVID, frankly"); *id.* ¶ 164 ("COVID choppiness"); *id.* ¶ 178 ("ongoing Covid overhang"); *see also id.* ¶¶ 149, 157, 162, 164, 166, 170. Plaintiff contends that while Defendants described the COVID pull-forward as a temporary and short-term issue, they nonetheless understood that account sharing was a significant and long-term problem. Plaintiff further contends that Defendants understood that the company had expended considerable resources quantifying the extent of the problem before and during the pandemic. *E.g.*, *id.* ¶¶ 206–211 ("strike effort" formed in spring 2020 to combat account sharing).

To plead the falsity of an opinion statement, a plaintiff must adequately allege either that (1) "'the speaker did not hold the belief she professed' and that the belief is objectively untrue," (2) "that a statement of fact contained within an opinion statement" is untrue, or (3) "when a plaintiff relies on a theory of omission" that material omitted facts were known to the defendants that go to the basis for their opinions and rendered the statements "misleading to a reasonable person reading the statement fairly and in context." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017). When a speaker offers an opinion, a reasonable investor expects "not just that the [speaker] believes the opinion … but that it fairly aligns with the information in the [speaker's] possession at the time." *Omnicare*, 575 U.S.. at 188–89. Here, Plaintiff first fails to plead facts suggesting Defendants did not hold the

14

beliefs they announced about the pandemic and its effect on Netflix's business. *See Omnicare*, 575 U.S. at 194 (pleading falsity of opinion "is no small task"). Second, Plaintiff does not allege that a statement of fact contained in the statement was untrue. Third, Plaintiff fails to adequately allege that facts about account sharing formed the basis of their opinions about the COVID pull-forward. As such, Plaintiff fails to plead an actionable misrepresentation or omission as for these statements.

### 3. Defendants' Statements About Netflix's "Underlying Growth Metrics" And "Long-Term Growth Trajectory"

Plaintiff alleges that Defendants' statements about Netflix's metrics, long-term growth, and "churn" were false and misleading for reasons that go beyond account sharing. *See* SAC ¶ 149 ("very strong underlying growth metrics" and "long-term growth trajectory is at least as strong as ever"); *id.* ¶ 157 ("core underlying metrics are very healthy"); *id.* ¶ 155 ("viewing per household was up"; "churn was down year-over-year" and Netflix experienced "worse than expected churn" in 2021); *id.* ¶ 164 ("there's still a bit of choppiness to our growth"); *see also id.* ¶¶ 166, 168, 176, 182. Specifically, Plaintiff alleges that during an earnings call on October 19, 2021 Defendant Neumann stated that "the business remained healthy . . . with churn at low levels" and "retention was very healthy." *Id.* ¶ 176. Plaintiff contends that this representation conflicts with materials from an Audit Committee meeting attended by Neumann on October 18, 2021, which stated that Netflix experienced "worse than expected churn" in UCAN in Q3'21, causing Netflix to miss internal projections for paid net adds in the region by 63%. *Id.* ¶ 220. Plaintiff argues that these facts raise the inference that the UCAN market's saturation level created an inherent level of churn that would be difficult for user acquisition to outpace. *Id.* ¶ 155.

Defendants respond that Mr. Neumann's statement that global "churn" was "low" in 2021 compared to 2020 and 2019 levels does not contradict the committee materials' finding that churn in UCAN was "worse than expected" internally. *Id.* ¶¶ 13, 110. The Court agrees that these representations about global performance were not rendered misleading by allegedly omitted information concerning the UCAN market. Plaintiff's theory of falsity otherwise relies on previously rejected theories relating to account sharing and market saturation, and thus fails for the

15

reasons described above.

In his opposition, Plaintiff points to allegations in the SAC that Netflix counted views by account sharers as views by members, which inflated the viewing metric and gave a misleading impression of the popularity of Netflix's content and its ability to earn revenue for its content. *Id.* ¶¶ 96, 109; ECF No. 55 at 22. However, the SAC does not plead any false or misleading statements about viewership specifically or allege with particularity why any such statements are false.

\* \* \*

Accordingly, Plaintiffs fail to plausibly allege that the statements at issue were false or misleading. Given this ruling, the Court need not reach Defendants' other arguments.

### C. Section 20(a) Claim

Because Plaintiff's Section 20(a) claim requires a viable Section 10(b) claim, the Section 20(a) claim must be dismissed. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, *Intuitive Surgical*, 759 F.3d 1051, 1064 n.6 (9th Cir. 2014).

### D. Leave to Amend

"A district court's discretion to deny leave to amend is 'particularly broad' where the plaintiff has previously amended." *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (quoting *Sisseton–Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996). The Court previously dismissed the complaint without prejudice and gave Plaintiffs specific directions to add to any additional factual allegations demonstrating falsity. That Plaintiffs "failed to correct these deficiencies in its . . . [amended complaint] is 'a strong indication that the plaintiff[] ha[s] no additional facts to plead.'" *Zucco Partners*, 552 F.3d 981, 1007 (9th Cir. 2009) (citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1098 (9th Cir. 2002)). The Court concludes that any further leave to amend would be futile.

/ / /

/ / /

/ / /

/ / /

16

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss Plaintiffs' claim under Section 10(b) and derivative claim under Section 20(a). The dismissal is with prejudice. The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: November 26, 2024



JON S. TIGAR
United States District Judge